UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

_____
                                    )
CHRISTOPHER FITZGERALD,             )
                                    )
                      Plaintiff     )
                                    )        CIVIL ACTION NO.
v.                                  )
                                    )        No. 04-12138-NG
CBS BROADCASTING, INC.,             )
                                    )
                      Defendant     )
_____)

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS MOTION
FOR PARTIAL SUMMARY JUDGMENT**

This Memorandum is submitted in support of Plaintiff's Motion for Partial

Summary Judgment on the issues of 1) liability and 2) willful copyright infringement, and

3) to refute Defendant's defenses for the unauthorized use of a copyrighted photograph of

the notorious mafia hit man, Stephen ("The Rifleman") Flemmi.  Flemmi, who is now

serving life in prison for numerous murders, was an associate of James "Whitey" Bulger,

the fugitive mobster boss who heads the FBI's Most Wanted List.

I.    **FACTS**

      A.    **Fitzgerald is a Professional Freelance Photographer.**

      Christopher Fitzgerald is and has been a professional freelance photographer

for many years.  [Fitzgerald Affidavit ¶ 1; ("Fitz. ¶ 1").]  On January 6, 1995,

Fitzgerald acting on a tip from the *Boston Globe* photographed Flemmi, who was

being taken from the Framingham State Police barracks to an undisclosed location.

Fitzgerald was able to take only two photographs of Flemmi.  Fitzgerald was the only photographer in Framingham at the time of Flemmi's transfer.  [Fitz. ¶ 2 & 3.]  On the following day, one of Fitzgerald's two photographs of Flemmi was published on the front page of the *Globe*.  [Fitz. ¶ 4.]

>    **B.**    **Fitzgerald owns the Copyrights to Both Flemmi Photographs.**

Fitzgerald owns the copyrights to both photographs (the "Flemmi Photographs").  Both Photographs were registered with Copyright Office on February 10, 1998.  [Fitz. ¶ 5, and Exhibits A & B.]  To the best of Fitzgerald's knowledge and belief, the Flemmi Photographs are the best relatively recent images of Flemmi that are available for publication.  Flemmi's official arrest photographs have apparently never been released by the authorities.  [Fitz. ¶ 6.]

The Flemmi Photographs have been used and published on numerous occasions both with Fitzgerald's permission and without his permission.  Fitzgerald has aggressively pursued all claims for unauthorized uses of the Flemmi Photographs.  [Fitz. ¶ 7.]  To date, Fitzgerald has earned $4,350 in licensing fees for authorized uses of the Flemmi Photographs, and $58,600 in settlements for unauthorized uses, including a payment of $15,000 from CBS in 1999.  [Fitz. ¶ 7 and the attached Exhibit.]

>    **C.**    **Fitzgerald sued WBZ-TV and CBS for Copyright Infringement for The Unauthorized use of the same Flemmi Photographs.**

In 1998, WBZ-TV, a CBS affiliate, used one of the Flemmi Photographs in news broadcasts without Fitzgerald's permission.  [Fitz. ¶ 8.]  Fitzgerald made a claim against WBZ-TV and later filed a lawsuit in this Court alleging copyright infringement for one of the Flemmi Photographs that was copied from the *Boston Globe* and broadcast it on Channel 4 on numerous occasions.  [Fitz. ¶ 9; see,

Fitzgerald v. CBS Corporation, US District Court, District of Massachusetts, Docket

Number 98-11510-JLT (the "1998 Action").]

     In March 1998, while Fitzgerald's lawsuit against WBZ-TV was pending, the

CBS television network in New York, contacted Fitzgerald to see if CBS could secure

the right to use the Flemmi Photographs on *60 Minutes*, a nationally broadcast CBS

television program.  [Fitz. ¶ 10.]  Fitzgerald licensed CBS to use both of his Flemmi

Photographs on *60 Minutes* each for "one single screen exposure."  The licensing

agreement says:

> 6.  This contract does not grant CBS or its affiliates the permission to republish
> these photos on other television programs or in other media.  Additional uses
> and re-broadcasts . . . would require further negotiation.

See Stock Photography Contract attached hereto as Exhibit C and the Invoice attached

as Exhibit D.  [Fitz. ¶ 11.]

     In a letter to the producer of *60 Minutes* on March 18, 1998, Fitzgerald said,

> As a reminder, I would be grateful if you could include a copyright notice in the
> show credits.  I am leery of other news organizations gleaning the photos
> without permission, especially since these are the only topical photos – still or
> video—that exist of Mr. Flemmi (at least to the best of my knowledge).

See Exhibit E.  [Fitz. ¶ 12.]  CBS agreed to the limited usage of the Flemmi

Photographs.

     When CBS broadcast the *60 Minutes* program with the story about Flemmi,

Fitzgerald noticed that CBS used one of his Flemmi Photographs for a total of five

single screen exposures, four exposures more than CBS was licensed to use the image.

[Fitz. ¶ 13.]  Fitzgerald amended his Complaint in the 1998 Action and alleged the

further infringement of the Flemmi Photographs by CBS on *60 Minutes*.  In November

1999, Fitzgerald and CBS settled this lawsuit for $15,000.   [See, Mutual Settlement and Release attached as Exhibit F and Fitz. ¶ 14.]

**D.    In 2004, WBZ-TV used one of the Flemmi Photographs again without Fitzgerald's permission.**

WBZ-TV (now called "CBS 4 Boston" but referred to herein as "WBZ-TV") admits that it used one of the Flemmi Photographs on various news broadcasts on June 24 and June 25, 2004, as well as on certain other occasions, and it admits that the Photograph was posted on WBZ-TV's website.  [Defendant's Answer to Complaint and Defendant's Answer to Interrogatory # 5, Exhibit G.]   The present Action followed shortly thereafter.[1]   Basically, WBZ-TV claims either that its use of the Flemmi Photograph was fair use under 17 U.S.C. §107, or that it was an innocent mistake. WBZ-TV claims that it made a "routine" copy of the *60 Minutes* program in 1998, and while the copy was still at WBZ-TV but before the Flemmi Photographs were purged from the tape archives as a result of the 1998 Action, some "unidentified" individual in the newsroom in Boston made a so-called "pitch reel" from the *60 Minutes* tape.   [CBS Ints. # 3, Exhibit G.]  According to WBZ-TV, a "pitch reel" is a tape organized by subject matter and used to facilitate the editing process of news reports on that subject matter.  [CBS Ints. # 3.]   The pitch reel that was archived in the video library of WBZ-TV was indexed under the category of "Crime" and with the descriptor "Bulger/Flemmi."  [CBS Ints. # 3.]   The pitch reel was available to all WBZ-TV employees [CBS Ints. #3.], and it was used by WBZ-TV in June 2004, in a story about

---

[1] The same Flemmi Photograph was also broadcast without Fitzgerald's permission by UPN 38 (WSBK-TV, Channel 38 Boston), which is another CBS affiliated station.  This unauthorized use is the subject of a separate action against CBS that is pending in this court.  See, Fitzgerald v. CBS Broadcasting, Inc., Case Number 06-11302-NG.

John Martorano, a person who had Mafia connections somewhat related to Flemmi.

[CBS Ints. # 3.]

Fitzgerald owns a *rare* and valuable asset in the Flemmi Photographs and he has carefully monitored and controlled both photographs in order to prevent unauthorized uses and to preserve the continuing value of the Flemmi Photographs.  [Fitz. ¶ 16.]

> **E.    The unauthorized and undisclosed copy of the *60 Minutes* broadcast in 1998 was the source of the Flemmi Photograph that was used by WBZ-TV in the June 2004 newscasts.**

WBZ-TV kept both the off-air copy of the 1998 *60 Minutes* broadcast and the so-called "pitch reel" in the station's film library.  The existence of these tapes, which CBS speculated were made shortly after the May 1998 broadcast of *60 Minutes* [Rule 30(b)(6) Deposition of Jennifer Street, news director of WBZ-TV, p. 44 ("Street 44"); see Exhibit H], were not disclosed to Fitzgerald as part of the settlement of the 1998 Action as Fitzgerald maintains they should have been.[2]  CBS warranted in the Mutual Settlement and Release [Exhibit F] that it was not aware "of any uses by the Defendant of the photographs at issue in the Lawsuit [the 1998 Action] other than those that have been disclosed in the pleadings filed and discovery conducted in the Lawsuit."  [Exhibit F, ¶ 5.]  Ms. Street admitted that neither CBS nor WBZ-TV disclosed to Fitzgerald that WBZ-TV made a copy of the *60 Minutes* broadcast or that it made the pitch reel.  [Street 118.]  If Fitzgerald knew that these tapes existed, he would have insisted that the station destroy these tapes as part of his settlement with CBS.  [Fitz. ¶ 17.]  Either the undisclosed recording of the *60 Minutes* broadcast or the pitch reel were the source of the Photograph that was used by WBZ-TV in 2004.

_____

[2] See, Plaintiff's Memorandum in Opposition to Defendant's Motion to Quash Depositions, which Motion is pending before this court.  The Settlement Agreement and Release executed by the parties in the 1998 Action does not extend to the bootleg copy of the 60 Minutes tape or the "pitch reel" made by WBZ-TV.

## II.  **ARGUMENT**

### A.  **There are no genuine issues of material fact as to liability for copyright infringement including willful infringement, and as to Defendant's Defenses. Therefore, Plaintiff is entitled to summary judgment as to these issues.**

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56 (c).

A genuine issue is "one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant . . . would permit a rational fact finder to resolve the issue in favor of either party."  Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir.1990) (internal citations omitted).  A material fact is one which has the "potential to affect the outcome of the suit under the applicable law."  Sanchez v. Alvarado, 101 F.3d 223, 227 (1st Cir.1996) (internal citations and quotation omitted). The moving party bears the initial burden of establishing that there is no genuine issue of material fact.  See, Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. See, id. at 324, 106 S. Ct. at 2553.  In evaluating motions for summary judgment, however, the court will not consider "conclusory allegations, improbable inferences, and unsupported speculation." Galloza v. Foy, 389 F.3d 26, 28 (1st Cir.2004) (internal citation omitted).  When the issue in dispute is the credibility of the moving party's witness, the nonmoving party must allege supporting evidence to

establish a genuine issue of material fact.  Moreau v. Local Union No. 247, Int'l Bhd. of Firemen & Oilers, AFL-CIO, 851 F.2d 516, 519 (1st Cir.1988) (citing Anderson v. Liberty Lobby, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). "[A] bare assertion that the opposing party's uncontroverted evidence might be disbelieved is insufficient." Favorito v. Pannell, 27 F.3d 716, 721 (1st Cir.1994).

> **B.**    **Fitzgerald holds valid copyrights to the Flemmi Photographs as evidenced by the Certificates of Registration issued by the Copyright Office and Defendant admits using one of the Photographs.**

In Lotus Development Corp. v. Borland Intern., Inc., 49 F.3d 807, 813 (1st Cir. 1995), the court said that in order to establish copyright infringement, a plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." [Citing Feist Publications, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361, 111 S.Ct. 1282, 1296 (1991); other citations omitted.]  To show ownership of a valid copyright and therefore satisfy Plaintiff's first requirement, Fitzgerald must prove that his work as a whole is original and that he has complied with applicable statutory formalities. See, Engineering Dynamics, Inc. v. Structural Software, Inc., 26 F.3d 1335, 1340 (5th Cir. 1994). "Once the plaintiff produces a certificate of copyright, which constitutes *prima facie* evidence of copyrightability in judicial proceedings, the burden shifts to the defendant to demonstrate why the claim of copyright is invalid.  CMM Cable Rep, Inc. v. Ocean Coast Props., Inc., 97 F.3d 1504, 1513 (1st Cir.1996).  Fitzgerald has met his first burden by submitting copies of his valid Certificates of Registration from the Copyright Office.  [See, Exhibits A and B.]

To show actionable copying and therefore satisfy Plaintiff's second requirement, Fitzgerald must prove that the alleged infringer copied plaintiff's copyrighted work. Since CBS admits that it broadcast one of the Flemmi Photographs and that it posted the

Photograph on Defendant's website, Fitzgerald has also met the second prong of the test set out in Feist. (499 U.S. at 361.)

### C.    Defendant's Defense of Fair Use Fails

CBS admits that the Flemmi Photograph was used without Plaintiff's permission or authority [Street 96-7.], but it relies on the fair use defense in § 107.  The Copyright Act "creates a balance between the artist's right to control the work during the term of the copyright protection and the public's need for access to creative works."  (Stewart v. Abend, 495 U.S. 207, 228, 110 S.Ct. 1750, 1764)  The reasonable use of copyrighted material is thus allowed without the copyright owner's permission but only under narrow circumstances.  Yet "since the doctrine is an equitable rule of reason, no generally applicable definition is possible, and each case raising the question must be decided on its own facts." (Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 560).

### 1.    Defendant's claim of fair use for news-reporting purposes under § 107 of the Copyright Act will fail when the four factors under this section are examined.

The four factors included in Section 107 of the Act are especially relevant in determining whether an unauthorized use is a fair use or a prohibited use.  Id.   Fair use is a mixed question of law and fact.  Id.  As will be shown, WBZ-TV's defense of fair use will fail when the factors in §107 are applied to the circumstances and undisputed facts.

### a.    The First Factor in § 107, the purpose and character of the use, weighs heavily in favor of Fitzgerald.

Various cases have cautioned against abusing the news reporting exemption in §107 by either masking infringement as news or assuming that news always constitutes fair use.  (The promise of copyright would be an empty one if it could be avoided merely by dubbing the infringement a fair use news report.  (Harper & Row, 471 U.S. at 557))

In <u>Roy Export Company Establishment of Vaduz, Liechtenstein v. Columbia</u>

<u>Broadcasting System, Inc.</u>, 672 F.2d 1095, 1100 (S.D.N.Y. 1982), defendant CBS argued

that the unauthorized use of film clips from a compilation of Charlie Chaplin movies in a

biography of the actor upon his death was fair use.  The court rejected this defense

concluding that the television network's right to report newsworthy events did not shield

it from liability because "the showing of copyrighted films was not essential to CBS's

news report of Charlie Chaplin's death or to its assessment of his place in history." (<u>Id</u>.)

Similarly, a television network's unauthorized use of a film documentary in the

network's biography of an athlete during the Olympics was not found to be fair use in

<u>Iowa State University Research Foundation, Inc. v. American Broadcasting Companies,</u>

<u>Inc.</u> 621 F.2d 57, 61 (S.D.N.Y. 1980.)

> "ABC possessed an unfettered right to use any factual information revealed in [plaintiff's film] for the purpose of enlightening its audience, but it can claim no need to 'bodily appropriate' Iowa's 'expression' of that information by utilizing portions of the actual film. . . .  [T]he fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance."

In <u>New Boston Television, Inc. v. Entertainment Sports Programming Network, Inc.</u>,

1981 WL 1374, Docket No. 81-1010-Z (D.Mass. 1981), plaintiff (licensor of WSBK-TV,

Channel 38 before the license was transferred to CBS), denied that ESPN's use of

Channel 38's copyrighted Red Sox and Bruins broadcasts was fair use since ESPN could

report game highlights without using WSBK's footage.  While protection of the public

right to access news is a primary justification for the fair use defense, this right is

sufficiently protected by enabling defendants to report the underlying facts which

plaintiff's video tape records.  <u>Id</u>. at *2.  Fair use does not automatically empower a news

organization to appropriate copyrighted expressions in order to communicate factual information.

The Flemmi Photograph was not inextricably related to WBZ-TV's news report on the sentencing of Martorano, a local mobster who revealed incriminating information on Flemmi and Bulger upon learning of their FBI links. While the length of Martorano's sentence may have been of some interest to the public, there was no compelling need for the public to see a photograph of Flemmi which would justify CBS's exploitation of the Flemmi Photograph as news, especially since Defendant had a courtroom illustration of Flemmi which it commissioned and could freely use and which CBS admits resembles Fitzgerald's photograph of Flemmi. [Street 67-8.] Flemmi was incarcerated and he posed no risk to the public. Therefore, WBZ-TV had no compelling need to use the Flemmi Photograph in a routine 2004 broadcast.

What Defendant did seek to gain from the use of Plaintiff's Flemmi photograph was pure commercial gain and this "tends to weigh against a finding of fair use." (Harper & Row, 471 U.S. at 562. (See, also, Campbell v Acuff-Rose Music, Inc., 510 U.S. 569, 585 (1994); the "fact that a publication was commercial as opposed to nonprofit is a separate factor that tends to weigh against a finding fair use.") Furthermore, WBZ-TV was manifestly aware that its commercial exploitation of the Flemmi Photographs was not tolerated by Fitzgerald in 1998 and assuredly it would not be tolerated in 2004.

In A & M Records v. Napster, 239 F. 3d 1004 (2001), the court said that "direct economic benefit is not required to demonstrate commercial use." In Harper & Row, 471 U.S. at 562, the court said that "the crux of the profit/nonprofit distinction is not whether

the sole motive of the use is monetary gain but whether the user stands to profit from

exploitation of the copyrighted material without paying the customary price."

Hence, CBS is at fault for the "corporate theft" of commercially exploiting the

Flemmi photograph while avoiding paying Fitzgerald any royalties.  [Iowa State, 621

F.2d at 61.]  Defendant also usurped Plaintiff's 'expression' when it was unnecessary to

the reporting of facts of Martarono's sentencing.  Thus, the first factor under § 107

weighs heavily in Plaintiff's favor.

> **b.    The Second Factor in § 107, the nature of the copyrighted work,
> weighs heavily in favor of Fitzgerald.**

The second factor in Section 107 concerns "the nature of the copyrighted work"

and generally relates to the extent to which the work is a creative work as opposed to a

factual work, and also whether or not the work had been previously published.  Nunez v.

Caribbean International News Corp., 235 F. 3d 18, 23 (1st cir. 2000), citing Harper &

Row, 471 U.S. at 563-4.

Very few photographs of Stephen Flemmi are known to exist, and most of them

are outdated shots.  Plaintiff's photographs show Flemmi in street clothes during his final

arrest, which is a significant moment in a crime saga that continues to this day. [Fitz. ¶

17.]  There is no question that the Flemmi Photographs are creative expression and they

are copyrightable.  While fair use is narrowed for unpublished works in recognition of the

copyright holder's right of first publication [Id. at 552-5.], that Plaintiff's work has been

previously published does not widen the scope for fair use.  On the contrary, in light of

the fact that it was CBS who previously published Fitzgerald's work resulting in the 1998

Action, the nature of the work and Fitzgerald's prior claim of infringement significantly

narrows CBS's scope for fair use.  Furthermore, CBS hired an illustrator to draw sketches

of Flemmi for unlimited use when he appeared in US District Court in Boston.  [Street 66-7.]  CBS could have easily used its own commissioned illustrations in place of Fitzgerald's Photographs.  This factor weighs heavily in favor of Fitzgerald.

> **c.     The Third Factor in § 107, the amount and substantiality of the portion used, weighs heavily in favor of Fitzgerald.**

CBS used a portion of the Flemmi image in its news broadcasts and on the WBZ-TV website.  The station cropped the photograph to exclude the police officers who were escorting Flemmi to prison.  Nevertheless, Flemmi's head and face were totally and clearly visible.  Thus, CBS used the "heart" of Fitzgerald's work.  (Harper & Row, 471 U.S. at 565; and Campbell, 510 U.S. at 587.  In Castle Rock Entertainment v. Carol Publishing Group, Inc., 150 F.3d 132, 144 (2nd Cir. 1998) the court said that the "inquiry must focus upon whether 'the extent of . . . copying' is consistent with or more than necessary to further 'the purpose and character of the use.'"  In the present Action, the image of Flemmi is the key element of Fitzgerald's photograph.  However, as mentioned in discussion of the first fair use factor, airing the Flemmi photograph without a license was consistent with commercially exploiting Plaintiff's valuable work without fair payment, and it was more than was necessary to further the purpose of relaying news of Flemmi's possible impact on Martorano's sentence.  Thus, this third factor clearly favors Fitzgerald.

> **d.     The Fourth Factor in § 107, the effect of the use upon the potential market for or value of the copyrighted work, weighs heavily in favor of Fitzgerald.**

Under the fourth factor of Section 107 the court must consider "the effect of the use upon the potential market for or value of the copyrighted work."  The rarity of the Flemmi photographs gives the Photographs particular value in a particular market.  This

market heats up whenever Stephen Flemmi and his partner in crime, Whitey Bulger come up in the news.  As more news unfolds about Flemmi and Bulger, Fitzgerald will have continuing opportunities to exploit the market for his valuable photographs.  [Fitz. ¶ 18 and the Exhibit attached.]  The unauthorized use of Plaintiff's photographs during such periods has a seriously damaging effect on Plaintiff's copyright, because it usurps Fitzgerald's marketplace.  Why would any news organization pay to use the Flemmi Photographs, as they have in the past, when they can effectively use the images for free under the guise of news reporting and fair use?  ("If the defendant's work adversely affects the value of any of the rights in the copyrighted work . . . the use is not fair." Harper & Row, 471 U.S. at 567, 105 S.Ct. at 2234, citing 3 Nimmer §13.05[B], at 13-77-78.)

Fitzgerald's living as a professional freelance photographer, depends in part upon his ability to license exclusive images to the marketplace, which is one of the reasons why Fitzgerald has been careful to control the use of the Flemmi Photographs and to aggressively pursue all unauthorized uses.  [Fitz. ¶ 19.]  As noted in Harper & Row, 471 U.S. at 568, "to negate fair use one need only show that if the challenged use 'should become widespread, it would adversely affect the potential market for the copyrighted work'" (citing Sony Corp. of America, Inc. v. Universal City Studios, Inc., 464 U.S. 417, 451).  It is clear that should the challenged use here become widespread, it would completely usurp most, if not all of Plaintiff's markets.  WBZ-TV's continuous disregard for Plaintiff's copyrights place the fourth factor heavily on Fitzgerald's side.

**e.    The court is not limited to a consideration of the four factors of § 107; the court should consider that CBS demonstrated a complete lack of good faith in using Fitzgerald's Photograph without permission.**

Consideration of the four factors that underlie the defense of fair use clearly shows that CBS's use of Fitzgerald's Flemmi photograph was not fair use. Morever, Defendant did not make use of Plaintiff's photograph in good faith and "fair use presupposes good faith and fair dealing." (Harper & Row, 471 U.S. at 562). The relevance of both good and bad faith to fair use has played an important role in many of the cases cited herein.

News Director, Jennifer Street has been employed by WBZ-TV in the news department continuously from 1990 to date [Street 9-20], and she admits remembering the 1998 order "not to use the Flemmi Photographs." [Street 59.] Also, Eric Cox is and has been the film librarian at WBZ-TV from at least 1998 to date. [Street 38.] Clearly, both of these employees should have questioned the reuse of the Flemmi Photograph in 2004.

Obviously, WBZ-TV failed to implement a reasonable and effective standard of practice because all copies of the Flemmi Photographs were not expunged from its library or even labeled to prevent their further use. If Film Librarian, Eric Cox, was able to locate the Flemmi Photograph for use in June 2004, it clearly should have found the Photographs and expunged them when the 1998 claim of infringement was made. Obviously, WBZ-TV failed to implement an effective system to safeguard and prevent the use of the Flemmi Photographs. The consequence is that such negligence constitutes bad faith and diminishes Defendant's right to assert the defense of fair use in this Action. WBZ-TV failed to disclose that it made and retained a copy of the *60 Minutes* broadcast

as it was required to do under the Mutual Settlement and Release document signed in 1999.  WBZ-TV 's sloppy professional practices show an absence of good faith that in total, amounts to blatant bad faith.  To then claim the defense of fair use is an offensive abuse of equity and an affront to the principles for which the defense stands.

### f.    Archiving a copy of the *60 Minutes* Story is not Fair Use

Clearly, WBZ-TV's copying of the *60 Minutes* broadcast is a violation of the 1998 Stock Photograph Agreement [Exhibit D] and Fitzgerald's exclusive rights under Section 106 of the Copyright Act.  For CBS to copy the *60 Minutes* broadcast, make the pitch reel, and then to hold the tapes in its library archives without any plan for their use greatly diminishes Defendant's claim of fair use.

In American Geophysical Union v. Texaco, 60 F. 3d 913 (2nd Cir. 1994), it was held that the systematic copying of scientific articles by researchers for office archiving purposes is not fair use.  And in New York Times Co. Inc. v. Tasini, 533 US 483 (2001), the court found that licenses that permitted the New York Times to print articles by freelance writers did not extend to the articles then being held and made available in the electronic databases of LEXIS/NEXIS.  These cases indicate that if the copying of material to be "archived" is not fair use, even to a certain extent for educational purposes, then to archive a copy of the Flemmi Photographs for possible unknown news reporting purposes should also not be fair use.  It is unreasonable to infringe a copyright for the purpose of potential but not definite use, particularly when it is not known at the time of the initial infringement whether the potential use of the material would be fair or not. Furthermore, WBZ-TV was abundantly aware that Fitzgerald owned the Flemmi

Photographs and it could easily have contacted Plaintiff if the images were essential to a news story.

> **2.      The First Amendment Does Not Sanction Defendant's Use of Photograph.**

Defendant claims the unlikely defense of a First Amendment exception. Although this exception has been considered in cases involving violations of copyright law, it has only been successful in the limited circumstances involving comparative television advertisements.  (Triangle Publications, Inc. v Knight-Ridder Newspapers, Inc., 626 F.2d 1171, (Fl. 1980)).  Generally, the Copyright Act (namely, §106 and §107) has been sufficient for encouraging the free flow of ideas and also resolving conflicts that arise.  The Copyright Act does this by offering limited protection to an author so that the public might have the benefit of his work and while recognizing fair use.  Without the Act's protection of author's rights, however, the First Amendment would be counterproductive for there would be no incentive to create expressions if they were free for all to use.  Hence, the two entities work together to promote the free communication of facts while protecting an author's expression (Harper & Row, 471 U.S. at 556): "where the First Amendment removes obstacles to the free flow of ideas, copyright law adds positive incentives to encourage the flow." (Pacific & Southern, Inc. v Duncan, 744 F.2d 1490, 1499, (Ga. 1984)).

The Copyright Act protects Plaintiff's right to compensation in order to encourage him to continue to take photographs.  Without the opportunity to exploit the market, Plaintiff would not be able to reap the fruits of his labors.  The fair use defense exists so that there may be reasonable use of copyrighted works without needing an author's

permission under <u>very narrow</u> circumstances.  As the court in <u>Italian Book Corp. v</u>

<u>American Broadcasting Cos.</u>, 458 F. Supp. 65, 71 (D.N.Y 1978) aptly put it,

> where…the thrust of the suit is to obtain compensation rather than to restrain
> communication, recourse to the First Amendment may be inappropriate as well as
> unnecessary.  The copyright owner must be compensated for an infringing use.  If
> the defendant's use is fair and reasonable, no infringement has occurred and no
> compensation is owing.

"The First Amendment is not a license to trammel on legally recognized rights in

intellectual property," (<u>Dallas Cowboy Cheerleaders, Inc. v. Scoreboard Posters</u>, 600

F.2d 1184, 1188 (5th Cir. 1979)), and to blankly state a First Amendment privilege here

would be doing just that.  It is only through a thorough consideration of the fair use

defense in copyright law that reasonable use can be properly weighed against the

copyright owner's rights.  A claim to a First Amendment privilege or exception does not

allow any reasoned consideration of the copyright owner's rights and ought to be

dismissed as an impermissible attempt to bypass copyright laws.

    **3.    Other Defenses of the Defendant.**

Defendant alleges that its use of the Flemmi Photograph was a lawful under 17

U.S.C. §113(c).  This defense deals with news reports of copyrighted works lawfully

reproduced in useful articles and it seems misplaced in this Action.  Defendant also

claims that Fitzgerald has waived any claims he had by permitting widespread use of the

Flemmi Photographs.  This is clearly contrary to all of the evidence.  [See, Fitz.

Affidavit and attached Exhibit.]

    **4.    Plaintiff maintains that the undisputed facts show that WBZ-TV
willfully infringed his copyright.**

In general, plaintiffs in copyright infringement cases may elect to recover

statutory damages in lieu of actual damages and profits. 17 U.S.C. §504(a).  It is likely

that Plaintiff will elect to recover statutory damages in this Action.  Statutory damages

are available under Section 504(c) in a sum of not less than $750 or more than $30,000 as

the court considers just.  However, where the copyright owner establishes willful

infringement, the Court may increase the award of statutory damages to a sum of not

more than $150,000.  [§504(c)(2).]  Where the infringer establishes that it was not aware

and had no reason to believe that its acts constituted copyright infringement, *i.e.,* innocent

infringement, the Court, in its discretion, may reduce the award of statutory damages to a

sum not less than $200.  Id.  Fitzgerald believes that the uncontroverted facts demonstrate

that WBZ-TV has willfully infringed his copyright and that the question of WBZ-TV's

willful infringement should be presented to the jury for an assessment of damages.

> **A.    The terms "willful" and "innocent" have specialized meanings in copyright law.**

The terms "willful" and "innocent" have specialized meanings in copyright law.

Jobete Music Co., Inc. v. Johnson Communications, Inc., 285 F.Supp.2d 1077, 1085-86

(S.D.Ohio 2003).  The Sixth Circuit has interpreted the word "willfully" to mean with

knowledge that the defendant's conduct constitutes copyright infringement. Otherwise,

there would be no point in providing specially for the reduction of minimum awards in

the case of innocent infringement, because any infringement that was non-willful would

necessarily be innocent.  "Innocent" intent, however, is more than just the absence of

willfulness.  In Fitzgerald Publ'g. Co. v. Baylor Publ'g Co., 807 F. 2d 1110, 1115 (2nd

Cir. 1986), the court explained that it is plain that "willfully" infringing and "innocent

intent" are not the converse of one another.  Thus, it is possible in the same action for a

plaintiff not to be able to prove a defendant's willfulness, and, at the same time, for the

defendant to be unable to show that it acted innocently.

### B. Courts have wide discretion in awarding statutory damages.

It is well-established that trial courts have wide discretion in awarding damages within the statutory range provided in §504(c)(1).  Columbia Pictures Indus., Inc. v. T & F Enters., Inc., 68 F.Supp.2d 833, 840 (E.D. Mich. 1999).  In determining the amount of damages to be awarded, courts generally consider (1) the infringer's blameworthiness, *i.e.,* whether the infringement was willful, knowing, or innocent, (2) the expenses saved and the profits reaped by the defendants in connection with the infringement, and (3) the revenues lost by the plaintiffs due to the defendants' conduct. Id.; Fitzgerald Publ'g. Co., 807 F. 2d at 1115.

It is widely accepted that attempts to avoid infringing behavior by instructing employees not to play copyrighted music does not render the "accidental" infringement innocent when the defendant is given prior notice of his obligations under the copyright laws.  See, Swallow Turn Music, Inc. v. Wilson, 831 F. Supp. 575 (E.D. Texas 1993) (The owner of a tavern contended that the band contractually agreed not to perform any materials which they were not authorized to perform. Defendant therefore claimed that he did not violate the copyright laws with respect to the four songs played by the band.  The Court rejected the owner's contentions, noting that the defendant was repeatedly made aware that his usual business practices resulted in copyright violations.)  Thus, WBZ-TV cannot avoid Statutory Damages simply because it instructed its video librarian to expunge the Flemmi Photographs.  The efforts of the WBZ-TV librarian were simply inadequate.  (Just as the lack of actual or constructive knowledge will establish an innocent intent, so a defendant's actual or constructive knowledge proves willfulness.) Fitzgerald Publ'g. Co., 807 F. 2d at 1115.

Statutory Damages are available without proof of plaintiff's actual damages or proof of any damages. Starbucks Corp. v. Morgan, 99 Civ. 1404, 2000 WL 949665 at*2 (S.D.N.Y. July 11, 2000); 4 Nimmer on Copyright §14.04; 2 William F. Patry, Copyright Law and Practice at 1170 (1994). Statutory damages have a deterrent component and the wealth of the defendant has been widely recognized as relevant to the deterrent effect of a damage award. Lowrey's Reports, Inc. v. Legg Mason, Inc., 302 F.Supp.2d 455, 461 (D. Md. 2004). Even for uninjurious and unprofitable invasions of copyright, the court may, if it deems it just, impose a liability within the statutory limits to sanction and vindicate the statutory policy of discouraging infringements. Peer Int'l Corp. v. Pausa Records, Inc., 909 F. 2d 1332, 1337 (9th Cir. 1990), cert. den. 111 S. Ct. 1019 (1991). A defendant's burden of proving innocent infringement has been described by one commentator as "a heavy one." National Football League v. Primetime 24 Joint Venture, 131 F. Supp.2d 458 (S.D.N.Y. 2001), citing 2 William F. Patry, Copyright Law and Practice at 1175 (1994). The level of sophistication of the defendant in business is an entirely proper means of determining whether or not the infringement was innocent. Warner Bros., Inc. v. Dae Rim Trading, Inc., 677 F. Supp. 740 (S.D.N.Y. 1988).

To borrow from an oft-cited quote of Nimmer's, "'willfully' means with knowledge that the defendant's conduct constitutes copyright infringement. Otherwise, there would be no point in providing specially for the reduction of minimum awards in the case of innocent copyright infringement, as any infringement that was nonwillful would by definition be innocent." But 'willful' does not just mean 'with knowledge' for "one who 'recklessly disregards' a copyright holder's rights, even if lacking actual knowledge of infringement, may be subject to enhanced damages." (Venegas-Hernandez

v. Sonolux Records, 370 F.3d 183, 196 (1st Cir. 2004); Nimmer § 14.04[B][3][a])  Both

definitions of 'willful' need not be proved directly, but may be inferred from Defendant's

conduct. (Schiffer Publishing, Ltd. v. Chronicle Books, LLC, 2005 WL 67077 *5; Bly v.

Banbury Books, Inc., 638 F. Supp. 983, 986 (E.D. PA 1986)).  Defendant is at fault on all

definitions of willful within the context of the Copyright Act.

WBZ-TV was aware that Plaintiff's photograph was copyrighted but its "purge"

order was not effective since the Flemmi Photographs were obviously not destroyed.[3]

Thus WBZ-TV violated its own directive and acted in "reckless disregard" of Plaintiff's

copyrights.  Defendant was negligent in failing to abide by any standard of practice that

might acknowledge the importance of copyrights particularly for a major television

station in a top market.  WBZ-TV claims that there were standards in place when it used

copyrighted materials under the fair use exception.  However, Ms. Street admitted that

WBZ-TV used the Flemmi Photograph "without following the [fair use] procedure in the

CBS News Standards."  [Street 149].  Clearly, WBZ-TV acted in disregard of the license

given to CBS in 1998, and did not implement reasonable standards to prevent future

infringements.  Also, WBZ-TV admits that it did not even follow its own written

guidelines in using materials for which it now claims a fair use news reporting

exemption.  [Street 149.]

In Jobete Music Co., Inc. v. Johnson Communications, Inc., 285 F. Supp.2d 1077

(S.D.Ohio 2003), while the radio station had "a plan in place" to avoid playing

copyrighted songs, the station was still held liable for willful infringement when the

songs were 'accidentally' aired.  For authority, Jobete cites Swallow Turn Music, Inc. v.

---

[3] Street admitted that one of the five Flemmi Photographs in the *60 Minutes* tape that was provided to
Plaintiff during discovery was still remaining after the images were supposedly purged.  When asked why
that one was not "blacked out," Street replied, "I believe it was simply an error."  [Street 58.]

Wilson, 831 F.Supp. 575 (E.D.Tex.1993) where a defendant tavern owner was held to

have willfully infringed copyrighted songs despite making a contract with a band in

which the band agreed not to perform the songs but did:

> [t]hus, Swallow Turn Music teaches that a broadcaster who is aware of his
> obligations under copyright law remains responsible for ensuring that copyrighted
> music is not aired without permission. The defendant cannot avoid liability by
> contractually placing that responsibility on others, and a breach of that contract
> does not render the defendant an innocent infringer.

(Jobete, 285 F. Supp. 2d at 1089). Similarly, despite "a plan in place" at WBZ-TV,

Defendant is still liable for willful infringement when that plan is not executed properly

and when WBZ-TV is aware that its conduct will constitute infringement, or it recklessly

disregards this risk. And just as in Jobete, Defendant "has been sued before for similar

violations. Although that case had been settled, it is still persuasive to this Court that the

defendants were aware of the consequences of playing copyrighted works without a

license or other authorization." (Id. at 1090).

    One of the flaws with the explanation given by WBZ-TV is that the station was

never authorized to record a copy of the *60 Minutes* segment containing the Flemmi

Photographs. (See, Exhibit C.) If WBZ-TV had never made this bootlegged copy, it

would not have been able to make the pitch reel, and it would not have infringed

Plaintiff's Photograph. This is exactly what Fitzgerald was concerned about when he

stated in writing that he was leery of other news organizations obtaining the photographs

and using them without permission. [See, Exhibits C and D.]

    How many times and in how many ways was Fitzgerald obligated to tell WBZ-

TV not to use the Flemmi Photographs before the station got the message? One would

hope that one lawsuit was enough. Thus, CBS cannot avoid a finding of willful

infringement simply because it instructed its video librarian to review all tapes and remove all copies of the Flemmi Photographs.  The efforts of the CBS librarian were simply inadequate and ineffective.  (Just as the lack of actual or constructive knowledge will establish an innocent intent, so a defendant's actual or constructive knowledge proves willfulness.)  <u>Fitzgerald Publ'g. Co.</u>, 807 F. 2d at 1115.

**III.    Conclusion.**

This court should determine that there are no issues of material fact that will support any of the defenses proffered by the Defendant, and that Defendant willfully infringed Plaintiff's copyright to one of the Flemmi Photographs.

CHRISTOPHER FITZGERALD,
By his attorney,

<u>/s/ Andrew D. Epstein</u>

September 1, 2006          Andrew D. Epstein, Esq. (BBO #155-140)
Barker, Epstein & Loscocco
10 Winthrop Square
Boston, MA  02110
(617) 482-4900
FAX: (617) 426-5251