# Exhibit H

### Page 6

1  A.  I am.
2  Q.  And your husband's name?
3  A.  Kyle Erlandsen; E-R-L-A-N-D-S-E-N.
4  Q.  And do you have any children?
5  A.  I do, I have a son.
6  Q.  And could you tell us your educational
7  background starting with high school?
8  A.  I graduated from four-year high school, public
9  school, in Ridgefield, Connecticut. I attended Syracuse
10 University, where I graduated in 1977 from the Newhouse
11 School of Public Communication with a bachelor's of
12 science.
13 Q.  Now, I'm going to ask you a series of
14 questions. If you don't understand a question, please
15 ask me to rephrase, and I will do my best to make it
16 intelligible to you --
17 A.  Great.
18 Q.  -- because I'm just here to get your answer
19 and not here to trick you on a question.
20     If you want me to repeat the question,
21 please ask me to repeat the question. If it's not
22 clear, I'll try to clarify it. If you can't hear me, I
23 will speak up. And before you answer a question, before
24 you give an answer to a question, wait until I finish

### Page 7

1  the question because although the stenographer is
2  wonderful, she get write down --
3  A.  Sure.
4  Q.  -- what I'm saying and what you're saying
5  simultaneously.
6  A.  Understood.
7  Q.  And if you get to names, like you just got to
8  your husband's name, that's not a readily apparent name,
9  if you could spell it for the stenographer, I'm sure she
10 will appreciate it a lot.
11     Do you know who Stephen Flemmi is?
12 A.  I do.
13 Q.  And could you tell us who he is?
14 A.  He's a reputed mobster who is currently in
15 custody charged with at least 18 murders that occurred
16 during the 1960's, '70's and '80's in the greater Boston
17 area.
18 Q.  Are you familiar with these two pictures I'm
19 about to show you?
20 A.  I'm very familiar with this photograph. I
21 have seen this photograph only in the context of
22 preparing for this deposition.
23 Q.  So when you said, you're very familiar with
24 this photograph, it's the picture of -- what picture is

### Page 8

1  it?
2  A.  It's the picture of Stephen Flemmi being
3  escorted by the Massachusetts State police officer.
4  It's the picture in which only Stephen Flemmi's face is
5  identifiable. He's wearing a Chicago Bear's hat and
6  he's looking at the screen right of the photograph.
7  Q.  And the other photograph?
8  A.  The other photograph appears to be taken
9  within seconds of the first, where he is looking screen
10 left, and you see the faces of a Massachusetts State
11 trooper and some other individuals.
12     MR. EPSTEIN: Okay. Could we have these
13 marked as Exhibits 1 and 2? Exhibit 1 being the
14 photograph of Stephen Flemmi looking ahead to the
15 right and the other of Stephen Flemmi looking back
16 over his shoulder to the left.
17 (Exhibits 1 and 2 Marked for Identification)
18 BY MR. EPSTEIN:
19 Q.  Could you tell me about your employment
20 history please, your first job after you graduated from
21 Syracuse University?
22 A.  Sure. My first job was a news producer in
23 Charleston, South Carolina I worked for a CBS affiliate,
24 WCSC-TV in Charleston. I worked there from September of

### Page 9

1  1987 until June of 1990. In June of 1990, I came to
2  work for WBZ-TV in Boston, as a writer, a news writer.
3  You have to tell me how --
4  Q.  I will ask you more questions.
5     How long did you continue as a news
6  writer?
7  A.  For one year.
8  Q.  And what did you do after that?
9  A.  I became the producer of the Morning News
10 which at that time was a one-hour program that aired
11 from 6:00 to 7:00 in the morning on WBZ.
12 Q.  What were your functions as producer?
13 A.  I wrote the newscast. I decided in what order
14 stories would appear. I was responsible for what we
15 call, the teases, the clips that go into the show.
16     In my capacity as Morning News producer,
17 I was in charge of the newsroom during the overnight
18 hours. There was no manager above me, although there
19 were managers on-call.
20 Q.  A lot of responsibility for a young woman.
21 A.  Yes, it is.
22 Q.  You actually wrote the --
23 A.  I had a writer that worked with me.
24 Q.  Good example of waiting until I finished the

Page 10

1  question.
2      A.  Sorry.
3      Q.  So did you write all the news and commentaries
4  that would be broadcast on --
5      A.  I would not define it as commentary. I would
6  define it as news writing, but yes.
7      Q.  Did you have any assistance?
8      A.  I had a writer who worked with me.
9      Q.  Who was your superior at the time?
10     A.  The news director was a gentleman named Stan
11 Hopkins for a few months while I was the producer.
12 Following that, a gentleman named Jeff Barlett was my
13 news director while I was the producer of the Morning
14 News. I couldn't tell you exact years.
15     Q.  How long did you continue in the role as
16 producer of the Morning News?
17     A.  Until 1994.
18     Q.  Where did you go?
19     A.  I became the producer of the 5:30 newscast on
20 WBZ.
21     Q.  And what did that job entail?
22     A.  The duties were similar. It was a shorter
23 newscast. It was a half-hour show, for which I was
24 responsible for the lining up of the stories and most of

Page 11

1  the writing of the show and working with the writers and
2  reporters and the anchors in preparing the newscast for
3  air.
4      Q.  Did you get involved in choosing any visuals
5  to be used on the news --
6      A.  Yes.
7      Q.  -- at any time while you were either the
8  producer of the Morning News or the producer of the 5:30
9  News?
10     A.  Yes.
11     Q.  Another good example of waiting until I finish
12 the question.
13         What were your duties and
14 responsibilities in that regard?
15     A.  In regard to choosing visuals?
16     Q.  Choosing visuals to be used on the air.
17     A.  When we talk about writing for television
18 newscast, the writer's duties or producer's duties, when
19 you write a story, invariably there will be some form of
20 visual accompanying that story. Occasionally, it's
21 simply the anchor on camera reading the story. But in
22 most cases, a visual would be a graphic or piece of
23 video that accompanies that.
24     Q.  Why is that?

Page 12

1      A.  It's the writer's duty to match that video
2  with the words that are written for the story.
3      Q.  And what is a video that usually accompanies
4  the story?
5      A.  It's a visual medium.
6      Q.  And if there doesn't happen to be a video or a
7  photograph or an illustration or some kind of visual to
8  go along with the story, what happens then?
9      A.  If there's absolutely none, then usually the
10 story is read on camera by the anchor.
11     Q.  What kind of visuals did you attempt to use on
12 the air for stories?
13     A.  This is in my capacity as the Morning News for
14 the 5:30 --
15     Q.  That's correct.
16     A.  Usually, they were in the form of video.
17 Usually video that was shot by WBZ photographers for --
18 part of that time we were a NBC station, so by a NBC
19 Network. Once we became CBS, which is after the 5:30
20 Morning News, it would be an affiliation of our Network,
21 and at the time it was also CNN. So we would use video
22 provided to us by CNN.
23         Those are really the three major sources
24 of video. Graphics were usually designed by our own

Page 13

1  in-house graphics department.
2      Q.  Have you always had an in-house graphics
3  department while you have been at --
4      A.  Yes.
5      Q.  -- Channel 4?
6          MS. MURRANE: He's tricking you with pauses.
7          MR. EPSTEIN: Off the record.
8          (Off Record Discussion)
9  BY MR. EPSTEIN:
10     Q.  What kind of things does the in-house graphics
11 department normally do for news broadcast?
12     A.  Usually, it takes the form of putting a
13 written word on television.
14     Q.  What do you mean by that?
15     A.  Usually we use what I'll call bullet points to
16 re-enforce some of the language that the anchor is
17 using; the headlines of the story. There's the latest
18 on the Big Dig unit and the collapse, and we'll do three
19 points: Romney says it will be open in September and
20 Amorello has a hearing; and we'll re-enforce what the
21 anchor is saying with those words.
22         Another common use of graphics is if
23 someone, who we have interviewed, has chosen not to
24 speak with us on camera. We will take a quote and put

Jennifer Street                                                                                                                07/19/2006

Page 14

1  it in writing through our graphics department and put
2  that quote up so the anchor can read what was said to us
3  via the quote.
4      Q.  Is there a rule of thumb in your business as
5  to how often you would like the graphics or video
6  footage to change?
7      A.  I don't understand the question.
8      Q.  Would you agree with me, you would like to
9  have a graphic on the screen to go along with the story?
10 Is that the best way for you to present the news?
11     A.  As opposed to video?
12     Q.  As opposed to having no graphics, nothing to
13 go along with the story, no visual image?
14     A.  It really depends.  It's a case-by-case
15 instance.  It depends on how many other graphics we've
16 used in the newscast.  To some extent, we try to
17 prioritize, so that not every story has a graphics
18 design to it.  It's also limited.
19     Q.  When I say graphics, I'm also including video
20 and still photographs.  Any other kind of visual image
21 that goes up on the screen?
22     A.  Is the question, would I prefer to have an
23 image on the screen as opposed to just an anchor talking
24 head?

Page 15

1      Q.  Yes, that's one question.
2      A.  In most cases.
3      Q.  And in most cases, do you have a preference as
4  to how quick which different videos or images or still
5  photographs or illustrations go up on the screen?
6      A.  I could not generalize that with a broad
7  answer.
8      Q.  Okay.
9      A.  It depends on each case.
10     Q.  So after you became the producer of the 5:30
11 News, what was your next position?
12     A.  I became the producer of the 11 o'clock News.
13     Q.  And when was that, approximately?
14     A.  That was approximately in 1995.
15     Q.  What were your duties as the producer of the
16 11:00 p.m. News starting in 1995?
17     A.  Very similar to my duties as the producer of
18 the Morning News and the producer of the 5:30.  I was
19 responsible for the lineup of the show, for choosing the
20 words and pictures that went into the newscast.
21     Q.  Who was your superior at that time?
22     A.  Peter Brown was the news director.
23     Q.  Is he still with the station?
24     A.  He left the station two years and two months

Page 16

1  ago.
2      Q.  Where did he go?
3      A.  He is the vice president of communications for
4  Brigham and Women's Hospital in Boston.  I believe
5  that's his title.
6      Q.  Thank you.
7          And how long did you continue as the
8  producer of the 11:00 p.m. News?
9      A.  Approximately, 18 months.
10     Q.  What happened after 18 months?
11     A.  I became the producer of the 6 O'clock News.
12     Q.  How long is that news program?
13     A.  At the time, the 6 O'clock News was a one-hour
14 news program.
15     Q.  Did you do the same basic things of the
16 6:00 p.m. News as producer of the 11:00 p.m. and 5:30
17 a.m. News?
18     A.  I did.
19     Q.  And the Morning News?
20     A.  I did.
21     Q.  And after your 18-month tenure as producer of
22 the 6:00 p.m. News, where did you go?
23     A.  My 18-month tenure was as producer of the
24 11 O'clock News.  I was producer of the 6 O'clock

Page 17

1  News --
2      Q.  I'm sorry, you're right?
3      A.  -- for about 18 months.
4          And in 1997, I became the executive
5  producer in charge of the 11 O'clock News.
6      Q.  What is the difference between being the
7  executive producer of the 11:00 p.m. News and the
8  producer?
9      A.  I was the supervisor in charge -- I became a
10 news manager, and was the supervisor in charge of the
11 newsroom for what we call, the nightside.  My duties
12 were to supervise the anchors, the reporters, the
13 producers of the program, the writers, the editors.
14         While I did not write the newscast, I
15 copy-edited the newscast and was responsible,
16 ultimately, for all material that aired on that show.
17     Q.  With respect to WBZ and the television
18 industry in general, especially in the Boston market, is
19 there particular time slot that's more important than
20 any other particular time slot?
21     A.  I would say the 6 and 11 O'clock newscasts in
22 the mid-'90's carried more weight than other newscasts.
23     Q.  Let's talk about the late 1990's and the early
24 2000's; does the same hold true?

LegaLink Boston, a Merrill Company
(617) 542-0039

Page 18

1   A.  I would add the morning newscast to that
2   higher priority.
3   Q.  Would you say they're all about equal?
4   A.  Yes.
5   Q.  And when you say, They're All About Equal, is
6   that in terms of revenue that is generated by the
7   newscast or any other criteria?
8   A.  I'm not talking about revenue. I'm talking
9   about stature, if you will, as perceived by the people
10  who work in the newsroom.
11  Q.  Now, is that stature within the industry
12  amongst your colleagues; is that what you're talking
13  about?
14  A.  Yes.
15  Q.  Did you hold any positions after you were
16  executive producer of the 11:00 p.m. News?
17  A.  Yes, I became the executive producer the
18  dayside news. I was in charge of the day-to-day
19  operations for the Noon newscast, the 5 O'clock and 5:30
20  newscasts, and the 6 O'clock newscast; same general job
21  description as the nightside executive producer.
22  Q.  And how long did you continue in that
23  position?
24  A.  For five years.

Page 19

1   Q.  What happened after five years?
2   A.  I became the assistant news director.
3   Q.  What were your duties as the assistant news
4   director?
5   A.  That's a great question. I was the No. 2 in
6   charge of the newsroom, of all the news operations for
7   both WBZ-TV and WSBK-TV.
8   Q.  Who was your superior when you were first
9   appointed assistant news director?
10  A.  Matt Ellis, who was at that time, news
11  director.
12  Q.  Where is Mr. Ellis now?
13  A.  I believe he owns his own public relations
14  firm.
15  Q.  In the Boston area?
16  A.  Yes, it's in the Boston area. And I believe
17  it's called Matt Ellis Associates or something like
18  that, but his name is the name of the company.
19  Q.  Was there a news director between Peter Brown
20  and Matt Ellis?
21  A.  No.
22  Q.  And did you get any other job at WBZ after you
23  were the assistant news director?
24  A.  In July of 2005, I became the acting news

Page 20

1   director and became the news director in full title in
2   November of 2005.
3   Q.  The press release indicated that you were
4   named the assistant news director in September of 2004.
5   It was actually in July?
6   A.  No, I didn't talk about the date I became
7   assistant news director. That was approximately fall of
8   2004.
9   Q.  So that's approximately right?
10  A.  About nine months later, I became the acting
11  news director and my title changed to simply news
12  director in November of 2005.
13  Q.  Okay. Great.
14      MS. MURRANE:  Can we go off for the record a
15  second?
16      (Exhibit 3 Marked for Identification)
17  BY MR. EPSTEIN:
18  Q.  Now you are here today because I sent out a
19  Notice of Taking Deposition originally asking for you to
20  come into the office, to my office, at 10 o'clock on
21  Thursday, May 25th of this year. And because of
22  scheduling problems and most recently because of the
23  Big Dig fiasco about a week ago, we've agreed that you
24  could come here today rather than on the appointed date.

Page 21

1   A.  Thank you for the postponement last week. I
2   appreciate it.
3   Q.  My pleasure.
4       But I'm going to show you a copy of the
5   Notice of Taking Deposition and ask you, if you have
6   seen this document?
7   A.  Yes, I have.
8   Q.  And are you prepared to talk about the items
9   that are specified in this Notice of Taking Deposition?
10  A.  To the best of my ability.
11  Q.  Okay. Great.
12      Now are you the same Jennifer Street who
13  signed the Answers to Interrogatories in this case on
14  behalf of the defendant?
15  A.  I am.
16  Q.  Have you ever signed any other interrogatories
17  in any other cases involving WBZ, CBS 4 Boston or
18  UPN 38?
19  A.  I have not.
20  Q.  Have you ever testified in court or in a
21  deposition on behalf of your employer, CBS Broadcasting?
22  A.  I have not.
23  Q.  Did you talk to anyone in preparation for this
24  deposition?

Page 38

1  in the station's library and remove any images of the
2  Flemmi photographs, Exhibits 1 and 2.
3      Who was the librarian at the time; do you
4  know?
5      A.  Eric Cox was the librarian.
6      Q.  And he's still the librarian?
7      A.  Correct.
8      Q.  You went on to say that the message was sent
9  via internal e-mail to all staff instructing them to
10 search their individual files for copies of the Flemmi
11 photographs, that is Exhibits 1 and 2, and to destroy
12 any tape in which the photograph was used.
13     Do you have a copy of that internal
14 e-mail?
15     A.  I do not.
16     Q.  Did you look for one?
17     A.  I did.
18     Q.  And is there any way you can go through
19 electronic records at CBS to find a copy of that e-mail?
20     A.  I believe that that was done during the first
21 lawsuit.  I'm quite certain it does not exist.
22     Q.  And how did you come to know that you think it
23 was done during the first lawsuit?
24     A.  Through discussions that I had in

Page 39

1  preparation -- well, in preparation for this deposition,
2  but a year ago when I began meeting with Mary.
3      Q.  And who did you talk to about that?
4      A.  I actually spoke to the former news director,
5  Peter Brown, who had fairly intimate knowledge about the
6  lawsuit.
7      Q.  You testified this morning, and you also
8  stated in your answer to the interrogatory, that CBS 4
9  routinely records a copy of all 60 Minutes' broadcasts.
10     And they do that even if there are no
11 stories of local or regional news; is that correct?
12     A.  That's correct.
13     Q.  And to the best of your knowledge, the library
14 at 1170 Soldiers Field Road has copies of all 60
15 Minutes' broadcasts in-house?
16     A.  Of all?
17     Q.  Yes.
18     A.  They get held on to for several months and
19 then the tapes get recycled.
20     Q.  How many months do you keep them?
21     A.  I don't know the exact time period; say
22 approximately six.
23     Q.  If you ever needed a copy of a 60 Minutes
24 broadcast from, say, 10 years ago, could you get a copy?

Page 40

1      A.  That would depend on who at 60 Minutes I was
2  dealing with and if they were willing to give me a copy
3  of the broadcast, but I would have to contact 60
4  Minutes.
5      Q.  And if you needed a particular story that
6  appeared on the 60 Minutes broadcast 10 years ago, you
7  would probably pick up the phone and call somebody in
8  New York to get it or somebody on your staff would do
9  that?
10     A.  Yes, Tom Janssen would be the person to make
11 that inquiry.
12     Q.  Have you ever known 60 Minutes to ever deny a
13 request for some footage that was broadcast on 60
14 Minutes?
15     A.  I have never been aware of such a denial.
16     Q.  Have you ever been aware of a denial by the
17 Network, CBS Network to give you footage or photographs
18 of anything that was aired over the Network?
19     A.  I am not aware of WBZ or UPN 38 being denied a
20 request for video.
21     Q.  Is there any kind of policy at WBZ-TV to deal
22 with contacting the network to get copies of any program
23 that may have aired or any portion of a program that may
24 have aired over the network?

Page 41

1      A.  Is there any kind of policy?
2      Q.  Right.
3      A.  Meaning written procedure?
4      Q.  Yes.
5      A.  No.
6      Q.  Are you aware of any of the other stations
7  owned by CBS Broadcasting that have ever contacted the
8  Network to get copies of a story or any part of a story
9  or any visual within the story and they were denied
10 permission to use it on the air?
11     A.  I'm not aware of that, no.
12     Q.  Does CBS provide Channel 4 with a log of the
13 stories that are going to be on any 60 Minutes
14 broadcast?
15     A.  Yes.
16     Q.  Do they do that before or after the broadcast?
17     A.  Before.
18     Q.  And what does the log normally look like?
19     A.  I would not define it as a log, as much as a
20 document that lists a couple of lines about each story
21 that will be on 60 Minutes.  It's done for the purpose
22 of asking the affiliate to help promote 60 Minutes in
23 the upcoming week.
24     Q.  And what would you call these documents that

Page 42

1  you get? I called it a log. You were uncomfortable
2  with that terminology.
3      A. I would call it a one sheet, colloquially.
4  It's a memo.
5      Q. And how do you receive them?
6      A. Electronically via e-mail.
7          (Off Record Discussion)
8  BY MR. EPSTEIN:
9      Q. Do you know when the original 60 Minutes'
10 story was broadcast, the one that included
11 Mr. Fitzgerald's photographs?
12     A. I don't know the date off the top of my head.
13     Q. If I were to suggest, May 10th, 1998, would
14 that help to refresh your --
15     A. That sounds about right.
16     Q. -- memory?
17         You said in your answers to
18 interrogatories that a copy of the May 1998, 60 Minutes'
19 broadcast was purged. Do you know when it was purged?
20     A. No, I don't know exactly when it was purged.
21     Q. Do you know why it was purged?
22     A. I believe it came there while we were in
23 litigation or shortly after, and the position of the
24 station was that we did not want to have to go down that

Page 43

1  road again. This is regarding the first 1998 lawsuit,
2  we did not want to --
3      Q. When you say, It Was Purged, from where was it
4  purged from?
5      A. From the library. The original 60 Minutes'
6  recording was tossed out.
7      Q. Now, was it physically tossed out or was it
8  used and re-recorded?
9      A. I don't know.
10     Q. And do you know what the practice at WBZ-TV is
11 when they have television shows they record off the
12 Network but have no further need for it?
13     A. Depending on the age of the tape, the tape
14 might be what we called, blacked over.
15     Q. I'm sorry, what was the word?
16     A. Blacked over. Black is laid over the original
17 recording, and then the tape is used again to record
18 something else. If the tape has reached its recycle
19 date, it's throws out. It's thrown away.
20     Q. And do you know what the lifetime is for a
21 tape that you would record these shows on?
22     A. For shows that are recorded once a week, the
23 life span is probably about a year.
24     Q. And that's the life span to record and

Page 44

1  re-record?
2      A. Correct.
3      Q. But not to keep within the library?
4      A. Correct.
5      Q. Now, you said that on information and belief
6  an employee of CBS 4 used the copy of the 60 Minutes'
7  broadcast before it was purged to create a pitch reel on
8  organized crime that appeared -- that included one or
9  two both of these photographs of Stephen Flemmi that
10 have been marked as Exhibit 1 and 2.
11         Who provided the information and how did
12 you come to have the belief that you have?
13     A. I came to have the belief I have because the
14 tape exists. As to who made that recording, we call it
15 a dub. Who dubbed that tape, I have no knowledge nor
16 does our tape librarian or our video manager.
17         We do not know who did it.
18     Q. Do you have any idea when it was done?
19     A. I could only speculate it was very shortly
20 after broadcast because the tape was purged shortly
21 after that.
22     Q. Shortly after the broadcast, when?
23     A. The May broadcast of the 60 Minutes.
24     Q. You stated in your answers to interrogatories

Page 45

1  that you do not know at this time who the identity of
2  the employee was.
3          Can you speculate who it might be?
4      A. No.
5      Q. Did you ask Eric Cox if he did it?
6      A. Yes.
7      Q. And he denied doing that?
8      A. Correct.
9      Q. Is it one of Eric Cox's job duties to do
10 things like that?
11     A. Yes.
12     Q. Why don't you tell us what a pitch reel is?
13     A. Sure. A pitch reel is a tape in which we
14 collect various pieces of video, all having to do with
15 one story. And we then save that tape. It's cataloged
16 by topic. And we save that tape indefinitely, so that
17 we have access, easy quick access, to video.
18         An example would be, you know, this week
19 we certainly made a video, all the video, of the Big Dig
20 collapse that we think we'll want to save for future
21 use.
22     Q. Do you save complete stories on this pitch
23 reel or only portions of a story?
24     A. Very often a reporter's story is saved in its

Page 58

1  this, but forgive me if I'm asking it again: Did you
2  watch the pitch reel in preparation for this deposition?
3      A.  Yes, I watched it, but not in its entirety. I
4  used fast forward to go through certain spots.
5      Q.  What is on that pitch reel?
6      A.  A copy of the 60 Minutes' program we just
7  watched.
8      Q.  In its entirety?
9      A.  The copy that I watched had parts of it
10 blacked out.
11     Q.  What parts were blacked out?
12     A.  Based on what I just viewed, photos of Steve
13 Flemmi.
14     Q.  Were all of the photos of Steve Flemmi blacked
15 out?
16     A.  No, there was the final one that was
17 remaining.
18     Q.  There was one that remained?
19     A.  Yes.
20     Q.  Why wasn't that one blacked out?
21     A.  I believe it was simply an error.
22     Q.  When were those photographs of Flemmi blacked
23 out out of the pitch reel?
24     A.  I don't know.

Page 59

1      Q.  Who blacked them out?
2      A.  I believe Eric Cox did.
3      Q.  Did anyone tell him to black them out?
4      A.  I was not the person who told him. My
5  knowledge of this case is that he was told sometime
6  after the 1998 litigation or during the 1998 litigation
7  to expunge any photo of Steve Flemmi, any Christopher
8  Fitzgerald photo of Steve Flemmi that existed in our
9  file tape system.
10     Q.  And you don't know who told him that, told him
11 to do it?
12     A.  I'm certain it was Peter Brown.
13     Q.  Did you talk to Peter Brown?
14     A.  When?
15     Q.  At any time after the first lawsuit was filed
16 against CBS?
17     A.  As a member of the news staff, I read the
18 e-mail and was told by news management, we were not to
19 use the Flemmi photograph.
20     Q.  After Peter Brown left the station, have you
21 spoken to him at all about this lawsuit?
22     A.  Once.
23     Q.  What was your conversation?
24     A.  I mentioned to him that we were back in

Page 60

1  litigation, and I asked him if he knew of any e-mails
2  that still existed instructing us not to use the photo,
3  and he did not.
4      Q.  And anything else that you discussed?
5      A.  Not regarding this case.
6      Q.  Did he express any opinion about the second
7  lawsuit that's been filed?
8      A.  I think he expressed sympathy for me that I
9  had to deal with it.
10     Q.  Did he comment on it at all?
11     A.  No.
12     Q.  Did you talk about the concept of fair use
13 with Peter Brown at any time?
14     A.  I don't remember.
15     Q.  Do you know what fair use is?
16     A.  I would like to think I do.
17     Q.  Could you tell us what your knowledge --
18     A.  Sure.
19     Q.  -- of fair use is?
20     A.  Yeah, first of all, I don't make any decisions
21 regarding fair use because I'm not an attorney and it is
22 a legal matter. I consult with our attorney when the
23 matter of fair use comes up in our newsroom.
24     Q.  Do you have in-house counsel or is it

Page 61

1  out-house counsel?
2      A.  It's in-house counsel based in New York City.
3      Q.  And who is in-house counsel's employer?
4      A.  CBS.
5      Q.  Okay. Is there a particular person that you
6  contact when there's a question of fair use that comes
7  up?
8      A.  Yes, Nicholas Poser; P-O-S-E-R.
9      Q.  Tell us what your impression of fair use is?
10     A.  Sure.
11         When there is an image piece of video or
12 photograph that we deem extremely newsworthy, we use it
13 in the context of a news report or newscast for a
14 limited period of time.
15     Q.  You used the words, extremely newsworthy, when
16 you were describing fair use?
17     A.  Mm-hmm.
18     Q.  Why did you use the word, extremely?
19     A.  I guess to emphasize that I wouldn't just take
20 any old piece of video that didn't belong to me; that it
21 would have to truly be newsworthy.
22     Q.  And what makes a particular picture newsworthy
23 or extremely newsworthy in your mind?
24     A.  I don't think that's a question that -- a

Page 66

```
1    Q.  Who is she?
2    A.  She's a courtroom artist.
3    Q.  Is she under contract with WBZ?
4    A.  On retainer; we call her in and pay her when
5  we use her work.
6    Q.  And when do you use her work?
7    A.  Usually in conjunction with federal court
8  appearances.
9    Q.  And how does she charge you?
10   A.  She sends us an invoice.
11   Q.  How much does she charge for each court
12 appearance?
13   A.  I don't know off top of my head; probably
14 about $200.
15   Q.  And was that the same fee she charged in 2004?
16   A.  I don't know.
17   Q.  Is there a way to find out what she formally
18 charges?
19   A.  Yes.
20   Q.  Do you normally hire Jane Collins to go to
21 federal court to sketch people who are being arraigned
22 or tried or --
23   A.  Yes.
24   Q.  -- sentenced or whatever is going on in court?
```

Page 67

```
1    A.  People making appearances in federal court
2  because cameras are not allowed there.
3    Q.  And how many times can you use the sketches
4  that Jane Collins does for you on a news broadcast?
5    A.  Unlimited.
6    Q.  Is that part of the arrangement she has with
7  you?
8    A.  Yes.
9    Q.  I would like to show you another piece of
10 paper, and ask you if you recognize those images that
11 were taken off of a television screen with sketches
12 purporting to be by Jane Collins?
13   A.  Yes, I recognize the sketches and I know I've
14 seen them.
15   Q.  So WBZ, CBS, whatever entirety we're talking
16 about, contracted with Jane Collins to go to federal
17 court and to do illustrations of Stephen Flemmi?
18   A.  Absolutely, yes.
19   Q.  And you have unlimited usage rights?
20   A.  I couldn't tell you by looking at that, that's
21 Stephen Flemmi, but yeah.
22   Q.  Would you agree with me, there's certainly a
23 resemblance between the picture of Steve Flemmi
24 Exhibit 1, and the picture I just placed in front of you
```

Page 68

```
1  with the sketch of Jane Collins?
2    A.  Sure, there's a resemblance.
3    Q.  Do you save those sketches?
4    A.  These would be saved as file tape.
5    Q.  Would they it be saved on a pitch reel?
6    A.  Perhaps.
7    Q.  So that if you, or Eric Cox, were to go to the
8  computer system and type in the name, Flemmi, you might
9  get both the photograph of Flemmi that exists on the
10 pitch reel even today, that one picture at least, plus
11 you would get sketches that would show up on a pitch
12 reel file tape somewhere?
13   A.  To be clear, that picture does not exist in
14 our news reel today.
15   Q.  Which picture?
16   A.  This photograph of Flemmi does not exist in
17 our news reel today.
18   Q.  Even the one that was not purged?
19   A.  Because that tape is in the Mary's office.
20   Q.  Okay.
21   A.  Please ask the second part of your question
22 again.
23   Q.  If you were to go to Eric Cox and he were have
24 do a search on the computer, would these sketches of
```

Page 69

```
1  Flemmi --
2    A.  Yes, if they did not come up as part of that
3  search, we would be able to find them through other
4  methods of searching for file tape.
5    Q.  What would those methods be?
6    A.  Looking through stories having to do with the
7  Boston mob; looking physically through the hard copies
8  and books that we keep, to see if there are stories from
9  a court appearance that would contain sketches.
10       MR. EPSTEIN:  Could I have this marked as the
11   next exhibit?
12       (Exhibit 9 Marked for Identification)
13       MR. EPSTEIN:  I'm going to play the tape that
14   has the illustration in it.
15       (Tape played)
16       MR. EPSTEIN:  Let's have this marked as the
17   next exhibit.
18       (Exhibit 10 Marked for Identification)
19 BY MR. EPSTEIN:
20   Q.  Now, Miss Street, the tape that was just
21 marked as Exhibit No. 10, contains on its spine, the CBS
22 logo, the words, five minutes, January 6, 8, 9, 1995.
23 And also the tape we just watched had the illustration
24 of Stephen Flemmi on it by Jane Collins; would you
```

Page 94

1  in their international broadcast.
2  Q.  Okay. Did WBZ-TV or UPN 38 ever get a copy of
3  this document?
4  A.  No.
5  Q.  Do you know where this document came from?
6  A.  Presumably, from the Network itself.
7      MR. EPSTEIN:  I would like to have this marked
8  as the next exhibit, please.
9      (Exhibit 19 Marked for Identification)
10 BY MR. EPSTEIN:
11 Q.  I would like to show you another document that
12 has been produced by counsel, and these two pages have
13 been Bates stamped 0054 and 0055.
14     Do you recognize this document?
15 A.  Only from looking over the documents in
16 preparation for deposition.
17 Q.  Where did this document come from?
18 A.  Again, I believe from the Network, from 60
19 Minutes.
20 Q.  Have you ever seen this document before it was
21 supplied to me by your attorneys?
22 A.  No.
23 Q.  Was this document ever in the records of
24 WBZ-TV or you UPN 38?

Page 95

1  A.  No, not to my knowledge.
2      MR. EPSTEIN:  Could I have this marked as the
3  next exhibit?
4      (Exhibit 20 Marked for Identification)
5  BY MR. EPSTEIN:
6  Q.  And one more document that I would like to
7  show you, which is a document with the WBZ 4 logo on the
8  upper left-hand side with the date December 22, 1998.
9      Could you tell us what this document is?
10 A.  It's my understanding, I don't have firsthand
11 knowledge, but this was a document prepared by a news
12 manager at WBZ as part of the litigation that occurred
13 in 1998 of the number of times and the amount of time
14 Chris Fitzgerald's photo was used in our newscast.  That
15 is my understanding.
16 Q.  And when you normally record how many seconds
17 an image is used on screen, do you split the second into
18 more than half-second increments?
19 A.  I don't, but a person who formed this document
20 did.
21 Q.  Perhaps you didn't understand my question.
22     When you normally have a document like
23 this, where it has 2 seconds, 1.5 seconds, 2.5 seconds,
24 and so on, do you sometimes cut the seconds --

Page 96

1  A.  There's nothing normal about this document for
2  me.  I can't say.  I had never characterized it like
3  that, so there's no normal for me.
4  Q.  Fair enough.
5      MR. EPSTEIN:  Let's get this marked.
6      (Exhibit 21 Marked for Identification)
7      (Short Recess)
8  BY MR. EPSTEIN:
9  Q.  Now, we have just gone over Exhibits 12
10 through 21.
11     Are there any other agreements that you
12 are aware of between CBS or WBZ-TV Channel 4 Boston or
13 UPN 38, whereby CBS, the Network, or Channel 4, Channel
14 38, could use either of the Stephen Flemmi photographs,
15 Exhibit 1 or Exhibit 2?
16 A.  No.
17 Q.  No other oral agreement, no other written
18 agreement that you're aware of?
19 A.  Not that I'm aware of.
20 Q.  Have you made a thorough inquiry of your staff
21 and the CBS Network to see if there are any other
22 agreements or written documents?
23 A.  My inquiry has been to my staff, not to the
24 Network.  I should say the staff at the time because it

Page 97

1  was not my staff a year ago or a year and a half ago
2  when this came about.
3  Q.  Fair enough.
4      At the time that the CBS Network first
5  broadcast the 60 Minutes program on May 10th, 1998 with
6  the story about Stephen Flemmi, and others, did CBS have
7  the right to use the Fitzgerald's photographs in that
8  story a total of five times?
9      MS. MURRANE:  Objection.  Go ahead.
10 A.  The May 10th, 60 Minutes broadcast?
11 Q.  From everything you reviewed this morning, all
12 the documents from Exhibits No. 12 through and including
13 Exhibit No. 21, is there anything in there where you
14 believe that 60 Minutes had the authority to use either
15 one or both of Mr. Fitzgerald's photographs of Stephen
16 Flemmi a total of five times?
17 A.  Yes, I believe they did so completely within
18 their right.
19 Q.  Could you point out a document to me that
20 gives them a right to use that picture five times?
21 A.  I'm looking at Exhibit 14 which is a contract,
22 a signed contract.
23 Q.  And where does it say they could use the
24 images five times?

Page 118

1  had a copy of Exhibit 1 in its possession anywhere?
2      A.  I lost track of the question, I'm sorry.
3      Q.  If CBS Corporation never told Chris Fitzgerald
4  that WBZ made a copy of the 60 Minutes' broadcast and
5  then made a pitch reel of that broadcast, there's no way
6  that Mr. Fitzgerald would ever know that CBS had a copy
7  of either of the Flemmi photographs in their file?
8      A.  I agree with that.
9      Q.  And would you agree that at the time that this
10 Mutual Settlement and Release was signed on
11 October 23rd, 1999, WBZ had never disclosed to CBS
12 Corporation that it had made a copy of the 60 Minutes'
13 broadcast or a pitch reel of the May 10, 1998 broadcast?
14     A.  I agree with that.
15     Q.  I would like to refer you to a question I
16 asked in interrogatory No. 9, and then your response.
17 When I asked about the procedures and standards and
18 guidelines or practices that you had in effect during
19 the five years prior to the asking of the interrogatory,
20 with respect to using or restraining from using
21 copyrighted materials, you said, Once material is
22 broadcast, CBS 4 and UPN 38 video manager is responsible
23 for ensuring that the material does not get archived.
24         That is as an example when there's an

Page 119

1  agreement that may limit the number of times the
2  material may be broadcast and/or set an expiration date
3  of broadcasting the material.
4         First, who was the video manager, if you
5  know, in 1998?
6      A.  I believe it was Tom Janssen.
7      Q.  And Tom Janssen, if my memory is correct, was
8  at some point in time the executive producer; was he
9  not?
10     A.  No, no, he's been the video manager --
11     Q.  Video manager right along, you're absolutely
12 correct.
13     A.  Yep.  I used his name in reference to
14 authorizing the recording of 60 Minutes.
15     Q.  Now, you gave, as an example there having been
16 an agreement that limited the number of times material
17 could be broadcast or may have set an expiration date of
18 the broadcast of material.
19         Can you think of any specific times that
20 WBZ or UPN 38 could use copyrighted material for
21 particular number of times or only for a particular time
22 segment?
23     A.  The Olympics.
24     Q.  And what were the photographs involved in

Page 120

1  that?
2      A.  It was video.  It was NBC footage, everyday
3  day for the sporting events.  That is the only films, so
4  NBC supplied certain footage for CBS.
5      Q.  Did CBS have to pay for that?
6      A.  No.
7      Q.  Do you regularly supply footage of sporting
8  events amongst and between the Network broadcasters?
9      A.  It is a fairly common occurrence that if, yes,
10 if ABC aired Monday Night Football, which is now a thing
11 of the past, that we would be able to use 30 seconds of
12 football highlights without paying for it.
13     Q.  Would you have to give credit to the other
14 networks to use the footage?
15     A.  Yes, usually there is an on-screen credit for
16 the footage.
17     Q.  Do you ever supply a video footage to the WBZ
18 Network?  Strike the question.
19         Knowing what you know about
20 Mr. Fitzgerald and his lawsuit against CBS Corporation
21 and WBZ, in 1998, and the use of the Flemmi photographs
22 that we've identified as Exhibits 1 and 2, would you
23 consider the subsequent use of the photo Flemmi in
24 Exhibit 1, by CBS 4 by UPN 38, to be fair use?

Page 121

1      MS. MURRANE:  Objection.
2      A.  I really have two answers to that question.
3  Yes, I think that in the coverage text we used it, it
4  was fair use.  It was a mistake in my opinion -- not in
5  my opinion.  It was a mistake for that to get on the air
6  not because it wasn't fair use but because we had gone
7  through the litigation with Mr. Fitzgerald in 1998.  We
8  made a decision we would not air the photograph ever
9  again based on our experience of having gone through
10 litigation.
11         It was not, as I said earlier, just not a
12 path we wanted to go down again.
13     Q.  If you absolutely, positively needed to use
14 and wanted to use Mr. Fitzgerald's photograph of Steve
15 Flemmi in the 2004 broadcast, and if you didn't have any
16 bad blood or prior litigation, I should say, with
17 Mr. Fitzgerald, how much would you have expected to pay
18 in licensing fees for the use of that photograph on the
19 news?
20     MS. MURRANE:  Objection.
21     A.  I would expect to pay about $150.
22     Q.  And on what do you base your expectation?
23     A.  The fact that I usually pay 75 to $100.
24     Q.  And why would you pay Mr. Fitzgerald more?

Page 146

1   CBS News Standards booklet?
2   A.  Yes, in discussions with our attorney.
3   Q.  Which attorney?
4   A.  Nick Poser, who I mentioned at the beginning
5   of this deposition.
6   Q.  Was it a discussion about specific
7   photographs --
8       MS. MURRANE:  Objection, I'm not sure --
9   Q.  -- or?
10      MS. MURRANE:  -- if we're getting into
11  attorney-client privilege, if she's seeking advice
12  from her internal counsel.
13      MR. EPSTEIN:  We do not know.
14      MS. MURRANE:  Then let's not talk about what
15  was discussed.
16  BY MR. EPSTEIN:
17  Q.  I'm trying to determine whether it was a
18  course given by him or it was a discussion because you
19  had questions?
20  A.  It comes in the context of more similar to a
21  course.
22  Q.  And where was the course given?
23  A.  At WBZ.
24  Q.  And Nick Poser was in attendance --

Page 147

1   A.  Yes.
2   Q.  -- at WBZ?
3   A.  Yes.
4   Q.  And how many other people were in that course,
5   if you will?
6   A.  I'm going to guess.  At the session I attended
7   there were 25, but he had three sessions that day.
8   Q.  And when was it that that occurred?
9   A.  This was approximately five years ago.
10  Q.  And is this the only instruction that you've
11  ever received on copyright laws of the United States?
12  A.  When you use the word, instruction, I presume
13  we're talking about formal instruction.  I'm quite sure
14  that I studied fair use at the New House School at
15  Syracuse University.
16  Q.  When did you graduate from Syracuse?
17  A.  In 1987, since you asked, but I would say
18  there have certainly been -- my true education and fair
19  use has come through discussions with Nick regarding
20  various cases.
21      I would say that's been my best
22  education, are the times we've had to discuss fair use
23  on a case-by-case basis.
24      MR. EPSTEIN:  Okay.  That's the information I

Page 148

1   don't want to get involved with.  But the other I
2   don't think was attorney-client privilege.
3       Would you agree?
4       MS. MURRANE:  If there was an instruction or
5   course, I'm okay with that.
6   BY MR. EPSTEIN:
7   Q.  These guidelines go on to say that:  As a
8   general ure. to meet the fair use test, copyrighted
9   footage must be directly relevant to a news story and
10  the excerpt should be no longer than truly necessary for
11  the news-reporting purposes involved.
12      And it's your testimony that your use of
13  the Steve Flemmi photograph in 2004, was truly necessary
14  for the news reporting purpose involved, and it was no
15  longer than truly necessary; would you agree that?
16  A.  Yes, I would agree with that.
17  Q.  Then it goes to say:  The use of such material
18  must be discussed in advance with the executive producer
19  or bureau chief.
20      Now, was the use of that photograph
21  discussed in advance with the executive producer at that
22  time for any of the news broadcast or the bureau
23  chief --
24  A.  I don't have any specific knowledge of any

Page 149

1   conversations that happened.  I was not the executive
2   producer at the time nor was I the news director.
3   Q.  Now, who was the executive producer or bureau
4   chief for all of the news broadcasts in 2004 that you
5   used the Flemmi photograph in?
6   A.  The executive producer for the 11 o'clock News
7   is a gentleman name Peter Wilson.
8   Q.  Is he still with WBZ?
9   A.  Yes.  And the senior producer for the Morning
10  News is a person named Maggie McGrath.
11  Q.  Is she still there?
12  A.  Yes.
13  Q.  Now it goes on to say:  It must also be
14  approved by the CBS News Business Affairs Department.
15      Do you know if the use of the Steve
16  Flemmi photograph in Exhibit 1 was approved by the CBS
17  News Business Affairs Department?
18  A.  I don't believe it was.
19  Q.  So that WBZ Boston and UPN 38 used that Steve
20  Flemmi photograph in 2004 without following the
21  procedures in the CBS News Standards, would you agree
22  with me?
23  A.  I believe so.
24  Q.  Thank you.