UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

---

CHRISTOPHER FITZGERALD )
)
Plaintiff, )
)
v. ) CIVIL ACTION
) NO. 04-CV-12138-NG
)
CBS BROADCASTING INC. )
)
Defendant. )
)

---

**RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OF
DEFENDANT CBS BROADCASTING INC.**

In accordance with Local Rule 56.1, Defendant CBS Broadcasting Inc. submits this Statement of Undisputed Material Facts in support of its motion for summary judgment.

1. Plaintiff Christopher Fitzgerald is a resident of Massachusetts, with a home office for his photography business at 8 High Street, North Grafton, Worcester County, Massachusetts. See Complaint at ¶1; Deposition of Christopher Fitzgerald dated July 20, 2006 ("Fitzgerald Dep.") at 17:2-17:11, attached as Exhibit 1 to the Affidavit of Mary B. Murrane ("Murrane Aff.").

2. Defendant CBS Broadcasting Inc. is an affiliate of CBS Corp. ("CBS"). CBS, formerly known as Viacom, owns and operates the Boston television stations of CBS 4 (Channel 4) (previously known as WBZ-TV) and WSBK-TV (previously known (and sometimes referred to by the parties) as UPN 38). Answer of CBS Broadcasting Inc., Corporate Disclosure Statement of CBS Broadcasting Inc. At all relevant times, both CBS 4 and WSBK-TV (until recently known as UPN 38)

have been owned by CBS Corp. Answers and Objections of CBS Broadcasting Inc. to Plaintiff's First Set of Interrogatories ("CBS Interrogatory Responses"), Interrogatory No. 5, attached as Exhibit 2 to Murrane Aff.; Deposition of Jennifer Street dated July 19, 2006 ("Street Dep.") at 137:16-138-4; 126:2-132:2, attached as Exhibit 3 to Murrane Aff.

3. This case centers around a photograph taken by plaintiff in 1995, while on assignment for *The Boston Globe*, which depicts mobster Stephen "The Rifleman" Flemmi outside the Framingham State Police Barracks being escorted by law enforcement officers after his arrest (the "Photograph"). Complaint at ¶3 and Exhibit A; Fitzgerald Dep. at 79:3-80:23, attached as Exhibit 1 to Murrane Aff. A copy of the Photograph is attached as Exhibit 4 to Murrane Aff.

**A.   The Photograph Concerns a Matter of Legitimate Public Interest.**

4. Stephen "The Rifleman" Flemmi, the subject of the Photograph at issue in this case, is a notorious figure in the Boston crime world. During the past ten years alone, Flemmi and his former partner James "Whitey" Bulger ("Bulger") have been mentioned in more than twenty-two hundred (2,200) newspaper articles. Murrane Aff. at ¶16. At least fifty-five (55) judicial opinions reference Flemmi's name, further evidence of his extensive involvement in the history of organized crime in Boston. Murrane Aff. at ¶15.

5. For years, Flemmi and Bulger led the organized crime syndicate known as the "Winter Hill Gang." Callahan v. United States, 426 F.3d 444, 446 (1st Cir. 2005). The Winter Hill Gang dominated the Boston crime scene during the 1970s and 1980s, committing a litany of crimes that ran the gambit from murder to bribery, extortion, loan sharking, and illegal gambling. Id.

6. During Flemmi and Bulger's reign over the Winter Hill Gang, the Federal Bureau of Investigation ("FBI") trained its sights on the Gang's main rival,

the Boston branch of La Cosa Nostra. Flemmi and Bulger were recruited by the FBI as informants to aid in that effort. Id. Both were "very pleased to help," and eventually were promoted to the status of "Top Echelon" informants. Id. at 447.

7. Flemmi and Bulger's status as FBI informants did not curtail their criminal activity. McIntyre v. United States, -- --- F.Supp.2d ----, 2006 WL 2536270 *18 (D. Mass. 2006). As the First Circuit has explained, "[t]he FBI, intent on keeping its informants happy, turned a blind eye to [Bulger's and Flemmi's] crimes and failed to follow FBI guidelines for dealing with informants. For example, FBI agents interfered with the investigation of Bulger and Flemmi for [murder] by preventing Oklahoma FBI agents from interviewing them. The FBI also informed Bulger and Flemmi of a 'bugged' location to prevent them from incriminating themselves." Callahan, 426 F.3d at 446. "This cozy relationship created a protective shield around Bulger and Flemmi that emboldened them in their criminal activities -- so much so that at one point Flemmi stated that the FBI gave Bulger and him free reign to commit any crime short of murder." Id.

B. **The Origin of the Photograph and Its Prior Uses.**

8. On January 6, 1995, while working as a freelance photographer for *The Boston Globe*, Fitzgerald was sent to the Framingham state police barracks to attempt to obtain a photograph of Flemmi, who recently had been arrested by federal authorities. Fitzgerald Dep. at 79:3-80:23; Complaint, ¶ 3.

9. The *Globe* sent Fitzgerald on the assignment based upon a tip the newspaper -- not Fitzgerald -- had received regarding Flemmi's whereabouts. Fitzgerald Dep. at 79:3-80:23. The *Globe's* tip proved accurate, as Fitzgerald was able to see Flemmi in public view as he was being escorted by police from the barracks. Id.

3

10. Fitzgerald had no control over the timing, location, lighting or subject of the Photograph. Nor did Flemmi pose for the Photograph. To the contrary, Fitzgerald had to walk backwards while taking the pictures, and managed only two photos that were properly in focus. Id.

11. One of those two is the Photograph at issue in this case. On January 7, 1995, the Photograph was published on the front page of *The Boston Globe*. Id. and 83:10-83:16. The *Globe* paid Fitzgerald $150 for the assignment. Fitzgerald Dep. at 91:1 - 91:24.

C. **The Plea Agreement and Sentencing of John Martorano.**

12. John Martorano, a long-time soldier in the Winter Hill Gang, was arrested in 1995, after spending 16 years as a fugitive. Government's Motion for Departure Pursuant to Section 5K1.1 of the United States Sentencing Guidelines, filed in United States v. Martorano, dated May 13, 2004 ("Martorano Sentencing Memorandum") at p. 1.

13. After his arrest, Martorano learned that while he was working for Flemmi and Bulger in the Winter Hill Gang, Flemmi and Bulger were serving as FBI informants. Id. at 2-3. It was after this revelation that Martorano entered into a plea agreement with federal and state law enforcement officials and agreed to cooperate with their ongoing criminal investigations. Id. at 3.

14. As stated by the Government in papers submitted in Martorano's sentencing proceedings, Martorano's decision to cooperate with law enforcement authorities in their investigation of Flemmi and Bulger raised issues of national concern:

> There is little doubt that the tortured path of the prosecution which commenced in 1995 has left an indelible stamp on the history of Boston. The fact that James Bulger and Stephen Flemmi were informants for the FBI while at the same time being the leaders of an extremely violent and dangerous criminal organization not only raised concerns at the national

level regarding the FBI's implementation of its informant program, but also created legal issues that threatened the viability of the then pending prosecution.

Id. at 6.

15.     According to the Government, "[t]o say that Martorano 'broke the logjam' would be an understatement." Id. at 7. His cooperation "sent ripples through the underworld" and "ultimately led, in whole or in part, to the following significant events":

- The indictment of Flemmi and Bulger for racketeering and related offenses, including approximately twenty murders;
- the recovery of the remains of six individuals murdered by Flemmi, Bulger and others;
- Flemmi's conviction and life-sentence. Id. at 7-8.

16.     The government also credited Martorano with assisting in obtaining the cooperation of Kevin Weeks and Frank Salemmi; the indictments and convictions of Boston Police Department police officer Michael Flemmi, former FBI agent John Connolly, former FBI agent H. Paul Rico, Massachusetts State Police lieutenant Richard Schneiderhan; and the seizure of the largest cache of illegal weapons in the history of the Commonwealth of Massachusetts. Id.

**D.    CBS 4 News Made Limited Use of the Photograph in Reporting on Martorano's Sentence.**

17.     Martorano's sentencing was held on June 24, 2004. CBS Interrogatory Responses, Interrogatory No. 5, attached as Exhibit 2 to Murrane Aff.

18.     In light of the violent nature of his criminal past, as well as the impact his plea and cooperation had on the indictment of prominent organized crime figures such as Flemmi and Bulger, the sentencing hearing was widely covered by the press. Murrane Aff. at ¶17.

19. Reporter Christina Hager prepared a report on the Martorano sentencing for the June 24, 2004 evening news broadcasts on CBS 4 and WSBK-TV (then known as UPN 38). CBS Interrogatory Responses, Interrogatory No. 5, attached as Exhibit 2 to Murrane Aff.

20. Hager and a video editor located pictures of Martorano, Bulger, Connolly and others for the broadcast, but were unable to find a photograph of Flemmi before the 10:00 news on UPN-38. Id.

21. Between the 10:00 p.m. UPN 38 news broadcast and the 11:00 p.m. CBS 4 news broadcast, the video editor continued his search for a photograph of Flemmi. Id. He ultimately found a copy of the Photograph on a subject matter tape (called a pitch reel by news staff) on a shelf in the shared CBS 4 and UPN 38 video library. Id.

22. The station did not make use of the entire Photograph, but instead cropped out the portion showing the police officers escorting Flemmi after his arrest in 1995. Fitzgerald's Brief at 12. See also Murrane Aff. at ¶8, and Exhibit 7 thereto.

23. The Photograph appeared on-screen for approximately two seconds during the two and one half minute report on the Martorano sentencing that aired on the CBS 4 local news at 11:00 p.m. on June 24, 2004. Exhibit 6 to Murrane Aff. (DVD recording of CBS 4 Martorano news story, broadcast on the 11:00 p.m. news on June 24, 2004).

24. The newscast was re-broadcast a few hours later, at 1:35 a.m. on June 25, 2004. CBS Interrogatory Responses, Interrogatory No. 5. In addition, a link to the Martorano report was posted on the home page of the CBS 4 web site from June 25 to June 29, 2004. CBS Interrogatory Responses, Interrogatory No. 5. See also Murrane Aff. at ¶8, and Exhibit 7 thereto.

25. The Photograph may also have been broadcast on June 25, 2004 in CBS 4 newscasts that aired at 5:00 a.m. and 6:00 a.m. and on a 7:00 a.m. UPN 38 newscast. Because those morning newscasts are not archived, CBS has not been able to confirm whether the Photograph in fact ran on those newscasts. CBS Interrogatory Responses, Interrogatory No. 5.

26. The sale of commercial advertisements for CBS 4 newscasts are made weeks, and sometimes months, in advance of the actual broadcasts. CBS Interrogatory Responses, Interrogatory No 18. Advertisers who bought time on the June 24 and June 25, 2004 newscasts therefore did so without knowing that the Photograph would appear in those broadcasts.

27. In addition, because CBS 4 generated no advertising revenue from its website in 2004, the link to the newscast on the CBS 4 website also did not generate any revenue. Street Dep. at 136:2-136:6.

28. CBS 4 and UPN 38 are assets wholly owned and operated by CBS. They have no separate corporate existence. Answer of CBS Broadcasting Inc.; Ownership Report for Commercial Broadcast Stations filed by Viacom Inc. (n/k/a CBS Corp.), attached as Exhibit 8 to Murrane Aff.

29. They operate as "sister stations," physically located in the same office space. Their news operations share studio space, a video library, and news equipment, as well as employee resources such as writers, reporters, camera crew, on-air personalities, producers and directors. Street Dep. at 137:16-138-4; 126:2-132:2.

30. For example, when CBS 4 finishes its broadcast of the news at 6:58 p.m., the same anchors stay at their desk, a new background is put into place behind them and the same two anchors then report the 7:00 p.m. news on UPN 38. Street Dep. at 130:9-130:21

31. The news programs are produced by the same employees whether the news is running on CBS 4 or UPN 38, and these employees are all paid by the same CBS entity. Street Dep. at 140:5-140:11.

E. **The Photograph Was Published and Broadcast Numerous Times Before the 2004 CBS 4 Newscasts.**

32. The Photograph was published several times after it first appeared on the front page of *The Boston Globe* in 1995 and prior to the newscasts at issue in this case. Fitzgerald Dep. at 88:7-88:16, and Fitzgerald Dep. Exhibit 33.

33. During discovery in this case Fitzgerald did not and could not distinguish which of the two successive photographs he took of Flemmi was used by which entities over the ensuing years. Fitzgerald Dep. Exhibit 33; Fitzgerald Dep. at 90:19-104:7.

34. The photographs, taken in quick succession, are quite similar. Exhibits 4 and 10 to Murrane Aff. The history of the usage of the Photograph presented here, therefore, includes both photographs.

35. The *Globe* republished the Photograph at least six additional times from 1995-98. Fitzgerald Dep. Exhibit 33; Fitzgerald Dep. at 90:19-104:7.

36. *The New York Times* published the Photograph twice in the spring of 1999; *The American Lawyer* magazine published the Photograph in May of 1999; and *The Boston Herald* published the Photograph at least twice in 2001. Id.

37. The Photograph also aired on the national television program *American's Most Wanted* in 1998. Id.

38. In addition, in 1998, CBS entered into a Stock Photograph Agreement with Fitzgerald concerning the use of the Photograph on CBS's *60 Minutes* program. Fitzgerald admits to 20 uses of the Photograph by media organizations, exclusive of

any uses by CBS. Income and Usage History of Stephen Flemmi Photographs, attached as an exhibit to the September 1, 2006 Affidavit of Christopher Fitzgerald.

39. The Stock Photograph Agreement expressly allows *60 Minutes* to include the Photograph "in video sales of the two segments in which [it] aired." Stock Photography Contract at ¶5, attached as Exhibit 11 to Murrane Aff.

40. For Fitzgerald, litigation has been more profitable than licensing the Photograph. Fitzgerald Dep. at 8:15-16:10; 88:17-89:6; Fitzgerald Dep. Exhibit 33.

41. Fitzgerald has sued or threatened to sue six times over print and broadcast uses of the Photograph (including one prior suit against CBS), resulting in six settlements ranging from $1,600 to $21,000, for an aggregate of $58,600 in litigation payments. Affidavit of Christopher Fitzgerald dated September 1, 2006 at ¶7, and the exhibit attached thereto.

42. In stark contrast, Fitzgerald has received a total of *$4,350* in licensing payments for *seventeen* other uses of the Photograph. Id.

43. Licensing payments for the Photograph have ranged from $75 to $150 per use for the print media, to $800 for national and international broadcasts (and national rebroadcasts) by *America's Most Wanted*. Fitzgerald Dep. Exhibit 33; Fitzgerald Dep. at 90:19-104:7.

44. According to Fitzgerald's testimony, the market value of the Photograph depends upon the "the interest in the public at that time and date of the story." Fitzgerald Dep. at 108:18-108:24.

45. In his summary judgment papers, Fitzgerald concedes that the market for the Photograph "heats up whenever Stephen Flemmi and his partner in crime, Whitey Bulger[,] come up in the news. As more news unfolds about Flemmi and Bulger, Fitzgerald will have continuing opportunities to exploit the market" for the Photograph. Fitzgerald Brief at 12-13.

F.    **Fitzgerald's Prior Suit Against CBS.**

46.    Fitzgerald brought suit against CBS in 1998 alleging copyright violations based upon prior uses of the Photograph by CBS 4 and *60 Minutes*. Fitzgerald v. CBS Corporation, Civil Action No. 98-cv-11510-JLT; Fitzgerald Dep. at 111:5-111:15.

47.    In its defense, CBS asserted that the use of the Photograph was a protected fair use or otherwise protected under the First Amendment. Answer filed by CBS in Civil Action No. 98-11510, attached as Exhibit 12 to Murrane Aff.

48.    The case settled in 1999, with neither side admitting liability and each expressly agreeing that the settlement payment of $15,000 to Fitzgerald "shall not be deemed a license fee, nor any admission, statement against interest or concession by the Defendant with respect to the claims and defenses asserted in the Lawsuit" and further agreed that the settlement was made "to avoid the expense of litigation, without any admission of liability or concessions by either party as to the claims and defenses asserted in the Lawsuit." Mutual Settlement and Release at ¶14, attached as Exhibit 13 to Murrane Aff.

G.    **Preventative Measures Taken by CBS to Avoid Future Litigation.**

49.    After Fitzgerald's 1998 suit, CBS 4 undertook measures to avoid a future lawsuit. CBS Interrogatory Responses, Interrogatory No. 3. In 1998, CBS 4 instructed its librarian to review all archive tapes in the station's library and remove any images of the Photograph. Id.

50.    In addition, a message was sent via the internal e-mail system to all staff instructing them to search their individual files for copies of the Photograph and to destroy any tape in which the Photograph was used. Id.

51.    Despite these efforts, a copy of the Photograph inadvertently remained in the possession of CBS 4. Id.

52. In 1998, CBS 4 routinely made copies of all *60 Minutes* news reports as an information resource in the event future CBS 4 news stories concerned similar issues. Id. A May 1998 *60 Minutes* broadcast (one of the broadcasts at issue in Fitzgerald's 1998 suit) included five images of the Photograph. In accordance with standard practice, the *60 Minutes* report was recorded by CBS 4. Id.

53. In addition, a copy of the broadcast apparently was used by someone at the station to create a "pitch reel" on organized crime. (A "pitch reel" is a tape organized by subject matter and used to facilitate the editing process of news reports on that subject matter). Id.

54. Although CBS does not know who created the pitch reel, it does know that it was not created by either the video librarian or by station management. Street Dep. at 44:5-45:8.

55. The initial copy of the May 1998 *60 Minutes* broadcast subsequently was purged by the librarian as part of the preventative measures taken in response to Fitzgerald's first lawsuit. Street Dep. at 39:13-39:22. In addition, the pitch reel was purged of four of the five images of the Photograph, but one image apparently was overlooked and remained on the tape. Street Dep. at 57:25-58:21.

56. In August 2000, the pitch reel was placed in the CBS 4 video library and stored on a shelf in a section of the library housing tapes that contained mafia stories. CBS Interrogatory Responses, Interrogatory No. 3.

57. The library is maintained by a full-time librarian, but is accessible by employees of CBS 4 and UPN 38, including reporters, writers, creative services, graphics department, producers, and news editors. Id.

58. It was from this pitch reel that the Photograph was obtained between 10:00 p.m. and 11:00 p.m. on June 24, 2004 for use in the Martorano sentencing news report. CBS Interrogatory Responses, Interrogatory No. 5.

11

H.  **The Lawsuit Filed by Fitzgerald Against the Same Defendant, Related to the Same Photograph, During the Same Time Frame.**

59. In the instant action, Magistrate Collings stated in the Report of Alternative Dispute Resolution Provider (docket entry 14): "Further progress [on resolving the case] might be possible once a legal determination is made as to whether the case involves just one use or two uses (CBS 4 and Channel 38) of the copyrighted picture(s), since such a decision will determine the maximum statutory damages which can be awarded at trial." Murrane Aff. at ¶19.

60. This issue was not raised in plaintiff's motion for summary judgment. Rather, on July 28, 2006, Fitzgerald filed a lawsuit against CBS, purporting to state a claim based only on the use of the Photograph in reports on the Martorano sentencing that allegedly aired on UPN 38 on June 24 and 25, 2004. See Fitzgerald v. CBS Broadcasting Inc., D. Mass. 06-CV-11302-NG, and Murrane Aff. at ¶18.

61. CBS has separately moved to dismiss this 2006 lawsuit as an impermissible attempt to recover double damages by claim splitting, a motion CBS respectfully incorporates by reference herein. (Docket entry 4, in Civil Action No. 06-CV-11302-NG)); Murrane Aff. at ¶18.

Respectfully submitted,

CBS BROADCASTING INC.,

By its attorneys,

/s/ Mary B. Murrane
Jonathan M. Albano, BBO#013850
Mary B. Murrane, BBO# 644448
**BINGHAM MCCUTCHEN LLP**
150 Federal Street
Boston, MA  02110
(617) 951-8000

Dated:  September 20, 2006

## Certificate of Service

I hereby certify that this document, which was filed through the ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non registered participants by First Class U.S. Mail on September 20, 2006.

/s/ Mary B. Murrane
Mary B. Murrane