UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF MASSACHUSETTS

CHRISTOPHER FITZGERALD )
) 
Plaintiff, )
)
v. )  CIVIL ACTION
)  NO. 04-CV-12138-NG
)
CBS BROADCASTING INC. )
)
Defendant. )
)

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
SUMMARY JUDGMENT OF DEFENDANT CBS BROADCASTING INC.
AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL
SUMMARY JUDGMENT**

The parties' cross-motions for summary judgment present this court with three principal issues of copyright law: (1) whether the defendant made a fair use of a photograph of reputed mobster Stephen "The Rifleman" Flemmi ("Flemmi") in a breaking news report; (2) whether a copyright plaintiff may assert multiple statutory damages claims against the same defendant based on alleged infringements of the same work; and (3) whether the plaintiff is entitled to a partial summary judgment ruling that, notwithstanding the fair use defense, the defendant committed a willful violation of the Copyright Act entitling the plaintiff to an award of enhanced statutory damages. Defendant CBS Corp. ("CBS")[1] respectfully submits that the fair use defense bars

---

[1] Defendant's Answer and its Corporate Disclosure Statement filed in this matter informed Fitzgerald that CBS Corp., *not* CBS Broadcasting Inc., was the owner of CBS 4 and WSBK-TV (previously known (and sometimes referred to by the parties) as UPN 38). SOF at ¶2. Although Fitzgerald has not yet moved to substitute the correct defendant, this motion proceeds on the basis that the misnomer will be corrected before the court rules on the merits of the pending motions for summary judgment.

plaintiff's copyright claims as a matter of law, that plaintiff's attempt to collect multiple statutory damages awards from the same defendant for alleged infringements of the same work is prohibited by the Copyright Act, and that the record precludes plaintiff's attempt to obtain a pretrial ruling that CBS willfully violated his copyright.

On June 24, 2004, after admitting to committing over one dozen murders, former Winter Hill Gang member John Martorano ("Martoranto") was sentenced to 14 years in jail. Martorano's sentence reflected the significant assistance he provided law enforcement authorities in their efforts to prosecute Flemmi and his former associates. The Boston television station CBS 4 reported the news of Martorano's sentencing and included in the report a cropped version of a photograph taken of Flemmi being escorted by police to prison after his arrest in 1995 (the "Photograph"). The Photograph was taken by plaintiff Christopher Fitzgerald ("Fitzgerald") while on assignment for *The Boston Globe* and appeared on-screen for approximately 2 seconds. Fitzgerald maintains that, despite the Photograph's relevance to a breaking news report on a matter of intense and legitimate public interest, the public was not entitled to see the Photograph without his consent.

As shown below, the brief and limited use of the Photograph at issue in this case is a protected "fair use" under Section 107 of the Copyright Act. The "fair use" doctrine permits the use of copyrighted material without the copyright owner's consent where, as here, the work was used for purposes of news reporting (a favored use specifically enumerated in the statute); the use was for a different, informative purpose than the original work; the work had been previously published and is primarily factual in nature; the use was brief (two seconds) and limited to the purpose of the news report; and the use neither competed with nor usurped the market for the original work. Based on these undisputed facts, summary judgment should enter dismissing Fitzgerald's complaint on fair use grounds.

In addition to the fair use issue presented by both parties, Fitzgerald has asserted a right to recover multiple awards of enhanced statutory damages against CBS on the theory

that the Photograph allegedly aired on both CBS 4 and WSBK-TV (formerly known as UPN 38), two stations that are wholly owned by CBS. Because the Copyright Act clearly provides that a plaintiff is limited to *one* award of statutory damages against any *one* defendant for all infringements of any *one* work, Fitzgerald's attempt at a double recovery fails as a matter of law. Finally, the record in this case precludes Fitzgerald's attempt to obtain a pretrial ruling that CBS willfully violated his copyright.

### I.     SUMMARY OF UNDISPUTED MATERIAL FACTS

**A.     The Photograph Concerns a Matter of Legitimate Public Interest.**

Stephen "The Rifleman" Flemmi, the subject of the Photograph at issue in this case, is a notorious figure in the Boston crime world. Statement of Undisputed Material Facts ("SOF") at ¶4; Affidavit of Mary B. Murrane ("Murrane Aff.") at ¶¶15-17. During the past ten years alone, Flemmi and his former partner James "Whitey" Bulger ("Bulger") have been mentioned in more than twenty-two hundred (2,200) newspaper articles. At least fifty-five (55) judicial opinions reference Flemmi's name, further evidence of his extensive involvement in the history of organized crime in Boston. SOF at ¶4; Murrane Aff. at ¶¶15-16.

For years, Flemmi and Bulger led the organized crime syndicate known as the "Winter Hill Gang." SOF at ¶5; Callahan v. United States, 426 F.3d 444, 446 (1st Cir. 2005). The Winter Hill Gang dominated the Boston crime scene during the 1970s and 1980s, committing a litany of crimes that ran the gambit from murder to bribery, extortion, loan sharking, and illegal gambling. Id.

During Flemmi and Bulger's reign over the Winter Hill Gang, the Federal Bureau of Investigation ("FBI") trained its sights on the Gang's main rival, the Boston branch of La Cosa Nostra. Flemmi and Bulger were recruited by the FBI as informants to aid in that effort. Id. Both were "very pleased to help," and eventually were promoted to the status of "Top Echelon" informants. Id. at 447.

Flemmi and Bulger's status as FBI informants did not curtail their criminal activity. SOF at ¶7; McIntyre v. United States, -- --- F.Supp.2d ----, 2006 WL 2536270 *18 (D. Mass. 2006). As the First Circuit has explained, "[t]he FBI, intent on keeping its informants happy, turned a blind eye to [Bulger's and Flemmi's] crimes and failed to follow FBI guidelines for dealing with informants. For example, FBI agents interfered with the investigation of Bulger and Flemmi for [murder] by preventing Oklahoma FBI agents from interviewing them. The FBI also informed Bulger and Flemmi of a 'bugged' location to prevent them from incriminating themselves." SOF at ¶7; Callahan, 426 F.3d at 446. "This cozy relationship created a protective shield around Bulger and Flemmi that emboldened them in their criminal activities -- so much so that at one point Flemmi stated that the FBI gave Bulger and him free reign to commit any crime short of murder." Id.

**B.     The Origin of the Photograph and Its Prior Uses.**

On January 6, 1995, while working as a freelance photographer for *The Boston Globe*, Fitzgerald was sent to the Framingham state police barracks to attempt to obtain a photograph of Flemmi, who recently had been arrested by federal authorities. SOF at ¶8; Deposition of Christopher Fitzgerald dated July 20, 2006 ("Fitzgerald Dep.") at 79:3-80:23; Complaint, ¶ 3. The *Globe* sent Fitzgerald on the assignment based upon a tip the newspaper -- not Fitzgerald -- had received regarding Flemmi's whereabouts. SOF at ¶ 9; Fitzgerald Dep. at 79:3-80:23. The *Globe's* tip proved accurate, as Fitzgerald was able to see Flemmi in public view as he was being escorted by police from the barracks. Id.

Fitzgerald had no control over the timing, location, lighting or subject of the Photograph. Nor did Flemmi pose for the Photograph. To the contrary, Fitzgerald had to walk backwards while taking the pictures, and managed only two photos that were properly in focus. SOF at ¶ 9; Fitzgerald Dep. at 79:3-80:23. One of those two is the Photograph at issue in this case. On January 7, 1995, the Photograph was published on

4

the front page of *The Boston Globe*. Id. and 83:10-83:16. The *Globe* paid Fitzgerald $150 for the assignment. SOF at ¶9; Fitzgerald Dep. at 91:1 - 91:24.

C.     **The Plea Agreement and Sentencing of John Martorano.**

John Martorano, a long-time soldier in the Winter Hill Gang, was arrested in 1995, after spending 16 years as a fugitive. SOF at ¶12; Government's Motion for Departure Pursuant to Section 5K1.1 of the United States Sentencing Guidelines, filed in United States v. Martorano, dated May 13, 2004 ("Martorano Sentencing Memorandum") at p. 1. After his arrest, Martorano learned that while he was working for Flemmi and Bulger in the Winter Hill Gang, Flemmi and Bulger were serving as FBI informants. Id. at 2-3. It was after this revelation that Martorano entered into a plea agreement with federal and state law enforcement officials and agreed to cooperate with their ongoing criminal investigations. Id. at 3.

As stated by the Government in papers submitted in Martorano's sentencing proceedings, Martorano's decision to cooperate with law enforcement authorities in their investigation of Flemmi and Bulger raised issues of national concern:

> There is little doubt that the tortured path of the prosecution which commenced in 1995 has left an indelible stamp on the history of Boston. The fact that James Bulger and Stephen Flemmi were informants for the FBI while at the same time being the leaders of an extremely violent and dangerous criminal organization not only raised concerns at the national level regarding the FBI's implementation of its informant program, but also created legal issues that threatened the viability of the then pending prosecution.

Id. at 6.

According to the Government, "[t]o say that Martorano 'broke the logjam' would be an understatement." Id. at 7. His cooperation "sent ripples through the underworld" and "ultimately led, in whole or in part, to the following significant events":

- The indictment of Flemmi and Bulger for racketeering and related offenses, including approximately twenty murders;

- the recovery of the remains of six individuals murdered by Flemmi, Bulger and others;

- Flemmi's conviction and life-sentence. Id. at 7-8.[2]

### D. CBS 4 News Made Limited Use of the Photograph in Reporting on Martorano's Sentence.

Martorano's sentencing was held on June 24, 2004. SOF at ¶17; Answers and Objections of CBS Broadcasting Inc. to Plaintiff's First Set of Interrogatories ("CBS Interrogatory Responses"), Interrogatory No. 5, attached as Exhibit 2 to Murrane Aff. In light of the violent nature of his criminal past, as well as the impact his plea and cooperation had on the indictment of prominent organized crime figures such as Flemmi and Bulger, the sentencing hearing was widely covered by the press. SOF at ¶18; Murrane Aff. at ¶17.

Reporter Christina Hager prepared a report on the Martorano sentencing for the June 24, 2004 evening news broadcasts on CBS 4 and WSBK-TV (then known as UPN 38).[3] SOF at ¶19; CBS Interrogatory Responses, Interrogatory No. 5. Hager and a video editor located pictures of Martorano, Bulger, Connolly and others for the broadcast, but were unable to find a photograph of Flemmi before the 10:00 news on UPN-38. SOF at ¶20; CBS Interrogatory Responses, Interrogatory No. 5. Between the 10:00 p.m. UPN 38 news broadcast and the 11:00 p.m. CBS 4 news broadcast, the video editor continued his

---

[2] The government also credited Martorano with assisting in obtaining the cooperation of Kevin Weeks and Frank Salemmi; the indictments and convictions of Boston Police Department police officer Michael Flemmi, former FBI agent John Connolly, former FBI agent H. Paul Rico, Massachusetts State Police lieutenant Richard Schneiderhan; and the seizure of the largest cache of illegal weapons in the history of the Commonwealth of Massachusetts. Id.

[3] At all relevant times, both CBS 4 and WSBK-TV (until recently known as UPN 38) have been owned by CBS Corp. SOF at ¶ 2; CBS Interrogatory Responses, Interrogatory No. 5, attached as Exhibit 2 to Murrane Aff.; Deposition of Jennifer Street dated July 19, 2006 ("Street Dep.") at 137:16-138-4; 126:2-132:2

search for a photograph of Flemmi. SOF at ¶21; CBS Interrogatory Responses, Interrogatory No. 5. He ultimately found a copy of the Photograph on a subject matter tape (called a pitch reel by news staff) on a shelf in the shared CBS 4 and UPN 38 video library. Id.

The station did not make use of the entire Photograph, but instead cropped out the portion showing the police officers escorting Flemmi after his arrest in 1995. SOF at ¶22; Fitzgerald's Brief at 12; Murrane Aff. at ¶8 and Exhibit 7 thereto. The Photograph appeared on-screen for approximately two seconds during the two and one half minute report on the Martorano sentencing that aired on the CBS 4 local news at 11:00 p.m. on June 24, 2004. SOF at ¶23; Exhibit 6 to Murrane Aff. The newscast was re-broadcast a few hours later, at 1:35 a.m. on June 25, 2004. SOF at ¶24; CBS Interrogatory Responses, Interrogatory No. 5. In addition, a link to the Martorano report was posted on the home page of the CBS 4 web site from June 25 to June 29, 2004. SOF at ¶24; CBS Interrogatory Responses, Interrogatory No. 5.[4]

The sale of commercial advertisements for CBS 4 newscasts are made weeks, and sometimes months, in advance of the actual broadcasts. SOF at ¶26; CBS Interrogatory Responses, Interrogatory No 18. Advertisers who bought time on the June 24 and June 25, 2004 newscasts therefore did so without knowing that the Photograph would appear in those broadcasts. In addition, because CBS 4 generated no advertising revenue from its website in 2004, the link to the newscast on the CBS 4 website also did not generate any revenue. SOF at ¶27; Street Dep. at 136:2-136:6.

---

[4] The Photograph may also have been broadcast on June 25, 2004 in CBS 4 newscasts that aired at 5:00 a.m. and 6:00 a.m. and on a 7:00 a.m. UPN 38 newscast. Because those morning newscasts are not archived, CBS has not been able to confirm whether the Photograph in fact ran on those newscasts. SOF at ¶25; CBS Interrogatory Responses, Interrogatory No. 5.

E.  **The Photograph Was Published and Broadcast Numerous Times Before the 2004 CBS 4 Newscasts.**

The Photograph was published several times after it first appeared on the front page of *The Boston Globe* in 1995 and prior to the newscasts at issue in this case.[5] SOF at ¶32; Fitzgerald Dep. at 88:7-88:16, and Fitzgerald Dep. Exhibit 33. The *Globe* republished the Photograph at least six additional times from 1995-98. SOF at ¶35; Fitzgerald Dep. at 88:7-88:16, and Fitzgerald Dep. Exhibit 33. *The New York Times* published the Photograph twice in the spring of 1999; *The American Lawyer* magazine published the Photograph in May of 1999; and *The Boston Herald* published the Photograph at least twice in 2001. SOF at ¶36; Fitzgerald Dep. at 88:7-88:16, and Fitzgerald Dep. Exhibit 33. The Photograph also aired on the national television program *American's Most Wanted* in 1998. SOF at ¶37; Fitzgerald Dep. at 88:7-88:16, and Fitzgerald Dep. Exhibit 33. In addition, in 1998, CBS entered into a Stock Photograph Agreement with Fitzgerald concerning the use of the Photograph on CBS's *60 Minutes* program. SOF at ¶38. Fitzgerald admits to 20 uses of the Photograph by media organizations, exclusive of any uses by CBS. SOF at ¶¶33-38; Income and Usage History of Stephen Flemmi Photographs, attached as an exhibit to the September 1, 2006 Affidavit of Christopher Fitzgerald.[6]

---

[5] During discovery in this case Fitzgerald did not and could not distinguish which of the two successive photographs he took of Flemmi was used by which entities over the ensuing years. SOF at ¶33; Fitzgerald Dep. Exhibit 33; Fitzgerald Dep. at 90:19-104:7. The photographs, taken in quick succession, are quite similar. SOF at ¶34; Exhibits 4 and 10 to Murrane Aff. The history of the usage of the Photograph presented here, therefore, includes both photographs.

[6] For Fitzgerald, litigation has been more profitable than licensing the Photograph. SOF at ¶40; Fitzgerald Dep. at 8:15-16:10; 88:17-89:6; Fitzgerald Dep. Exhibit 33. Fitzgerald has sued or threatened to sue six times over print and broadcast uses of the Photograph (including one prior suit against CBS), resulting in six settlements ranging from $1,600 to $21,000, for an aggregate of $58,600 in litigation payments. SOF at ¶41; Affidavit of Christopher Fitzgerald dated September 1, 2006 at ¶7, and the exhibit attached thereto.

F.  **Fitzgerald's Prior Suit Against CBS.**

Fitzgerald brought suit against CBS in 1998 alleging copyright violations based upon prior uses of the Photograph by CBS 4 and *60 Minutes*. Fitzgerald v. CBS Corporation, Civil Action No. 98-cv-11510-JLT; SOF at ¶46; Fitzgerald Dep. at 111:5-111:15. In its defense, CBS asserted that the use of the Photograph was a protected fair use or otherwise protected under the First Amendment. SOF at ¶47; Answer filed by CBS in Civil Action No. 98-11510, attached as Exhibit 12 to Murrane Aff. The case settled in 1999, with neither side admitting liability and each expressly agreeing that the settlement payment of $15,000 to Fitzgerald "shall not be deemed a license fee, nor any admission, statement against interest or concession by the Defendant with respect to the claims and defenses asserted in the Lawsuit." SOF at ¶48; Mutual Settlement and Release at ¶14 attached as Exhibit 13 to Murrane Aff.

G.  **Preventative Measures Taken by CBS to Avoid Future Litigation.**

After Fitzgerald's 1998 suit, CBS 4 undertook measures to avoid a future lawsuit. SOF at ¶49; CBS Interrogatory Responses, Interrogatory No. 3. In 1998, CBS 4 instructed its librarian to review all archive tapes in the station's library and remove any images of the Photograph. Id. In addition, a message was sent via the internal e-mail system to all staff instructing them to search their individual files for copies of the Photograph and to destroy any tape in which the Photograph was used. SOF at ¶50; CBS Interrogatory Responses, Interrogatory No. 3.

Despite these efforts, a copy of the Photograph inadvertently remained in the possession of CBS 4. SOF at ¶51; CBS Interrogatory Responses, Interrogatory No. 3. In

---

In stark contrast, Fitzgerald has received a total of *$4,350* in licensing payments for *seventeen* other uses of the Photograph. Id. Licensing payments for the Photograph have ranged from $75 to $150 per use for the print media, to $800 for national and international broadcasts (and national rebroadcasts) by *America's Most Wanted*. SOF at ¶43; Fitzgerald Dep. Exhibit 33; Fitzgerald Dep. at 90:19-104:7.

1998, CBS 4 routinely made copies of all *60 Minutes* news reports as an information resource in the event future CBS 4 news stories concerned similar issues. SOF at ¶52; CBS Interrogatory Responses, Interrogatory No. 3. A May 1998 *60 Minutes* broadcast (one of the broadcasts at issue in Fitzgerald's 1998 suit) included five images of the Photograph. In accordance with standard practice, the *60 Minutes* report was recorded by CBS 4. Id. In addition, a copy of the broadcast apparently was used by someone at the station to create a "pitch reel" on organized crime. (A "pitch reel" is a tape organized by subject matter and used to facilitate the editing process of news reports on that subject matter). SOF at ¶53; CBS Interrogatory Responses, Interrogatory No. 3.[7]

The initial copy of the May 1998 *60 Minutes* broadcast subsequently was purged by the librarian as part of the preventative measures taken in response to Fitzgerald's first lawsuit. SOF at ¶55; Street Dep. at 39:13-39:22. In addition, the pitch reel was purged of four of the five images of the Photograph, but one image apparently was overlooked and remained on the tape. SOF at ¶55, Street Dep. at 57:25-58:21. In August 2000, the pitch reel was placed in the CBS 4 video library and stored on a shelf in a section of the library housing tapes that contained mafia stories. SOF at ¶56; CBS Interrogatory Responses, Interrogatory No. 3. The library is maintained by a full-time librarian, but is accessible by employees of CBS 4 and UPN 38, including reporters, writers, creative services, graphics department, producers, and news editors. SOF at ¶57; CBS Interrogatory Responses, Interrogatory No. 3. It was from this pitch reel that the Photograph was obtained between 10:00 p.m. and 11:00 p.m. on June 24, 2004 for use in the Martorano sentencing news report. SOF at ¶58; CBS Interrogatory Responses, Interrogatory No. 5.

---

[7] Although CBS does not know who created the pitch reel, it does know that it was not created by either the video librarian or by station management. SOF at ¶54; Street Deposition at 44:5-45:8.

## II.    ARGUMENT

### CBS IS ENTITLED TO SUMMARY JUDGMENT BECAUSE IT MADE FAIR USE OF THE PHOTOGRAPH IN A BREAKING NEWS REPORT.

This action presents a particularly compelling case for application of the fair use doctrine because: (1) CBS used the Photograph for news reporting; (2) CBS's use of the Photograph was "transformative" because it was used to enhance a breaking news story and not to exploit the original purpose of the Photograph; (3) the Photograph was widely distributed before CBS's use and is primarily a factual, not a creative, work; (4) CBS's use of the Photograph was brief (two seconds) and limited to the purpose of the newscast; and (5) the use did not in any way impair the potential market for the Photograph. Accordingly, the Court should grant CBS's motion for summary judgment.[8]

### A.    The Newscasts Were a Fair Use of the Photograph.

"Section 107 of the Copyright Act permits the unauthorized use or reproduction of copyrighted work if it is 'for purposes such as criticism, comment, *news reporting*, teaching ..., scholarship, or research.'" Bill Graham Archives v. Dorling Kindersley Ltd., 448 F.3d 605, 608 (2d Cir. 2006) (emphasis added). As shown below, because the use of the Photograph for a news report concerning the Martorano sentencing hearing was a fair use under the Copyright Act, Fitzgerald's claims should be dismissed.[9]

"The [fair use] doctrine affords a means of accommodating the exclusive rights of the copyright owner and 'the public's interest in the dissemination of information affecting areas

---

[8] Fair use issues commonly are resolved on summary judgment where, as here, there are no material facts in dispute. See Nuñez v. Caribbean Int'l News Corp., 235 F.3d 18, 23 (1st Cir. 2000) (affirming summary judgment for defendant on fair use grounds); Castle Rock Entertainment, Inc. v. Carol Publ'g Group, 150 F.3d 132, 137 (2d Cir. 1999) ("[t]his court has on a number of occasions resolved fair use at the summary judgment stage").

[9] For purposes of this summary judgment motion only, CBS assumes that Fitzgerald owns a valid copyright in the Photograph.

of universal concern...'" Haberman v. Hustler Magazine, Inc., 626 F. Supp. 201, 208 (D. Mass. 1986), quoting, Wainwright Securities, Inc. v. Wall Street Transcript Corp., 558 F.2d 91, 94 (2d Cir. 1977). If the use falls into one of the categories enumerated in the statute, such as news reporting, the Court will look to a variety of factors to determine if the publication was a fair use:

> ... the fair use of a copyright work ... for purposes such as criticism, comments, *news reporting*, teaching ... scholarship, or research, is *not an infringement of copyright*. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include --
>
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. §107 (emphasis added).

"The above factors are not the only factors that should be considered, nor should any one of these factors be determinative." Penelope v. Brown, 792, F. Supp. 132, 136 (D. Mass. 1992), citing, Harper & Row Publishers, Inc. v. Nation Enter., 471 U.S. 539, 549 (1985). The determination of fair use is a case-by-case analysis, with all factors "weighed together in light of the purposes of copyright." Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 578 (1994).

1. **The Purpose and Character of the Use Weighs in Favor of Fair Use.**

The first factor -- the purpose and character of CBS's use of the Photograph -- strongly favors CBS. In determining the purpose and character of the use, courts consider (1) whether the material was used for one of the favored purposes specifically mentioned in the statute, and (2) whether the defendant used the material for a meaningfully different or "transformative" purpose than the original work. Campbell,

510 U.S. at 579; Video-Cinema Films, Inc. v. Cable News Network, Inc., 2001 WL 1518264 *6 (S.D.N.Y. 2001).

If the use is for one of the specified statutory purposes, "there will be a 'strong presumption' that factor one favors the defendant." Arica Institute, Inc. v. Palmer, 970 F.2d 1067, 1077 (2d Cir. 1992). See also Rubin v. Brooks/Cole Publishing Co., 836 F. Supp. 909, 917 (D. Mass. 1993) ("If the [work] falls into one of the enumerated fair use categories ... there is a 'strong presumption' that the use is productive.").

In this case, because the Photograph was used in a news report on Martorano's sentencing, and "news reporting" is a favored purpose specifically enumerated in the statute, the purpose and character of the use strongly favors CBS. Wright v. Warner Books, Inc., 953 F.2d 731, 736-37 (2d Cir. 1991) ("If a [work] falls into one of these categories ... assessment of the first fair use factor should be at an end."); Mathieson v. Associated Press, 23 U.S.P.Q.2d (BNA) 1685, 1688, 1992 WL 164447 * 3 (S.D.N.Y. 1992) (Where use involves news reporting, "[c]ourt must lean decidedly in the direction of finding fair use even as it looks at the other factors.").

Second, CBS's use of the Photograph was "transformative" -- i.e., it "add[ed] something new, with a further purpose or different character, altering the first with new expression, meaning, or message." Campbell, 510 U.S at 579, citing Folsom v. Marsh, 9 F.Cas. 342, 348 (C.C.D. Mass. 1841) (additional citations omitted). See also Nuñez v. Caribbean Int'l News Corp., 235 F.3d 18, 23 (1st Cir. 2000). As Judge Leval explained in his oft-cited article on fair use, the type of activity that "the fair use doctrine intends to protect for the enrichment of society," occurs where, as here, the copyrighted work is used as "raw material" to create "new information ... aesthetics ... insights and understandings." Pierre N. Leval, Toward a Fair Use Standard, 103 Harv. L.Rev. 1105, 1111 (1990).

In this case, the Photograph was used to enhance a news report on a significant sentencing decision that "sent ripples through the underworld" and that "broke the

logjam" on the "tortured path" of a prosecution that had "left an indelible stamp on the history of Boston." SOF at ¶15; Martorano Sentencing Memorandum at 6. CBS's purpose in using the Photograph was to inform the audience about the significance of Martorano's sentence and plea agreement and the well-known figures effected by the ruling. The Photograph was used because of its relevance to that breaking news event in 2004, not to illustrate Flemmi's arrest in 1995. Indeed, as Fitzgerald concedes, the Photograph was cropped to "exclude the police officers who were escorting Flemmi to prison" after his arrest in 1995. Fitzgerald's Brief at 12; SOF at ¶22; Murrane Aff. at ¶8 and Exhibit 7 thereto. Because the Photograph was used for an entirely different, informative purpose than its original use in 1995, factor one favors CBS. See generally Nuñez, 235 F.3d at 22-23 (newspaper's use of modeling portfolio photographs to "provide news reporting to a hungry public" about a controversy concerning a beauty contestant had a transformative effect triggering fair use protections); Graham, 448 F.3d at 610-12 (use of images of Grateful Dead concert posters to illustrate band biography was a transformative, protected fair use where the images were accompanied by commentary, comprised only a fraction of the allegedly infringing work, and enriched the presentation rather than exploiting the posters for commercial gain); Video-Cinema Films, 2001 WL 1518264 *9 (S.D.N.Y. 2001) (use of film clips from copyrighted movie in televised obituaries of actor Robert Mitchum was transformative, protected fair use intended to inform the public of the actor's death and to educate the public regarding his impact on the arts); Mathieson v. Associated Press, 23 U.S.P.Q.2d (BNA) at 1688, 1992 WL 164447 * 3 (S.D.N.Y. 1992) ("the character and purpose of [the Associated Press's] use of plaintiff's photos [of Oliver North] falls well within the bounds of responsible news reporting on a matter of legitimate public interest").[10]

---

[10] See also Hofheinz v. A & E Television Networks, Inc., 146 F. Supp.2d 442, 446-47 (S.D.N.Y. 2001) (unauthorized use of film clips in biographical film was fair use because the

Fitzgerald's motion for partial summary judgment fails to even acknowledge that the use of the Photograph falls squarely into an enumerated fair use category of §107, or the transformative nature of using the Photograph in a breaking news report. Instead, his argument under factor one is principally based on his claim that CBS used the Photograph for "pure commercial gain." Fitzgerald's Brief at 10. As the Supreme Court has held, however, the mere fact that a defendant is a for-profit entity does not create any presumption of unfairness: "If, indeed, commerciality carried presumptive force against a finding of fairness, the presumption would swallow nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research, since these activities 'are generally conducted for profit in this country.'" Campbell, 510 U.S. at 584 (quoting Harper & Row, 471 U.S. at 592). See also New Era Publications Int'l v. Carol Publishing Group, 904 F.2d 152, 156 (2d Cir. 1990) ("To be sure, the author and [publisher] want to make a profit in publishing the book. But the author's use of [copyrighted] material 'to enrich' his biography is a protected fair use, 'notwithstanding that he and his publisher anticipate profits.'"); Graham, 448 F.3d at 612 (because the defendant did not use the images in its commercial advertising or to promote sales, but rather used the pictures to describe the history of a band, the use was incidental to the commercial value of the publication); Haberman, 626 F. Supp. at 210 (depictions of copyrighted artwork on inside pages of *Hustler* magazine were fair use, in contrast to cases in which works were used for front page advertising or to entice a potential purchaser).

Moreover, this is not a case in which a defendant sold the copyrighted work of another for commercial gain. Compare Bruce v. Weekly World News, Inc., 150

---

biography "was not shown to recreate the creative expression reposing in plaintiff's film," but for the transformative purpose of enabling the viewer to better understand the subject matter of the film); Kelly v. Arriba Soft. Corp., 336 F.3d 811, 818-20 (9th Cir. 2003) (finding online search engine's use of thumbnail-sized images to be highly transformative).

F. Supp.2d 313 (D. Mass. 2001) (defendant's unauthorized use of copyrighted photograph on promotional t-shirts sold to the public was copyright violation). Advertisements for the June 24 and 25, 2004 newscasts were sold weeks in advance of the broadcasts. SOF at ¶26; CBS Interrogatory Responses, Interrogatory No 18. The advertisements, therefore, were purchased before Martorano was sentenced and without any consideration as to the use of Photograph. Nor did the temporary link to the Martorano report on CBS 4's website generate any revenue to CBS; indeed, the website did not generate any advertising revenue in all of 2004. SOF at ¶27; Street Dep. at 136:2-136:6. Fitzgerald's allegation that the Photograph was used for "pure commercial gain" therefore lacks any legal or factual support. See generally Rubin, 836 F Supp. at 917 ("Whether the inclusion of copied material was made evident to prospective purchasers has been held relevant when considering whether the alleged infringer profited from use of the copied material.").

Fitzgerald also argues that factor one favors his copyright claim because the Photograph allegedly was "not inextricably related" to the news report on Martorano's sentencing, which Fitzgerald asserts either could have been prepared without any photograph of Flemmi or by using a sketch artist's drawing. Fitzgerald Brief at 10. As the Supreme Court has cautioned, however, courts applying the first factor of § 107 should not "'decid[e] what is and what is not news.'" Harper & Row, 471 U.S. at 561. Yet that is precisely the prerogative claimed by Fitzgerald. He concedes, somewhat begrudgingly, that "the length of Martorano's sentence may have been of some interest to the public." Fitzgerald's Brief at 10. But he purports to reserve for himself the editorial judgment concerning whether the public had a legitimate interest in seeing a photograph of a person who played such an integral, and notorious, role in both the sentencing decision and the underlying controversy about the FBI's informant program. In the words of Professor Nimmer, "it is intolerable that a photographer's prerogative may cut

off entirely from public access a photograph that, by hypothesis, is one of which the public should be aware. Any privacy interest should be reserved to the subjects depicted in the photograph, and not to the photographer himself." 1 Nimmer on Copyright, §1.10[C][2] (2006).[11] Because the Photograph was used for a transformative news report, factor one favors CBS.

### 2.     The Nature of the Copyrighted Work Favors a Finding of Fair Use.

In assessing the second factor -- "the nature of the copyrighted work" -- the most important consideration is whether the Photograph is a published, previously distributed work. 17 U.S.C. §107(2). See Harper & Row, 471 U.S. at 563 ("The fact that a work is unpublished is a critical element of its 'nature.'"); Kelly v. Arriba Soft. Corp., 336 F.3d 811, 820 (9th Cir. 2003). Indeed, where the work already had been published, the Second Circuit has found that this fact alone supports a finding in favor of the defendant with

---

[11] None of the cases cited by Fitzgerald support his contention that a two-second use of a photograph in a news report on a matter of intense public interest is not a protected fair use. In Roy Export Co. Establishment of Vaduz, Lichtenstein v. Columbia Broadcasting System, Inc., 672 F.2d 1095 (2d Cir. 1982), the defendant aired a compilation of classic scenes from Charlie Chaplin's movies, the sequence and timing of which had been selected and edited by others from Chaplin's greatest works. The broadcast was contrary to assurances given by the defendant in obtaining a copy of the work that it would show only brief portions of the excerpted films, and only on its regular nightly news program. 672 F.2d at 1098. The trial court found the fair use defense inapplicable, noting that the defendant had no right to broadcast the "precise artistic means" through which Chaplin's films had been showcased in the compilation. 672 F.2d at 1100.

In Iowa State University Research Foundation, Inc. v. American Broadcasting Companies, Inc., 621 F.2d 57 (S.D.N.Y. 1980), the defendant broadcast portions of a student's film biography of Olympic wrestler Dan Gable. Noting that the defendant had copied the film while purporting to assess its value for possible purchase, and falsely had denied ever using the film, the court concluded that the defendant had no right to "bodily appropriate" the filmmaker's "expression" of information by utilizing portions of the film. 621 F.2d at 61-62. Finally, New Boston Television, Inc. v. Entertainment Sports Programming Network, Inc., 1981 WL 1374 (D. Mass. 1981) simply held that ESPN had no right to broadcast Red Sox "highlights" on its *Sportscenter* program without the consent of the owner of the copyrighted "expression" of the team's performance.