# EXHIBIT 1

Case 1:04-cv-12138-NG    Document 37-2    Filed 09/20/2006    Page 1 of 12

Page 1

VOLUME: 1

PAGES: 1-126

EXHIBITS: 29-49

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

CHRISTOPHER FITZGERALD,       ) CIVIL ACTION
　　　PLAINTIFF,                ) NO. 05-10403-DPW
V.                            )
CBS BROADCASTING, INC.,       )
　　　DEFENDANT.                )
_____)

DEPOSITION OF CHRISTOPHER J. FITZGERALD

DATE: JULY 20, 2006

TIME: 10:22 A.M.

PLACE: BINGHAM MCCUTCHEN, LLP

150 FEDERAL STREET

BOSTON, MA 02110

Page 2

```
 1            APPEARANCES
 2  COUNSEL FOR PLAINTIFF:
 3  Andrew D. Epstein, Esq.
 4  Barker, Epstein & Loscocco
 5  10 Winthrop Square
 6  Boston, MA 02110
 7  617.482.4900
 8  photolaw@aol.com
 9  COUNSEL FOR THE DEFENDANT:
10  Mary B. Murrane, Esq.
11  Bingham McCutchen LLP
12  150 Federal Street
13  Boston, MA 02110
14  617.951.8000
15  mary.murrane@bingham.com
16  ALSO PRESENT:
17  Josephne Deang
18
19
20
21
22
23
24
```

Page 3

```
 1              INDEX
 2  WITNESS            EXAMINATION BY       PAGE
 3  Christopher Fitzgerald    By Ms. Murrane      6
 4
 ...
24
```

Page 4

```
 1              EXHIBITS
 2  NUMBER    DESCRIPTION                              PAGE
 3  29        Amended Notice of Taking Deposition       20
 4  30        3/10/98 Stock Photograph Contract         57
 5  31        Job 4                                     81
 6  32        Invoice                                   81
 7  33        Income and Usage of Flemmi Photo          84
 8  34        Plaintiff's Answers and Objections        86
 9            to Defendant's First Set of Interroga-
10            tories
11  35        Plaintiff's Answers and Objections        86
12            to Defendant's Second Set of
13            Interrogatories
14  36        6/10/97 invoice                           92
15  37        6/26/97 invoice                           93
16  38        1/8/98 invoice                            93
17            1/8/98 letter to Stephen Baronovics
18  39        1/8/98 invoice                            94
19  40        1/11/98 invoice                           95
20  41        3/18/98 invoice and check stub            95
21  42        5/27/98 invoice                           96
22  43        6/12/98 invoice                           96
23  44        6/29/98 invoice                           96
24  45        8/24/01 and 7/8/01 letter to              97
```

Page 5

```
 1         EXHIBITS (CONT'D)
 2         Christopher Fitzgerald
 3  46     7/11/01 letter to Garo Lachinian         101
 4         and 7/15/01 letter to Christopher
 5         Fitzgerald
 6  47     copy of the check stub for exhibit 32    102
 7         which is a comprehensive invoice
 8         of several jobs for The Boston Globe
 9  48     7/17/01 letter to Garo Lachinian         102
10  49     Video                                    120
```

Page 6

1   PROCEEDING
2   (WITNESS ADMINISTERED OATH BY THE STENOGRAPHER)
3       MS. MURRANE: Good morning.
4       THE WITNESS: Good morning.
5       MS. MURRANE: We met yesterday but I'll give you
6   another introduction this morning. My name is Mary Murrane and,
7   as you know, I'm here on behalf of CBS Broadcasting, Inc. for
8   your deposition today. Mr. Epstein, I assume that we'll have
9   objections, except as to form and privilege, reserved until the
10  time of trial and also reserve motions to strike.
11      MR. EPSTEIN: That's fine. One of the things we did
12  not discuss yesterday was the reading and signing of the
13  deposition transcript.
14      MS. MURRANE: We would like to review and read and
15  sign yesterday's.
16      MR. EPSTEIN: That would be great and we'll do the
17  same. We have thirty days to read it once we receive it and
18  then sign it, but not necessarily before a notary. Is that
19  okay?
20      MS. MURRANE: That's fine.
21          DIRECT EXAMINATION
22  (By Ms. Murrane)
23      Q: Can you state your full name for the record, please?
24      A: Christopher J. Fitzgerald.

Page 7

1       MS. MURRANE: You kind of know the ground rules
2   because you were at yesterday's deposition, but I'll go over
3   them for you today. As you know, you just raised your hand and
4   your testimony here today is all under oath. We'll go for a
5   while and if at anytime you need a break, just let me know and
6   I'll stop at the next most logical spot and we'll take a break.
7   You should always be sure to speak clearly for the court
8   reporter so that she is able to take down all of your responses.
9   If I ask you a question and you nod your head that won't make
10  it into the transcript because it's not spoken.
11      THE WITNESS: I understand.
12      MS. MURRANE: And you'll need to make sure you say
13  things like: yes and no, instead of uh-hu because that will be
14  ambiguous on the transcript.
15      THE WITNESS: Okay.
16      MS. MURRANE: If you don't understand any question
17  that I ask you, if you could let me know that and I'll try to
18  rephrase it in a way that makes more sense to you. And if you
19  haven't told me you don't understand a question, I will assume
20  that you do and that you're responding in accordance with it.
21  To make a complete record we'll try not to step over each
22  other's questions and answers. I'll try to always wait until
23  you've fully completed your answer. Even if you know what the
24  last part of my question is going to be, it's sort of a slow

Page 8

1   process and you have to sit quietly by until I finish so that we
2   can make a clear record for the court reporter.
3       Q: Have you ever had your deposition taken before?
4       A: No.
5       Q: Have you ever given any testimony in a trial before?
6       A: No.
7       Q: Have you ever been a party to a lawsuit?
8       A: Yes.
9       Q: When was the first time you were a party to a lawsuit?
10      A: The first that CBS infringed upon my copyright.
11      Q: When was that?
12      A: 1998.
13      Q: What was the result of that case?
14      A: We came to a settlement.
15      Q: Have you ever been a party to any other lawsuit, other
16  than the one we're here for today?
17      A: Yes.
18      Q: What?
19      A: There were other infringements committed by other
20  televised media in Boston. Those parties.
21      Q: If we just work chronologically, which was the first
22  case in which you brought a lawsuit?
23      A: Are you referring to after CBS?
24      MS. MURRANE: No.

Page 9

1       THE WITNESS: Okay, the first one was CBS. The next
2   one I believe was Channel 56.
3       Q: Channel 56. When was that lawsuit filed?
4       A: 1998.
5       Q: What court?
6       A: I forgot what court it was.
7       Q: Do you know if it was state or federal?
8       A: I don't remember.
9       Q: Was it in Massachusetts?
10      A: Yes.
11      Q: Did you ever have a court appearance that you went to?
12      A: No.
13      Q: No?
14      A: No.
15      Q: Do you remember who the named defendant was?
16      A: It was, I believe it was the call letters of Channel
17  56, W something. I don't remember the exact letters.
18      Q: Were there any other defendants listed?
19      A: I do not remember.
20      Q: Were there any other plaintiffs other than you?
21      A: No.
22      Q: What was the basis for the lawsuit?
23      A: They infringed upon my Flemmi photos.
24      Q: And by the "Flemmi photos" do you mean the two

Page 10

1  photographs that were marked as exhibits 1 and 2 in yesterday's
2  deposition of Jennifer Street?
3      A: I believe it was the photo of Flemmi looking to the
4  left.
5      Q: Which was one of the exhibits yesterday?
6      A: Yes.
7      Q: You said that they infringed upon your copyright. Is
8  that right?
9      A: They illegally published the photo without my
10 permission.
11     Q: In what way did they publish the photo?
12     A: They gleaned it from the front page of the Boston
13 Globe and published it repeatedly.
14     Q: And by published it what do you mean?
15     A: They aired it on their news broadcasts.
16     Q: How many?
17     A: There was several violations. I don't know precisely
18 how many. I don't recall.
19     Q: More than five?
20     A: I don't recall.
21     Q: More than 20?
22     A: I do not believe it was that many.
23     Q: But more than one?
24     A: Yes.

Page 11

1      Q: What happened with that Channel 56 lawsuit?
2      A: It was settled.
3      Q: When was it settled?
4      A: Within a year or two afterwards.
5      Q: So 1999 or 2000?
6      A: I believe that is correct.
7      Q: What was the next lawsuit?
8      A: I believe it was Channel 7.
9      Q: When was that suit filed?
10     A: Approximately the same, around the late 1900s to early
11 2000. Somewhere in that area. I forgot the exact dates.
12     Q: 1998 to 2000, somewhere in there?
13     A: I believe it happened after the infringement by
14 Channel 56 in that case.
15     Q: What court was that lawsuit in?
16     A: I don't know.
17     Q: Do you know if it was state or federal?
18     A: I do not know.
19     Q: It was in Massachusetts?
20     A: Correct.
21     Q: Do you know if it was the same court where you filed
22 the lawsuit against Channel 56?
23     A: No.
24     Q: It was not the same court?

Page 12

1      A: I do not know.
2      Q: Did you ever make a court appearance in this Channel 7
3  case?
4      A: I did not make a court appearance.
5      Q: What was the subject matter of this lawsuit?
6      A: It was the infringement of my Steven Flemmi photo,
7  copyright infringement that is.
8      Q: Was it the same photograph that was the subject of the
9  Channel 56 lawsuit?
10     A: Yes.
11     Q: Where did Channel 7 obtain the photograph that was
12 aired?
13     A: From the Boston Globe.
14     Q: When did Channel 7 air the photograph at issue in that
15 lawsuit?
16     A: Off the top of my head I don't know the exact dates.
17 I mean there were multiple infringements. It wasn't just once.
18     Q: Do you know during what programs the photograph would
19 have been aired as it related to the Channel 7 lawsuit?
20     A: Channel 7 news.
21     Q: Was it aired more than five times?
22     A: I don't know the exact amounts.
23     Q: Less than 20?
24     A: I just don't know.

Page 13

1      Q: Less than 50?
2      A: I would presume that is correct.
3      Q: What was the resolution of the Channel 7 lawsuit?
4      A: It was settled.
5      Q: When did that settle?
6      A: I don't know the exact date. I don't know the exact
7  date.
8      Q: Can you tell me the approximate date?
9      A: After 2000, I'm thinking.
10     Q: Was there any after 2000?
11     A: I don't know the exact date.
12     Q: I'm not asking for the exact date. Before 2002?
13     A: I would say somewhere around then but I don't know the
14 exact date. I truly do not know it off the top of my head
15 unless I refer to documents.
16     Q: Was it before 2005?
17     A: Yes.
18     Q: Before 2004?
19     A: I don't want to go there because I don't want to say
20 something that's inaccurate. I don't want to make a presumption
21 that would prove to be wrong later on.
22     Q: So you know the lawsuit settled somewhere between the
23 four year span of 2000 and 2004?
24     A: Why don't we make it 1999 to 2004 just to be sure I

Electronically signed by AIDA MEDEIROS (001-110-266-3715)                    edcdb324-93b3-4bf3-9cfe-a9fb35e68ab9

Page 14

1  don't say something that isn't correct.
2      MR. EPSTEIN: Aren't all of these dates part of
3  Exhibit A that you have to the latest set of interrogatories,
4  Ms. Murrane?
5      MS. MURRANE: I don't know. We'll get to that.
6  Q: What's the next lawsuit that you filed?
7  A: I believe it was the Boston Herald.
8  Q: Approximately when did you file that lawsuit?
9  A: That was after 2000.
10 Q: Were you the only plaintiff in that lawsuit?
11 A: Yes.
12 Q: Was the Boston Herald the only defendant?
13 A: I believe it was the only defendant.
14 Q: I forgot to ask in the Channel 7 lawsuit were you the
15 only plaintiff?
16 A: Yes.
17 Q: And was Channel 7 the only defendant?
18 A: I believe it was the only defendant.
19 Q: What was the subject matter of the Boston Herald
20 lawsuit?
21 A: They infringed upon the copyright of my Flemmi photo.
22 Q: And the Flemmi photo, are we talking about the same
23 photos that were the subject of the Channel 56 and Channel 7
24 lawsuits?

Page 15

1  A: I believe it was the same photo.
2  Q: Do you know where the Boston Herald obtained the
3  photograph that it published?
4  A: It came from either myself or an agency that I had
5  that I gave license to photo through an agency.
6  Q: So can you describe how the use was, as you asserted
7  in the Complaint, an unlawful use of the photograph?
8  A: It appeared on their web site. I'm sorry, wait a
9  minute. Scratch that. I believe they used it once -- let me
10 think for a second here. Without going back to documents to
11 verify it, which I can do, I believe I licensed it to them
12 legitimately and then later they used a file photo without
13 permission and the file photo was also used on the web site
14 bostonherald.com.
15 Q: What was the result of that lawsuit?
16 A: A settlement.
17 Q: Do you know how recently that was settled?
18 A: After 2000.
19 Q: Before 2004?
20 A: Before April of 2004.
21 Q: What was the next lawsuit that you brought?
22 A: Boston Globe/Dateline NBC. Wait a minute. I don't
23 know if that was a lawsuit. I don't think that was a lawsuit.
24 They infringed on my copyright and I believe I just worked it

Page 16

1  out with them. I think that's what happened. In fact, I'm
2  almost certain that's what happened.
3  Q: So we're up to the lawsuit against the Boston Herald.
4  Do you know what the next lawsuit is that you filed?
5  A: I think that was the last one.
6  Q: Except for this one?
7  A: Yes.
8  Q: So we've got four lawsuits in total. Does that sound
9  right to you?
10 A: Yes.
11 Q: As a part of the Channel 56, the Channel 7, or the
12 Boston Herald lawsuit, did you ever sign any answers to
13 interrogatories?
14 A: I did not.
15 Q: And you didn't have your deposition taken?
16 A: I did not.
17 Q: Are there any other cases where you've been a
18 defendant or a plaintiff?
19 A: Not that I can think of.
20 Q: Have you ever testified or been consulted as an expert
21 in litigation?
22 A: No.
23 Q: Was your counsel for the Channel 56, Channel 7 and the
24 Boston Herald lawsuits Mr. Epstein?

Page 17

1  A: Correct.
2  Q: What's your current address?
3  A: 8 High Street, apartment number 4 in North Grafton,
4  Massachusetts 01536.
5  Q: Your phone number?
6  A: 508.839.5920.
7  Q: Do you have a separate work address?
8  A: I have a home office.
9  Q: Do you have a separate work phone number for that home
10 office?
11 A: No.
12 Q: Did you review anything to prepare for this deposition
13 today?
14 A: Yes.
15 Q: What did you review?
16 A: I reviewed the interrogatories from approximately one
17 month ago and I reviewed the chronology of events.
18 Q: What's the chronology of events?
19 A: What we just described in the last questions you gave
20 to me.
21 Q: Is that a document that you reviewed?
22 A: It was a summation that was submitted I believe as
23 part of the paperwork here. Amongst all the voluminous
24 paperwork I know I submitted that.

Page 18

1  Q: Is this the document that you reviewed to prepare for
2  today's deposition?
3  A: Yes.
4  Q: And is that what you mean by the chronology of events?
5  A: That and, I'm not referring only to the amounts of my
6  payments here. I'm referring to, for example, if someone called
7  me up what did I say to them on the phone. Things like that.
8  Q: Do you have a document that reflects all of these
9  different events?
10 A: I printed that out on my computer. Yes.
11 Q: Have you produced that to your lawyer for him to
12 produce to me in response to a document request?
13 A: Yes. No, no, wait a minute, no because it was dated
14 in 1998 and I just expanded on it.
15 Q: Is that something that you can provide to your lawyer
16 for production to me?
17 A: Yes.
18    MR. EPSTEIN: Objection. It may be prepared for me
19 at my request, so I'm not sure we're so quick to produce it.
20    MS. MURRANE: Well, if you can investigate that and
21 get back to me with an answer.
22    MR. EPSTEIN: If I feel that it is appropriate for
23 production, then we will certainly produce it, if we have not
24 already. We will produce it provided there's an appropriate

Page 19

1  request for the production of the document.
2     MS. MURRANE: I believe that it would be contained
3  within the two document requests that we've already produced to
4  you and would be responsive to that.
5     MR. EPSTEIN: I believe that I have produced
6  everything that is responsive to your document request. I
7  believe what Mr. Fitzgerald is talking about is something that
8  was prepared at my request as part of the work product for this
9  litigation.
10    MS. MURRANE: If you can just take a look at that
11 and let me know your position. Let's mark this as exhibit
12 number 1.
13    MR. EPSTEIN: What is it?
14    MS. MURRANE: Just the deposition notice.
15    (Exhibit No. 1 Marked)
16 Q: Mr. Fitzgerald, I've handed you what's been marked as
17 exhibit number 1, do you recognize that document?
18    MR. EPSTEIN: If we can go back one step. Is it
19 possible to continue the sequential --
20    MS. MURRANE: Numbering. As long as you know where
21 we left off.
22    MR. EPSTEIN: The last document was 28, so this
23 would be document number 29.
24    MS. MURRANE: That's fine.

Page 20

1     MR. EPSTEIN: It just makes it easier if we ever get
2  to trial on this.
3     (Exhibit No. 1 Re-marked as Exhibit No. 29)
4  Q: I've handed you what's been marked as exhibit number
5  29, do you recognize that document?
6  A: There's a different date on this document.
7  Q: Different date than what?
8  A: I believe, I don't recognize it. I'm sorry, rephrase
9  your question.
10 Q: Did you see a document that looks like this one that
11 had you scheduled you to appear on an earlier day for
12 deposition?
13 A: It resembles what I've seen in recent paperwork.
14 Q: And it's this document that brings you here for a
15 deposition today. Is that right?
16 A: Yes. The last time the date was different. We
17 cancelled last week.
18    MS. MURRANE: That's right.
19 Q: But this document has today's date on it?
20 A: Correct.
21 Q: And today's time, the day we started, the time we
22 started your deposition?
23 A: (No verbal response).
24 Q: So we were talking about what you reviewed to prepare

Page 21

1  for today's deposition and you said you reviewed the
2  interrogatory responses from about a month ago and a chronology
3  from your computer. What else?
4  A: After I reviewed the chronology I realized there was
5  an error in what I had submitted. We talked about that AP I
6  made a mistake on the date of to AP request for the Flemmi
7  photo. After I detected that error around 11:30 last night I
8  e-mailed my attorney to inform him and asked him to inform you.
9  Q: What other documents did you review in preparation for
10 today's deposition?
11 A: I reviewed a history of re-licensing to find out what
12 would be the most, what was the highest amount I earned on a
13 re-licensing arrangement.
14 Q: When you say you reviewed a history of re-licensing,
15 what do you mean?
16 A: I don't mean to say a history. I looked up the most I
17 ever made for a re-licensing of a photo unrelated to the civil
18 actions we had discussed.
19 Q: How did you do that?
20 A: I went into my computer. First I had an idea of what
21 the party was. I went into my computer into my digital
22 database. It came up on my database and that enabled me to find
23 out where the paperwork was from that licensing arrangement and
24 then I was able to access the information that way. It was done

Page 22

1  -- that's what I did.
2    Q: So are you able to go into your computer and printout
3  a list of licensing information for all of your photographs?
4    A: No.
5    Q: So for this you were looking at physical bills?
6        MS. MURRANE: I'm sorry, I just didn't follow the
7  answer.
8    A: I went into a database of photos looking for a
9  specific photo. When I find that photo it enabled me to
10 determine the approximate date of to licensing arrangement.
11 When I got that date I was able to go to the hard copy paperwork
12 in boxes in the closet and sift through it and find it.
13       (Counsel Confers with Witness)
14       MS. MURRANE: I'll just ask that you take a break if
15 you're going to speak to your client during the deposition. I'd
16 rather not have him coached during the middle of it.
17       MR. EPSTEIN: There were no questions. You were
18 writing and I thought it was an appropriate time to chat with my
19 client.
20       MS. MURRANE: I'm happy to take a break anytime you
21 need.
22       MR. EPSTEIN: I didn't think it was necessary to
23 take a long break for what I needed to say.
24       MS. MURRANE: I'm happy to take a short break

Page 23

1  whenever you need.
2    Q: So we've got the interrogatories, the chronology, the
3  history of re-licensing. What other documents did you look at?
4    A: I think that's it.
5    Q: Did you talk to anyone to prepare for today's
6  deposition, other than your attorney?
7    A: No..
8    Q: Can you tell me your educational history?
9    A: Yes. I attended Boston College, a degree in secondary
10 education.
11   Q: When did you graduate?
12   A: 1980.
13   Q: Where did you go to high school?
14   A: Millis High School in Massachusetts.
15   Q: Any post-graduate work?
16   A: None.
17   Q: I'll go through this quickly. When you graduated
18 college in 1980 did you start working after that?
19   A: Yes.
20   Q: Where were you employed?
21   A: State of Massachusetts.
22   Q: What was your position?
23   A: I was a instructor and then shortly thereafter a
24 supervisor within DYS, Department of Youth Services.

Page 24

1    Q: Can you give me a brief description of what your job
2  was?
3    A: Yes. We took adjudicated youth on outdoor hiking
4  expeditions modeled after Outward Bound.
5    Q: How long did you hold that position?
6    A: Two years. Positions.
7    Q: Positions. Instructor and then Supervisor. Correct?
8    A: Assistant Supervisor.
9    Q: Then what did you do?
10   A: I briefly freelanced as a photographer starting my
11 career, present career.
12   Q: How long did you do that?
13   A: Half a year, approximately.
14   Q: What did you do after that?
15   A: I became a staff photographer at the Milford Daily
16 News.
17   Q: At this point are we talking about 1983?
18   A: Yes.
19   Q: How long were you in that position?
20   A: It might have been late 1982 but I was in there
21 approximately two years.
22   Q: Did you take courses at Boston College in photography?
23   A: I did not.
24   Q: Self taught?

Page 25

1    A: Adult education.
2    Q: What did you do after you were a staff photographer at
3  the Milford Daily News?
4    A: I became a staff photographer at the Middlesex Daily
5  News and then I became the chief of photography at the Middlesex
6  Daily News.
7    Q: When were you promoted to chief of photography?
8    A: I believe it was in 1986.
9    Q: So after about a year?
10   A: It was around '86.
11   Q: How long were you at the Middlesex Daily News?
12   A: Four years.
13   Q: Until about 1990?
14   A: Approximately, yes.
15   Q: What did you do then?
16   A: I started freelancing for magazines and newspapers.
17   Q: How long did you do that?
18   A: To the current date.
19   Q: So since you started freelancing in 1990 you've been
20 self-employed?
21   A: Yes.
22   Q: Can you describe your business?
23   A: I am a portrait photographer on location.
24   Q: Tell me what that means?

Page 26

1  A: It means I go and bring the lighting and equipment to
2  the location of the subject, as opposed to the subject coming to
3  a studio.
4  Q: How long have you been a portrait photographer on
5  location?
6  A: Well, I've been doing portraits ever since I started
7  freelancing.
8  Q: You do work for magazines and newspapers. Is that
9  correct?
10 A: Currently I do just magazine work. I don't do
11 newspaper work anymore.
12 Q: When did you stop doing newspaper work?
13 A: Approximately 2001, I'm sorry, 2001 I believe,
14 approximately.
15 Q: Why?
16 A: I did not agree with the contractual, contract
17 disputes.
18 Q: Tell me what you mean by that?
19 A: My newspaper clients introduced contracts that I would
20 not agree to signing.
21 Q: What was it that you didn't agree with?
22 A: Matters of usage of the photos.
23 Q: Can you be more specific?
24 A: Yes. My previous arrangement with these clients was

Page 27

1  to provide a photo or photos for one time publication rights.
2  These clients demanded additional rights without extra
3  compensation. Accordingly, I severed my relationship with these
4  clients.
5  Q: What clients are these?
6  A: The Boston Globe, the New York Times, the LA Times and
7  the Washington Post.
8  Q: Prior to 2001 did you do work for magazines?
9  A: Yes.
10 Q: Prior to 2001 did you do freelance photography that
11 wasn't portrait photography on location?
12 A: Yes.
13 Q: What else did you do?
14 A: I did what may be described as news assignments for
15 newspapers.
16 Q: What does that mean?
17 A: It means covering general news, breaking news and
18 feature stories.
19 Q: When you say "cover", tell me what you mean by that?
20 A: It means receiving an assignment to go to a location
21 to photograph an event, or a circumstance, or a situation, or a
22 person.
23 Q: Did you ever do that kind of work for magazines or
24 just newspapers?

Page 28

1  A: On rare occasions.
2  Q: Who do your current clients include?
3  A: Woman's World, Barrons Financial Weekly, National Law
4  Journal. Those are my main ones.
5  MS. MURRANE: A bunch of lawyers.
6  THE WITNESS: I've also done the ABA Journal, not
7  lately but I've taken many photos in law firms.
8  Q: From 1990 to 2001 when your work included news
9  assignments for newspapers, how would new jobs come up?
10 A: If it was an out-of-state newspaper I would receive a
11 telephone call from the photo editor. If it was the Boston
12 Globe in the early years I would go into The Globe and be handed
13 several assignments, physical hard copy. In the later years
14 they would fax to me my assignments.
15 Q: How often would you get assignments from The Boston
16 Globe?
17 MR. EPSTEIN: What year are we talking about? That
18 period of 11 years?
19 Q: Let's start, well in the early days when you used to
20 go into the office and have them physically handed to you, how
21 often was it that you were going in to get those assignments?
22 A: Two or three days a week.
23 Q: Was the arrangement that you would know to come and
24 check in once in a while and see what they had or that they

Page 29

1  would call you on an as-needed basis?
2  A: They would call me up usually at the beginning of the
3  week. I would go in and there would be someone working the
4  photo desk and they would hand me several slips of paper, each
5  one representing an assignment.
6  Q: Did the two or three days a week in which you would
7  get assignments in hand for going to the news office change in
8  frequency over the years?
9  A: No.
10 Q: Until about 2001?
11 A: Yes.
12 Q: Do you ever take photographs that aren't a particular
13 assignment to you and market them?
14 A: On occasion.
15 Q: Can you think of any occasions when you've done that?
16 A: I went to Africa last year and took photos in
17 Zimbabwe.
18 Q: Any other occasions?
19 A: Yes. I did some hiking. In 2004 I did some
20 backpacking and submitted some nature photos.
21 Q: Anything other than travel or nature oriented photos?
22 A: Yes. Two or three years ago I covered a demonstration
23 in Boston.
24 Q: What was the demonstration?

8 (Pages 26 to 29)

Page 30

1   A: It was at the State House. The Gay Rights
2   demonstrations when they had that controversy in the Supreme
3   Court, the state Supreme Court rendered that decision.
4   Q: About gay marriage?
5   A: Yes.
6   Q: Were you able to market those photographs?
7   A: Yes.
8   Q: Who purchased them?
9   A: I don't know.
10  Q: You don't remember?
11  A: No. I submitted them to a stock agency and what
12  happens is a stock agency will send me a sales report and
13  sometimes the sales report might, I'm not sure if this is
14  completely accurate. Basically, it will say September sales or
15  something like that and it will tell you how much you earn from
16  it but it won't say everywhere it was used. Sometimes it'll say
17  in little tiny letters. I don't pay much attention to that.
18  Q: How do you set prices for the photographs you take?
19  A: This is on assignment?
20  Q: Is it different the way you set prices for on
21  assignment versus portrait photography?
22  A: Portrait photography will be on assignment, so it's --
23  MS. MURRANE: That's what I mean, on assignment.
24  THE WITNESS: I negotiate with the photo editor.

Page 31

1   Q: How do you decide where you start in your
2   negotiations?
3   A: The intended usage of the photo.
4   Q: Tell me what you mean by that?
5   A: I ask the photo editor how often they intend to use
6   the photo.
7   Q: Anything else?
8   A: If it's a cover photo it's going to be more than a
9   inside photo.
10  Q: Anything else?
11  A: As far as assignments, the circulation of the
12  publication plays a factor; is it profit, is it non-profit.
13  Q: Anything else?
14  A: I mean if it's a, how can I say this. You can have a
15  cover and you can have an inside story but sometimes you'll have
16  these supplements. You know what a supplement is, it's like a
17  pull out publication within a publication.
18  Q: Like the Calendar section of the Boston Globe?
19  A: You could say that, yes. If it's a cover for that
20  then that's going to have a different rate. It will be higher
21  than a conventional inside photo but less than a cover of a true
22  cover, if you know what I mean by that.
23  Q: Anything else?
24  A: That pretty much covers it.

Page 32

1   Q: Does the subject matter of the photo make a
2   difference?
3   A: The only time it could make a difference would be in
4   my expenses. If it requires extra travel, or props, or
5   something like that.
6   Q: How do you set pricing for re-use of a photograph?
7   A: There's a number of factors. Everything is
8   negotiable. The circulation of a publication. The type of use
9   of the photo, that being advertising, public relations, or
10  editorial. The space of a photo within a publication.
11  Sometimes the amount of copies that are produced, not copies of
12  the photo, the copies of a reprint run.
13  Q: So kind of like circulation?
14  A: There's different, when it comes to re-use there's all
15  kinds of uses. I use a book called "Negotiating Stock Photo
16  Prices". The book provides a long and detailed list of any
17  possible use and suggests, gives you an idea of what kind of
18  pricing is used, could be used. But again, everything is
19  negotiable. There's no set rate out there.
20  Q: Do you know who the author is of "Negotiating Stock
21  Photos"?
22  A: Yes. His name is Jim Pickerill.
23  Q: Can you spell that?
24  A: P-i-c-k-e-r-i-l-l.

Page 33

1   Q: Is this a book you can go to the bookstore and pick
2   up?
3   A: No, but I can provide you a telephone number to order
4   it.
5   Q: Who is Jim Pickerill?
6   A: He is a expert on stock photography.
7   Q: Where does he live?
8   A: I believe he lives in Virginia.
9   Q: So you said there are several different kinds of
10  re-uses. Is it fair to say by that you mean different mediums
11  and different kinds of print publications and that sort of
12  thing?
13  A: Yes.
14  Q: Can we talk about the factors you would consider in
15  setting a price for re-use of a photograph that's going to be
16  used in television?
17  A: Yes. I would consult the book, "Negotiating Stock
18  Photo Prices". I would go to the back of the book and look up
19  the television rates. That's it.
20  Q: Is there one rate for television?
21  A: No. It's divided up into local, regional and national
22  rates.
23  Q: Did you look up in this book the re-use of a
24  photograph on TV for the Boston area?

Page 34

1   A: Yes.
2   Q: Do you remember what that number was?
3   A: Could you rephrase that first?
4   Q: Sure. Have you looked up under "Negotiating Stock
5   Photos" at the back of the book television rates for the Boston
6   area on re-use of photos?
7   A: I'm going to try to answer by clarifying your
8   question. I've used the book for a photo, yes, not just for
9   local Boston area market rates but also I consulted the rates
10  for regional and national usages.
11  Q: Recently?
12  A: No.
13  Q: Do you know what those numbers are?
14  A: This is going to be approximate now. I believe it's
15  approximately $400 for local, $600 for regional, $650, I
16  believe. I think it's $800 to $1,200 for national and I'd like
17  to mention that it does say in the book that if you have a photo
18  that is perceived to be of greater news value it should be
19  priced higher. I may be somewhat off in that middle category.
20  I'd have to look it up to be sure.
21  Q: Does the book list any other considerations in
22  determining the price for re-use in television?
23  A: I believe it differentiates between editorial use and
24  advertising use.

Page 35

1   Q: And by "editorial use" do you mean for a news
2   publication, news program?
3   A: News is editorial. I mean editorial could be other
4   things too as long as there's no product being sold.
5   Q: Which would get a higher rate?
6   A: The advertising would receive a higher rate.
7   Q: So the market, the kind of use, editorial versus
8   advertising, and if the photo is of great news value. Are there
9   any other considerations in this book?
10  A: Are you talking about television now?
11      MS. MURRANE: Television re-use.
12      THE WITNESS: It's possible that he gives a category
13  in promotional uses which is kind of a vague, but I believe it's
14  primarily advertising or editorial.
15  Q: So we've got the type of these editorial, maybe
16  promotional advertising and then you can correct me if I'm
17  wrong, but I understood you to say that it would depend on both
18  the market and how wide the broadcast was going to be, local
19  versus regional versus national. Is that right?
20  A: Am I permitted to speculate here?
21      MS. MURRANE: Why don't I just rephrase the question
22  because I think it's an easy one.
23      THE WITNESS: I mean it's possible that, I don't
24  want to say with certainty but it's possible that he also lists

Page 36

1   viewership of a station, but I don't know. I believe it's
2   primarily the three categories: national, regional, or local.
3   I think those are the three primary benchmarks and then
4   advertising or editorial.
5   Q: You testified the book indicates that if there is a
6   photo that is of greater news value it should be priced higher?
7   A: That, yes. Yes.
8   Q: Are there any other factors that this book suggests to
9   take into consideration in pricing photographs for re-use on a
10  television station?
11  A: I don't know of any others.
12  Q: What else do you consider in pricing your photographs
13  for re-use in television?
14  A: May I interject something here? The book gets updated
15  every few years and reprinted and it evolves as technology
16  evolves. So I'm speaking of a earlier edition, the one that I
17  used. Just to let you know that.
18  Q: When did you buy your book, do you remember?
19  A: I'm probably on my third volume. I first bought it in
20  the 1990s sometime. I don't know the exact period, probably the
21  mid 90s.
22  Q: When is the latest volume you purchased?
23  A: I'm going to guess around 2002.
24  Q: So we'll go back. Those are all the factors that you

Page 37

1   can think of that the Negotiating Stock Photos book suggests to
2   consider in re-use of a photograph for television broadcast?
3   A: Yes.
4   Q: What do you consider in setting a price for re-use of
5   a photograph in a television broadcast?
6   A: I use the suggestions in the book.
7   Q: Anything else?
8   A: No.
9   Q: Have you ever negotiated re-use of a photograph for a
10  television broadcast?
11  A: Yes.
12  Q: Was the deal that you struck along the lines of what
13  was recommended in Negotiating Stock Photos?
14  A: Usually.
15  Q: When wasn't it?
16  A: When it comes to negotiating sometimes news producers
17  want additional rights, so it's not just one time broadcast use.
18  The book does not give me any guide beyond that. I have to
19  come up with my own and make my own decisions at that point.
20  Q: Tell me what factors you take into consideration in
21  coming up with your own decision on that point?
22  A: It's the producer or the representative of the
23  broadcast who is asking for those rights. I'm trying to think
24  how often that has happened. I think only twice I've had to do

Page 38

1  that. The first time was with 60 minutes and the second time
2  was with another broadcast national. They wanted, I think they
3  wanted the rights to re-use it again. I think that was it.
4      Q: In those two instances what factors did you take into
5  consideration in negotiating that re-use of the photos on
6  television?
7      A: I didn't introduce, what do you mean by "factors"?
8  I'm not trying to be difficult here. I'm not clear.
9      Q: Things like we discussed earlier that were in the book
10 could be, I mean you need to tell me, but what the region is,
11 the news value. How do you decide whether it should be worth
12 more or less money?
13     A: I base it on, you're asking me a question, you're
14 trying to do it in a broad stroke rather than specific
15 negotiations so it's hard to do that because they're all
16 different, each negotiation.
17     Q: I'll take that. You said there were two instances
18 where you had to negotiate something that was more than a one
19 time use for television broadcast. Right?
20     A: I vaguely recall one national media representative
21 wanting to use it a second time, so I negotiated a rate with her
22 which consisted of the initial negotiated rate and a percentage
23 higher for the second use. I can't give you that number. I
24 don't recall what it was now.

Page 39

1      Q: If we looked at that piece of paper that I pulled out
2  earlier today, would that refresh your recollection about what
3  it was?
4      A: Are you referring to the 60 Minutes negotiation?
5      Q: That list that I had earlier today and asked you if
6  that was the chronology?
7      A: I mean it's going to just give me the bottom line
8  figures. I don't know if I can tell right off by looking at the
9  bottom line figures. Perhaps but I don't know.
10     Q: Let's just go back. We've got two times. There's 60
11 Minutes where the agreement that you struck was more than a one
12 time re-use. Is that right?
13     A: Yes.
14     Q: And so you had to come up with it on your own for that
15 additional licensing agreement. Is that correct?
16     A: Yes.
17     Q: Can you tell me what you considered in how you came to
18 those pricing figures?
19     A: The representative from 60 Minutes gave me a short
20 list of additional rights that she wanted and we negotiated some
21 numbers for that, financial numbers for that and we agreed upon
22 them. That's as clear as I can be about it. I hope that's what
23 you're looking for.
24     Q: In negotiating those figures were there any things

Page 40

1  that you looked to to encourage them to pay you a higher price,
2  or that made you agree to a lower one?
3      A: It was the additional rights that she requested that
4  resulted in the higher price. That was it.
5      Q: Is it fair to say that generally you rely upon
6  Negotiating Stock Photos, the book?
7      A: Sometimes.
8      Q: When don't you?
9      A: Sometimes a magazine will call me and it's going to be
10 quarter page use and I'll just give them a figure off the top of
11 my head.
12     Q: And the figure off the top of my head where does that
13 come from?
14     A: A perception of what the industry is paying for
15 something like that.
16     Q: How do you arrive at your perception?
17     A: Reading trade magazines, reading photograph forums.
18 Going to an AS&P meeting, anything, well no scratch that last
19 one. They don't really talk about rates at an AS&P meeting.
20 Just keeping up in the industry.
21     Q: So occasionally sometimes for magazines you don't
22 consult the book?
23     A: Correct.
24     Q: Any other times you don't consult the book?

Page 41

1      A: I sometimes, sometimes when I get a request for
2  reprints.
3      Q: What's a request for reprints?
4      A: A reprint is when a, this is going to get a little
5  into detail. I take a person's photo who works at a business.
6  The photo is published in the editorial media. The person
7  decides he wants to use that photo in a marketing campaign in
8  which the article is copied hundreds or thousands of times and
9  put into a marketing kit and disseminated to potential clients.
10 They will contact the photographer to negotiate the rights to
11 include the photo in the copy of the reprints.
12     Q: Any other times you don't consult the Negotiating
13 Stock Photos book?
14     A: Occasionally I'll, sometimes of a non-profit calls. I
15 think that's pretty much it.
16     Q: Why don't you consult the book sometimes if a
17 non-profit calls?
18     A: (No verbal response).
19     Q: You only give them a deal because it's a non-profit
20 organization. You're being a good guy?
21         MR. EPSTEIN: If you want to characterize Mr.
22 Fitzgerald as a guy with a heart, go ahead.
23     A: When a non-profit calls I have to determine if it's a
24 non-profit that is full of people making a lot of money and is