Page 42

1  really using non-profit as a, how can I say this. Let me
2  scratch that. If you get a volunteer organization that wants to
3  use a photo there's no reason to get out books. You either give
4  it to them or if there's some kind of commercial thing going on,
5  you give them a reduction. And it's done very easily over the
6  phone. If it's a huge corporation and they're going to use it
7  for a big campaign then you need more of a guide, a benchmark to
8  start from. Then I will, I'll still cut them a percentage off
9  but then I would need a source book.
10     Q: So if it's the United Way versus your local Boy Scout
11  Troop?
12     A: Something like that.
13     Q: Any other times when you don't consult the book?
14     A: I know this is not a straight answer. There probably
15  are but I can't think of anymore.
16     Q: Is there anything that you can look at to think of
17  others?
18     A: Could you rephrase that?
19     Q: Is there any piece of paper that you could look at to
20  know the answer to the question?
21     A: Yes. I mean sometimes I've used something, are you
22  talking in context of what. Are you talking about just stock in
23  general now or are we talking about TV? I'm a little blurry as
24  to where we are.

Page 43

1     Q: We're talking global photographs, times that you don't
2  consult a book in setting a price?
3     A: I sometimes use an online estimator. It's called the
4  EP Estimator.
5     Q: Is that something you have to pay a fee to use?
6     A: No. I haven't used it in a while but I did for a
7  while. You go to a web site. It's a web site by a trade
8  organization and it's a way of determining reprint rates. It
9  consists of a formula of the usage of the photo within a
10  publication and the circulation and the advertising rate of the
11  potential client. You type in all these figures and it comes
12  out with a potential starting point in negotiation.
13     Q: For reprints?
14     A: For reprints.
15     Q: Who is the trade organization?
16     A: Let me just clarify. I believe it does more than
17  reprints but I've only used it for reprints. It's called
18  Editorial Photographers.
19     Q: Are there any other times you don't consult the book?
20     A: I think that's it.
21     Q: Are there any other resources that you turn to? We've
22  got the Negotiating Stock Photos?
23     A: For pricing we're talking about?
24     MS. MURRANE: For pricing, yes. And the EP

Page 44

1  Estimator web site.
2     THE WITNESS: No.
3     Q: No other resources?
4     A: (No verbal response).
5     MR. EPSTEIN: If we could take a break soon.
6     MS. MURRANE: I will take a break right now.
7     (Off the Record at 11:30 a.m.)
8     (Resume at 11:35 a.m.)
9     MS. MURRANE: Back on the record.
10     Q: How did you learn about the Negotiating Stock Photos
11  book?
12     A: I think I was at a convention of the National Press
13  Photographers Association but I can't say for sure.
14     Q: Years ago?
15     A: Yes.
16     Q: Is it fair to say that the prices for photographs on
17  assignment will vary depending on the medium that's going to use
18  it? So newspaper versus television?
19     A: Yes.
20     Q: Is it fair to say that most of your work is done for
21  print media?
22     A: Yes.
23     Q: Within the print media realm how would you split out,
24  if you can, categories of kinds of publication and pricing? So

Page 45

1  newspapers and magazines or --
2     MR. EPSTEIN: I'm sorry, could you repeat that
3  question, Mary. I'm not sure I got it.
4     Q: Within print media how would you split out, what
5  categories would you identify for medium that you sell
6  photographs to and charge different prices?
7     A: Using a broad stroke, newspapers would be the lower
8  category for pricing. Are we talking editorial?
9     MS. MURRANE: Let's just talk editorial.
10     THE WITNESS: Newspapers followed by magazines and
11  that's it.
12     Q: For editorial?
13     A: Yes.
14     Q: Is there a usual price that you would charge for a
15  photograph, and again we'll talk just editorial usage, in a
16  newspaper?
17     MR. EPSTEIN: Objection.
18     A: No.
19     Q: What would be the range?
20     MR. EPSTEIN: Objection again.
21     A: $150 to $250 for an assignment and I would negotiate
22  10% or 15% more if they want to put it online in their web site
23  in context with a story.
24     Q: Have you ever sold photographs that you've taken on

Page 46

1  assignment to newspapers for more than $250?
2      A: May I get a clarification here? Are you talking about
3  taking a photo after it's been published in the newspaper and
4  re-licensing it elsewhere?
5          MS. MURRANE: Let's talk about just the first use.
6          THE WITNESS: Are you talking about the client
7  newspaper that hires me? I don't understand your question.
8          MS. MURRANE: Let's start over.
9          THE WITNESS: If you could rephrase your question.
10         MS. MURRANE: I'll start all over.
11     Q: Not talking re-use. Talking photo assignments. How
12  do you get paid for those?
13     A: I perform the assignment, submit an invoice via mail
14  and a check arrives.
15     Q: How is the price figured for the assignment?
16     A: I negotiate with the photo editor.
17     Q: Is it under the rubric of this Negotiating Stock
18  Photos book we discussed earlier?
19     A: Not at all. That book is entirely for the
20  re-licensing the photos which occurs after the initial
21  publication.
22     Q: So how is it that you arrive at a price for the
23  initial assignment, the first photograph?
24     A: For a newspaper?

Page 47

1      Q: For a newspaper?
2      A: I base it at a lower rate because it requires less
3  work than a magazine job. Often that's the case.
4      Q: How would you define the photos that you take that
5  aren't portrait photographer on location photographs?
6      A: They're attending an event, going to an event. Let me
7  start over.
8      Q: I'm just looking for a term we can use to talk about
9  that idea?
10     A: Photography on location. I mean someone says go up to
11  New Hampshire and take a picture of covered bridges. There's no
12  people involved unless you want to have someone walk into the
13  foreground or something. How do you define that? It's
14  photography on location. It's going to the assignment, bringing
15  your gear, as opposed to having someone come to you.
16     Q: Can we differentiate between going to catch a photo of
17  Steve Flemmi as he's being handcuffed and carted off to going to
18  a law firm's office and taking a photograph?
19     A: I think I know, some photographers go to an event not
20  on assignment, shoot photos and it's called shooting photos on
21  speculation or shooting on spec, in short. I hope that's what
22  you were alluding to.
23     Q: I think we talked about that concept earlier and you
24  mentioned some nature and travel photographs that you had taken

Page 48

1  and that would be shooting photos on spec?
2      A: Correct.
3      Q: What I'm looking to find is a term we can use to
4  discuss today is one that differentiates between, both would be
5  assignments. One assignment would be the come to Bingham
6  McCutchen and take the portrait of Mary Murrane and the other
7  assignment would be to go down to the State House and cover a
8  meeting about the Big Dig as everybody is getting into their
9  limos and driving off.
10     A: I would characterize the first as being what's called
11  an environmental portrait. I would characterize the second as
12  being a general news assignment. Those are common terms in the
13  industry.
14         MS. MURRANE: That's what I'll use.
15     Q: So in setting prices for a news assignment what
16  factors do you consider?
17     A: I consider the labor, the usage, and the expenses.
18     Q: What do you mean by labor?
19     A: The amount of time it requires to bring in and out
20  equipment. Do I have to go and buy props. The time I'm going
21  to spend on the location. Weather. Occasionally that's a
22  factor.
23     Q: If you have to go shoot in the eye of a hurricane you
24  might charge more for that?

Page 49

1      A: I went up Mt. Monadnock and hiked in the middle of
2  July with photo gear. I mean something like that. That's not
3  so much a big issue. I'm just trying to give you as many, but
4  anyway.
5      Q: When you say "usage" tell me what you mean by that?
6
7      A: How the photo is going to be used and how often by the
8  magazine or the publication, whatever it may be.
9      Q: In this context I'm talking about a newspaper?
10     A: Newspaper. Almost, in fact, I have always handled
11  newspaper assignments as one time use.
12     Q: So in usage you consider how many times they want to
13  use the photograph. Correct?
14     A: It is one time use.
15     Q: Do you also consider, as we talked about before,
16  whether it's going to be on the front page of the inside or on
17  the front of a special section?
18     A: In most instances, well it depends on the publication.
19  In almost all instances with a newspaper, well for example, the
20  Boston Globe, the Boston Globe which was the newspaper I did
21  most of my work with I would bill them differently according to
22  what section the picture appeared.
23     Q: So Business section versus Living Arts versus front
24  section?

Page 50

1    A: Business versus Calendar versus a weekly zone.
2    Q: Do you mean anything else when you say you considered
3    usage?
4    A: Well, as I mentioned earlier, occasionally a
5    publication may want to put something on a sectional front.
6    I've occasionally done assignments for the Globe that were
7    non-editorial and that commanded a higher fee.
8    Q: Other than that do you mean anything else by usage?
9    A: Based on past experience or just my general attitude
10   now?
11   Q: Based on what you considered in setting --
12   A: Present tense?
13   Q: Well, you don't work with newspapers anymore.
14   Correct?
15   A: Correct.
16   Q: So it has to be past tense?
17   A: Then that would cover it.
18   Q: You said you also consider expenses. What do you mean
19   by that?
20   A: Travel, mileage, parking, film, lab, tolls, telephone.
21   Anything that is incurred in setting up the assignment.
22   Q: Parking tickets?
23   A: You know what, I pay for them myself. I don't want to
24   tick off the hand that feeds me.

Page 51

1    Q: Anything else that you consider in setting rate for
2    an assignment, a news assignment in a newspaper context?
3    A: I think that covers it.
4    Q: Can you tell me the range of prices for news
5    assignments for newspapers that you've charged?
6    A: What years? When I started freelancing after I became
7    a staff photographer?
8    Q: I assume when you were staff photographer you were on
9    a payroll and you got paid that way?
10   A: Yes, but are you talking about the New York Times, the
11   Boston Globe?
12       MS. MURRANE: Yes.
13       THE WITNESS: Okay. I believe the lowest rate I
14   charged and I hope I'm not making a mistake here because
15   there's different newspapers, different rates, and different
16   sections of the Globe. It can be confusing to remember all
17   this. I believe the lowest rate I charged was $150 and the
18   highest rate that's a hard one.
19       MS. MURRANE: You can approximate.
20       THE WITNESS: I'm going to have to back up a little
21   bit here. We're talking about the Boston Globe now. I could go
22   out on a quote, unquote "assignment" for the editor of the
23   Calendar section who will pay me $150. On the same afternoon I
24   could go out for the editor of the West Weekly section who will

Page 52

1    pay me $150. That evening I can go out on a job for the
2    Business editor who will pay me $250 for a sectional.
3    Q: I'm speaking per photograph?
4    A: Per assignment.
5    Q: Per assignment because you would shoot several
6    photographs?
7    A: That clarifies it. Between $150 and $250.
8    Q: Did you ever get more than $250 for an assignment,
9    news assignment for a newspaper?
10   A: Just a point of clarification. It's $150 to $250,
11   plus expenses.
12   Q: Plus expenses?
13   A: Yes. Did I ever get more? I don't recall. Well, is
14   Barrons Financial Weekly a newspaper or magazine?
15       MS. MURRANE: You tell me.
16       THE WITNESS: It's a journal. It's a hybrid, isn't
17   it? Well, I'm not asking you. You're asking me the questions.
18   I mean if Barrons Financial Weekly if I do a cover for them I'm
19   going to get, I don't do them that often but I've occasionally
20   done it. Over a thousand dollars. If I do an inside supplement
21   for them I'm going to get $600 I believe it is. So I mean they
22   don't happen that often but sometimes they do, but for most
23   assignments it's going to be $150 to $250.
24   Q: Have you ever had occasion to do a news assignment for

Page 53

1    television?
2    A: No.
3    Q: So any negotiations that you've had with something to
4    be used in television is always a re-use?
5    A: Yes. I think I have to backtrack there. I did a
6    shoot for I think it was the Discovery Channel. I don't
7    remember the rate I charged them.
8    Q: Any others?
9    A: I don't think so. It might just pop into *my head
10   like that one just did, but it's such a rare, I mean that may
11   have been the only one. I can't think of anything else. Wait a
12   minute, well I did one for Network, was it NBC or it might have
13   been CBS, but it wasn't for air. It was Stupid Petrex, Dave
14   Letterman. They had a trial here and they wanted I guess some
15   promotional photos of it. I think I might have done, was it
16   Stupid?
17       MR. EPSTEIN: You tell us.
18       THE WITNESS: I can't even remember anymore.
19   Q: But it wasn't in the context of editorial?
20   A: Correct.
21   Q: We went through, you might say ad nauseam, earlier the
22   factors that you consider in setting a price for re-use of a
23   photograph on television. Can you tell me how determining
24   re-use price for a photograph in a newspaper would differ from

Page 54

1  the process you described?
2       MR. EPSTEIN: Objection.
3       A: You're talking about renegotiating with a newspaper,
4  re-licensing with a newspaper?
5       MS. MURRANE: Yes.
6       THE WITNESS: The actual process would be the same.
7  I would be speaking on the telephone to a representative of the
8  publication. I would negotiate usages. It would be a similar
9  process.
10      Q: Would you consult the same sources?
11      A: Yes.
12      Q: Other than the sources that you consult, is there
13  anything else that you take into account in setting the price
14  for re-use of a photograph for a newspaper?
15      MR. EPSTEIN: Objection.
16      A: You've said, to quote you, we've gone through this ad
17  nauseam, so I've given you a lot and I think I've pretty much
18  have said everything that I know I would use as a source. I've
19  given you as much as I know. I don't know what else to say.
20      Q: That's why rather than going through all of them again
21  I'm asking you to tell me how newspaper would be different than
22  TV, or if it's the same kind of process, same considerations?
23      A: Yes. It's a telephone negotiation between two
24  parties.

Page 55

1       Q: And the factors that you consider in arriving at the
2  price would you look at the same materials and consider the same
3  types of factors that you did for television re-use that we
4  described earlier?
5       A: Well, I mean yes and no.
6       Q: Tell me how yes and no?
7       A: I'm not going to charge a, well with a newspaper I'm
8  going to use the source book. Excuse me, that's incorrect.
9  With the television I'm going to use the source book. I use the
10 source book for the television. For the newspapers I use the
11 source book and all other things that were mentioned previously.
12 So television is a narrower frame of reference for me. I'm
13 using a narrower frame of reference.
14      Q: In determining the price for re-use of a photograph in
15 an editorial context, is there an impact on the price based on
16 how many times that photo has run before?
17      A: It's possible. You can't generalize. Most
18 negotiations I would characterize as routine, but you can have a
19 photo every now and then that has a greater news value, hence a
20 greater monetary value.
21      MS. MURRANE: I think my question is a little
22 different.
23      Q: Is there an impact on pricing based on how many times
24 a photograph has already been used?

Page 56

1       MR. EPSTEIN: Objection.
2       A: Yes. I would imagine that this is true.
3       Q: What would that impact be?
4       A: If a photo has a wider exposure it will diminish in
5  value within the marketplace.
6       Q: You told me earlier that you went back to your records
7  and looked up what the highest re-use licensing fee was that you
8  had received. What was that fee?
9       A: It was approximately $2,500. It was for a reprint of
10 a photo.
11      Q: What was the photo?
12      A: And it was also for online use too. It was a photo of
13 a, you could describe the person as a fund manager.
14      Q: So this would be a photograph that was an
15 environmental portrait, not a news assignment?
16      A: Correct. Yes, correct.
17      Q: Can you tell me the most you've ever obtained for
18 re-use of a news assignment photograph?
19      A: I think $1,600. Wait a second, $1,600 I believe.
20      Q: What was that photograph?
21      A: Steven Flemmi.
22      Q: Who paid for that?
23      A: CBS.
24      Q: Was it 60 Minutes?

Page 57

1       A: Yes. I just want to clarify that in your paperwork
2  I'm sure you have the precise figure that I received for that
3  assignment. I'm thinking it's $1,600 but it could be $1,700 or
4  $1,800, but I think it was $1,600.
5       (Exhibit No. 30 Marked)
6       Q: Mr. Fitzgerald, I'm going to hand you what's been
7  marked as exhibit number 30 in this deposition and ask if you
8  recognize that document?
9       A: I do.
10      Q: What is it?
11      A: It is my Stock Photography Contract with 60 Minutes
12 for the use of the Steven Flemmi photographs.
13      MR. EPSTEIN: Could you hold on for one quick
14 second? Is that the same as exhibit 14 from yesterday?
15      MS. MURRANE: Could be.
16      MR. EPSTEIN: It's basically the same as yesterday.
17 This is my copy?
18      MS. MURRANE: Yes.
19      MR. EPSTEIN: Thank you.
20      Q: Does this document refresh your recollection about the
21 highest fee?
22      A: I notice this is $1,300, so I'm thinking that there is
23 another national broadcast that I did receive a higher
24 renumeration for.

Page 58

1  Q: Do you think that was in the range of $1,600?
2  A: I believe so, yeah. You would have that paperwork.
3  Q: What is it that I would look for in helping you
4  remember what that was?
5  A: It might have been America's Most Wanted but I'm not
6  sure if that's the one. It might have been Dateline, no that
7  was not. It might have been America's Most Wanted. I'm just
8  not sure.
9     MS. MURRANE: Let's take a look at this contract for
10 a little bit.
11 Q: Is that your signature there down at the bottom where
12 it says, "Christopher Fitzgerald"?
13 A: Yes it is.
14 Q: And you reviewed this contract and approved it. Is
15 that correct?
16 A: Yes.
17 Q: You understood what its terms meant?
18 A: Yes.
19 Q: Can you tell me paragraph number "1." where it starts
20 with the phrase, "For the sum of $800.00," what "non-exclusive
21 right to broadcast one single screen exposure of both photos on
22 one segment" meant?
23 A: It gives them the right to use one photo on one
24 segment of CBS. However, it does not give them the right to be

Page 59

1  the only publication that can re-use that photo.
2  Q: When we talk about the photos are we speaking of what
3  were marked yesterday as exhibits 1 and 2, which I'm handing you
4  a copy of now?
5  A: Correct.
6  Q: Does this contract relate to both of those photos?
7  A: Yes.
8  Q: Do you know if both of those photos were used by 60
9  Minutes?
10 A: They used one of those photos.
11 Q: Do you know which one?
12 A: They used the photo, exhibit number 1.
13 Q: Can you tell me what paragraph number "2." in exhibit
14 30 means?
15 A: Could I back up for a moment, please?
16    MS. MURRANE: Sure.
17    THE WITNESS: This contract grants them the right,
18 it pertains to both photos. However, according to this contract
19 they are permitted, they are licensed to choose one photo and
20 publish that one photo once. That's it. Could you please give
21 me your second question?
22    MS. MURRANE: Sure.
23 Q: Can you tell me what paragraph number "2." of this
24 contract means?

Page 60

1  A: This permits CBS, let me just read it again here.
2  This permits CBS to use the photos in a follow-up, broadcast,
3  single screen of the story.
4  Q: So would it be fair to say that it gives the right to
5  do a re-broadcast of what was granted in number "1."?
6     MR. EPSTEIN: Objection.
7  A: It gives 60 Minutes the right to air one more time in
8  context with the story.
9  Q: So if they ran a follow-up story about the Winter Hill
10 Gang they could use this photo one more time?
11 A: They can take the story, 60 Minutes with that same
12 person. The story that appeared on 60 Minutes they can
13 re-broadcast a second time.
14 Q: They can do a re-run?
15 A: Of that segment.
16 Q: In paragraph "1.", the right that was granted there
17 for a single screen exposure of one of the two photographs, how
18 much did you charge for that?
19 A: $800.
20 Q: How much did you charge for the right for a
21 re-broadcast?
22 A: $280.
23 Q: What does paragraph number "3." of that contract
24 provide?

Page 61

1  A: It permits them to take that same segment and
2  re-broadcast it in a follow-up broadcast internationally, that
3  being defined as outside the United States.
4  Q: How much did you charge for that?
5  A: $170.
6  Q: What does paragraph "4." of the contract provide?
7  A: They may include the photo in the same segment if it
8  appears in an airline broadcast.
9  Q: What did you charge for that?
10 A: $25.00.
11 Q: Does that limit how many airlines can use it or how
12 many times they can, how many different flights they can show it
13 on?
14 A: No.
15 Q: What does paragraph number "5." provide?
16 A: $25.00.
17 Q: What does the $25.00 pertain to?
18 A: That's granting them the right to include it on
19 airline broadcasts.
20    MS. MURRANE: That's number "4."
21    THE WITNESS: I'm sorry.
22    MR. EPSTEIN: Read the paragraph before you answer.
23    THE WITNESS: It allows them to, if 60 Minutes wants
24 to sell videos of that segment this licenses 60 Minutes to

Page 62

1  include the photos in those segments if they are in the videos.
2      Q: So as an example, if I called up 60 Minutes and wanted
3  to get a copy of the story in which this was aired they could
4  sell me that video and it could include the photograph?
5      A: Correct.
6      Q: And if XYZ Corporation called up for the same purpose,
7  they wanted to have a copy of that video from 60 Minutes, 60
8  Minutes could sell them that video?
9      A: Correct.
10     Q: And the money that you charged for that was $25.00?
11     A: Correct.
12     Q: That's a flat fee. That's not if I call up and Mr.
13 Epstein calls up and we both order copies, you don't get $25.00
14 twice?
15     A: That is correct.
16     Q: Can you tell me the range of prices that you charged
17 for re-use of a photograph from a news assignment used on
18 television?
19     MS. MURRANE: I think we've got the upper end at
20 $1,600.
21     A: It's an approximation but I know you have that in your
22 paperwork because I haven't licensed that many photos to
23 television. So I know that everything that I have re-licensed
24 was included in my response to your interrogatory. So I'm

Page 63

1  saying off the top of my head approximately $600 but I could be
2  off, below or above a little bit.
3      MS. MURRANE: We'll pull that out and you can look
4  at it and we can talk in specifics instead of memory.
5      Q: The lawsuit that you filed that brings us here today
6  involves just one photograph. Is that right?
7      A: It involves one photograph and possibly two.
8      Q: Which photograph does it definitely involve?
9      A: It involves exhibit number 1.
10     Q: Which photograph does it possibly involve?
11     A: Number 2 as well.
12     Q: And how does it possibly involve number 2?
13     A: At yesterday's interrogatory I saw two appear in
14 archives. I'm just not sure if, I'm just curious to know if 2
15 is still in the archives of CBS. I'm just not sure. I was a
16 little confused yesterday.
17     MS. MURRANE: Let's go back to the complaint in this
18 case.
19     Q: Can you tell me what the basis for the lawsuit that
20 you've brought, that brings us here today, is?
21     A: Yes. CBS 4 and UPN 38 and possibly the web site of
22 UPN 38 they stole my copyright and published it illegally.
23     Q: When you say "my copyright" what do you mean?
24     A: I'm referring to the copyright of my Steven Flemmi

Page 64

1  photo. exhibit number 1.
2      Q: Is there anything in the complaint regarding exhibit
3  number 2?
4      A: In the language of the complaint, I have to review it
5  again but both of those photos were submitted to 60 Minutes and
6  CBS 4 and UPN 38 obtained these photos from 60 Minutes.
7  Therefore, there's a relationship between both photos being
8  included in the complaint
9      Q: We can pull out the complaint if you need to look at
10 it, but is it fair to say the complaint centers around
11 allegations that CBS Broadcasting published photographs,
12 published images of exhibit number 1?
13     MR. EPSTEIN: Objection.
14     A: The complaint is because CBS 4, UPN 38 and the web
15 site stole my photos from CBS National and published them
16 illegally.
17     Q: What did they publish?
18     A: They published exhibit 1.
19     Q: Did they publish exhibit 2?
20     A: Not to my knowledge. However, I'm not convinced that
21 they haven't archived it and also was the -- that's enough. I
22 confuse myself.
23     Q: They published exhibit number 1?
24     A: Yes.

Page 65

1      Q: You're not aware that they published exhibit number 2?
2      A: I'm not aware that they published it but I'm concerned
3  that they may have archived it.
4      Q: From what?
5      A: I don't know from what.
6      Q: Have you reviewed any videotapes that were produced in
7  this litigation that show the exhibit number 2 photograph?
8      A: In deposition, yesterday's deposition.
9      Q: When did you see that?
10     A: Exhibit 11 I believe it was. It was the network
11 slices. It's 11 or 19. I've forgotten which one it is.
12     Q: Describe the video to me that you saw?
13     A: Yes. It was the last video we saw.
14     MR. EPSTEIN: May I see that, please?
15     THE WITNESS: It was defined, I believe, as network
16 slices. You might call it a hodge podge of images from the
17 pitrial. The reason I'm sure of this is because when we viewed
18 the first video during the deposition which showed the airing of
19 60 Minutes, every single time the Flemmi photo appeared I wrote
20 an arrow on my piece of paper pointing to the right because
21 Flemmi was looking to the right. Then you produced the pitrial
22 from the archives of CBS 4 in Boston and the picture of Flemmi
23 looking on the left appeared and that's why I became concerned.
24     MR. EPSTEIN: Let the record reflect that we were

17 (Pages 62 to 65)

Page 66

1 referring to exhibit number 10 in the Jennifer Street deposition
2 taken yesterday.
3    MS. MURRANE: I'm just going to have to ask some
4 questions to clear this up because I'm confused.
5    Q: You said we looked first at the video that showed the
6 original 60 Minutes story. Is that right?
7    A: Correct.
8    Q: And then we looked at a video that in yesterday's
9 deposition we described as the pitrial which was --
10    A: Those are your words right now.
11    MS. MURRANE: Let me finish the question. I just
12 want to clear it up.
13    THE WITNESS: I apologize for interrupting.
14    Q: Then we looked at a video that Mr. Epstein and
15 Jennifer Street was describing in that deposition as a pitrial
16 and what it actually was is a copy of the 60 Minutes broadcast?
17    A: No, that's incorrect.
18    Q: So the video that you're talking about is a video that
19 showed snippets of various news stories?
20    A: Correct.
21    Q: It was sort of --
22    A: It was a hodge podge.
23    Q: And it was a little jerky. There were black spots in
24 the middle and it showed several different stories?

Page 67

1    A: Yes.
2    MR. EPSTEIN: Objection.
3    THE WITNESS: It was the last video we saw. It was
4 marked as an exhibit. It was right after lunch. The first
5 thing we did after lunch.
6    Q: Describe the video to me again?
7    A: It was a hodge podge of photos relating to the local
8 Flemmi coverage. I believe the Flemmi photo appeared once. I
9 just noticed that when it appeared it was exhibit 2 rather than
10 exhibit 1 and I said to myself why is that photo appearing as
11 well.
12    Q: The Flemmi photo only appeared once on this hodge
13 podge of coverage?
14    A: It appeared.
15    Q: Several times?
16    A: I'm getting confused now. My point is this. Both
17 exhibits have appeared in the video you produced for deposition
18 and I was surprised to see this one as well.
19    MS. MURRANE: That's what I'm trying to clear up
20 because it's just not the case. Can we go off the record for a
21 second?
22    (Off the Record at 12:24 p.m.)
23    (Resume at 12:25 p.m.)
24    Q: So your memory is the videotape that causes you

Page 68

1 concern is the last one that was played during the deposition of
2 Jennifer Street?
3    MR. EPSTEIN: Objection.
4    A: No. My primary concern is the video that was pilfered
5 from the 60 Minutes broadcast, excuse me the photo that was
6 pilfered from the 60 Minutes broadcast.
7    MS. MURRANE: We're trying to clear up which video
8 it is that you saw yesterday where you understood, where you saw
9 a picture of Flemmi, the one that is on exhibit number 2. I
10 just want to clear up what video that was and where that video
11 came from.
12    Q: Tell me when that video was played during the
13 deposition?
14    A: After lunch. Right after lunch.
15    Q: Was it the last video that was played that day?
16    A: I believe it was.
17    Q: So I've got here what were marked as exhibits number
18 10 and 11 in the Jennifer Street deposition. Number 10 has a
19 note on it that says, "illustration of Flemmi". Do you remember
20 watching a videotape yesterday that showed an "illustration of
21 Flemmi"?
22    A: I remember seeing an illustration of Flemmi. I know
23 it was passed around as a hard piece of paper. Yeah, I'm
24 starting to, I mean vaguely. I saw a lot and listened to a lot

Page 69

1 yesterday. I saw illustrations of Flemmi.
2    Q: And you saw it on this video?
3    A: I don't recall now.
4    Q: And then I've got what's been marked as exhibit number
5 11, which is the last number of the videotapes we've got from
6 yesterday. Can you tell me what the spine of that exhibit
7 number 11 says?
8    A: "WBZ Flemmi photos".
9    Q: Do you know whether this video was produced by CBS or
10 if it's something that was within your lawyer's office?
11    A: I do not know the difference.
12    Q: And if I represented to you that this is not a video
13 that was produced by CBS, does that make any difference in your
14 previous answer about number 2?
15    A: Yes.
16    Q: What's the difference?
17    A: I don't know.
18    Q: You don't know?
19    A: No.
20    Q: It makes a difference but you don't know what the
21 difference is?
22    MR. EPSTEIN: I just need to clarify this. When you
23 say it was not produced by CBS, do you mean it was not produced
24 by CBS in this 2004 lawsuit?

Page 70

1   MS. MURRANE: Yes.
2   MR. EPSTEIN: Or, that it was not produced by CBS in
3   the 1998 lawsuit?
4   MS. MURRANE: It was not produced by CBS in this
5   2004 lawsuit.
6   MR. EPSTEIN: But you're not discounting the fact
7   that it may have been produced by CBS as part of the 1998
8   lawsuit?
9   MS. MURRANE: No, I'm not.
10  THE WITNESS: So what's the question you're asking?
11  Q: Are you bringing any claims based on use of exhibit
12  number 2?
13  A: No.
14  Q: So we've got one photograph at issue in this lawsuit?
15  MR. EPSTEIN: That we know about.
16  A: That we know about, yeah.
17  MS. MURRANE: I'll let the witness answer.
18  MR. EPSTEIN: He already testified to that.
19  Q: When did you see exhibit number 1 broadcast in a
20  circumstance that gave rise to this 2004 lawsuit?
21  MR. EPSTEIN: Objection. I'm instructing the
22  witness not to answer that question.
23  Q: Did you see exhibit number 1 in a broadcast as it was
24  broadcast on television live?

Page 71

1   A: Yes.
2   Q: Which broadcast?
3   A: 60 Minutes.
4   MS. MURRANE: No, no, no, I'm sorry, bad question.
5   Let's do it this way.
6   Q: On June 24, 2004 did you watch the 11:00 o'clock CBS 4
7   news program?
8   A: No.
9   Q: On June 25, 2004 at 1:35 in the morning did you watch
10  the CBS 4 news program?
11  A: No.
12  Q: On June 25, 2004 at 5:00 a.m. did you watch the CBS 4
13  news program?
14  A: No.
15  Q: On June 25, 2004 at 6:00 a.m. did you watch the CBS 4
16  news program?
17  A: No.
18  Q: And on June 25, 2004 at 7:00 a.m. did you watch the
19  UPN news program?
20  A: No.
21  Q: Did you go to the CBS 4 web site on June 24, 2004?
22  A: No.
23  Q: Did you go to the CBS 4 web site on June 25, 2004?
24  A: No.

Page 72

1   Q: Did you go to the CBS 4 web site anytime in the month
2   following June 24, 2004?
3   A: No.
4   Q: Did you go to the UPN web site on June 24, 2004?
5   A: No.
6   Q: Did you go to the UPN web site on June 25, 2004?
7   A: No.
8   Q: Did you go to the UPN web site anytime in the month
9   following June 24, 2004?
10  A: In the month following you said?
11  MS. MURRANE: Yes.
12  THE WITNESS: No.
13  Q: Have you ever gone on the CBS web site?
14  A: Yes.
15  Q: Have you ever seen a Flemmi photograph on that web
16  site?
17  A: No.
18  Q: Have you ever gone on the UPN 38 web site?
19  A: Yes.
20  Q: Have you ever seen a Flemmi photograph on the UPN 38
21  web site?
22  A: No.
23  Q: Do you have a recording of the news broadcast from
24  11:00 o'clock on CBS 4 for June 24, 2004 that was not produced

Page 73

1   by my client in this case?
2   A: It's confusing.
3   Q: Do you have your own copy of the news broadcast from
4   June 24, 2004 at 11:00 o'clock?
5   A: No.
6   Q: Do you have your own copy of the June 25, 2004 1:30
7   a.m. CBS 4 news broadcast?
8   A: I do not.
9   Q: Do you have your own copy of the June 25, 2004 5:00
10  a.m. CBS 4 news broadcast?
11  A: No.
12  Q: How about the June 25, 2004 6:00 a.m. CBS 4 broadcast?
13  A: No.
14  Q: And how about the June 25, 2004 7:00 UPN 38 broadcast?
15  A: No.
16  Q: When do you understand that the Flemmi photos ran?
17  A: They ran during the spring of 2004.
18  Q: What date?
19  A: I don't know the specific dates.
20  Q: What did you look at to refresh your recollection on
21  the dates?
22  A: Materials from my attorney.
23  Q: How about the complaint?
24  (Brief Pause While Witness Reviews Document)

Electronically signed by AIDA MEDEIROS (001-110-266-3715)    edcdb324-93b3-4bf3-9cfe-a9fb35e68ab9

Page 74

1    THE WITNESS: Do you want me to stop when I reach
2  these points as I'm reading this, or what do you want me to do
3  here?
4    MS. MURRANE: I'll give you a question and you can
5  tell me when you know the answer to the question.
6    Q: What dates did the Flemmi photographs run on CBS or
7  UPN 38?
8    MR. EPSTEIN: Why don't you read the whole document
9  first and then you can answer the questions, rather than doing
10 it when you find the answer to the question. Just a suggestion.
11   THE WITNESS: Read through the whole document and
12 then go back?
13   MR. EPSTEIN: Sure.
14   THE WITNESS: Can I check off a spot where the
15 answers are?
16   MR. EPSTEIN: Not on this. No, you can't. I can
17 give you a post-it note.
18   (Brief Pause While Witness Reviews Document)
19   THE WITNESS: It's referring to section 5. Would
20 you like me to read it?
21   Q: No, I'd like you to tell me when the Flemmi
22 photographs ran?
23   A: "On numerous occasions, including but not limited to,
24 June 24, 2004 and June 25, 2004."

Page 75

1    Q: When did they run? What times?
2    A: I don't know the specific times off the top of my
3  head.
4    Q: Do you know them at all?
5    A: I don't know the specific times off the top of my
6  head.
7    Q: Do you know where they ran?
8    A: During the news broadcasts, some of them. I don't
9  know every one.
10   Q: Did they run on every news broadcast?
11   A: I do not know.
12   Q: Do you know if they ran on one news broadcast?
13   A: I don't know. I know they ran one, yes.
14   Q: Do you know if they ran more than one?
15   A: Yes.
16   Q: How many?
17   A: I don't know.
18   Q: How do you know they ran more than one?
19   MR. EPSTEIN: Objection. I'm going to instruct the
20 witness not to answer.
21   Q: Do you know if they ran more than two?
22   A: Yes.
23   Q: Do you know when they ran?
24   A: I don't know the specific dates.

Page 76

1    Q: Do you know whether it was evening or morning?
2    A: I believe it was both.
3    Q: Evening and morning?
4    A: Yes.
5    Q: And is this because you've reviewed videotapes of
6  those newscasts?
7    A: It is because I have seen, visually seen the web site
8  copy and I've been informed of this fact that it was ran on the
9  television.
10   Q: Is there anything in your possession that evidences
11 whether these photographs ran?
12   A: No.
13   Q: Do you know --
14   MR. EPSTEIN: Excuse me, just to clarify, ran on
15 television or on the web site?
16   MS. MURRANE: Yes.
17   Q: Do you have anything that evidences whether these
18 photographs ran on television?
19   A: No.
20   Q: Do you know if exhibit number 1 ran on UPN?
21   A: Yes.
22   Q: How?
23   A: I was informed.
24   Q: When did it run on UPN?

Page 77

1    A: I do not know the specific date.
2    Q: Do you have anything that evidences whether exhibit
3  number 1 ran on UPN 38?
4    A: No.
5    Q: Have you reviewed the video that CBS produced in
6  response to their document production of any broadcast from
7  either June 24th or 25th of 2004?
8    A: I have a vague recollection.
9    Q: A vague recollection of what?
10   A: Of viewing it.
11   Q: And it would be the one newscast that was on video
12 produced by CBS Broadcasting?
13   A: I think so.
14   Q: Do you know what news broadcast that was?
15   A: No.
16   Q: Do you know if that was CBS 4 or UPN 38?
17   A: I believe it was CBS 4 but I can't state with
18 certainty.
19   Q: I'm going to hand you what was marked as exhibit
20 number 26 in yesterday's deposition of Jennifer Street and ask
21 if you know what that document is?
22   A: It is the picture of the Flemmi photo appearing
23 online.
24   Q: Online where?

Page 78

1  A: I believe it's Channel 39, UPN.
2  Q: How do you believe that?
3  A: From the deposition.
4  Q: Is there anything on this document that indicates it's
5  from Channel 38?
6     MR. EPSTEIN: Would it help to look at the original
7  exhibit?
8     (Brief Pause While Witness Reviews Document)
9  A: It's Channel 4 according to what I'm looking at now.
10 Q: Other than what's been marked as exhibit 26, do you
11 have anything else that evidences use of exhibit number 1 on the
12 CBS 4 web site?
13 A: I'd have to ask my attorney about that. He has all
14 the materials.
15    MS. MURRANE: We'll get to the document productions
16 in a little bit.
17 Q: You never personally went and looked at this web site?
18 A: As it appears in front of me now on this sheet of
19 paper?
20    MS. MURRANE: No, no, no. You looked at this piece
21 of paper. I know that.
22    THE WITNESS: I've visited CBS 4 and UPN 38, yes.
23 Q: Did you ever seen this photograph when you visited the
24 site?

Page 79

1  A: I have not seen that photograph when I visited the
2  site.
3  Q: At sometime did The Globe call you to do a news
4  assignment related to Steven Flemmi?
5  A: Yes.
6  Q: When was that?
7  A: January of 1995.
8  Q: In 1995 how were you getting assignments from The
9  Globe?
10 A: Sometimes by phone. Sometimes I'd have to drive in
11 and be handed the assignments. You might describe it as the
12 period between when I used to almost always go in and drive and
13 they started to phone me.
14    MS. MURRANE: Can we go off the record for a second?
15    (Off the Record Discussion)
16 Q: What did The Globe tell you about this assignment?
17 A: They told me that they had received a tip, a news tip
18 about a mobster having been arrested. They didn't know where
19 this mobster was being held but according to the tipster,
20 according to their belief he was being held in a State Police
21 barracks somewhere and it was their intention to stake out some
22 State Police barracks. If the suspect was brought out they
23 would have a photographer available at those barracks. They
24 assigned me to stake out the Framingham State Police barracks,

Page 80

1  so I got there in the morning and I hung around outside and
2  checked in with the desk and just basically waited to see if a
3  suspect would come out.
4  Q: What happened?
5  A: I kind of got a heads up from the person behind, you
6  might describe it a desk sergeant, that a suspect was going to
7  come out. During the morning they brought him out and he was
8  accompanied by a couple of State Police officers and I
9  photographed him being walked from the front of the barracks to
10 a cruiser.
11 Q: How many shots did you get?
12 A: I believe, you know what I can't say for sure. I mean
13 I'm walking backwards and I've got a few seconds to get this.
14 Perhaps the accurate way I could answer the question is by
15 saying not how many I shot but how many I got in focus on him
16 looking. I would answer that two. There may have been a couple
17 before and after where it was out of focus or he was just
18 looking the other way, or something like that. But I got two
19 clear shots of Mr. Flemmi.
20 Q: Are those exhibits 1 and 2?
21 A: Yes.
22 Q: How much did you get paid for this news assignment?
23 A: I received $150.
24    MS. MURRANE: We'll mark these as the next two.

Page 81

1     (Exhibit Nos. 31 and 32 Marked)
2  Q: Which one is which?
3  A: 31 is Job 4 and 32 is an overall invoice.
4  Q: Exhibit number 31, do you recognize that document?
5  A: Yes. This is the specific line item invoice for that
6  assignment for The Boston Globe involving the Flemmi photo.
7  Q: Who created this document?
8  A: I did that.
9  Q: What does it represent?
10 A: It represents my remuneration for having taken the
11 photos of Steven Flemmi.
12 Q: We see on here a fee of $150 for the assignment. Is
13 that right?
14 A: Plus expenses.
15 Q: And then the expenses are the film, mileage, tolls,
16 parking, phone?
17 A: Correct.
18 Q: For a total of $174.95?
19 A: Yes.
20 Q: Then what's exhibit number 32?
21 A: That is a compilation of invoices from several jobs
22 handled for The Boston Globe during that approximate period of
23 time.
24 Q: And job number 4 is the Flemmi assignment?

21 (Pages 78 to 81)

Page 82

1   A: Correct.
2   Q: It shows the same total. It all matches up to exhibit
3   31?
4   A: (No verbal response).
5   Q: Is there any other documentation reflecting job number
6   4, this assignment for The Globe?
7   A: There's a copy of the check stub.
8   Q: Anything else?
9   A: No.
10  Q: Is there any agreement, any written agreement on who
11  owns the photograph?
12  A: No.
13  Q: Is there anything in writing that lays out how The
14  Globe can use the Flemmi photograph?
15  A: No. Let me just backtrack a moment there. In the
16  pause I was thinking. I mean after that date there is paperwork
17  because The Globe and Dateline had a, they used my, The Globe
18  gave the photo to Dateline and as a result I received a payment.
19  So there might be some paperwork relating to, you know,
20  reminding The Globe that this is one time use. You can't be
21  giving this photo to other people. That happened after all
22  that. After the assignment. I just want to be accurate to
23  answer your question. So when you say is there any paperwork or
24  documentation how The Globe can use it, there may in fact be a

Page 83

1   reminder to The Globe later on that regarding the paperwork when
2   they gave it to Dateline.
3   Q: In answer to the question of whether there's any
4   written agreement about who owns the photograph?
5   A: There is no written agreement.
6   Q: And in answer to the question of whether there's any
7   written agreement regarding use of the photograph?
8   A: I would not call it, there is no written agreements,
9   no.
10  Q: Did one or both of one the photographs that are in
11  exhibits number 1 and 2 run the next day in The Boston Globe?
12  MR. EPSTEIN: Which is the next day, after they were
13  taken?
14  MS. MURRANE: Yes.
15  A: There was a photo that appeared on the front page of
16  The Boston Globe.
17  Q: Do you have a copy of that Boston Globe in your files?
18  A: I do.
19  Q: Did you provide a copy of that to your attorney to be
20  produced in this matter?
21  A: My impression was that he had a copy from the last
22  lawsuit, so why send him another one. I figured he would just
23  automatically include it.
24  Q: Is this it?

Page 84

1   A: No. That I believe is a subsequent file use of the
2   photo by The Boston Globe, if indeed that's The Boston Globe.
3   I can't even tell. The Globe used it several times after the
4   front page use.
5   Q: Would you recognize the front page use if you saw it?
6   A: Oh, yes.
7   MR. EPSTEIN: Just to interject, I don't believe
8   I've provided you with a copy of the front page and I'm not sure
9   I have one in my file. So just to remind Mr. Fitzgerald, if you
10  do have a copy of the front page send it to me and I in turn
11  will produce it.
12  MS. MURRANE: If it's not that one, I don't think I
13  have it.
14  MR. EPSTEIN: That is not. That's subsequent use by
15  The Globe.
16  MS. MURRANE: I think this is a good spot to take a
17  break for lunch.
18  (Lunch Recess at 12:53 p.m.)
19  (Resume at 1:42 p.m.)
20  MS. MURRANE: I would like to mark this as an
21  exhibit.
22  (Exhibit No. 33 Marked)
23  Q: Mr. Fitzgerald, the court reporter has handed you
24  what's been marked as exhibit 33. Can you tell me what that

Page 85

1   document is?
2   A: It is a record of my earnings from the re-use of The
3   Boston, from the re-use of the Steven Flemmi photo.
4   Q: So of exhibits 1 and 2?
5   A: It's also a record of my payment for that assignment
6   as well.
7   Q: And for exhibits 1 and 2?
8   A: (No verbal response).
9   Q: These two?
10  A: Yes.
11  Q: It's not for any other Flemmi photograph?
12  A: No.
13  Q: And you put this information together?
14  A: Yes.
15  MR. EPSTEIN: Let me just clarify. I'm not sure
16  that he put it together. I think it may have been prepared in
17  my office but I think it was done in response to either an
18  interrogatory, probably an interrogatory.
19  Q: At some point in time you received actually two
20  requests, two interrogatories from my office. Is that correct?
21  A: I just remember getting a lot of paperwork I would
22  define as voluminous and answering everything I got. So I'm
23  going to assume that what you referred to is included in that.
24  MS. MURRANE: We'll mark these as the next two.

Page 86

1  (Exhibit Nos. 34 and 35 Marked)
2  MR. EPSTEIN: Is there a question before Mr.
3  Fitzgerald?
4  MS. MURRANE: Not yet.
5  MR. EPSTEIN: Take your time and review these if you
6  haven't them, even if it takes you a half an hour.
7  Q: Mr. Fitzgerald, I'm just going to ask if you recognize
8  what have been marked as exhibit numbers 34 and 35?
9  A: I believe these are the interrogatories I received
10 approximately a month or two ago. Wait a minute, no. I
11 received them I think it was earlier in the year. This is one
12 of the more detailed ones, time-consuming ones.
13 Q: Let's flip to the last page of exhibit 34. And on
14 that page is that your signature there?
15 A: Yes.
16 Q: What's the date of that?
17 A: 27th of January, 2006.
18 Q: What does your signature represent on this document?
19 A: An affirmation that I've responded to it.
20 Q: So you provided the information for these
21 interrogatories?
22 A: Yes.
23 Q: Then for exhibit number 35 do the same thing, flip to
24 the last page, and is that your signature on the last page

Page 87

1  there?
2  A: Yes.
3  Q: What's the date of that?
4  A: The date is the 19th of July, 2006.
5  Q: That's yesterday?
6  A: Correct.
7  Q: So these two are both sets of interrogatories that you
8  responded to and signed?
9  A: Yes.
10 Q: In your answers to interrogatories, specifically the
11 second set which is exhibit number 35, there were some questions
12 asked about what in that document was exhibit A but what here
13 today is exhibit 33. Do you see that in interrogatory number
14 "12."?
15 A: I'm a little confused here. 33 is the list of income
16 and the question is?
17 Q: In interrogatory number, flip back one page --
18 A: 12 here.
19 Q: There are some questions that are asked that relate to
20 that document, exhibit 33?
21 A: Okay.
22 MR. EPSTEIN: Do you understand? Exhibit A is the
23 same as exhibit 33.
24 THE WITNESS: Okay.

Page 88

1  MS. MURRANE: If you need to take a moment to read
2  it that's fine.
3  THE WITNESS: But what is your question now?
4  MR. EPSTEIN: That was the question. Do you
5  understand that Exhibit A is Exhibit 33?
6  THE WITNESS: Okay, I understand now.
7  Q: One of the questions in interrogatory number "12." was
8  whether exhibit number 33 is a complete and accurate list of all
9  uses of the photograph and your response was that other than use
10 by CBS 4 and UPN 38 and CBS Broadcasting, you have no knowledge
11 of other unauthorized or authorized uses. Correct?
12 A: I would lump together UPN 38, I mean the web site use
13 as well in that list.
14 Q: So that's not on exhibit 33?
15 A: Your exceptions mention the web site. That to me is
16 another, yes. Otherwise, yes.
17 Q: And in interrogatory number "12." in subparagraph "a."
18 I ask whether exhibit 33 is a complete and accurate list of all
19 written and oral licensing agreements, contracts, or other
20 agreements entered into with any person with respect to the
21 photograph and your response in the interrogatories is, "I
22 believe so." Is that correct?
23 A: Yes. I just realized that I do have an agency that
24 would license the photo if someone would still use it again.

Page 89

1  For example, the Funny sale was done through this agent, the
2  Herald sale. So the sale is registered. It just went through
3  an agent.
4  Q: So with respect to whether --
5  A: Otherwise, yes. I mean all the record of transactions
6  here is accurate to the best of my knowledge.
7  Q: Interrogatory number "12." response to subparagraph
8  "a." whether exhibit number 33 contains all written and oral
9  licensing agreements, contracts, or other agreements entered
10 into with any person with respect to the photograph, you've
11 identified an agreement you have with a stock agency for
12 potential future use, but you know of nothing else?
13 A: Yes, that is accurate.
14 Q: And is there anywhere else that you could go to and be
15 certain that this list is actually complete?
16 A: I mean the list is based on my records and my
17 recollections. It's based on my records.
18 Q: Have you exhausted every effort that you could to make
19 this list complete?
20 A: Yes. I'm getting into real fine detail here but this
21 is what we're here for, I suppose. When the Flemmi photo
22 became, when the interest became significant in the Flemmi
23 photo, after the FBI scandal was unveiled, I did contact a stock
24 agency in Rhode Island and encouraged them to call some

Electronically signed by AIDA MEDEIROS (001-110-266-3715)

edcdb324-93b3-4bf3-9cfe-a9fb35e68ab9