Page 90

1  magazines about it. It was just an oral suggestion made over
2  the phone and that was, I didn't put that in that. I didn't
3  think to. There was no transactions that resulted from that but
4  since clause A wants a list of all written and oral agreements,
5  contracts, or other agreements, technically that would fall into
6  that category. But that agency is no longer dealing with the
7  Funny photo. You wanted me to say if I exhausted everything and
8  I'm trying to just purge everything even if it doesn't seem to
9  have much bearing on the case, but there you have it. I don't
10 know of anything else.
11     Q: That does it. No more. Right?
12     A: (No verbal response).
13     Q: Nothing else you can think of that you could review
14 --
15     A: Correct. Knock on wood if I can find it in this room.
16     Q: Did anything ever happen at that Rhode Island stock
17 agency phone call?
18     A: They never sold anything from it.
19     MS. MURRANE: So what I'd like to do is use exhibit
20 33 and I've got here some stacks of invoices and bills. We'll
21 mark them as separate exhibits as we go through them, so we'll
22 not mark them yet. But to have you match up for me these with
23 this.
24     THE WITNESS: Okay.

Page 91

1      MS. MURRANE: So I'll give you this stack and if we
2  could just start with the first entry on exhibit 33 and we see
3  $150 for The Boston Globe, page 1, January 7, 1995.
4      THE WITNESS: And you want me to find it in here?
5      MS. MURRANE: Find the invoice that reflects that in
6  here, or any other documents that reflect it.
7      (Brief Pause While Witness Reviews Document)
8      THE WITNESS: Hold on a second here. You notice
9  that this income I'm listing here represents, this does not
10 include expenses. So they're not going to match. The bottom
11 lines are not going to match the line items. Do you see what
12 I'm saying?
13     MS. MURRANE: That's fair. I see what you're
14 saying.
15     THE WITNESS: It just makes it a little more
16 confusing to find all this stuff here.
17     MS. MURRANE: You'll be better at it than I will.
18     Q: And actually I'm going to maybe help you out and ask
19 whether exhibit 31 might be the one that goes with that first
20 entry?
21     A: Yes. Correct.
22     Q: So that was for that first time you got the assignment
23 and you went out and photographed Flemmi?
24     A: Correct. Yes.

Page 92

1      Q: If you go to the second line, "Boston Globe file photo
2  $75", do you see in these documents --
3      (Brief Pause While Witness Reviews Document)
4      MS. MURRANE: And just because it might be helpful,
5  I'll note for you that the way it appears to me is there's a
6  date the invoice is listed, but then underneath there's a
7  reprint date and that's the date that matches up, I believe, to
8  the list that you provided.
9      THE WITNESS: So we're looking for the second one
10 dated June 7th.
11     MS. MURRANE: That's right.
12     THE WITNESS: So the invoice would be shortly
13 thereafter. Wait a minute, that would be on this. Right? That
14 would be the next one. No, what am I saying. It wouldn't be.
15 We're looking for somewhere after June 7th of '97. This is it.
16     Q: So can you just pull that one out of the stack and
17 we'll mark that as the next exhibit?
18     A: Yes.
19     (Exhibit No. 36 Marked)
20     Q: If we go to the next line we've got June 26th?
21     A: I think it's this one here. This is dated July 29,
22 1998. Oh, I'm sorry.
23     MS. MURRANE: I believe it may be an invoice that's
24 dated July 4th?

Page 93

1      THE WITNESS: Yeah, he's holding it in front of me.
2      MS. MURRANE: It was towards the front of my stack.
3      THE WITNESS: July 4th. Okay. That looks to be the
4  one.
5      Q: So we'll mark that as the next exhibit, exhibit 37,
6  which goes with the third entry, $75.00 for June 26, 1997. Is
7  that right?
8      A: Yes.
9      (Exhibit No. 37 Marked)
10     MS. MURRANE: I'll let you go ahead and look for the
11 next one.
12     (Brief Pause While Witness Reviews Document)
13     THE WITNESS: It's going to say "STF", I think. Here
14 it is. "STF Productions" January 8th.
15     Q: Then is there a letter in this stack of documents that
16 reflects that same transaction?
17     A: I don't know. Wait a minute, yeah there is. Right
18 here.
19     MS. MURRANE: So let's mark those two together as
20 one exhibit.
21     (Exhibit No. 38 Marked)
22     Q: And this is America's Most Wanted. What was the
23 licensing fee in that?
24     A: $800.

Page 94

1  Q: What was the rights that you gave them?
2  A: I gave them the rights to use the photo domestically
3  and internationally, including repeat broadcasts within context
4  of the story.
5  Q: So this isn't the $1,600 licensing fee you were
6  remembering?
7  A: No. I was incorrect when I made that assumption.
8  Q: So we've got exhibit number 38 matched up with line 4.
9  Can you find what matches with line 5?
10 A: I have it right here.
11    MS. MURRANE: We'll mark that as the next exhibit.
12    (Exhibit No. 39 Marked)
13 Q: And this was another one for The Boston Globe. Is
14 that right?
15 A: Correct.
16 Q: For $75.00?
17 A: Correct.
18 Q: So exhibit number 39 goes with the fifth line. Is
19 that correct?
20 A: Yes.
21 Q: January 11, 1998?
22 A: Right here.
23    MS. MURRANE: Next exhibit.
24    (Exhibit No. 40 Marked)

Page 95

1  Q: And then the next one is 60 Minutes TV Broadcast?
2  A: Do you already have that?
3     MS. MURRANE: We went over the contract but I
4  believe I kept the bill in.
5     THE WITNESS: Here it is.
6  Q: Then I think I have the check stub in that same stack
7  too. Is that right?
8  A: Correct. Right here.
9     MS. MURRANE: Let's mark those two together as
10 exhibit number 41.
11    (Exhibit No. 41 Marked)
12 Q: Then next we have listed is American Lawyer Magazine
13 license?
14 A: I'm holding it right now.
15    MR. EPSTEIN: Would you stop the questioning for a
16 minute? I'm a little behind you.
17    MS. MURRANE: Sure.
18    (Brief Pause)
19 Q: I think we were up to the American Lawyer Magazine
20 license for May 17, 1998?
21 A: I'm holding it right here.
22    MS. MURRANE: We'll mark that as exhibit number 42.
23    (Exhibit No. 42 Marked)
24 Q: Next on the list, Boston Globe file photo, June 12,

Page 96

1  1998?
2  A: I have it here.
3     MS. MURRANE: And this is marked as exhibit number
4  43.
5     (Exhibit No. 43 Marked)
6  Q: The next one, Boston Globe file photo, July 20, 1998
7  for $75.00?
8  A: I think I have it here. The invoice is the 29th so
9  that would be several days. That makes sense.
10    MS. MURRANE: We'll mark that as exhibit number 44.
11    (Exhibit No. 44 Marked)
12 Q: We've got the New York Times use, page A7 on March 13,
13 1999?
14 A: I don't know if I have that here. I don't think it's
15 here.
16 Q: Do you know if you have that in your files?
17 A: I don't think I have it. I think I have just a record
18 of it somewhere but, you know, in my compilation I kept but I
19 don't have the actual paperwork or I would have submitted it
20 with the batch of requests.
21 Q: Did you have paperwork at some point?
22 A: I probably did.
23 Q: It just got misplaced?
24 A: I mean I just can't imagine not sending an invoice.

Page 97

1  Q: It probably just got misplaced?
2  A: Probably, yes.
3  Q: The next entry, New York Times second use, Spring
4  1999?
5  A: I can go back and look. It's possible that I have it
6  and I just neglected to include it. I don't know where it is.
7  I mean I'll look again. How about that?
8     MS. MURRANE: Fair enough.
9  Q: Are there any other licensing uses indicated on this
10 list?
11 A: Yes. The Boston Herald.
12 Q: Where am I missing it?
13    MS. MURRANE: There it is, second from the bottom,
14 $300.00.
15    THE WITNESS: Which combines these two sales reports
16 here.
17    MS. MURRANE: Let's mark that as exhibit number 45.
18    (Exhibit No. 45 Marked)
19    THE WITNESS: How much did you say the amount was?
20    MS. MURRANE: $300.
21 Q: Not right?
22 A: Let me think for a second here. It may be a
23 mathematical mix-up here. I think they should total $450 but
24 before we write it down, I mean that includes the agency's cut.

Page 98

1  Do you want me to just have my cut or?
2       MS. MURRANE: I just want to match up which invoices
3  go with the entries on exhibit 33. I understand that there may
4  be some differences based on --
5       THE WITNESS: Oh, wait a minute, you know what there
6  are no invoices because I don't generate invoices for these.
7  This is done by the agency. That's why there's no invoices.
8       MS. MURRANE: I want to match up which paperwork
9  goes with which entries on exhibit 33.
10      THE WITNESS: So the figure of $300 should be
11 changed to $270. I erred by $30.00. Do you want me to
12 handwrite a change in on this?
13      MS. MURRANE: No.
14      THE WITNESS: But for the record, it's $270 Herald
15 authorized uses.
16 Q: On May 15th and July 9, 2001 according to your list?
17 A: Yes.
18 Q: And that goes with exhibit number 45?
19 A: Okay. Wait a minute. Can we backtrack? I'm
20 confusing everybody here. I'm looking at this now and this says
21 $300. We gotta back up here. I got another invoice that says
22 $300 from the Herald. I'm getting confused. See, I don't
23 generate invoices. I just get these sales reports and a check.
24 Okay, 15th of May, 2001. I'm talking outloud here.

Page 99

1       MS. MURRANE: Your attorney would tell you not to do
2  that.
3       MR. EPSTEIN: And he continued to do that.
4       THE WITNESS: I'm getting mushy brain here.
5       MR. EPSTEIN: Keep your mushy brain to yourself.
6  Let's keep the record clean and just answer the question that's
7  before you, please.
8       (Brief Pause While Witness Reviews Document)
9       THE WITNESS: Can I show this to you? I'm showing
10 you two invoices from Picture Desk International dated July 11,
11 2001, July 15, 2001. The first one, July 11th is for $300. The
12 second one is for $300. I am assuming that they are both
13 representing the same transactions and that's where there's a
14 mix-up occurring.
15 Q: So the same thing got billed twice?
16 A: I just have two pieces of paperwork. That's all I can
17 assume here. Then there's this other one here, August 24, 2001.
18 This represents a different month. This is July sales. That's
19 May sales. This I believe, the first one I just cited, those
20 two figures represent $300 from May sales in 2001 and this
21 Picture Desk invoice, record rather for August 24th is an amount
22 of $90 for sales in August of 2001. So the total Herald would
23 be $390, I believe, based on what I'm looking at here. There
24 you have it.

Page 100

1  Q: And that's for how many uses?
2  A: I can't say because if you read this here it says,
3  "Monthly sales through Press Link and Picture Desk web site". I
4  don't know how many uses they generated through the May sales.
5  They don't give me that information.
6  Q: Do you know what they should have charged for a use?
7  A: I leave that up to them. I have an agent and I trust
8  my agents to handle those matters.
9  Q: Does it appear to you that it was more than one use?
10 A: Yes. This one, the one dated in July of 2001 appears
11 to be, I believe it's two uses.
12 Q: So the entry we have second from the bottom here on
13 exhibit number 33, we changed it to $270, but actually you're
14 saying you think it needs to be higher?
15 A: Point it out to me here.
16 Q: It's the second from the bottom that starts "300.00"?
17 A: Okay. Yes, no this entry is correct. However, I
18 think I've neglected to include -- this is correct. I would add
19 another line item to this exhibit 33 for a total of $90, Boston
20 Herald via the Picture Desk International.
21 Q: So show me which documents line up with that $300
22 entry that's there?
23 A: I believe the document is titled, "July 11, 2001" and
24 "July 15, 2001" sales reports are the $300 line item near the

Page 101

1  bottom of 33.
2       MS. MURRANE: So let's mark those as an exhibit
3  together.
4       (Exhibit No. 46 Marked)
5  Q: Tell me what you understand exhibit 45 to be?
6  A: I believe this is a record of a photo that was
7  licensed by the Boston Herald via that agency in July of 2001.
8  Q: For how much?
9  A: It was licensed for $150 and I received $90.
10 Q: Can I see what papers you have left in front of you?
11 A: Yes.
12 Q: This one here, I think that is a duplicate, would you
13 agree, of something we already marked?
14 A: Yes.
15 Q: It's the 60 Minutes invoice for $1,300?
16 A: Yes.
17 Q: We're putting that to the wayside. This exhibit here
18 seems to reflect a bunch of transactions and is some kind of pay
19 stub?
20 A: Yes. This is a copy of the check stub for exhibit 32
21 which is a comprehensive invoice involving several jobs for The
22 Boston Globe.
23      MS. MURRANE: So we'll mark that as an exhibit.
24      (Exhibit No. 47 Marked)

Electronically signed by AIDA MEDEIROS (001-110-266-3715)    edcdb324-93b3-4bf3-9cfe-a9fb35e68ab9

Page 102

1  Q: And that matches up with exhibit 32 and on exhibit 32
2  the only job of the 1 through 7 jobs that reflects a Flemmi news
3  assignment job for?
4  A: Yes.
5      MS. MURRANE: So we're left with the one mystery
6  document.
7      MR. EPSTEIN: I'm confused because I'm missing 46.
8  Q: I guess I don't have a question pending so I'll ask
9  you one, whether you know how this document fits into the
10 picture of exhibit 33 that's the list?
11 A: I don't think it is on this list.
12 Q: So you think there's another entry that should be made
13 on this exhibit 33?
14 A: My answer is it's possible and the reason I can't be
15 certain is because I'm getting these sales reports July 11, 2001
16 which is the date on exhibit 46 from Picture Desk and it's a
17 Herald usage. And then on July 17th Picture Desk invoice is
18 another Herald usage. They're so close that I'm wondering if
19 they're duplicates of each other. I don't know that, though.
20     MS. MURRANE: I'll take the I don't know and we'll
21 mark it as the next exhibit.
22     (Exhibit No. 48 Marked)
23 Q: Going back to exhibit 33, there is an entry third from
24 the bottom for $150 authorized re-use by UHF Boston Television

Page 103

1  Station. Do you see that?
2  A: Yes.
3  Q: What's that?
4  A: What's the TV station?
5      MS. MURRANE: Yes.
6      THE WITNESS: I'd have to look at my paperwork. I
7  don't know off the top of my head.
8  Q: Did you go through that paperwork to collect all the
9  materials in response to the document request that I sent
10 earlier?
11 A: Yes.
12 Q: Did you find that paperwork?
13 A: I believe I did.
14 Q: Do you know if that paperwork was produced to me?
15 A: I was under the assumption that all of this was
16 produced to you and am under the assumption.
17 Q: Well, I'll just represent that I've given you the
18 universe of bills that I've gotten. Do you know who the UHF TV
19 Station is?
20 A: I'd have to look at my paperwork and I could answer
21 that question.
22 Q: On page 2, the last entry of $800 authorized
23 re-broadcast by Television Network. Do you know what that
24 refers to?

Page 104

1  A: It's on my paperwork and that's the only way I can
2  recall.
3  Q: Do you know if this entry of 2003 is the last time
4  anyone has purchased a license from you for the Flemmi photo?
5  A: I believe it is.
6  Q: And when I say from you I also include in that, you
7  know, via stock agencies from you?
8  A: I would still think it's the last sale, yes.
9      MS. MURRANE: I would just ask counsel to take a
10 look for the paperwork that relates to those two entries.
11     MR. EPSTEIN: If we can find it we'll be producing
12 it.
13 Q: Back to page 1. There's an entry for a $5,000
14 settlement on a January 19, 2000 infringement against a Boston
15 television station. Who was the Boston television station?
16     MR. EPSTEIN: Objection. Some of this information
17 was asked specifically to be held confidential, just like the
18 Settlement Agreement that we entered into with CBS. There was a
19 confidentiality clause in there. The reason why the television
20 station is not identified is solely because of that
21 confidentiality. So unless there's a court order asking me to
22 divulge the information, then I'm going to be reticent to
23 divulge it.
24 Q: Did you review the confidentiality provision of those

Page 105

1  settlement agreements?
2  A: I read all the settlement agreements.
3  Q: Do you know what that confidentiality provision is?
4  A: I am not permitted to speak about any income from a
5  settlement that I received with anyone, except my attorney.
6  Q: Do you know if it has any exceptions listed in it?
7  A: Not off the top of my head.
8  Q: For example, do you know if it says you're able to
9  provide that information to your accountant?
10 A: I don't remember.
11 Q: Do you know if it says whether you're able to provide
12 that information if required to do so by law?
13 A: I don't remember.
14     MS. MURRANE: Just to be clear, are you instructing
15 your witness not to answer any questions related to the
16 identities of these people or what the substance of the lawsuit
17 was about?
18     MR. EPSTEIN: Yes, to the extent that we do not want
19 to breach the contract that we may have with one or more of
20 these television stations.
21     MS. MURRANE: And you don't consider issuance of a
22 deposition notice in a pending lawsuit to be a order of law that
23 would give rise to your ability to produce that information?
24     MR. EPSTEIN: Frankly, I don't know the answer to

27 (Pages 102 to 105)

Page 106

1  that question.
2     MS. MURRANE: Okay. Well, I'm just going to reserve
3  our right to bring that before the judge and request that
4  information.
5     MR. EPSTEIN: Off the record.
6     MS. MURRANE: Okay.
7     (Off the Record Discussion)
8     Q: When we started the deposition, which to you must seem
9  to be many hours ago, we talked about lawsuits that you had
10 filed against various defendants related to use of the Flemmi
11 photo. Are the settlements related to those lawsuits all
12 contained within exhibit number 33?
13    A: Yes.
14    Q: I see six entries which all start with the word
15 "settlement". Would you agree with that?
16    A: I agree.
17    Q: So is it fair to assume that there are two cases where
18 there was no lawsuit filed but you asserted that there was some
19 kind of copyright infringement?
20    A: I'm thinking there's one use. Where are the two? I
21 know of one.
22    Q: I'm just doing math from there were four lawsuits and
23 I see six entries that start with the word "settlement"?
24    A: We mentioned this earlier. The sixth from the bottom,

Page 107

1  May 19, 2001 I don't recall if it was actually a case against
2  the newspaper, a civil action. I think it might have been me
3  saying, listen I've been infringed upon. Let's work this out.
4  And perhaps, and I use the word perhaps. It's likely that the
5  use of the word "case" here would have to be changed to dispute.
6     Q: And the dispute was resolved before any litigation had
7  to ensue?
8     A: I believe it was.
9     Q: Page 2, the top entry, payment on August 30, 2001 for
10 unauthorized re-use. Can you describe that to me?
11    A: By a local newspaper. I believe that was the Boston
12 Herald using a photo without permission.
13    Q: So could that actually be one of those exhibits that
14 we were confused about before?
15    A: It's possible.
16    Q: We've got an August 24, 2001 invoice, exhibit number
17 45, for $150?
18    A: The invoice is dated the 24th, excuse me. The sales
19 record is August 24th. This payment on exhibit, the payment
20 that's dated on exhibit 33 is on October 30th.
21    Q: August 30th you mean?
22    A: I'm sorry, August 30th. Correct. So all I can say is
23 it's possible. I mean I venture to say it's likely but I just
24 don't know.

Page 108

1     Q: Do you have any other explanation for that entry at
2  the top of page 2 of exhibit 33?
3     A: No.
4     MS. MURRANE: I just want to clarify we're looking
5  at exhibit 45.
6     Q: So looking at exhibit number 33 and excluding out
7  those entries that were payments based on settlements of a
8  lawsuit or another dispute, whether it resulted in filing an
9  actual complaint, what's the range of license fees that you
10 collected? What's the lowest and what's the highest?
11    A: The lowest fee was $75 and the highest fee would be
12 $1,600 for 60 Minutes.
13    Q: Would it be fair to split out these entries into kind
14 of two broad categories, one would be print media and the other
15 would be broadcast media?
16    MR. EPSTEIN: Objection.
17    A: Yes.
18    Q: And for print media what do you think is a fair value
19 for the photograph?
20    MR. EPSTEIN: Objection.
21    A: That question is impossible to answer because there's
22 a myriad of uses and I also have to factor in the value of the
23 photo vis-a-vis the, vis-a-vis the interest in the public at
24 that time and date of the story.

Page 109

1     Q: It depends on how newsworthy it is?
2     A: Yes. It's kind of like, this photo ebbs and flows in
3  value. That's what, I mean sometimes the story is red hot and
4  the interest peaks and then things quiet down and then something
5  else happens in the news and there is a renewed interest in the
6  photo.
7     Q: Would you say the same thing is true for broadcast
8  media?
9     A: Print and broadcast are similar in the way they react
10 to news.
11    Q: I'm going to hand you what's been marked from
12 yesterday's exhibit as number 23 and ask you if you recognize
13 that document?
14    MR. EPSTEIN: Take your time and review it if you
15 need to.
16    A: This is a settlement for the first copyright
17 infringement of the photo by CBS 4.
18    MR. EPSTEIN: I believe the question was do you
19 recognize the document.
20    THE WITNESS: Yes.
21    Q: And you said it's a settlement agreement. Who is it
22 between?
23    A: CBS Corporation and myself.
24    Q: What claims did that relate to?

Page 110

1  A: I'll have to review it before I answer the question.
2     (Brief Pause While Witness Reviews Document)
3     THE WITNESS: Could you give me the question again?
4     MS. MURRANE: Sure.
5  Q: My question is what claims does this settlement
6  agreement relate to?
7  A: This is the, I believe this is the settlement between
8  myself and CBS in Boston or CBS for their first infringement on
9  my copyright of the Flemmi photo.
10 Q: Does this settlement release, well it's titled,
11 "Mutual Settlement and Release". Does this Mutual Settlement
12 and Release include claims against 60 Minutes?
13 A: Can you --
14 Q: Does this Mutual Settlement and Release include
15 release of claims against 60 Minutes?
16 A: When you say releases, I mean --
17 Q: Does it relate to?
18 A: Yes. It relates to my claim against 60 Minutes,
19 excuse me, against CBS for the first copyright infringements.
20 Q: And that would be against CBS as it relates to
21 broadcast on CBS 4 and 60 Minutes?
22    MR. EPSTEIN: I'm assuming CBS 4 in those days and
23 not WBZ-TV Channel 4.
24    MS. MURRANE: Right.

Page 111

1     THE WITNESS: I'm confused now. I might be mixing
2  this up.
3     MS. MURRANE: Well, let's take it one step at a
4  time. We'll go back a little bit.
5  Q: You filed a complaint against CBS in about 1998. Is
6  that right?
7  A: Yes.
8  Q: When you initially filed the complaint the claims
9  arose from broadcast by the local CBS station, it's called CBS 4
10 now, of either exhibits 1 or 2. Correct?
11 A: Yes.
12 Q: And then at some point during that litigation there
13 was an amended complaint that was filed and it added claims
14 relating to broadcast by 60 Minutes of photographs more than you
15 asserted it should have appeared. Is that correct?
16 A: Correct.
17 Q: And so is this Mutual Settlement and Release related
18 to that lawsuit and those claims?
19 A: I just have trouble with legalese. That's why I'm
20 hesitating. I believe so.
21 Q: In fact, if you look at paragraph "2." on the front
22 page it says that, "Plaintiff," which is you, "... brought
23 causes of action in a case which is Civil Action No.
24 98-CV-11510." That would be the lawsuit that you filed against

Page 112

1  CBS and then amended?
2  A: So the question is?
3  Q: That the civil action referenced in paragraph "2." is
4  your claim against CBS Corporation from 1998. Correct?
5  A: I believe so.
6  Q: If you turn to the last page of the document, is that
7  your signature there?
8  A: Yes.
9  Q: Did you review this agreement before you signed it?
10 A: Yes.
11 Q: Did you understand its terms?
12 A: Yes.
13 Q: Did you understand that it released all claims related
14 to those asserted in the civil action number referenced on the
15 front page?
16    MR. EPSTEIN: Objection.
17 A: I understood it to include all claims for past
18 infringements, but I was positive that it did not indemnify 60
19 Minutes against future claims.
20 Q: I'm not saying anything about future claims. I'm just
21 asking about this is a release of the lawsuit from 1998?
22 A: Okay.
23    MR. EPSTEIN: I'm sorry, what was the question
24 again?

Page 113

1  Q: Is this --
2  A: It's confusing --
3     MR. EPSTEIN: Chris, let her ask the question.
4  Q: What is this a release of?
5     MR. EPSTEIN: Objection.
6  A: This is the settlement documentation from the first
7  infringement lawsuit against 60 Minutes, excuse me, against CBS.
8  Q: And it relates to which uses of the photograph?
9  A: It relates to the first infringement of the
10 photographs and I believe it also includes the amended aspect of
11 that lawsuit.
12 Q: When you say you believe, are you uncertain?
13 A: I have trouble with, I mean it's years later now and
14 I've been looking at all kinds of documents on this table and
15 this is probably the more legalese of them all and it's just
16 confusing. I feel uncomfortable making statements of certainty
17 when I'm just a little confused by all this stuff.
18 Q: Do you understand that your 1998 lawsuit has been
19 closed?
20 A: Yes.
21 Q: And that it was settled?
22 A: Yes.
23 Q: In its entirety?
24 A: Yes.

Electronically signed by AIDA MEDEIROS (001-110-266-3715)   edcdb324-93b3-4bf3-9cfe-a9fb35e68ab9

Page 114

1  Q: If you turn to page 6 and you look at paragraph
2  "14.", more legalese, I know, but if you can take a moment and
3  just read that paragraph and let me know when you're done?
4  (Brief Pause While Witness Reviews Document)
5  A: Okay.
6  Q: Now, when you signed this agreement and you reviewed
7  it and you understood its terms, did you understand that you
8  didn't have to admit that you didn't have a valid claim? You
9  got to continue to assert that there was a valid claim?
10  MR. EPSTEIN: Objection.
11  A: That's a confusing question.
12  Q: When you signed this agreement did you understand that
13  you were making any admission?
14  A: I guess I didn't think about that either way.
15  Q: Do you understand an understanding as we sit here
16  today? Did you admit anything in signing this agreement?
17  MR. EPSTEIN: Objection.
18  A: My understanding is that, I just, I didn't dwell on
19  that particular point when I read it. It didn't, I knew that I
20  was not allowed to state that I received the amount of the
21  settlement or talk about this case. I believe it was done in
22  order that 60 Minutes would not be exposed to the negative
23  publicity, or the result from that. That was my primary
24  reaction to why it was written this way.

Page 115

1  Q: The case didn't go to trial. Correct?
2  A: It settled. Correct.
3  Q: And there was no judgment entered against any party.
4  Correct?
5  A: Correct.
6  Q: So there was no adjudication about whether, there was
7  no decision by the court about whether the defendant's defenses
8  were correct, or plaintiff's claims were correct?
9  A: I believe that's correct.
10  Q: And neither side in this document, neither plaintiff
11  or defendant in this document admits that the other side was
12  correct?
13  MR. EPSTEIN: Objection.
14  MS. MURRANE: What's the basis for the objection?
15  MR. EPSTEIN: The objection is based upon the
16  warranties and representations contained in this agreement.
17  THE WITNESS: Oh, you're waiting for me?
18  MS. MURRANE: Yes.
19  THE WITNESS: I'm sorry.
20  MR. EPSTEIN: What's the question?
21  MS. MURRANE: Can we play it back?
22  (STENOGRAPHER READS BACK QUESTION)
23  Q: Do you understand the question?
24  A: No.

Page 116

1  Q: In settling this case did you say to the defendant: I
2  give up. You were right. I was wrong.
3  A: That I gave up and I was wrong?
4  MS. MURRANE: Yes.
5  MR. EPSTEIN: Objection.
6  THE WITNESS: But I didn't give up.
7  MS. MURRANE: That's my question. Just answer that
8  question.
9  MR. EPSTEIN: He just did.
10  Q: And did defendant say to you: I give up. I was
11  wrong.
12  A: When you say said it to me, what do you mean said?
13  Q: Paragraph "14." I didn't want to make you go through
14  the legalese stuff again. Let's read the whole thing. "It is
15  expressly agreed that this payment," the payment would be
16  payment from defendant to you. Correct?
17  A: Yes, I understand that.
18  Q: "... shall not be deemed a license fee." So they're
19  not saying they've licensed the photo and they're not paying you
20  a fee. Is that correct?
21  A: Yes.
22  Q: "... nor any admission." Do you understand what that
23  means?
24  A: Yes.

Page 117

1  Q: What does that mean?
2  A: Saying that you did something.
3  Q: "Statement against interest," do you know what that
4  means?
5  A: No.
6  Q: We'll pass by that one. It's basically the same
7  thing. "Or a concession by the defendant --
8  MR. EPSTEIN: Objection.
9  Q: "Or a concession by the defendant with respect to the
10  claims and defenses asserted in the lawsuit. Statement against
11  interest or concession by the defendant with respect to the
12  claims and defenses asserted in the lawsuit." Do you understand
13  what that means?
14  A: I think it's the defendant trying to say that he
15  didn't do what I said he was doing, had done.
16  Q: And that's a part of this agreement, correct, it's
17  right there in paragraph "14."?
18  A: It's kind of legalese but it seems to imply that.
19  Q: And that's right there in paragraph "14." just what I
20  read. Correct?
21  A: Correct.
22  MR. EPSTEIN: Objection.
23  THE WITNESS: Well, correct.
24  Q: I'm going to hand you what's been marked as exhibit

30 (Pages 114 to 117)

## Page 118

1  number 11 from yesterday. We had much discussion of this this
2  morning. That was produced to my by your counsel. Is that
3  something that came from your files?
4      A: No.
5      Q: Do you know where it comes from?
6      A: No.
7      Q: This is exhibit number 10. This is the video that we
8  watched yesterday that showed an illustration of Flemmi during a
9  news report. Is that a video that comes from your files?
10     A: No.
11     Q: Do you know where it comes from?
12     A: With certainty, I believe it comes from, well no.
13     Q: It was produced to me by your lawyer. Do you know
14  where your lawyer got it?
15     A: (No verbal response).
16     Q: Was it from you? Did you provide it to him or have
17  somebody else provide it to him?
18     A: I did not provide it.
19     Q: Did you have someone else provide it to him?
20     A: No. Which, no I don't believe so. What is this
21  visual from?
22     Q: Do you remember yesterday in the deposition we looked
23  at that illustration of Flemmi and there were two? There was
24  the close-up shot and then there was a farther away one in

## Page 119

1  court?
2      A: Describing the photo doesn't help me. It's what's
3  with the photo that would enable me to answer your question.
4      MS. MURRANE: It wasn't a photograph, it was just an
5  illustration.
6      THE WITNESS: Oh, an illustration.
7      MS. MURRANE: One was close-up. This is it.
8      MR. EPSTEIN: It was exhibit 9 yesterday
9      THE WITNESS: And the question is?
10     Q: Yesterday we watched a video that had that
11  illustration used in a news broadcast. Do you remember watching
12  that?
13     A: Yes.
14     Q: And exhibit number 10 is that video. I'm asking
15  whether exhibit number 10 came from your files?
16     A: No.
17     Q: And if you know where it came from?
18     A: I do not.
19     Q: Do you know where that illustration comes from?
20     A: No.
21     Q: Was that from your files?
22     A: No.
23     Q: Do you know who provided it to your counsel?
24     A: No.

## Page 120

1      MS. MURRANE: This is not marked as an exhibit but
2  we will mark it as an exhibit.
3      (Exhibit No. 49 Marked)
4      Q: It's been marked as exhibit number 49. Do you know
5  what that video is?
6      A: No.
7      Q: Did you provide it to your counsel?
8      A: No.
9      Q: Was there a use of the Flemmi photograph on Dateline?
10     A: Yes.
11     Q: Do you know on exhibit number 33 how that matches up?
12     A: I believe it's the sixth from the bottom, $1,600
13  settlement on May 19, 2001. Again, the word settlement implies
14  civil action and I think this is a mistake. I don't think there
15  was civil action.
16     Q: A dispute that was resolved before a complaint was
17  filed?
18     A: I believe so. I could be wrong but I think that's
19  what the case was.
20     Q: I'm going to hand you what was marked yesterday as
21  exhibit number 5 and ask if that video was produced from your
22  files?
23     A: No.
24     Q: Do you know did you have someone produce it to counsel

## Page 121

1  for you?
2      A: I don't remember.
3      Q: You don't know where it comes from?
4      A: (No verbal response).
5      Q: Since June 24, 2004, that's the date that 11:00
6  o'clock news broadcast ran on CBS 4, who have you spoken with at
7  either CBS 4 or UPN 38 or anyone at CBS Broadcasting, under that
8  umbrella?
9      A: No one.
10     MR. EPSTEIN: Other than Jennifer Street yesterday,
11  I assume.
12     MS. MURRANE: Yes, that's aside.
13     Q: No oral or written communication with anyone who works
14  for CBS Broadcasting?
15     A: Correct.
16     Q: You assert a copyright infringement in this case. Is
17  that correct?
18     A: Yes.
19     Q: Do you understand copyright law?
20     A: A layman's understanding.
21     Q: Do you understand that there are exceptions for
22  copyright provisions for certain kinds of uses?
23     A: No.
24     Q: You don't understand or you don't think there are any

## Page 122

1  exceptions?
2    A: I don't know.
3    Q: Have you ever heard of the fair use?
4    A: I've heard of the term.
5    Q: Do you have an understanding of what that means?
6    A: I have a vague understanding.
7    Q: What is that understanding?
8    A: My vague understanding is that there has to be a
9  compelling reason where the publication of a copyrighted
10 material would be essential to the public good.
11       MS. MURRANE: Let's go off the record for a second.
12       (Off the Record at 2:57 p.m.)
13       (Resume at 3:05 p.m.)
14       MS. MURRANE: Let's go back on the record. Just a
15 couple more and I promise, well a few.
16    Q: I asked you earlier about a bunch of different news
17 broadcasts on the dates of June 24th and 25th of 2004 and you
18 hadn't watched those. Correct?
19    A: Yes.
20    Q: The claims in your complaint all relate to use of the
21 Flemmi photo for news broadcasts?
22    A: And web site exposure.
23       MS. MURRANE: That's right.
24    Q: Other than your attorney, have you spoken with anyone

## Page 123

1  else who told you: I saw those Flemmi photos on CBS 4, UPN 38
2  on June 24th or June 25th?
3    A: No one.
4    Q: And other than your attorney, did anyone tell you:
5  hey, I saw that Flemmi photo run on a video clip of the web site
6  for CBS 4?
7    A: Nobody.
8       MS. MURRANE: I'm done. Do you have any follow-up?
9       MR. EPSTEIN: I have no questions.
10      (Off the Record at 3:07 p.m.)

## Page 124

1       STATE OF MASSACHUSETTS
2  DEPOSITION OF:   CHRISTOPHER J. FITZGERALD
3  DATE:            JULY 20, 2006
4  RE: CHRISTOPHER FITZGERALD
5     V. CBS BROADCASTING, INC.
6     CIVIL ACTION NO. 04-CV-12138-NG
7     I, Christopher Fitzgerald, hereby certify that I have read
8  the foregoing transcript of my testimony and further certify
9  that said transcript is a true and accurate record. Any changes
10 are noted in my errata sheet attached to this deposition.
11    Dated this _____ day of _____, 2006 under the pains and
12 penalties of perjury.

              _____
              CHRISTOPHER FITZGERALD

## Page 125

1       STATE OF MASSACHUSETTS
2  DEPOSITION OF:   CHRISTOPHER J. FITZGERALD
3  DATE:            JULY 20, 2006
4  RE: CHRISTOPHER FITZGERALD
5     V. CBS BROADCASTING, INC.
6     CIVIL ACTION NO. 04-CV-12138-NG
7       E R R A T A   S H E E T
8              DEPOSITION        SHOULD
9  PAGE NO.   LINE NO.   READS             READ

Page 126

```
 1      STATE OF MASSACHUSETTS
 2   DEPOSITION OF: CHRISTOPHER J. FITZGERALD
 3   DATE:       JULY 20, 2006
 4   RE: CHRISTOPHER FITZGERALD
 5      V. CBS BROADCASTING, INC.
 6      CIVIL ACTION NO. 04-CV-12138-NG
 7         C E R T I F I C A T E
 8      I, AIDA M. MEDEIROS, a professional court reporter and
 9   notary public for the Commonwealth of Massachusetts do hereby
10   certify as follows:
11      1.  that the foregoing has been transcribed by me to the
12   best of my knowledge, skill & ability;
13      2.  that I am not related to any of the parties in this
14   matter.
15      In witness whereof, I set my hand this 22ND day of July,
16   2006.
17
18      _____
19      Aida M. Medeiros
20      Notary Public
21      My Commission Expires: 5/15/09
22
23
24
```

Electronically signed by AIDA MEDEIROS (001-110-266-3715)

edcdb324-93b3-4bf3-9cfe-a9fb35e68ab9