# EXHIBIT 3

Street, Jennifer - Vol. 1 [30(b)(6)] 7/19/2006 12:00:00 PM

### Page 1

```
 1         Volume:  I
 2         Pages:  1 - 155
 3         Exhibits: 1 - 28
 4
 5      UNITED STATES DISTRICT COURT
 6      FOR THE DISTRICT OF MASSACHUSETTS
 7      CIVIL ACTION NO. 04-CV-12138-NG
 8   ------------------------
 9   CHRISTOPHER FITZGERALD,
10          Plaintiff,
11   V.
12   CBS BROADCASTING, INC.,
13          Defendant.
14   ------------------------
15
16      30(b)6 DEPOSITION OF CBS BROADCASTING, INC.
17          Through JENNIFER STREET
18      Wednesday, July 19, 2006, 10:10 a.m.
19          Barker, Epstein & Loscocco
20             10 Winthrop Square
21             Boston, Massachusetts
22      Reporter:  Rosemary F. Grogan, CSR, RPR
23      LegaLink Boston, a Merrill Company
24             (617)542-0039
```

### Page 2

```
 1   APPEARANCES:
 2   Representing the Plaintiff:
 3      BARKER, EPSTEIN & LOSCOCCO
 4      10 Winthrop Square
 5      Boston, MA  02110
 6      (617)482-4900
 7      BY:  ANDREW D. EPSTEIN, ESQUIRE
 8
 9   Representing the Defendant:
10      BINGHAM McCUTCHEN LLP
11      150 Federal Street
12      Boston, MA  02110-1726
13      (617)951-8278
14      BY:  MARY B. MURRANE, ESQUIRE
15
16   Also present:
17      Christopher Fitzgerald
18      Romi Paek
```

### Page 3

```
              I N D E X
DEPONENT:              EXAMINATION
JENNIFER STREET
   By Mr. Epstein          5
   By Ms. Murrane         151

              E X H I B I T S
NO.   DESCRIPTION                      PAGE NO.
 1    Color Photograph                     8
 2    Color Photograph                     8
 3    Notice of Taking Deposition         21
 4    CBS Television Documents            27
 5    Tape                                49
 6    Document Bates Stamp No. 0044       55
 7    Document Bates Stampe No. 0045      57
 8    Answers.Com Website Document        57
 9    Sketches                            69
10    Tape January 6, 8, 9, 1195          69
11    Tape WBZ Flemmi                     79
12    CBS Memorandum 3/3/98               82
13    Letter 3/17/98                      84
14    Stock Photography Contract 3/16/98  85
15    Letter to Binns from Fitzgerald     87
16    Letter 3/18/98 and Attachments      88/90
```

### Page 4

```
              I N D E X
              E X H I B I T S
NO.   DESCRIPTION                      PAGE NO.
17    Memo from Binns 5/6/98              92
18    60 Minutes Friday 5/8/98 Document   93
19    CBS Memorandum 5/8/98               94
20    60 Minutes Stock Footage & Still    95
      Photo Report
21    WBZ4 12/22/98 Document              96
22    Pitch Reel Document                107
23    Mutual Settlement and Release      116
24    Notes of Epstein on Document       116
25    Photocopy of Photograph            125
26    CBS 4 Website Document             137
27    Documents Bates Stamped 0123 and 0124  142
28    CBS News Standards Document -      152
      One page

      (Attorney Epstein retained original exhibits)
```

5

1   JENNIFER STREET, having been duly
2   sworn by the Notary Public, was examined and testified
3   as follows:
4
5   EXAMINATION BY MR. EPSTEIN:
6
7   MR. EPSTEIN: Could we agree to waive the
8   usual objections, except as to the form of the
9   questions, and waive all motions to strike until
10  the time of trial?
11  MS. MURRANE: Yes, and form of the question
12  and privilege.
13  BY MR. EPSTEIN:
14  Q. Could you identify yourself, please?
15  A. My name is Jennifer Street. I'm the news
16  director at CBS 4 and UPN 38.
17  Q. And where you do live -- is it Ms. Street or
18  Mrs. Street?
19  A. Ms. Street. You may call me Jennifer, please.
20  I live in Newton, Massachusetts.
21  Q. What's your address?
22  A. 156 Melrose Street in the village of
23  Auburndale.
24  Q. And are you married?

6

1   A. I am.
2   Q. And your husband's name?
3   A. Kyle Erlandsen; E-R-L-A-N-D-S-E-N.
4   Q. And do you have any children?
5   A. I do, I have a son.
6   Q. And could you tell us your educational
7   background starting with high school?
8   A. I graduated from four-year high school, public
9   school, in Ridgefield, Connecticut. I attended Syracuse
10  University, where I graduated in 1977 from the Newhouse
11  School of Public Communication with a bachelor's of
12  science.
13  Q. Now, I'm going to ask you a series of
14  questions. If you don't understand a question, please
15  ask me to rephrase, and I will do my best to make it
16  intelligible to you --
17  A. Great.
18  Q. -- because I'm just here to get your answer
19  and not here to trick you on a question.
20  If you want me to repeat the question,
21  please ask me to repeat the question. If it's not
22  clear, I'll try to clarify it. If you can't hear me, I
23  will speak up. And before you answer a question, before
24  you give an answer to a question, wait until I finish

7

1   the question because although the stenographer is
2   wonderful, she get write down --
3   A. Sure.
4   Q. -- what I'm saying and what you're saying
5   simultaneously.
6   A. Understood.
7   Q. And if you get to names, like you just got to
8   your husband's name, that's not a readily apparent name,
9   if you could spell it for the stenographer, I'm sure she
10  will appreciate it a lot.
11  Do you know who Stephen Flemmi is?
12  A. I do.
13  Q. And could you tell us who he is?
14  A. He's a reputed mobster who is currently in
15  custody charged with at least 18 murders that occurred
16  during the 1960's, '70's and '80's in the greater Boston
17  area.
18  Q. Are you familiar with these two pictures I'm
19  about to show you?
20  A. I'm very familiar with this photograph. I
21  have seen this photograph only in the context of
22  preparing for this deposition.
23  Q. So when you said, you're very familiar with
24  this photograph, it's the picture of -- what picture is

8

1   it?
2   A. It's the picture of Stephen Flemmi being
3   escorted by the Massachusetts State police officer.
4   It's the picture in which only Stephen Flemmi's face is
5   identifiable. He's wearing a Chicago Bear's hat and
6   he's looking at the screen right of the photograph.
7   Q. And the other photograph?
8   A. The other photograph appears to be taken
9   within seconds of the first, where he is looking screen
10  left, and you see the faces of a Massachusetts State
11  trooper and some other individuals.
12  MR. EPSTEIN: Okay. Could we have these
13  marked as Exhibits 1 and 2? Exhibit 1 being the
14  photograph of Stephen Flemmi looking ahead to the
15  right and the other of Stephen Flemmi looking back
16  over his shoulder to the left.
17  (Exhibits 1 and 2 Marked for Identification)
18  BY MR. EPSTEIN:
19  Q. Could you tell me about your employment
20  history please, your first job after you graduated from
21  Syracuse University?
22  A. Sure. My first job was a news producer in
23  Charleston, South Carolina I worked for a CBS affiliate,
24  WCSC-TV in Charleston. I worked there from September of

9

1  1987 until June of 1990. In June of 1990, I came to
2  work for WBZ-TV in Boston, as a writer, a news writer.
3  You have to tell me how --
4      Q.  I will ask you more questions.
5          How long did you continue as a news
6  writer?
7      A.  For one year.
8      Q.  And what did you do after that?
9      A.  I became the producer of the Morning News
10  which at that time was a one-hour program that aired
11  from 6:00 to 7:00 in the morning on WBZ.
12     Q.  What were your functions as producer?
13     A.  I wrote the newscast. I decided in what order
14  stories would appear. I was responsible for what we
15  call, the teases, the clips that go into the show.
16         In my capacity as Morning News producer,
17  I was in charge of the newsroom during the overnight
18  hours. There was no manager above me, although there
19  were managers on-call.
20     Q.  A lot of responsibility for a young woman.
21     A.  Yes, it is.
22     Q.  You actually wrote the --
23     A.  I had a writer that worked with me.
24     Q.  Good example of waiting until I finished the

10

1  question.
2      A.  Sorry.
3      Q.  So did you write all the news and commentaries
4  that would be broadcast on --
5      A.  I would not define it as commentary. I would
6  define it as news writing, but yes.
7      Q.  Did you have any assistance?
8      A.  I had a writer who worked with me.
9      Q.  Who was your superior at the time?
10     A.  The news director was a gentleman named Stan
11  Hopkins for a few months while I was the producer.
12  Following that, a gentleman named Jeff Barlett was my
13  news director while I was the producer of the Morning
14  News. I couldn't tell you exact years.
15     Q.  How long did you continue in the role as
16  producer of the Morning News?
17     A.  Until 1994.
18     Q.  Where did you go?
19     A.  I became the producer of the 5:30 newscast on
20  WBZ.
21     Q.  And what did that job entail?
22     A.  The duties were similar. It was a shorter
23  newscast. It was a half-hour show, for which I was
24  responsible for the lining up of the stories and most of

11

1  the writing of the show and working with the writers and
2  reporters and the anchors in preparing the newscast for
3  air.
4      Q.  Did you get involved in choosing any visuals
5  to be used on the news --
6      A.  Yes.
7      Q.  -- at any time while you were either the
8  producer of the Morning News or the producer of the 5:30
9  News?
10     A.  Yes.
11     Q.  Another good example of waiting until I finish
12  the question.
13         What were your duties and
14  responsibilities in that regard?
15     A.  In regard to choosing visuals?
16     Q.  Choosing visuals to be used on the air.
17     A.  When we talk about writing for television
18  newscast, the writer's duties or producer's duties, when
19  you write a story, invariably there will be some form of
20  visual accompanying that story. Occasionally, it's
21  simply the anchor on camera reading the story. But in
22  most cases, a visual would be a graphic or piece of
23  video that accompanies that.
24     Q.  Why is that?

12

1      A.  It's the writer's duty to match that video
2  with the words that are written for the story.
3      Q.  And what is a video that usually accompanies
4  the story?
5      A.  It's a visual medium.
6      Q.  And if there doesn't happen to be a video or a
7  photograph or an illustration or some kind of visual to
8  go along with the story, what happens then?
9      A.  If there's absolutely none, then usually the
10  story is read on camera by the anchor.
11     Q.  What kind of visuals did you attempt to use on
12  the air for stories?
13     A.  This is in my capacity as the Morning News for
14  the 5:30 --
15     Q.  That's correct.
16     A.  Usually, they were in the form of video.
17  Usually video that was shot by WBZ photographers for --
18  part of that time we were a NBC station, so by a NBC
19  Network. Once we became CBS, which is after the 5:30
20  Morning News, it would be an affiliation of our Network,
21  and at the time it was also CNN. So we would use video
22  provided to us by CNN.
23         Those are really the three major sources
24  of video. Graphics were usually designed by our own

13

1  in-house graphics department.
2      Q.  Have you always had an in-house graphics
3  department while you have been at --
4      A.  Yes.
5      Q.  -- Channel 4?
6          MS. MURRANE: He's tricking you with pauses.
7          MR. EPSTEIN: Off the record.
8          (Off Record Discussion)
9  BY MR. EPSTEIN:
10     Q.  What kind of things does the in-house graphics
11 department normally do for news broadcast?
12     A.  Usually, it takes the form of putting a
13 written word on television.
14     Q.  What do you mean by that?
15     A.  Usually we use what I'll call bullet points to
16 re-enforce some of the language that the anchor is
17 using; the headlines of the story. There's the latest
18 on the Big Dig unit and the collapse, and we'll do three
19 points: Romney says it will be open in September and
20 Amorello has a hearing; and we'll re-enforce what the
21 anchor is saying with those words.
22         Another common use of graphics is if
23 someone, who we have interviewed, has chosen not to
24 speak with us on camera. We will take a quote and put

14

1  it in writing through our graphics department and put
2  that quote up so the anchor can read what was said to us
3  via the quote.
4      Q.  Is there a rule of thumb in your business as
5  to how often you would like the graphics or video
6  footage to change?
7      A.  I don't understand the question.
8      Q.  Would you agree with me, you would like to
9  have a graphic on the screen to go along with the story?
10 Is that the best way for you to present the news?
11     A.  As opposed to video?
12     Q.  As opposed to having no graphics, nothing to
13 go along with the story, no visual image?
14     A.  It really depends. It's a case-by-case
15 instance. It depends on how many other graphics we've
16 used in the newscast. To some extent, we try to
17 prioritize, so that not every story has a graphics
18 design to it. It's also limited.
19     Q.  When I say graphics, I'm also including video
20 and still photographs. Any other kind of visual image
21 that goes up on the screen?
22     A.  Is the question, would I prefer to have an
23 image on the screen as opposed to just an anchor talking
24 head?

15

1      Q.  Yes, that's one question.
2      A.  In most cases.
3      Q.  And in most cases, do you have a preference as
4  to how quick which different videos or images or still
5  photographs or illustrations go up on the screen?
6      A.  I could not generalize that with a broad
7  answer.
8      Q.  Okay.
9      A.  It depends on each case.
10     Q.  So after you became the producer of the 5:30
11 News, what was your next position?
12     A.  I became the producer of the 11 o'clock News.
13     Q.  And when was that, approximately?
14     A.  That was approximately in 1995.
15     Q.  What were your duties as the producer of the
16 11:00 p.m. News starting in 1995?
17     A.  Very similar to my duties as the producer of
18 the Morning News and the producer of the 5:30. I was
19 responsible for the lineup of the show, for choosing the
20 words and pictures that went into the newscast.
21     Q.  Who was your superior at that time?
22     A.  Peter Brown was the news director.
23     Q.  Is he still with the station?
24     A.  He left the station two years and two months

16

1  ago.
2      Q.  Where did he go?
3      A.  He is the vice president of communications for
4  Brigham and Women's Hospital in Boston. I believe
5  that's his title.
6      Q.  Thank you.
7          And how long did you continue as the
8  producer of the 11:00 p.m. News?
9      A.  Approximately, 18 months.
10     Q.  What happened after 18 months?
11     A.  I became the producer of the 6 O'clock News.
12     Q.  How long is that news program?
13     A.  At the time, the 6 O'clock News was a one-hour
14 news program.
15     Q.  Did you do the same basic things of the
16 6:00 p.m. News as producer of the 11:00 p.m. and 5:30
17 a.m. News?
18     A.  I did.
19     Q.  And the Morning News?
20     A.  I did.
21     Q.  And after your 18-month tenure as producer of
22 the 6:00 p.m. News, where did you go?
23     A.  My 18-month tenure was as producer of the
24 11 O'clock News. I was producer of the 6 O'clock

**17**

1  News --
2  Q. I'm sorry, you're right?
3  A. -- for about 18 months.
4      And in 1997, I became the executive
5  producer in charge of the 11 O'clock News.
6  Q. What is the difference between being the
7  executive producer of the 11:00 p.m. News and the
8  producer?
9  A. I was the supervisor in charge -- I became a
10 news manager, and was the supervisor in charge of the
11 newsroom for what we call, the nightside. My duties
12 were to supervise the anchors, the reporters, the
13 producers of the program, the writers, the editors.
14     While I did not write the newscast, I
15 copy-edited the newscast and was responsible,
16 ultimately, for all material that aired on that show.
17 Q. With respect to WBZ and the television
18 industry in general, especially in the Boston market, is
19 there particular time slot that's more important than
20 any other particular time slot?
21 A. I would say the 6 and 11 O'clock newscasts in
22 the mid-'90's carried more weight than other newscasts.
23 Q. Let's talk about the late 1990's and the early
24 2000's; does the same hold true?

**18**

1  A. I would add the morning newscast to that
2  higher priority.
3  Q. Would you say they're all about equal?
4  A. Yes.
5  Q. And when you say, They're All About Equal, is
6  that in terms of revenue that is generated by the
7  newscast or any other criteria?
8  A. I'm not talking about revenue. I'm talking
9  about stature, if you will, as perceived by the people
10 who work in the newsroom.
11 Q. Now, is that stature within the industry
12 amongst your colleagues; is that what you're talking
13 about?
14 A. Yes.
15 Q. Did you hold any positions after you were
16 executive producer of the 11:00 p.m. News?
17 A. Yes, I became the executive producer the
18 dayside news. I was in charge of the day-to-day
19 operations for the Noon newscast, the 5 O'clock and 5:30
20 newscasts, and the 6 O'clock newscast; same general job
21 description as the nightside executive producer.
22 Q. And how long did you continue in that
23 position?
24 A. For five years.

**19**

1  Q. What happened after five years?
2  A. I became the assistant news director.
3  Q. What were your duties as the assistant news
4  director?
5  A. That's a great question. I was the No. 2 in
6  charge of the newsroom, of all the news operations for
7  both WBZ-TV and WSBK-TV.
8  Q. Who was your superior when you were first
9  appointed assistant news director?
10 A. Matt Ellis, who was at that time, news
11 director.
12 Q. Where is Mr. Ellis now?
13 A. I believe he owns his own public relations
14 firm.
15 Q. In the Boston area?
16 A. Yes, it's in the Boston area. And I believe
17 it's called Matt Ellis Associates or something like
18 that, but his name is the name of the company.
19 Q. Was there a news director between Peter Brown
20 and Matt Ellis?
21 A. No.
22 Q. And did you get any other job at WBZ after you
23 were the assistant news director?
24 A. In July of 2005, I became the acting news

**20**

1  director and became the news director in full title in
2  November of 2005.
3  Q. The press release indicated that you were
4  named the assistant news director in September of 2004.
5  It was actually in July?
6  A. No, I didn't talk about the date I became
7  assistant news director. That was approximately fall of
8  2004.
9  Q. So that's approximately right?
10 A. About nine months later, I became the acting
11 news director and my title changed to simply news
12 director in November of 2005.
13 Q. Okay. Great.
14     MS. MURRANE: Can we go off for the record a
15 second?
16     (Exhibit 3 Marked for Identification)
17 BY MR. EPSTEIN:
18 Q. Now you are here today because I sent out a
19 Notice of Taking Deposition originally asking for you to
20 come into the office, to my office, at 10 o'clock on
21 Thursday, May 25th of this year. And because of
22 scheduling problems and most recently because of the
23 Big Dig fiasco about a week ago, we've agreed that you
24 could come here today rather than on the appointed date.

21

1  A. Thank you for the postponement last week. I
2  appreciate it.
3  Q. My pleasure.
4     But I'm going to show you a copy of the
5  Notice of Taking Deposition and ask you, if you have
6  seen this document?
7  A. Yes, I have.
8  Q. And are you prepared to talk about the items
9  that are specified in this Notice of Taking Deposition?
10 A. To the best of my ability.
11 Q. Okay. Great.
12    Now are you the same Jennifer Street who
13 signed the Answers to Interrogatories in this case on
14 behalf of the defendant?
15 A. I am.
16 Q. Have you ever signed any other interrogatories
17 in any other cases involving WBZ, CBS 4 Boston or
18 UPN 38?
19 A. I have not.
20 Q. Have you ever testified in court or in a
21 deposition on behalf of your employer, CBS Broadcasting?
22 A. I have not.
23 Q. Did you talk to anyone in preparation for this
24 deposition?

22

1  A. I spoke with Mary Murrane.
2  Q. Okay. Did you talk to anybody else?
3  A. Yes, I spoke to Eric Cox, the newsroom
4  librarian, and I spoke with Tom Janssen.
5  Q. J-A-N-S-E-N?
6  A. Two Ss.
7  Q. And I'm sorry, Tom Janssen is who?
8  A. Video manager is his title. He's Eric's
9  supervisor.
10 Q. Okay. Thank you. Anyone else you spoke to?
11 A. Not in preparation for this deposition.
12 Q. Who did you speak to: Eric Cox or Tom
13 Janssen?
14 A. I spoke with both of them.
15 Q. At the same time?
16 A. No, I'm sorry. I spoke with Eric -- I don't
17 remember the order in which I spoke to them.
18 Q. What was your conversation, as best you can
19 recall with, Eric?
20 A. I simply wanted -- Eric and I had talked about
21 this over the last year in preparation for this. I
22 simply wanted to confirm that we still record 60 Minutes
23 as a matter of practice.
24 Q. And do you?

23

1  A. Yes.
2  Q. Do all the CBS stations do that?
3  A. I don't know.
4  Q. Did you talk to Mr. Cox about anything else?
5  A. Not in preparation for this deposition. He
6  and I have discussed this case before.
7  Q. What did you talk to Tom Janssen about?
8  A. I talked to Tom simply really about the fact I
9  was going to give this deposition. We also briefly
10 mentioned the recording of 60 Minutes' tapes. And I
11 believe that I simply confirmed with him for what might
12 be the 20th time, that the photograph marked Exhibit 1
13 does not exist in our file tape anywhere.
14 Q. Did you review any documents in preparation
15 for today's deposition?
16 A. I received the interrogatories, read over the
17 interrogatories that I had signed some time ago. I
18 refamiliarized myself with the questions and their
19 answers. And we submitted some documents recently just
20 before the deposition to you and I certainly looked over
21 those.
22 Q. Great.
23    Did you look over any tapes?
24 A. I did. I watched the tape that aired in June

24

1  of 2004, the Christina Hager piece.
2  Q. Anything else?
3  A. I looked at, what we'll call, the pitch reel,
4  for the sake of this conversation, a pitch reel, that we
5  call the New England Mob 60 Minutes tape to
6  refamiliarize myself with what was on that tape.
7     May I add to that?
8  Q. Sure.
9  A. That tape is no longer in the custody of CBS.
10 Mary has that tape and I viewed it because she loaned it
11 back to me to watch.
12 Q. What happened to the -- I'm sorry, strike the
13 question. Did you give your attorney, Miss Murrane, the
14 original pitch reel and Miss Murrane gave it back to
15 you?
16 A. Copy of it.
17 Q. Copy of it?
18    MR. EPSTEIN: So there exists both an original
19 and two copies; one of which you gave to me and one
20 of which you still have?
21    MS. MURRANE: Just to clarify, the pitch reel
22 is on a smaller video medium, and I can't watch
23 that. So it exists on a VCR tape, which is what I
24 loaned to Ms. Street.

25

1   And then there's another VCR tape which we
2   produced.
3       MR. EPSTEIN: Now, VCR being VHS tape?
4       MS. MURRANE: Yes, I'm sorry. I don't know
5   the different mediums.
6       MR. EPSTEIN: That's the VHS player behind the
7   stenographer.
8       MS. MURRANE: Yes, that's correct.
9   BY MR. EPSTEIN:
10  Q.  Am I correct?
11  A.  I can further explain the tape format, if you
12  wish.
13  Q.  The SLS is a consumer format?
14  A.  No, the VHS tape is a consumer format. It's
15  not a -- we use a professional format.
16  Q.  Anything else you reviewed in preparation for
17  today's deposition or any other people you spoke to?
18  A.  No.
19  Q.  While you've been at WBZ-TV, CBS Broadcasting,
20  has it ever been one of your responsibilities to
21  negotiate rights with third parties, whether they're
22  photographers, videographers, filmmakers, illustrators,
23  writers or other creative individuals, for rights to use
24  visuals in conjunction with broadcast on the two CBS

26

1   stations in Boston?
2   A.  It is something I have done, yes.
3   Q.  When was it that you did it?
4   A.  I couldn't tell you dates.
5   Q.  Is it something you do now?
6   A.  It's something I approve now, but I'm usually
7   not involved in the actual negotiation.
8   Q.  Okay. Did CBS at any time or does it now have
9   any particular forms that they use when they are buying
10  rights from third-party photographers, videographers,
11  filmmakers, illustrators, writers or other creative
12  people?
13      MS. MURRANE: I'm just going to object. Do
14  you mean when you say, Somebody's, do you mean CBS
15  or UPN 38 or are you --
16      MR. EPSTEIN: I'm referring specifically to
17  the television stations, Channel 4 and Channel 38.
18  Maybe I should rephrase the question in that
19  regard.
20  BY MR. EPSTEIN:
21  Q.  At any time that you've worked for either
22  Channel 4 or Channel 38, does or did Channel 4 or
23  Channel 38 ever use any forms when they were dealing
24  with gaining any rights from third parties such as

27

1   photographers, videographers, filmmakers, illustrators
2   or writers or other creative individuals for the rights
3   to use material in conjunction with broadcast television
4   on Channel 4 and Channel 38?
5   A.  There's no such form right and I'm not aware
6   there has been one during my tenure there.
7       (Exhibit 4 Marked for Identification)
8   BY MR. EPSTEIN:
9   Q.  The CBS Corporation owns quite a number of
10  television stations. Do you know how many?
11  A.  I should. There are 16 CBS stations, to my
12  best knowledge. The number of UPN stations, I'm not
13  completely clear, and I don't want to venture a guess.
14      I believe it's around the same amount.
15  Q.  I'm going to show you something that I got off
16  the Internet on February 25, 2006 in which 17 CBS
17  stations are listed.
18      Is that approximately correct?
19  A.  I was not including Detroit in that account,
20  so that's why I said 16.
21  Q.  So is Detroit one of those stations?
22  A.  I believe it is. It does not have a news
23  station, so in my world --
24  Q.  These no bias without the news.

28

1   A.  I apologize for that.
2   Q.  What about the number of UPN stations?
3   A.  15 appears to be right. I said approximately
4   16.
5   Q.  And are there any WBZ stations in the lineup?
6   A.  As of right now?
7   Q.  Yes.
8   A.  Well, WBZ is going out of business. It will
9   no longer exist.
10  Q.  But it's still in business, as we speak?
11  A.  It appears there's one, but I can't name that
12  for you.
13  Q.  Any other affiliated station?
14  A.  Yes, there are some independent television
15  stations.
16  Q.  So back in 2004, was this list of CBS stations
17  approximately correct?
18  A.  I believe that Sacramento is an addition since
19  2004.
20  Q.  So is that a CBS station or UPN station or its
21  own affiliate?
22  A.  I believe it's a CBS station.
23  Q.  The real question is back in 2004. That's the
24  date I want to zero in on.

29

1  A. Sacramento was not a CBS station at that time,
2  I don't believe. I don't know of any other changes.
3  Q. And starting in approximately September of
4  2006, the UPN 38 is going to unaffiliate itself with the
5  UPN Network; is that not correct?
6  A. That's correct.
7  Q. What's going to happen then with the station?
8  A. It will be run as an independent television
9  station.
10 Q. Still under the CBS Television Network?
11 A. Absolutely, yes. It will simply do what the
12 UPN affiliation does now. It provides us with 10 hours
13 of programming a week. And we will no longer have that
14 programming.
15    It will be programmed entirely by us at
16 CBS.
17 Q. When you say, Us at CBS, you mean from the
18 building at 1170 Soldiers Field Road?
19 A. Yes.
20 Q. In the interrogatories that I sent out to your
21 counsel and that you answered on behalf of the
22 defendant, I asked you how CBS 4 first obtained a copy
23 of the photograph, which I will refer to as Exhibit 1.
24    And your answer to the question was that

30

1  you obtained a copy of the photograph from an edition of
2  the Boston Globe; is that correct?
3  A. Yes.
4  Q. Were you in the news department at the time
5  that that photograph was obtained from the Boston Globe?
6  A. Was I physically in the newsroom?
7  Q. Did you work for the news department at that
8  time?
9  A. I did.
10 Q. What was your position?
11 A. Tell me the date.
12 Q. Well, that's a question. I don't know when
13 you first obtained a copy of it.
14 A. In 1998, I was the executive producer of the
15 11 o'clock News.
16 Q. Okay. Did WBZ-TV take this photograph from
17 the Boston Globe?
18 A. To the best of my knowledge.
19 Q. And how did you acquire that knowledge?
20 A. That was discussed amongst the several news
21 managers and producers at the time Mr. Fitzgerald called
22 the station following a phone call from Mr. Fitzgerald
23 to the newsroom.
24 Q. Do you know when that photograph was first

31

1  published in the Boston Globe?
2  A. I do not.
3  Q. If I were to tell you that the photograph was
4  originally published on the front page of the Boston
5  Globe on Saturday, January 7, 1995, might that help to
6  refresh your recollection?
7  A. I would have no reason to dispute that.
8  Q. Were you working in the news department at
9  Channel 4 in January 1995?
10 A. Yes.
11 Q. To the best of your knowledge, did WBZ-TV 4
12 use that photograph at any time in January 1995 when
13 Stephen Flemmi was arrested?
14 A. To the best of my knowledge, we did not.
15 Q. Do you keep tapes that go back to January of
16 1995 --
17 A. Yes.
18 Q. -- from news broadcasts?
19 A. Yes.
20 Q. So if I were to ask you to review broadcasts
21 from the morning news, the noontime news, the evening
22 news or the nighttime news from January 7th, maybe
23 January 8th or 9th, you would be able to do so today;
24 would you not?

32

1  A. Yes, I would be able to do that. I believe it
2  was done during the first lawsuit on this matter.
3  Q. And did you find any usage by WBZ-TV in 1995?
4  A. I did not do the search, and I really don't
5  feel qualified to answer that question. I'm only aware
6  that it happened.
7  Q. And who would know the answer to that question
8  or who would be able to find out that answer for that?
9  A. I could find out the answer to that question
10 and have it for you here today.
11 Q. Do you physically save editions from the
12 Boston Globe at Channel 4 and Channel 38?
13 A. No.
14 Q. So if you were to take a picture from The
15 Globe, you would take a picture from it, and would you
16 throw the newspaper away?
17 A. Correct.
18 Q. In your answer, you said that the Boston Globe
19 carried no notice of any copyright.
20    What do you mean by that?
21 A. The photograph appeared without a written
22 copyright on it.
23 Q. Okay. And what do you characterize as a
24 written copyright?

33

1   A. A symbol that indicates copyright which is a C
2   in a circle, and usually the person who is copyrighted,
3   the photo's name appears with it.
4   Q. And do you have any reason to believe that the
5   Boston Globe did not have a copyright on its masthead
6   for the entire paper?
7   A. I don't know.
8   Q. So when you said that the newspaper carried no
9   notice of any copyright, all you mean to say is that
10  there was no notice of copyright adjacent to the
11  photograph?
12  A. That is my understanding.
13  Q. At any time while you worked in the news
14  department for CBS Broadcasting here in Boston, have you
15  ever licensed the rights to use still photographs from
16  any photographers on a news broadcast?
17  A. I could not name a particular instance. I
18  believe we have. I can tell you that the CBS Network
19  has done it and we have used those photographs in
20  conjunction with the CBS news.
21  Q. During your tenure at CBS working in Boston
22  for either WBZ or UPN 38, do your news broadcasts have a
23  copyrighted notation on them?
24  A. Yes.

34

1   Q. And where do the copyright notations appear?
2   A. At the end of the program.
3   Q. It's part of the credit; is that correct?
4   A. Usually it's the only credit.
5   Q. Do you ever publish a copyright credit
6   adjacent to a broadcast that does not belong to CBS or
7   UPN or WBZ?
8   A. Yes.
9   Q. You do?
10  A. If we air -- let me make sure I understand the
11  question correctly. If we air a photograph that is not
12  our photograph, but we paid for the rights to it, we
13  will often include the photographer's name on it. It
14  really depends case-to-case on the deal we've struck
15  with the photographer.
16      Often, a photographer will ask for on-air
17  credit, and at that time we attach it to the photograph.
18  Q. Does the on-air credit go with the credits at
19  the end of the program or does it go adjacent to the
20  photograph?
21  A. Adjacent to the photograph.
22  Q. But the photographer has to ask for that?
23  A. Yes.
24  Q. And if the photographer asks for that, you

35

1   usually, but not always, accede to his or her wishes; is
2   that what your testimony is?
3   A. Yes.
4   Q. At any time during your tenure with Channels 4
5   and 38, did Channels 4 and 38 ever make use of
6   photographers from The Globe other than the Stephen
7   Flemmi photographs we're talking about this morning,
8   Exhibits 1 and 2?
9   A. Yes.
10  Q. Do you have arrangement with the Boston Globe
11  so that you can use images from The Globe?
12  A. Not without talking to them first; usually, it
13  involves a phone call to the photodesk.
14  Q. And does The Globe usually charge any fee for
15  your use of images from The Globe?
16  A. Never.
17  Q. Do you have any record of calling up the Globe
18  at any time from 1995 to 1998, to get permission to use
19  either of the photographers of Flemmi, Exhibits 1 and 2?
20  A. I personally did not make a phone call
21  regarding that photograph. I did not mean to answer on
22  behalf of the station. I'm talking about only myself.
23  Q. Did you find any records at WBZ or UPN 38 that
24  indicated that somebody called up The Globe to get

36

1   permission to run that photograph under --
2   A. No, it's not something I would expect to be
3   recorded anywhere.
4   Q. Do you have any reason to contact the Herald
5   to use any photographs on the air?
6   A. Yes.
7   Q. And does the Herald have the same policy that
8   The Globe has, that they don't charge you for use of
9   pictures on the air?
10  A. That is correct.
11      MS. MURRANE: Off the record for a second.
12      (Off Record Discussion)
13      (Short Recess)
14  BY MR. EPSTEIN:
15  Q. Do you have any arrangements with any other
16  newspaper so that you can use photos from the newspaper
17  on the air at either Channel 4 or Channel 38?
18  A. There are no formalized arrangements, but
19  certainly if we see something, we would be willing to
20  call that entity and ask if we could use it.
21  Q. And do you reciprocate with the newspapers, if
22  they wanted to use something they saw on the air, they
23  could call you up and get permission to use it?
24  A. Yes.

37

1  Q. Do you have that arrangement with the Boston
2  Globe also?
3  A. Yes. None of this, I would say, is a
4  formalized arrangement.
5  Q. What if Channel 5 or Channel 7 wanted to use a
6  news footage you had an exclusive on, could they use it?
7  A. I cannot imagine a circumstance in which I
8  would say yes in which you had an exclusive use on.
9  Q. Was that the policy in effect in 1995, as well
10 as in 1998 and 2004?
11    MS. MURRANE: Objection. I'm just not sure
12 what policy we're talking about.
13 BY MR. EPSTEIN:
14 Q. Was the policy you could use photographs from
15 either The Globe or The Herald or other newspapers, the
16 same in 1995, 1998 and 2004, to the best of your
17 knowledge?
18 A. I would not call it a policy. I would call it
19 an informal arrangement, but yes, it has not changed.
20 Q. Now, in your answer to interrogatory No. 3,
21 that were propounded to the defendant in this action on
22 behalf of Chris Fitzgerald, you stated that after
23 Mr. Fitzgerald commenced his 1998 lawsuit against CBS,
24 CBS instructed its librarian to review all archive tapes

38

1  in the station's library and remove any images of the
2  Flemmi photographs, Exhibits 1 and 2.
3     Who was the librarian at the time; do you
4  know?
5  A. Eric Cox was the librarian.
6  Q. And he's still the librarian?
7  A. Correct.
8  Q. You went on to say that the message was sent
9  via internal e-mail to all staff instructing them to
10 search their individual files for copies of the Flemmi
11 photographs, that is Exhibits 1 and 2, and to destroy
12 any tape in which the photograph was used.
13    Do you have a copy of that internal
14 e-mail?
15 A. I do not.
16 Q. Did you look for one?
17 A. I did.
18 Q. And is there any way you can go through
19 electronic records at CBS to find a copy of that e-mail?
20 A. I believe that that was done during the first
21 lawsuit. I'm quite certain it does not exist.
22 Q. And how did you come to know that you think it
23 was done during the first lawsuit?
24 A. Through discussions that I had in

39

1  preparation -- well, in preparation for this deposition,
2  but a year ago when I began meeting with Mary.
3  Q. And who did you talk to about that?
4  A. I actually spoke to the former news director,
5  Peter Brown, who had fairly intimate knowledge about the
6  lawsuit.
7  Q. You testified this morning, and you also
8  stated in your answer to the interrogatory, that CBS 4
9  routinely records a copy of all 60 Minutes' broadcasts.
10    And they do that even if there are no
11 stories of local or regional news; is that correct?
12 A. That's correct.
13 Q. And to the best of your knowledge, the library
14 at 1170 Soldiers Field Road has copies of all 60
15 Minutes' broadcasts in-house?
16 A. Of all?
17 Q. Yes.
18 A. They get held on to for several months and
19 then the tapes get recycled.
20 Q. How many months do you keep them?
21 A. I don't know the exact time period; say
22 approximately six.
23 Q. If you ever needed a copy of a 60 Minutes
24 broadcast from, say, 10 years ago, could you get a copy?

40

1  A. That would depend on who at 60 Minutes I was
2  dealing with and if they were willing to give me a copy
3  of the broadcast, but I would have to contact 60
4  Minutes.
5  Q. And if you needed a particular story that
6  appeared on the 60 Minutes broadcast 10 years ago, you
7  would probably pick up the phone and call somebody in
8  New York to get it or somebody on your staff would do
9  that?
10 A. Yes, Tom Janssen would be the person to make
11 that inquiry.
12 Q. Have you ever known 60 Minutes to ever deny a
13 request for some footage that was broadcast on 60
14 Minutes?
15 A. I have never been aware of such a denial.
16 Q. Have you ever been aware of a denial by the
17 Network, CBS Network to give you footage or photographs
18 of anything that was aired over the Network?
19 A. I am not aware of WBZ or UPN 38 being denied a
20 request for video.
21 Q. Is there any kind of policy at WBZ-TV to deal
22 with contacting the network to get copies of any program
23 that may have aired or any portion of a program that may
24 have aired over the network?

41

1  A. Is there any kind of policy?
2  Q. Right.
3  A. Meaning written procedure?
4  Q. Yes.
5  A. No.
6  Q. Are you aware of any of the other stations
7  owned by CBS Broadcasting that have ever contacted the
8  Network to get copies of a story or any part of a story
9  or any visual within the story and they were denied
10 permission to use it on the air?
11 A. I'm not aware of that, no.
12 Q. Does CBS provide Channel 4 with a log of the
13 stories that are going to be on any 60 Minutes
14 broadcast?
15 A. Yes.
16 Q. Do they do that before or after the broadcast?
17 A. Before.
18 Q. And what does the log normally look like?
19 A. I would not define it as a log, as much as a
20 document that lists a couple of lines about each story
21 that will be on 60 Minutes. It's done for the purpose
22 of asking the affiliate to help promote 60 Minutes in
23 the upcoming week.
24 Q. And what would you call these documents that

42

1  you get? I called it a log. You were uncomfortable
2  with that terminology.
3  A. I would call it a one sheet, colloquially.
4  It's a memo.
5  Q. And how do you receive them?
6  A. Electronically via e-mail.
7      (Off Record Discussion)
8  BY MR. EPSTEIN:
9  Q. Do you know when the original 60 Minutes'
10 story was broadcast, the one that included
11 Mr. Fitzgerald's photographs?
12 A. I don't know the date off the top of my head.
13 Q. If I were to suggest, May 10th, 1998, would
14 that help to refresh your --
15 A. That sounds about right.
16 Q. -- memory?
17     You said in your answers to
18 interrogatories that a copy of the May 1998, 60 Minutes'
19 broadcast was purged. Do you know when it was purged?
20 A. No, I don't know exactly when it was purged.
21 Q. Do you know why it was purged?
22 A. I believe it came there while we were in
23 litigation or shortly after, and the position of the
24 station was that we did not want to have to go down that

43

1  road again. This is regarding the first 1998 lawsuit,
2  we did not want to --
3  Q. When you say, It Was Purged, from where was it
4  purged from?
5  A. From the library. The original 60 Minutes'
6  recording was tossed out.
7  Q. Now, was it physically tossed out or was it
8  used and re-recorded?
9  A. I don't know.
10 Q. And do you know what the practice at WBZ-TV is
11 when they have television shows they record off the
12 Network but have no further need for it?
13 A. Depending on the age of the tape, the tape
14 might be what we called, blacked over.
15 Q. I'm sorry, what was the word?
16 A. Blacked over. Black is laid over the original
17 recording, and then the tape is used again to record
18 something else. If the tape has reached its recycle
19 date, it's throws out. It's thrown away.
20 Q. And do you know what the lifetime is for a
21 tape that you would record these shows on?
22 A. For shows that are recorded once a week, the
23 life span is probably about a year.
24 Q. And that's the life span to record and

44

1  re-record?
2  A. Correct.
3  Q. But not to keep within the library?
4  A. Correct.
5  Q. Now, you said that on information and belief
6  an employee of CBS 4 used the copy of the 60 Minutes'
7  broadcast before it was purged to create a pitch reel on
8  organized crime that appeared -- that included one or
9  two both of these photographs of Stephen Flemmi that
10 have been marked as Exhibit 1 and 2.
11     Who provided the information and how did
12 you come to have the belief that you have?
13 A. I came to have the belief I have because the
14 tape exists. As to who made that recording, we call it
15 a dub. Who dubbed that tape, I have no knowledge nor
16 does our tape librarian or our video manager.
17     We do not know who did it.
18 Q. Do you have any idea when it was done?
19 A. I could only speculate it was very shortly
20 after broadcast because the tape was purged shortly
21 after that.
22 Q. Shortly after the broadcast, when?
23 A. The May broadcast of the 60 Minutes.
24 Q. You stated in your answers to interrogatories

45

 1  that you do not know at this time who the identity of
 2  the employee was.
 3       Can you speculate who it might be?
 4  A.  No.
 5  Q.  Did you ask Eric Cox if he did it?
 6  A.  Yes.
 7  Q.  And he denied doing that?
 8  A.  Correct.
 9  Q.  Is it one of Eric Cox's job duties to do
10  things like that?
11  A.  Yes.
12  Q.  Why don't you tell us what a pitch reel is?
13  A.  Sure. A pitch reel is a tape in which we
14  collect various pieces of video, all having to do with
15  one story. And we then save that tape. It's cataloged
16  by topic. And we save that tape indefinitely, so that
17  we have access, easy quick access, to video.
18       An example would be, you know, this week
19  we certainly made a video, all the video, of the Big Dig
20  collapse that we think we'll want to save for future
21  use.
22  Q.  Do you save complete stories on this pitch
23  reel or only portions of a story?
24  A.  Very often a reporter's story is saved in its

46

 1  entirety, but what I call, raw tape, is also saved; in
 2  other words, lengthy strips of the tape that the
 3  photographer shot without any sort of editing done to
 4  it.
 5  Q.  I'm sorry. Without any what?
 6  A.  Without any editing done to it.
 7  Q.  And it's all saved on the same reel?
 8  A.  Yes.
 9  Q.  How many minutes or hours of material can be
10  saved on each reel?
11  A.  Most of the tapes in our library are one-hour
12  tapes. Whether or not they're actually filled with an
13  hour of material, depends on the story.
14  Q.  So if we use the Big Dig example and the
15  three-ton piece of concrete that ended up killing a
16  woman in the tunnel in Boston last week, you would put a
17  number of stories on a reel; is that what your testimony
18  is?
19  A.  Yes, correct.
20  Q.  And they would include outtakes as well as
21  things that were broadcast on television?
22  A.  Sometimes.
23  Q.  In addition to raw footage?
24  A.  Yes.

47

 1  Q.  And how would you use these pitch reels?
 2  A.  They're what we refer to as, file tape. And
 3  they'll be used for any number of years when a story is
 4  done referring back to what happened in 2006. And the
 5  reporter putting together that story or the producer
 6  putting together that story for air, needs a picture of
 7  the tunnel ceiling, they can go to our library, and it's
 8  probably filed under B for Big Dig, and pull out the
 9  tape and find the video that they need.
10  Q.  So if 10 years from now there was another
11  catastrophe in the tunnel, you could go back to the 2006
12  tape about the Big Dig and come up with file footage to
13  show what happened 10 years earlier?
14  A.  Correct.
15  Q.  I, frankly, may have asked you this question
16  and I forget what your answer is: But, did you review
17  the 60 Minutes' show that was first aired on May 10,
18  1998?
19  A.  Not in its entirety. I looked over the tape,
20  but I did not sit down and watch the entire 20 minutes.
21  Q.  I believe it's a 12-minute show.
22  A.  12 minutes.
23  Q.  But certainly more than 10.
24       Do you know how many times either of

48

 1  Mr. Fitzgerald's pictures of Flemmi, either Exhibit 1 or
 2  Exhibit 2, were used in the 60 Minutes' broadcast?
 3  A.  I don't know for sure because the tape I
 4  watched, most of the images I believe have been
 5  expunged.
 6       MR. EPSTEIN: Can we stipulate that
 7  Mr. Fitzgerald's pictures, either Exhibit 1 or
 8  Exhibit 2, were used five times on the 60 Minutes'
 9  broadcast?
10       MS. MURRANE: I don't think I can stipulate to
11  that.
12       MR. EPSTEIN: Okay. I'm going to show the 60
13  Minutes' broadcast, if I may. And while we are
14  watching the broadcast, I'm going to ask the
15  stenographer, if it's okay with you, not to write
16  down the commentary on the broadcast.
17       But if I happen to stop the tape and ask you
18  questions, then you can certainly record testimony.
19  But while the broadcast is going on, which I will
20  mark as an exhibit in this case, we'll just simply
21  listen to the broadcast and count the number of
22  time the Flemmi photograph was used.
23       MS. MURRANE: My only objection to that, that
24  if it's blacked out --

49

1    MR. EPSTEIN: No, this is the original
2    broadcast given to me as part of the 1998
3    litigation.
4    MS. MURRANE: Okay. So it has all the photo
5    shots?
6    MR. EPSTEIN: It has all the photos.
7    Now, while we're watching the show, if you
8    could take a piece of paper, and perhaps we can
9    count along, how many times either of those
10   particular photographs have been used?
11   THE WITNESS: Sure.
12   MS. MURRANE: You're asking her to keep a
13   tally?
14   MR. EPSTEIN: Just keep a tally.
15   MS. MURRANE: Could she keep it in her head?
16   MR. EPSTEIN: If she can keep it in her head.
17   If you're that good, by all means, you can do that.
18        (Tape played)
19        (Exhibit 5 Marked for Identification)
20        (Off Record Discussion)
21   BY MR. EPSTEIN:
22   Q.  Now, we've just watched an edition of 60
23   Minutes that contained the story of organized crime in
24   Boston, Flemmi and Bulger.

50

1    Did you happen to count the number of
2    times the photograph appeared in the story?
3    A.  I saw this photograph five times. I don't
4    believe I saw that photograph.
5    Q.  You saw Exhibit 1, five times, and you don't
6    believe you saw Exhibit 2 at all?
7    A.  I don't believe I did.
8    Q.  Now, you provided us with what you've
9    described as a pitch reel.
10   Do either of these three pages that I'm
11   showing you now, Miss Street, have anything to do with
12   the pitch reel?
13   A.  Yes. How would you like me to identify the
14   pages?
15   Q.  Well, the page that is mostly white with very
16   little black on it, let's start with that one.
17   A.  This looks like an entry that would go into
18   the file of our in-house computer system.
19   Q.  You also have paper copies of what's in the
20   computer system or just computer documents?
21   A.  It's really only computerized now.
22   Q.  So this is a printout of what's on the
23   computer?
24   A.  This is a printout of a computer file.

51

1    Q.  And could you tell us what it says, please?
2    A.  It says that the slug of the tape, which is
3    the title of the tape, is New England 60 Minutes. It is
4    characterized under the section in our library called,
5    Crime. It says, Video not good; and I don't know what
6    that is in reference to.
7    Q.  Okay. And underneath that?
8    A.  It says, Bulger/Flemmi, which is simply the
9    space here where this is written notes on what's on the
10   tape.
11   Q.  And do you have a search function on the
12   computer at the WBZ library?
13   A.  Yes.
14   Q.  So if you searched for organized crime in
15   Massachusetts, would this entry come up on the screen?
16   A.  No, I believe that you would have to use the
17   words, New England or 60 Minutes, for this to come up on
18   the video screen.
19   Q.  So if you typed the word, Bulger, this entry
20   would not come up on the screen?
21   A.  No, I believe that any of the words that have
22   been entered into, not the form, any of the words that
23   have been entered into this would come up on the search.
24   Q.  Including the word, Bulger?

52

1    A.  Yes.
2    Q.  Including the word, Flemmi?
3    A.  Yes.
4    MS. MURRANE: Are we going to mark this as a
5    new exhibit?
6    MR. EPSTEIN: Yes, yes.
7    BY MR. EPSTEIN:
8    Q.  And when it says, Shelf 2B, what does that
9    indicate?
10   A.  I don't know for certain, but I believe it
11   indicates where the library would find it.
12   Q.  And where it says, Submitted by Crime/2C, what
13   does that signify?
14   A.  I don't know.
15   Q.  When it says on August 18th, 2000, 11:29:17,
16   what does that signify?
17   A.  I believe that is the time stamp for the last
18   time this entry was used.
19   Q.  That's on the same line with Submitted By?
20   A.  Right.
21   Q.  Did you ask your librarian, Mr. Cox, what the
22   significance of these entries are?
23   A.  I did not. I have not had that conversation
24   with him, so I'm speaking from other experience.

53

1  Q. So in your experience you do not know what
2  Submitted By with Crime/2C means?
3  A. Correct. This is a form that Eric has taken,
4  a form to create his computer archive that is not
5  necessarily -- let me start again.
6     MS. MURRANE: What's the question?
7     MR. EPSTEIN: She was doing very well with the
8  question.
9     MS. MURRANE: What's the question that's
10 posed?
11 A. This form is not the form that's standard for
12 a library archive. This is a form that we use as a
13 matter of standard practice in what I call our desk
14 file. This is a form that is used when we take story
15 tips.
16 Q. What's a story tip?
17 A. When Attorney Epstein calls us and says, Hey,
18 a tile just fell in the Big Dig, you might want to get a
19 camera out there, a story is filed. Eric had taken --
20 computer system had taken that form to create his own
21 computer archive.
22 Q. And so to save it, Submitted By and On means
23 something specific to the library archive?
24 A. I don't believe it does.

54

1  Q. But you never asked?
2  A. Submitted by, Crime/2C?
3  Q. You didn't ask Eric Cox --
4  A. I have not.
5  Q. -- specifically what those notations mean?
6  A. I have not.
7  Q. And is Eric Cox the person who normally
8  creates these tip sheets or whatever you call it?
9  A. Yes. In the world of the library special
10 archives, he created the computer system and I believe
11 he did that around the year 2000.
12    MR. EPSTEIN: Now, we can have it marked as
13 the next exhibit.
14    MS. MURRANE: This one page or all of them?
15 I'm just asking so I can write it on my own notes.
16    MR. EPSTEIN: I gave them to you because I'm
17 going to introduce them as exhibits. So assume if
18 I give them to you, it's going to be marked.
19    MS. MURRANE: I'm just want to know, just
20 clarify my own record.
21    (Exhibit 6 Marked for Identification)
22 BY MR. EPSTEIN:
23 Q. Just referring back to Exhibit 6, one more
24 time, is there any other information that you can gain

55

1  from reviewing that piece of paper?
2  A. Only that this piece of paper was printed
3  January 5th, 2005 at 1:30 in the afternoon.
4  Q. The next piece of paper that's in front of
5  you, can you tell us what that is, please?
6  A. That's the photocopy of the label on the pitch
7  reel that we're discussing.
8  Q. Is this an exact copy in the exact size of
9  that particular pitch reel?
10 A. Correct.
11 Q. And what can you tell me about this particular
12 pitch reel from reading what's on the label that's on
13 the outside?
14 A. I can tell that it originated with 60 Minutes;
15 that there appears to be an 18-second shot of a picture
16 of Roger Wheeler. That there is -- I'm going to correct
17 myself.
18    I believe 18 seconds into the piece,
19 there's a picture of Roger Wheeler.
20 Q. Who's Roger Wheeler?
21 A. Roger Wheeler is the victim in the story we
22 just watched.
23 Q. Okay.
24 A. 22 seconds in, there is a video of Jai Alai;

56

1  31 seconds in, there is a picture of Roger Wheeler's
2  body in a car when he was murdered; that a minute 32
3  seconds in, there's a picture of Brian Halloran, one of
4  the mobsters involved in the piece; and approximately
5  four minutes and 18 seconds in, there's a picture of the
6  car in Florida in which John Callahan's body was found.
7  Q. Can you tell me approximately when the last
8  time CBS 4 Boston used the logo that appears on the
9  outside of that tape?
10 A. I can't tell you at this moment, although I
11 can find it pretty easily at the station, but I believe
12 it was in the early 2000s, probably 2003, but I would
13 prefer to refer to notes in my office.
14 Q. Do you currently use labels like this on the
15 outside of canisters?
16 A. Yes.
17 Q. The same label, the same logo?
18 A. No.
19 Q. If I could show you something that I retrieved
20 off of the Internet from Answers.com. Are you familiar
21 with the four logos that are shown --
22 A. Yes.
23 Q. -- on the piece of paper?
24 A. Well, there's six here.

57

1  Q. I'm sorry, six.
2     And are the dates of use in your memory
3  approximately correct?
4  A. Yes, as I've said a minute ago, I thought that
5  2003 sounded about right, and I would say yes.
6     MR. EPSTEIN: So let's have the document that
7  you have, that's the side of the canister, marked
8  as Exhibit 7. And we'll have --
9  A. This is the front of the tape.
10 Q. The front of tape?
11 A. I would call this the side of the tape.
12    MR. EPSTEIN: Let's mark it at the same time.
13 BY MR. EPSTEIN:
14 Q. The second page is the side of the tape?
15 A. (No verbal response).
16 Q. And would I be correct in assuming, this is
17 what is visible when it's standing on the shelf?
18 A. Like a spine of a book.
19    MR. EPSTEIN: We'll staple these together and
20 mark that as Exhibit 7; and this Answers.com as
21 Exhibit 8.
22    (Exhibits 7 and 8 Marked for Identification)
23 BY MR. EPSTEIN:
24 Q. Did you -- and again, I may have asked you

58

1  this, but forgive me if I'm asking it again: Did you
2  watch the pitch reel in preparation for this deposition?
3  A. Yes, I watched it, but not in its entirety. I
4  used fast forward to go through certain spots.
5  Q. What is on that pitch reel?
6  A. A copy of the 60 Minutes' program we just
7  watched.
8  Q. In its entirety?
9  A. The copy that I watched had parts of it
10 blacked out.
11 Q. What parts were blacked out?
12 A. Based on what I just viewed, photos of Steve
13 Flemmi.
14 Q. Were all of the photos of Steve Flemmi blacked
15 out?
16 A. No, there was the final one that was
17 remaining.
18 Q. There was one that remained?
19 A. Yes.
20 Q. Why wasn't that one blacked out?
21 A. I believe it was simply an error.
22 Q. When were those photographs of Flemmi blacked
23 out out of the pitch reel?
24 A. I don't know.

59

1  Q. Who blacked them out?
2  A. I believe Eric Cox did.
3  Q. Did anyone tell him to black them out?
4  A. I was not the person who told him. My
5  knowledge of this case is that he was told sometime
6  after the 1998 litigation or during the 1998 litigation
7  to expunge any photo of Steve Flemmi, any Christopher
8  Fitzgerald photo of Steve Flemmi that existed in our
9  file tape system.
10 Q. And you don't know who told him that, told him
11 to do it?
12 A. I'm certain it was Peter Brown.
13 Q. Did you talk to Peter Brown?
14 A. When?
15 Q. At any time after the first lawsuit was filed
16 against CBS?
17 A. As a member of the news staff, I read the
18 e-mail and was told by news management, we were not to
19 use the Flemmi photograph.
20 Q. After Peter Brown left the station, have you
21 spoken to him at all about this lawsuit?
22 A. Once.
23 Q. What was your conversation?
24 A. I mentioned to him that we were back in

60

1  litigation, and I asked him if he knew of any e-mails
2  that still existed instructing us not to use the photo,
3  and he did not.
4  Q. And anything else that you discussed?
5  A. Not regarding this case.
6  Q. Did he express any opinion about the second
7  lawsuit that's been filed?
8  A. I think he expressed sympathy for me that I
9  had to deal with it.
10 Q. Did he comment on it at all?
11 A. No.
12 Q. Did you talk about the concept of fair use
13 with Peter Brown at any time?
14 A. I don't remember.
15 Q. Do you know what fair use is?
16 A. I would like to think I do.
17 Q. Could you tell us what your knowledge --
18 A. Sure.
19 Q. -- of fair use is?
20 A. Yeah, first of all, I don't make any decisions
21 regarding fair use because I'm not an attorney and it is
22 a legal matter. I consult with our attorney when the
23 matter of fair use comes up in our newsroom.
24 Q. Do you have in-house counsel or is it

61

1  out-house counsel?
2  A. It's in-house counsel based in New York City.
3  Q. And who is in-house counsel's employer?
4  A. CBS.
5  Q. Okay. Is there a particular person that you
6  contact when there's a question of fair use that comes
7  up?
8  A. Yes, Nicholas Poser; P-O-S-E-R.
9  Q. Tell us what your impression of fair use is?
10 A. Sure.
11    When there is an image piece of video or
12 photograph that we deem extremely newsworthy, we use it
13 in the context of a news report or newscast for a
14 limited period of time.
15 Q. You used the words, extremely newsworthy, when
16 you were describing fair use?
17 A. Mm-hmm.
18 Q. Why did you use the word, extremely?
19 A. I guess to emphasize that I wouldn't just take
20 any old piece of video that didn't belong to me; that it
21 would have to truly be newsworthy.
22 Q. And what makes a particular picture newsworthy
23 or extremely newsworthy in your mind?
24 A. I don't think that's a question that -- a

62

1  direct question I could answer. I think it's a
2  case-by-case basis.
3  Q. Was the picture of Stephen Flemmi extremely
4  newsworthy at the time of his arrest in 1995?
5  A. Probably.
6  Q. Was it extremely newsworthy three years later
7  in 1998, when he may have appeared in court?
8  A. Probably.
9  Q. Was it extremely newsworthy when WBZ, again,
10 used the picture in connection with the story about John
11 Martorano?
12 A. I believe it was. Martorano's plea agreement
13 was an extraordinary moment in the history of the mob
14 story in Boston.
15 Q. Why was it necessary to show a picture of
16 Stephen Flemmi at the time that Martorano was sentenced?
17 A. Martorano had learned that Stephen Flemmi and
18 Whitey Bulger were FBI informants. Martorano was the
19 man actually committing a lot of murders that Bulger and
20 Flemmi had sanctioned. So Martorano, to use slang,
21 flipped on them and made it possible in the eyes of the
22 prosecutors to get Flemmi and Bulger, and that was a
23 major turning point in this case.
24    In addition to that, Martorano was given

63

1  what most of the public perceived as an incredibly light
2  sentence for the murders he committed. That is my
3  memory of the story.
4  Q. And what made the use of the image of Stephen
5  Flemmi extremely newsworthy that you would want to use
6  it in the story?
7  A. Well, for the couple of seconds that it was
8  up, it was the most recent image of Steve Flemmi that
9  existed, as far as I know, that wasn't a sketch.
10 Q. Why did the public need to see a picture of
11 Steve Flemmi?
12 A. Well, he's, in terms of crime figures in this
13 city, he's the second biggest crime figure this area has
14 ever seen.
15 Q. He's in jail. He's not at large, is he?
16 A. No, he's not.
17 Q. So is there any need for the public to -- the
18 audience that you broadcast to, to see a picture of
19 Stephen Flemmi on the --
20 A. I believe --
21 Q. -- Martorano story?
22 A. -- I believe in the context of a television
23 newscast that night, yes.
24 Q. Is that because television is a visual medium

64

1  and people like to see visual images when you watch and
2  listen to the news?
3  A. I think they expect it.
4  Q. So did you use the picture of Mr. Flemmi
5  because the audience expected to see a visual, if you
6  had one or more, because it is extremely newsworthy, to
7  use your words?
8  A. When I said they expected, that was in
9  response to what you just asked me. As I stated
10 earlier, I feel like this was a newsworthy event.
11 Q. Could you have used an illustration of Stephen
12 Flemmi?
13 A. Perhaps.
14 Q. Why do you say only, perhaps?
15 A. Because an illustration doesn't actually
16 portray an individual's likeness, in my opinion.
17 Q. So are you telling me a photograph of the
18 individual is better than an illustration of an
19 individual?
20 A. Yes.
21 Q. Better in terms of what?
22 A. Better in terms of identifying that
23 individual.
24 Q. Why was it necessary for WBZ-TV Channel 4

65

1  Boston to use a picture of Steve Flemmi in the broadcast
2  about John Martorano?
3     A.  Because we felt it was very necessary to tell
4  the story of Whitey Bulger, Stephen Flemmi and John
5  Martorano, and to set up who these individuals were so
6  our viewers would understand the impact of this case.
7  So a picture of Steve Flemmi was used for about two
8  seconds.
9     Q.  If you didn't have an image of Steve Flemmi,
10 would the story still have been as powerful and
11 informative to the broadcast audience to which you
12 broadcast?
13    A.  I don't think so.
14    Q.  If you had an illustration, but not a
15 photograph, of Stephen Flemmi, would you have used the
16 illustration in place of the photograph?
17    A.  Could we have physically used it?
18    Q.  Sure.
19    A.  Yes.
20    Q.  Did you have an illustration of Stephen
21 Flemmi?
22    A.  I don't know.
23    Q.  Do you know who Jane Collins is?
24    A.  I do.

66

1     Q.  Who is she?
2     A.  She's a courtroom artist.
3     Q.  Is she under contract with WBZ?
4     A.  On retainer; we call her in and pay her when
5  we use her work.
6     Q.  And when do you use her work?
7     A.  Usually in conjunction with federal court
8  appearances.
9     Q.  And how does she charge you?
10    A.  She sends us an invoice.
11    Q.  How much does she charge for each court
12 appearance?
13    A.  I don't know off top of my head; probably
14 about $200.
15    Q.  And was that the same fee she charged in 2004?
16    A.  I don't know.
17    Q.  Is there a way to find out what she formally
18 charges?
19    A.  Yes.
20    Q.  Do you normally hire Jane Collins to go to
21 federal court to sketch people who are being arraigned
22 or tried or --
23    A.  Yes.
24    Q.  -- sentenced or whatever is going on in court?

67

1     A.  People making appearances in federal court
2  because cameras are not allowed there.
3     Q.  And how many times can you use the sketches
4  that Jane Collins does for you on a news broadcast?
5     A.  Unlimited.
6     Q.  Is that part of the arrangement she has with
7  you?
8     A.  Yes.
9     Q.  I would like to show you another piece of
10 paper, and ask you if you recognize those images that
11 were taken off of a television screen with sketches
12 purporting to be by Jane Collins?
13    A.  Yes, I recognize the sketches and I know I've
14 seen them.
15    Q.  So WBZ, CBS, whatever entirety we're talking
16 about, contracted with Jane Collins to go to federal
17 court and to do illustrations of Stephen Flemmi?
18    A.  Absolutely, yes.
19    Q.  And you have unlimited usage rights?
20    A.  I couldn't tell you by looking at that, that's
21 Stephen Flemmi, but yeah.
22    Q.  Would you agree with me, there's certainly a
23 resemblance between the picture of Steve Flemmi
24 Exhibit 1, and the picture I just placed in front of you

68

1  with the sketch of Jane Collins?
2     A.  Sure, there's a resemblance.
3     Q.  Do you save those sketches?
4     A.  These would be saved as file tape.
5     Q.  Would they it be saved on a pitch reel?
6     A.  Perhaps.
7     Q.  So that if you, or Eric Cox, were to go to the
8  computer system and type in the name, Flemmi, you might
9  get both the photograph of Flemmi that exists on the
10 pitch reel even today, that one picture at least, plus
11 you would get sketches that would show up on a pitch
12 reel file tape somewhere?
13    A.  To be clear, that picture does not exist in
14 our news reel today.
15    Q.  Which picture?
16    A.  This photograph of Flemmi does not exist in
17 our news reel today.
18    Q.  Even the one that was not purged?
19    A.  Because that tape is in the Mary's office.
20    Q.  Okay.
21    A.  Please ask the second part of your question
22 again.
23    Q.  If you were to go to Eric Cox and he were have
24 do a search on the computer, would these sketches of

69

1   Flemmi --
2      A.  Yes, if they did not come up as part of that
3   search, we would be able to find them through other
4   methods of searching for file tape.
5      Q.  What would those methods be?
6      A.  Looking through stories having to do with the
7   Boston mob; looking physically through the hard copies
8   and books that we keep, to see if there are stories from
9   a court appearance that would contain sketches.
10         MR. EPSTEIN:  Could I have this marked as the
11   next exhibit?
12         (Exhibit 9 Marked for Identification)
13         MR. EPSTEIN:  I'm going to play the tape that
14   has the illustration in it.
15         (Tape played)
16         MR. EPSTEIN:  Let's have this marked as the
17   next exhibit.
18         (Exhibit 10 Marked for Identification)
19   BY MR. EPSTEIN:
20      Q.  Now, Miss Street, the tape that was just
21   marked as Exhibit No. 10, contains on its spine, the CBS
22   logo, the words, five minutes, January 6, 8, 9, 1995.
23   And also the tape we just watched had the illustration
24   of Stephen Flemmi on it by Jane Collins; would you

70

1   agree?
2      A.  Mm-hmm.
3         MR. EPSTEIN:  Off the record.
4         (Off Record Discussion)
5         (Lunch Recess)
6   BY MR. EPSTEIN:
7      Q.  Can you think of any other adjectives besides
8   the word, extremely, when you're talking about a
9   newsworthy picture?
10         MS. MURRANE:  Objection.
11   BY MR. EPSTEIN:
12      Q.  You can still answer the question.  She's just
13   objecting.
14      A.  I'm thinking about it.  No.
15      Q.  If there were a photographer who had taken a
16   picture of Whitey Bulger that was recent, say June 2006,
17   and it were published on the front page of The Globe,
18   would you consider that picture an extremely newsworthy
19   picture?
20      A.  If it happened within the last month?
21      Q.  Yes.
22      A.  Yes.
23      Q.  What's the most recent picture of Whitey
24   Bulger that you have available to you at Channel 4 and

71

1   Channel 38 now?
2         MS. MURRANE:  Objection.  Is this in a certain
3   category on the 30(b)(6)?  I'm not sure there's
4   something --
5         MR. EPSTEIN:  She's also the news director.
6   I'm looking for information to find out answers to
7   interrogatories.  I don't know if it has to be
8   exactly on 30(b)(6).
9         Let's just see where we go with it.
10         MS. MURRANE:  She can answer if she knows.
11      A.  I can't give you a date on -- in the piece.
12   The picture that was taken by -- his name is Stu and his
13   last name starts with a T.  He's a Boston Globe
14   photographer.  Boston Globe owns the picture.  It was
15   taken in the early '90's.
16         He's walking with Kevin Whites.
17      Q.  And do you have permission from The Globe to
18   use that photograph on the air?
19      A.  Yes.
20      Q.  In writing or is it oral?
21      A.  It's oral at first with the request that we
22   include the photographer's name and the courtesy which I
23   believe we saw on that piece.  At some point after it
24   had aired several times, the photographer asked The

72

1   Globe to ask us to cease using his name.  He did not
2   want his name associated with the photograph.
3      Q.  Do you know why?
4      A.  For reasons I can only guess.
5      Q.  And if you were to guess, what would you
6   guess?
7      A.  I believe he -- I'm not going to.
8         MS. MURRANE:  Objection.
9         MR. EPSTEIN:  What's the nature of your
10   objection?
11         MS. MURRANE:  You're asking for speculation.
12   BY MR. EPSTEIN:
13      Q.  That's all right to ask in a deposition.
14   What's your guess?
15      A.  A guess would be that he didn't want to feel
16   any reprisal from the Boston mob.
17      Q.  Did you have to pay The Globe or Stu T for
18   this picture?
19      A.  No.
20      Q.  Did anyone ask you for any compensation for
21   use of this picture?
22      A.  No.
23      Q.  If you were to use it again today in a news
24   broadcast, would you have to contact the Boston Globe,