Street, Jennifer - Vol. 1 [30(b)(6)]  7/19/2006  12:00:00 PM

73

1   or anyone else, for permission to use the photograph?
2       A.  I would not.
3       Q.  As time goes on, do pictures have sometimes
4   more or less newsworthiness?
5       A.  Yes, depending entirely on the news of the
6   day.
7       Q.  So some picture of, perhaps, Stephen Flemmi
8   could be extremely newsworthy on one day and only
9   moderately newsworthy on another day; would you agree?
10      A.  I do agree.
11      Q.  And then sometimes you, as a broadcast media,
12  would have a compelling need to publish a photograph of,
13  say, Whitey Bulger who was photographed in South Boston
14  and it's a recent picture, and in order to aid in the
15  apprehension of Whitey Bulger, there might be a
16  compelling need to publish or broadcast the photograph;
17  wouldn't you agree?
18      A.  I agree.
19      Q.  Was there a compelling need to publish the
20  Stephen Flemmi photograph in 1998 or in 2004?
21          MS. MURRANE:  Objection.
22      A.  In my opinion in 2004, the story was
23  newsworthy enough to publish that photograph.
24      Q.  We do agee that in 2004, you had access to a

74

1   sketch of Stephen Flemmi, don't we?
2       A.  As I believe I said earlier, in my opinion a
3   sketch is nowhere near --
4       Q.  The question I asked you is:  In 2004, you had
5   access to a sketch of Stephen Flemmi?
6       A.  Yes, I did.
7       Q.  And do you think it was extremely important
8   for your broadcast audience to see a picture of Stephen
9   Flemmi in 2004, when you used Mr. Fitzgerald's
10  photograph of Flemmi?
11      A.  I do think so.
12      Q.  Why?
13      A.  He's not a gentleman who's been photographed a
14  lot.  It's got an image we have access to.  And the
15  story of the Boston mob was taking on greater and
16  greater significance as we went through the early 2000's
17  with the revelation of Flemmi and Bulger's connections
18  to the F.B.I., their roles as informants, the
19  sanctioning of murders.
20          And I do feel like including his photo
21  for the two seconds it was up, was an important thing to
22  do.
23      Q.  Did you time how long the photograph was up on
24  the air?

75

1       A.  Here's what I have timed.  I have timed the
2   space that is now black on my copy of the Christina
3   Hager piece which was almost two seconds.
4       Q.  Is it over two seconds or under two seconds?
5       A.  Under two seconds.
6       Q.  But close enough to round up to two seconds?
7       A.  Yes.
8       Q.  I want to refer back to Exhibit No. 6 and
9   place it in front of you, Miss Street.  You said in your
10  answer to interrogatory No. 3, in August 2000, the pitch
11  reel containing a copy of the photograph, that is
12  Stephen Flemmi photograph either Exhibit 1 or 2, was
13  placed in the video library being housed in 1170
14  Soldiers Field Road and stored on the shelf with the
15  housing tapes that contain Mafia stories.
16          Now I asked you earlier before a lunch
17  break what the significance of the line was where it
18  says, Submitted By, and then there's a block that says,
19  Crime/2C, and then the word, On, and then nomenclature
20  that says 8/18/2000, 11:29:17.
21          Is that notation of that August 18, 2000,
22  does that refer to when the pitch reel containing a copy
23  of the Stephen Flemmi photograph was placed on the
24  individual video --

76

1       A.  No, I believe that's an automatic time stamp
2   in the computer as to when this computer entry was made.
3       Q.  So how is the pitch reel identified containing
4   the photograph, copy of the photograph, that was placed
5   in the video library at 1170 Soldiers Field Road in
6   August of 2000?
7       A.  It would make tapes that those two events
8   would correlate.
9       Q.  Did somebody tell you that's when the tape was
10  put on the video library shelf?
11      A.  I don't believe anybody told me that.
12      Q.  Was there a two-year time lapse between the
13  time that the 60 Minutes Program was broadcast on
14  May 10, 1998 and the time that the pitch reel containing
15  the Flemmi photograph was placed in the video library?
16      A.  I don't know.
17      Q.  Were there any other stories other than the
18  pitch reel besides the segment of the 60 Minutes story
19  about organized crime in Boston that was aired on
20  May 10th, 1998?
21      A.  So the question is whether there are other
22  stories?
23      Q.  Were there other stories with video clips,
24  audio clips of any other --

77

1    A.  No, I believe it was just the 60 Minutes
2    piece.
3    Q.  Have there been other stories about organized
4    crime in Boston from 1998 to date?
5    A.  Sure, yes.
6    Q.  And would you have expected that there would
7    be other stories of organized crime on that particular
8    pitch reel?
9    A.  On the 60 Minutes' pitch reel --
10   Q.  Yes.
11   A.  -- the pitch reel we're talking about?
12   Q.  That's correct.
13   A.  This pitch reel was not made.  Earlier in our
14   discussion, I described to you how pitch reels are made
15   that library gets tapes.  But this pitch reel was not
16   done in that fashion.
17       This is a dub of 60 Minutes that someone,
18   as you know, I don't know who made and it was placed on
19   a shelf.  But it was not a standard pitch reel; so no,
20   there are no other stories on there.
21   Q.  What do you mean by the word, dub?
22   A.  Duplicate.
23   Q.  And the size tape we are talking about that
24   you identify on Exhibit 6, is that the kind of tape that

78

1    pitch reels are normally stored on?
2    A.  That's one of two kinds.
3    Q.  What is the other one?
4    A.  A shorter tape, a 30-minute tape.  This is a
5    60-minutes tape; no relation to the name of the program.
6    Q.  And is there any reason why someone would use
7    a 60-minutes tape versus a 30-minute tape?
8    A.  They felt like they had a lot of material to
9    put on it.
10   Q.  I would like to show you one more tape,
11   Miss Street, and ask you if you can identify what this
12   tape is?
13       (Tape played)
14   MR. EPSTEIN:  First, let's have this marked as
15   the next exhibit.
16   (Exhibit 11 Marked for Identification)
17   BY MR. EPSTEIN:
18   Q.  Miss Street, would you identify what's printed
19   on the spine of this tape, please, that's been marked as
20   Exhibit No. 11?
21   A.  WBZ Flemmi photos.
22   Q.  And does that label on the spine have a CBS
23   logo on it?
24   A.  It does.

79

1    Q.  What is that?
2    A.  It's clips from various newscasts on WBZ, I
3    believe, in the mid-to-late 1990's.
4    Q.  And how could you put a date on it?
5    A.  As you pointed out, we've had a lot of
6    different logos and different font types, and that's how
7    I mentally attempt --
8    Q.  So that was a logo and font type that was used
9    at that particular time?
10   A.  Yes.
11   Q.  Would you call that a pitch reel?
12   A.  No.
13   Q.  How does that differ from a pitch reel?
14   A.  There's very little on here that could be used
15   that was complete enough to be used to pull video from.
16   There's no natural sound.
17   Q.  Can you tell from looking at that tape, what
18   that tape was prepared for?
19   A.  I believe it was probably prepared for the
20   1998 litigation.  That's a complete guess on my part.
21   Q.  I would say that's a good guess.
22   A.  I suppose it's an educated guess.
23   Q.  Is there any footage on that reel that we just
24   saw, Exhibit No. 11 from the 60 Minutes broadcast, that

80

1    was broadcast on May 10, 1998?
2    A.  Not to my knowledge.
3    Q.  You didn't see any 60 Minutes logo or CBS
4    Network logo, did you --
5    A.  I did not.
6    Q.  -- on any of the pictures?
7       All the pictures that were used on that
8    tape had the Channel 4 logo that was in use at that
9    approximate period of time?
10   A.  Correct.
11   Q.  Miss Street, I'm placing in front of you, a
12   document that says on the top, CBS Memorandum from Lisa
13   Binns to CND.HMG, I believe.
14       Do you recognize this document?
15   A.  I may have seen this in the paperwork that was
16   given to me for the deposition.
17   Q.  Do you have any idea what it is?
18   A.  I believe it's a part of a conversation
19   regarding the network's purchase of photographs of
20   Stephen Flemmi.
21   Q.  Okay.  And it does talk about Christopher
22   Fitzgerald in that memo, doesn't it?
23   A.  It does.
24   Q.  And it also talks about concern in the

81

1   handwriting at the bottom of the page, does it not?
2       A.  I need some help --
3       Q.  Well, if you look at the handwriting on the
4   bottom, it says, His concern: Other TV stations will
5   download and reuse, it looks to me --
6       A.  Yes.
7       Q.  -- one, two times?
8       A.  That might be transmission or -- I don't know.
9   Yes, I do recognize his concern and the handwriting.
10      Q.  The two times, let's assume it's transmissions
11  within one year, does the designation W/W mean
12  anything --
13      A.  It does not, to me.
14      Q.  -- to you?
15          What does No. 2 say?
16      A.  Home video.
17      Q.  And No. 3?
18      A.  In flight.
19      Q.  And the bottom it says:  I offered $1,000 for
20  two photos.  He asked for 1410; agreed on 1300 with
21  asterisk.
22          Do you agree with me?
23      A.  Yes.
24          MR. EPSTEIN:  Could I have that marked as the

82

1   next exhibit.
2       (Exhibit 12 Marked for Identification)
3   BY MR. EPSTEIN:
4       Q.  I show you another document that's dated
5   March 17, 1998 to Ms. Heddy Gold.  Do you know who she
6   is?
7       A.  Only by the title on the documentation I
8   looked at.
9       Q.  You don't know her personally, do you?
10      A.  I do not know her nor have I had a
11  conversation with her.
12      Q.  And did you and your attorneys produce this
13  document as part of the discovery in this case?
14          MS. MURRANE:  If you know whether --
15  BY MR. EPSTEIN:
16      Q.  Let's put it this way:  Your attorney did
17  produce this as part of the discovery in this case and
18  it has the Bates stamp No. 0053 in the lower right-hand
19  side.
20      A.  Okay.  May I ask if it was part of the 1998
21  litigation or part of 2004 litigation?
22      Q.  The 2004 litigation.
23          Have you had a chance to review this
24  document?

83

1       A.  Yes.
2       Q.  And you would agree with me that the terms of
3   the contract for the use of the stock images of Stephen
4   Flemmi on 60 Minutes are the same ones that Chris
5   Fitzgerald and Heddy Gold appear to agree on during
6   their telephone conversations?
7       A.  I do and.
8       Q.  Chris goes on to say, I will ship the
9   photographs to Ms. Binns, B-I-N-N-S, and mail an invoice
10  to you?
11      A.  Yes.
12      Q.  If the language is not to your liking, I will
13  anticipate hearing from you.
14          And could you read aloud the last
15  sentence in the third paragraph of this letter?
16      A.  Sure.  I am leery of other news organizations
17  gleaning the photos without permission, especially since
18  those are the only topical photos, still or video, that
19  exists of Mr. Flemmi, at least to my knowledge.
20      Q.  What does that mean to you?
21      A.  It means that Mr. Fitzgerald was concerned
22  that someone would record 60 Minutes and use the photos
23  for commercial use because he knows they're newsworthy.
24      Q.  And when you say, Commercial Use, what do you

84

1   mean by commercial use?
2       A.  Airing on a commercial enterprise.
3       Q.  Is a news organization a commercial
4   enterprise?
5       A.  Yes.
6       Q.  So when you say, commericial use, we're not
7   talking about somebody putting it on a T-shirt; he was
8   worried about --
9       A.  Well, I would say putting it on a T-shirt
10  would be commercial use --
11          MS. MURRANE:  Objection.
12      A.  -- but I don't think he was worried about
13  somebody having it in their personal collection of
14  photographs.
15          MR. EPSTEIN:  Could I have this marked as the
16  next exhibit?
17      (Exhibit 13 Marked for Identification)
18  BY MR. EPSTEIN:
19      Q.  Next document I'm going to show you is one
20  that was produced in this litigation by your counsel
21  Bates stamped 0047 entitled, Stock Photography Contract,
22  March 16, 1998.
23          Do you recognize this document?
24      A.  Yes.

85

1  Q. Could you tell us what it is?

2  A. It is a contract between Christopher

3  Fitzgerald and CBS News, specifically 60 Minutes.

4  Q. Okay. And it appears to be signed by Heddy

5  Gold, who appears to be the director of business affairs

6  for CBS News; would you agree?

7  A. I agree.

8  Q. Thank you.

9      MR. EPSTEIN: Could I have this marked please?

10     (Exhibit 14 Marked for Identification)

11  BY MR. EPSTEIN:

12  Q. In this contract, could you tell me by

13  reviewing it, what 60 Minutes could have used

14  Christopher Fitzgerald's picture for in the May 10, 1998

15  broadcast of the show?

16  A. I'm sorry, what they could have used his

17  picture for?

18     MS. MURRANE: Objection.

19  BY MR. EPSTEIN:

20  Q. Yes.

21     MR. EPSTEIN: What is the nature of the

22  objection?

23     MS. MURRANE: You're asking her about a

24  document she didn't negotiate or have any

86

1  involvement in and her interpretation of that

2  document.

3     MR. EPSTEIN: CBS produced it as part of

4  discovery, so she can certainly -- is qualified to

5  comment on what she thinks it says.

6     MS. MURRANE: What she knows about it.

7  A. What I know about it is what I read here,

8  which is that 60 Minutes had the right to use the photos

9  on May 10th in their broadcast, and then if that

10  broadcast were to be repeated, as television shows often

11  are, those photos could be used again for that one-time

12  repeat. That they had the right to use it in an

13  international or foreign broadcast of 60 Minutes. They

14  had the right to use them if the 60 Minutes' piece were

15  to air on an airline flight presentation.

16  Q. How about video sales?

17  A. I'm going over that one again. I'm not

18  entirely sure what that means.

19  Q. I'm sorry?

20  A. I'm going to presume it means that when people

21  call 60 Minutes and ask for a copy of the broadcast,

22  they're allowed to give them the entire broadcast with

23  the photographs in it, but I don't know for sure on that

24  one.

87

1  Q. Okay. Before we go on, does 60 Minutes

2  usually give away for free from its archives copies of a

3  60 Minutes' show or do they sell them?

4  A. They probably sell them; most networks do.

5  And then the final point is that the contract does not

6  grant CBS rights or its affiliates rights to use the

7  pictures.

8     MR. EPSTEIN: Can I have this marked as the

9  next exhibit, please.

10     (Exhibit 15 Marked for Identification)

11  BY MR. EPSTEIN:

12  Q. I'm going to show you another document,

13  Miss Street, and ask you if you can identify this?

14  A. Sure. It's a letter written within the same

15  week as the contract from Christopher Fitzgerald to the

16  producer of the 60 Minutes piece, whose name is Lisa

17  Binns, asking if the copyright notice would appear on

18  the credits of the show.

19  Q. And what does Mr. Fitzgerald state about this

20  photograph?

21  A. The same sentence I read earlier. I'm leery

22  of other news organizations gleaning the photographs

23  without permission, especially since these are the only

24  topical photos, still or video, which exists of

88

1  Mr. Flemmi, at least to the best of my knowledge.

2  Q. And Mr. Fitzgerald goes on to say, he's

3  including an invoice of Heddy Gold with this letter?

4  A. Right.

5     MS. MURRANE: Let me have this marked as the

6  next exhibit, please.

7     (Exhibit 16 Marked for Identification)

8  BY MR. EPSTEIN:

9  Q. I've given you another document; appears to

10  have Christopher Fitzgerald's name dated March 18, 1998.

11     Do you recognize that?

12  A. Yes, I believe this to be the enclosure

13  referred to in the last document.

14  Q. And in this letter, Mr. Fitzgerald is

15  including an invoice?

16  A. Correct.

17  Q. I'm going to show you another document; and

18  does that appear to be an invoice for the use of the

19  Flemmi photograph on the 60 Minutes' news broadcast?

20  A. It does.

21  Q. And yet a third document, which appears, to me

22  at least, to be a photocopy of the stock photo invoice

23  that I just showed you with an additional notation on

24  the lower right-hand side.

Street, Jennifer - Vol. 1 [30(b)(6)]  7/19/2006  12:00:00 PM

89

1    Can you read it?
2    A. I'm presuming that Heddy is marking that she
3    received this or perhaps this is the go ahead to pay it.
4    Q. Would you agree it says, Okay to pay, on the
5    bottom?
6    A. Okay. I didn't see, Okay to Pay, but I
7    recognize the signature from having done it myself.
8    Q. And is that a necessary notation to make on
9    the invoice by somebody who is the director of business
10   affairs for somebody like CBS News?
11   A. I believe it is. As the news director, I do
12   just that with all invoices that come through the
13   newsroom.
14   Q. And in keeping with that, I'll give you a
15   document that has CBS Memorandum on it from Heddy M.
16   Gold, which appear HMG; do you --
17   A. And I do believe those to be Heddy Gold's
18   initials.
19   Q. Then it says, Please rush payment in the
20   amount of $3,200; charge $220 to CBS Enterprises for the
21   international and videocassette rights.
22   Do you agree with me?
23   A. Yes.
24   Q. And lastly, I'm going to show you a copy of

90

1    another document; and could you tell me what that
2    appears to be?
3    A. That appears to be a stub of a check, not the
4    check itself, but the --
5    Q. Stub of a check from CBS, Inc.?
6    A. Correct.
7    Q. Dated May 14th, 1998?
8    A. Yes.
9    Q. For a total of $1,300.
10   A. Yes.
11   Q. And it says on it, Rights of Photo of Stephen
12   Flemmi; would you agree?
13   A. I do.
14   MR. EPSTEIN: I would like to have these
15   marked as the next Exhibit 16, composite exhibit.
16   (Exhibit 16 Marked for Identification)
17   BY MR. EPSTEIN:
18   Q. Okay. Let me show you another document, if I
19   may. This is from Lisa Binns to CND.HMG, which I gather
20   from the previous memos that HMG are the initials of the
21   business director, but I don't know what CND is; perhaps
22   CBS News Department?
23   A. It could easily be.
24   Q. And what's the date on this document?

91

1    A. The date is 5/6/98.
2    I just need to read this, if you don't
3    mind?
4    Q. No, not at all.
5    A. Okay.
6    Q. This document was produced by your attorneys
7    and Bate stamped 0056 in connection with the 2004
8    litigation.
9    Could you tell me what this is?
10   MS. MURRANE: Same objection. We have no
11   foundation that it's her document, that this is her
12   handwriting, that she received it. She can testify
13   about what she knows.
14   MR. EPSTEIN: I'm just asking her what she
15   knows.
16   A. Well, I don't know much about it at all. I
17   can tell you what I think it is from looking at it, if
18   that's what you want?
19   Q. If you don't know what this document is, I
20   want your best educated guess as to what you think it
21   is?
22   A. My educated guess is that Heddy, the business
23   director, asked Lisa for contact numbers to call the
24   Boston Globe and the Boston Herald to inquire about

92

1    photographs that they may have wanted to help with their
2    piece on the Wheeler murder.
3    Q. And the Wheeler murder was one of the subjects
4    of the 60 Minutes' broadcast --
5    A. Yes.
6    Q. -- that we just watched from May 10, 1998?
7    A. Yes, absolutely.
8    MR. EPSTEIN: I would like to have that
9    marked.
10   (Exhibit 17 Marked for Identification)
11   BY MR. EPSTEIN:
12   Q. I've just placed another document in front of
13   you, and I wonder if you recognize this document,
14   Miss Street?
15   A. This appears to me to be a format for 60
16   Minutes.
17   Q. And what do you mean by Format?
18   A. The lineup of the program form while it was
19   typed on the fifth -- I'm sorry, the 8th of May, 1998;
20   presumably it's the show that was to air on the 10th.
21   Q. The 10th being Sunday?
22   A. Yes.
23   Q. And that's the day that the 60 Minutes'
24   broadcast is on, on Sundays?

93

1    A. Yes.
2    Q. And is this similar to the type of e-mail
3    document that you would have routinely gotten from 60
4    Minutes containing the content of the upcoming show?
5    A. Not at all.
6    Q. Do you know where this document came from?
7    A. I presume from 60 Minutes.
8    Q. Okay. You didn't find this document within
9    the business records of WBZ-TV or UPN 38 or CBS 4
10   Boston?
11   A. There's no way in the course of a routine week
12   we would have access to this; in fact, I've never seen
13   one of these before.
14   Q. Okay.
15      MR. EPSTEIN: I would like to have this one
16   marked as the next exhibit.
17      (Exhibit 18 Marked for Identification)
18   BY MR. EPSTEIN:
19   Q. I just showed you another document that you
20   have produced as part of this litigation, Bate stamped
21   0049; and do you know what this document is?
22   A. It appears to be a memo from the CBS business
23   news manager to an executive of CBS international,
24   informing them of what they're able to use and not use

94

1    in their international broadcast.
2    Q. Okay. Did WBZ-TV or UPN 38 ever get a copy of
3    this document?
4    A. No.
5    Q. Do you know where this document came from?
6    A. Presumably, from the Network itself.
7      MR. EPSTEIN: I would like to have this marked
8    as the next exhibit, please.
9      (Exhibit 19 Marked for Identification)
10   BY MR. EPSTEIN:
11   Q. I would like to show you another document that
12   has been produced by counsel, and these two pages have
13   been Bates stamped 0054 and 0055.
14      Do you recognize this document?
15   A. Only from looking over the documents in
16   preparation for deposition.
17   Q. Where did this document come from?
18   A. Again, I believe from the Network, from 60
19   Minutes.
20   Q. Have you ever seen this document before it was
21   supplied to me by your attorneys?
22   A. No.
23   Q. Was this document ever in the records of
24   WBZ-TV or you UPN 38?

95

1    A. No, not to my knowledge.
2      MR. EPSTEIN: Could I have this marked as the
3    next exhibit?
4      (Exhibit 20 Marked for Identification)
5    BY MR. EPSTEIN:
6    Q. And one more document that I would like to
7    show you, which is a document with the WBZ 4 logo on the
8    upper left-hand side with the date December 22, 1998.
9      Could you tell us what this document is?
10   A. It's my understanding, I don't have firsthand
11   knowledge, but this was a document prepared by a news
12   manager at WBZ as part of the litigation that occurred
13   in 1998 of the number of times and the amount of time
14   Chris Fitzgerald's photo was used in our newscast. That
15   is my understanding.
16   Q. And when you normally record how many seconds
17   an image is used on screen, do you split the second into
18   more than half-seconds increments?
19   A. I don't, but a person who formed this document
20   did.
21   Q. Perhaps you didn't understand my question.
22      When you normally have a document like
23   this, where it has 2 seconds, 1.5 seconds, 2.5 seconds,
24   and so on, do you sometimes cut the seconds --

96

1    A. There's nothing normal about this document for
2    me. I can't say. I had never characterized it like
3    that, so there's no normal for me.
4    Q. Fair enough.
5      MR. EPSTEIN: Let's get this marked.
6      (Exhibit 21 Marked for Identification)
7      (Short Recess)
8    BY MR. EPSTEIN:
9    Q. Now, we have just gone over Exhibits 12
10   through 21.
11      Are there any other agreements that you
12   are aware of between CBS or WBZ-TV Channel 4 Boston or
13   UPN 38, whereby CBS, the Network, or Channel 4, Channel
14   38, could use either of the Stephen Flemmi photographs,
15   Exhibit 1 or Exhibit 2?
16   A. No.
17   Q. No other oral agreement, no other written
18   agreement that you're aware of?
19   A. Not that I'm aware of.
20   Q. Have you made a thorough inquiry of your staff
21   and the CBS Network to see if there are any other
22   agreements or written documents?
23   A. My inquiry has been to my staff, not to the
24   Network. I should say the staff at the time because it

97

1   was not my staff a year ago or a year and a half ago
2   when this came about.
3       Q.   Fair enough.
4           At the time that the CBS Network first
5   broadcast the 60 Minutes program on May 10th, 1998 with
6   the story about Stephen Flemmi, and others, did CBS have
7   the right to use the Fitzgerald's photographs in that
8   story a total of five times?
9       MS. MURRANE:   Objection.  Go ahead.
10      A.   The May 10th, 60 Minutes broadcast?
11      Q.   From everything you reviewed this morning, all
12  the documents from Exhibits No. 12 through and including
13  Exhibit No. 21, is there anything in there where you
14  believe that 60 Minutes had the authority to use either
15  one or both of Mr. Fitzgerald's photographs of Stephen
16  Flemmi a total of five times?
17      A.   Yes, I believe they did so completely within
18  their right.
19      Q.   Could you point out a document to me that
20  gives them a right to use that picture five times?
21      A.   I'm looking at Exhibit 14 which is a contract,
22  a signed contract.
23      Q.   And where does it say they could use the
24  images five times?

98

1       A.   I think the five times is spelled out on this
2   document.  Oh, excuse me, it's not my document.  But it
3   does say, Broadcast one single screen exposure of both
4   photos.
5       Q.   Did CBS, in fact, broadcast more than one
6   single screen exposure of either of those photographs?
7       A.   It broadcast more than one single screen
8   exposure of one of the photographs.
9       Q.   Okay.  So is there anything in this document
10  that you can see that would give them permission to use
11  any picture of Stephen Flemmi five times --
12      MS. MURRANE:   Objection.
13  BY MR. EPSTEIN:
14      Q.   -- on that broadcast?
15      A.   Not that I can see, but this is not my
16  document.  I didn't negotiate the deal.  I was not privy
17  to conversations that were had.
18      Q.   Okay.  Did you at any time during your tenure
19  at WBZ TV, CBS Broadcasting in Boston, whether with
20  Channel 4 or Channel 38, ever see this document at or
21  approximately the time that the May 10th, 1998, 60
22  Minutes program was broadcast by CBS in New York?
23      A.   I did not.
24      Q.   Is there anything in this document that gives

99

1   Channel 4 the authority to make a copy of the 60 Minutes
2   broadcast?
3       MS. MURRANE:   Objection.  Can we just clarify
4   which document are you still talking about?
5   BY MR. EPSTEIN:
6       Q.   The document that's in front of you.
7       A.   Document 14 --
8       MS. MURRANE:   Objection.
9       A.   -- Exhibit 14.
10      Q.   Is there anything in Exhibit 14, that gives
11  WBZ-TV in Boston the right to record the 60 Minutes
12  broadcast of May 10, 1998?
13      A.   No.
14      Q.   In fact, is there language in that document
15  that seems to suggest or does state that CBS could not
16  make a copy of that broadcast?
17      A.   It states that CBS should not publish the
18  photos.  It said nothing about whether or not we could
19  record the program photos.
20      Q.   And what about the last sentence of paragraph
21  six?
22      MS. MURRANE:   Objection.  Is there a question?
23      A.   Is there a question?
24      Q.   I refer you to the last sentence of paragraph

100

1   six.  Is there anything in that sentence that gives or
2   prohibits Channel 4 from making a copy of the 60 Minutes
3   broadcast that was done on May 10th, 1998?
4       A.   I'm drawing a distinction between your
5   language of making a copy and the language here that is
6   about use and rebroadcast.
7       Q.   Okay.  Would you agree with me that making a
8   copy of a broadcast is a use of a broadcast?
9       MS. MURRANE:   Objection; again, you're asking
10  her to interpret a contract.
11      MR. EPSTEIN:   I know.
12      A.   I guess I wouldn't see it as such, no.
13      Q.   What does the word, use, mean to you?
14      A.   Publishing in the context of this document.
15      Q.   And what does the word, rebroadcast, mean to
16  you?
17      A.   Putting it on air; transmitting it over our
18  airwaves.
19      Q.   So you're equating the word of use with the
20  word rebroadcast?
21      A.   In the context, I am.  I don't see language
22  here that I don't have the right to roll tape owned by
23  60 Minutes.
24      Q.   Do you agree that CBS exceeded the license

101

1    that was given by Mr. Fitzgerald when it used one of the

2    Flemmi photographs on the 60 Minutes' show broadcast on

3    May 10, 1998 a total of five times?

4        MS. MURRANE: Objection. She can answer if

5    she knows.

6    A. Again, I didn't make this deal. I don't feel

7    qualified to answer that question.

8    Q. Well, I'm asking you to look at Exhibit

9    No. 14.

10    A. Yeah.

11    Q. In looking at Exhibit No. 14, is there

12    anything in that document that appears to give CBS a

13    license to use the Flemmi photograph more than once for

14    each photograph?

15        MS. MURRANE: Objection.

16    A. You used the word, appears. I can say it

17    appears not to. I don't state that as fact because I

18    don't know how one single screen exposure was defined by

19    the parties.

20    Q. How would you define one single screen

21    exposure?

22    A. As seeing the photo appear on the screen once.

23    Q. Based on your definition of single screen

24    exposure, would you say that CBS has violated that term

102

1    of the agreement?

2        MS. MURRANE: Objection.

3    A. It appears that way to me.

4    Q. And I know you didn't negotiate any of these

5    documents I'm going to be talking about. I understand

6    that completely. Before counsel objects, I'm telling

7    you I understand that.

8        But in the context of this Stock

9    Photography Contract, which has been marked as

10    Exhibit 14, and what appears to be Mr. Fitzgerald's

11    concern about the apprehension he had about other news

12    organizations getting the photograph and using it

13    without permission, would you agree that WBZ-TV did not

14    have the right to make a copy of the 60 Minutes' program

15    that included the story about Flemmi that was broadcast

16    on May 10, 1998?

17        MS. MURRANE: Objection?

18    A. I don't agree we didn't have a right to make a

19    copy. I don't agree with that.

20    Q. Okay. So let's assume you did have the right

21    to make a copy, what could you have used the copy for?

22    A. There were other images in the story that I

23    believe we might have been able to use or at least

24    become aware of them --

103

1    Q. What about the Flemmi -- I'm sorry. Did you

2    finish your answer?

3    A. Yeah, become aware of what our colleagues at

4    60 Minutes had gotten. As it turned out, a piece had

5    contained a lot of file footage we had already seen and

6    much of it was from us.

7    Q. Did the CBS Network know that you were making

8    a copy of the CBS broadcast on May 10, 1998?

9    A. I don't know.

10    Q. Was it ever the practice of WBZ-TV 4 to ever

11    notify the Network that you were making a copy of any of

12    its shows or any of its broadcasts?

13    A. I am not aware of that.

14    Q. If the Network ever gets a photograph or video

15    footage or film footage or illustration or any kind of

16    graphics that are protected by copyright, do they ever

17    notify you that you cannot use any of that material for

18    any purpose other than its original broadcast?

19    A. I have never been aware of 60 Minutes putting

20    out such information. I'm aware of the CBS evening news

21    putting such information out to its affiliates.

22    Q. And how do you disseminate that?

23    A. Usually electronically.

24    Q. And when you get an electronic notice from CBS

104

1    Network, what do you do with it?

2    A. Well, I take note of it. I usually, as the

3    practice of WBZ, put out our own note to our staff and

4    our own electronic system, which is different than the

5    one that CBS uses, but it is an electronic system in

6    which virtually every employee logs in and reads his or

7    her mail.

8    Q. So if there were a news broadcast on the air

9    and there was a photograph that was copyright protected

10    and you hadn't purged that photograph and you weren't

11    supposed to make a copy of it, would you notify the

12    staff of the copy of the day's broadcast of that

13    photograph?

14    A. Probably. We would also announce it by

15    informing the news people who did the editing and the

16    producing of the shows in a meeting with the news people

17    who announce it in a meeting.

18    Q. And I may have asked this question before and

19    forgive me for asking it twice, but sometimes I forget

20    what I had for breakfast this morning: Do you know when

21    that -- I'm sorry, strike the question.

22        Would you agree with me that the pitch

23    reel was made from that 60 Minutes broadcast of May 10,

24    1998?

105

1    A. Yes.
2    Q. And do you know when that pitch reel was made?
3    How long after or soon after the 1998 broadcast of the
4    60 Minutes show?
5    A. No, we did discuss this earlier. I don't know
6    when. I don't know who. Only that it must have been
7    made fairly soon after the broadcast.
8    Q. And how did you come to the conclusion that it
9    must have been made shortly after the broadcast?
10   A. Because given the litigation that happened in
11   1998, it was certainly the policy of WBZ and UPN 38, we
12   would not use Mr. Fitzgerald's photograph because we
13   didn't want to have to go down this path again.
14   Q. Okay. If you had been given a copy of
15   Exhibit 14, the Stock Photography Contract, between CBS
16   News and Christopher Fitzgerald, if you had been given a
17   copy of that on or about May 10th, 1998, would you have
18   made a recording of the 60 Minutes' broadcast that
19   evening?
20       MS. MURRANE: Objection.
21   A. That's a good question. Probably not.
22   Q. Why not?
23   A. Having gone the road we went down or were in
24   the middle of in May of 1998, there's no one at the

106

1    television station that wanted to continue to do
2    litigation with Mr. Fitzgerald or yourself or anyone
3    else, and perhaps the safest way to ensure that didn't
4    happen would be not to make the recording.
5    Q. And of course if the recording were never
6    made, a pitch reel would never have been made. And if
7    the pitch reel would never have been made, the June of
8    2004 broadcast of the news that contained Mr. Flemmi's
9    photograph would never have been aired; would you agree
10   with me?
11   A. I thought about that many times. Yes, I
12   agree.
13   Q. Would you agree with me that if the librarian
14   at WBZ, Eric Cox, was aware that Fitzgerald owned the
15   copyrights to the Flemmi photographs, and if he had a
16   copy of Exhibit 14, the Stock Photography Contract, he
17   probably would not have authorized a pitch reel to be
18   made?
19       MS. MURRANE: Objection.
20   A. He didn't know how to authorize a pitch reel
21   to be made.
22   Q. Okay. Would he have authorized a copy of the
23   60 Minutes' broadcast to be made?
24       MS. MURRANE: Objection.

107

1    A. He doesn't authorize whether copies are made.
2    That's Tom Janssen.
3    Q. That's who?
4    A. Tom Janssen.
5    Q. Just as a housekeeping matter, I would like to
6    show you a document that I created that says, Pitch Reel
7    on top, and has a picture taken off a television screen
8    of Whitey Bulger on the left and Stephen Flemmi on the
9    right.
10       Would you agree with me that this
11   photograph of Stephen Flemmi still appears on the pitch
12   reel that was produced by your attorneys to me in this
13   litigation?
14   A. One image.
15   Q. This one image. The other three uses were
16   purged from the pitch reel, but this one image?
17   A. After watching the tape here, I believe it's
18   four.
19   Q. So four uses were purged but one-fifth use was
20   not purged; would you agree?
21   A. Yes.
22       MR. EPSTEIN: Could I have this marked as the
23   next exhibit.
24       (Exhibit 22 Marked for Identification)

108

1    BY MR. EPSTEIN:
2    Q. At the time that the pitch reel was made, did
3    WBZ-TV or UPN 38 have a plan in place to avoid the
4    unauthorized use of photos like Christopher Fitzgerald's
5    pictures of Stephen Flemmi?
6        MS. MURRANE: Objection.
7    A. The plan was the same as it's been. It was
8    notification usually by electronic e-mail and discussion
9    at a meeting.
10   Q. Notification from whom and by whom?
11   A. I'm sorry, the question is -- you should
12   repeat the question.
13   Q. Sure.
14       When the pitch reel was made, and we
15   don't know when exactly it was made, and I'm thinking
16   that's the objection your counsel has. At the time the
17   pitch reel was made, did WBZ have any kind of plan in
18   place to avoid the unauthorized use of photographs like
19   that of Christopher Fitzgerald's pictures of Stephen
20   Flemmi?
21       MS. MURRANE: Objection.
22   A. Yeah, it doesn't particularly matter when the
23   pitch reel was made because the policy has remained
24   consistent through the '90's and into the decade that

109

1  follows. If there is a photo we agree we're not going
2  to air, we try to expunge it from file tape.
3          It hasn't happened that often. We try to
4  expunge it from file tape. We put a notice
5  electronically out to news staff that the photograph is
6  not to be used. We try to spread it through word of
7  mouth and then place it on notices and in our bulletin
8  that this is something that should not appear on our
9  air.
10     Q.  To the best of your recollection, how many
11  times has it happened in the past that you can't use a
12  photograph?
13     A.  That we have in our possession a photograph
14  that we can't use?
15     Q.  That's correct.
16     A.  Twice, 1998 and 2004. I'm serious, if my
17  memory --
18     Q.  Are we talking about the Stephen Flemmi --
19     A.  I'm talking about these photographs. To the
20  best of my knowledge, this is the only case in my 16
21  years.
22     Q.  In your 16 years at the television station,
23  WBZ, Channel 4 Boston, CBS, UPN 38, whatever
24  nomenclature I left out, you've never been sued or

110

1  accused of any copyright infringement of any photograph,
2  film or video footage, illustration, graphic other than
3  those brought to Mr. Fitzgerald?
4     A.  Not to my knowledge. I will say that in those
5  years that I was the 6:00 a.m. producer and 5:30 p.m.
6  producer, if there were discussions on levels there may
7  have well been discussion of levels higher than me,
8  although as producer of a show, I'm frontline.
9          And so I believe I would know that if we
10  had crossed any lines and had been accused of any such
11  thing.
12     Q.  And you have no knowledge of any such claims
13  or accusations or lawsuits?
14     A.  Not in my memory. I can't say that I remember
15  every moment over the last 16 years.
16     MS. MURRANE:  That's okay, Mr. Epstein doesn't
17  remember what he had for breakfast.
18     THE WITNESS:  Me either.
19     MR. EPSTEIN:  I'm giving away a secret. I do
20  remember breakfast.
21  BY MR. EPSTEIN:
22     Q.  What involvement, if any, did you have in the
23  prior lawsuit brought by Mr. Fitzgerald against
24  Channel 4 and CBS?

111

1     A.  None.
2     Q.  Were you involved in any discussions?
3     A.  I was told not to use the Steve Flemmi photo,
4  which it now appears to be it an exhibit; and Exhibit 2,
5  what I would call the other photo. But I was only
6  informed of that in my capacity as executive producer of
7  the 11 o'clock News and hoping to make sure the mistake
8  doesn't happen again.
9     Q.  I'm sorry, you said it was Exhibit 2 with
10  Flemmi looking to the left?
11     A.  Now, I watched the clip reel that you showed
12  me earlier that was prepared in connection with this
13  case. I believe this is the photograph that we used.
14  You're talking about --
15     Q.  I'm confused.
16     A.  I am too. Let's start again.
17     Q.  The picture was taken -- let's assume it's
18  safe to assume the picture was taken in 1995?
19     A.  Mm-hmm.
20     Q.  And we have two pictures of Mr. Flemmi to that
21  extent?
22     A.  Yes.
23     Q.  One of Mr. Flemmi looking forward and one of
24  him looking over his shoulder.

112

1          Which of those two photographs has WBZ-TV
2  or UPN 38 used?
3     A.  After reviewing the tape that you showed me
4  what was prepared for the 1998 lawsuit which I had no
5  involvement in that suit, I now believe at this moment
6  that Mr. Flemmi looking over his shoulder is the
7  photograph that was used in connection with the 1998
8  suit.
9          In connection with the lawsuit we're here
10  discussing today, I believe it's the other photograph of
11  Mr. Flemmi looking forward.
12     Q.  Okay. Do you know where WBZ-TV got a copy of
13  the picture shown in Exhibit 2 with Flemmi is looking at
14  his shoulder?
15     A.  Boston Globe.
16     Q.  Do you know when Channel 4 copied that
17  photograph out of the Boston Globe?
18     A.  I do not.
19     Q.  And do you know if anyone at Channel 4 ever
20  called the Boston Globe to find out if they could
21  specifically get permission to use the photograph in
22  Exhibit 2, which is Flemmi looking over his shoulder?
23     A.  I only know that is fairly standard practice,
24  but I don't have knowledge of a specific phone call in

113

1    connection with this case.
2    Q.  Do you have any idea why Exhibit 11, which
3    contains all those very short clippings of Flemmi --
4    A.  Mm-hmm.
5    Q.  -- was prepared?
6    MS. MURRANE:  Objection; asked and answered.
7    MR. EPSTEIN:  I can ask it again.  That's not
8    a reasonable objection in a deposition.
9    A.  Why it was prepared?
10   Q.  Yes.
11   A.  I can only surmise, it was prepared in
12   connection with the 1998 suit.
13   Q.  And from looking at the logo and the label on
14   the outside of the VHS recording that I have in front of
15   me, could you tell me approximately when this was
16   prepared?
17   A.  I can't tell you that nor did I think that was
18   a logo done by us.  I thought perhaps it was a logo done
19   by you.
20   Q.  No, it's not.
21   A.  I don't recognize that as any standard in our
22   labeling system.  It looks like it was done by a
23   computer.
24   Q.  I do not have a computer savvy enough to do

114

1    that.
2    A.  We don't use a lot of VHS tapes, and perhaps
3    that's was a label for VHS tapes that I just wasn't
4    aware of it at the time.
5    Q.  Were you aware that Mr. Fitzgerald and CBS
6    settled the lawsuit that was brought in 1998?
7    A.  I was aware, yes, that the case had been
8    resolved in a settlement.  I was not aware of any
9    details of that settlement.
10   (Short Recess)
11   BY MR. EPSTEIN:
12   Q.  I've just shown you another document that has
13   been produced in response to a request for documents in
14   this litigation, and it's been Bates stamped 0071
15   through 0079, and it says at the top of the page, Mutual
16   Settlement and Release.
17   Do you recognize this document?
18   A.  I have to honestly say, I don't know if I saw
19   that as part of our paperwork, or not, getting ready for
20   the deposition.
21   MR. EPSTEIN:  What did the witness say?  I'm
22   sorry.
23   (Record Read)
24   MS. MURRANE:  I just want you to know that

115

1    this document has one of your notes on it.
2    MR. EPSTEIN:  And the note appears on page
3    three of the Mutual Settlement Agreement and
4    Release, so I'm going to ask if you can make a copy
5    of this page again.
6    MS. MURRANE:  And substitute it out?
7    MR. EPSTEIN:  Not substitute it, but include
8    it in with the exhibit.  Thank you for pointing it
9    out to me.
10   Could I ask you to substitute one page for the
11   other page?  We'll clip this page with my note on
12   it.  Actually, we won't.  I'll introduce this as a
13   separate exhibit.
14   So why don't we, while we're at it, have
15   this document marked, Mutual Settlement and Release,
16   marked as the next exhibit; and then page three with my
17   inadvertent note on it marked as the exhibit that
18   follows 23.
19   (Exhibits 23 and 24 Marked for Identification)
20   BY MR. EPSTEIN:
21   Q.  So since the question I'm about to ask was
22   already let out of the bag, do you know if CBS
23   Corporation, or WBZ -- I'm sorry, strike the question.
24   Do you know if CBS Corporation disclosed

116

1    that WBZ made a copy of the 60 Minutes' show from
2    May 10, 1998 at any time before or about the time that
3    this Mutual Settlement Agreement and Release was signed
4    by the parties?
5    A.  I have no idea.
6    Q.  Who would know?
7    A.  The question is, did WBZ disclose to 60
8    Minutes that we recorded the show?
9    Q.  Did WBZ ever disclose to CBS Corporation and
10   Network, that it made a copy of the 60 Minutes'
11   broadcast of May 10th, 1998 on or before October 23rd,
12   1999, the date that this Mutual Settlement and Release
13   was signed by the parties?
14   A.  I don't know.  I don't know who would know.  I
15   highly doubt it, if it was disclosed.
16   Q.  Why do you doubt it was disclosed?
17   A.  Because to the best of my knowledge, no one
18   really paid attention to that pitch reel.  I don't know
19   how that pitch reel set up on the shelf.  I don't know
20   who made the dub.
21   Q.  What about the original broadcast?
22   A.  Yeah, Eric got rid of it, but I don't know if
23   he would disclose to the CBS Corporation that we had
24   recorded it.  Eric Cox would be the person to ask

117

1   because he's the one that got rid of the 60 Minutes'
2   tape.
3        Q.  And would you agree with me that the picture
4   that shows up in the 60 Minutes' photograph, is the
5   picture of Flemmi that appears in Exhibit No. 1?
6        A.  Yes, Exhibit 1.
7        Q.  And would you agree with me that the picture
8   of Flemmi that appears in Exhibit No. 2, is the only
9   image of Flemmi that appears on the tape marked Exhibit
10  No. 11, Flemmi photos from WBZ?
11       A.  Yes, I agree.
12       Q.  And do you have any knowledge of any uses of
13  the photo of Flemmi that appears in Exhibit No. 1 by WBZ
14  or UPN 38 at any time after this Mutual Settlement and
15  Release Agreement was signed on October 23rd, 1999,
16  other than the news broadcast that was broadcast in
17  June of 2004?
18       A.  No, I have no knowledge of any other use nor
19  do I believe it occurred.
20       Q.  So, would you agree with me that unless
21  Mr. Fitzgerald were told by CBS Corporation or the
22  Network or WBZ, that WBZ made a copy of the 60 Minutes'
23  broadcast and later made a pitch reel of that broadcast,
24  he would have no way of telling whether or not WBZ ever

118

1   had a copy of Exhibit 1 in its possession anywhere?
2        A.  I lost track of the question, I'm sorry.
3        Q.  If CBS Corporation never told Chris Fitzgerald
4   that WBZ made a copy of the 60 Minutes' broadcast and
5   then made a pitch reel of that broadcast, there's no way
6   that Mr. Fitzgerald would ever know that CBS had a copy
7   of either of the Flemmi photographs in their file?
8        A.  I agree with that.
9        Q.  And would you agree that at the time that this
10  Mutual Settlement and Release was signed on
11  October 23rd, 1999, WBZ had never disclosed to CBS
12  Corporation that it had made a copy of the 60 Minutes'
13  broadcast or a pitch reel of the May 10, 1998 broadcast?
14       A.  I agree with that.
15       Q.  I would like to refer you to a question I
16  asked in interrogatory No. 9, and then your response.
17  When I asked about the procedures and standards and
18  guidelines or practices that you had in effect during
19  the five years prior to the asking of the interrogatory,
20  with respect to using or restraining from using
21  copyrighted materials, you said, Once material is
22  broadcast, CBS 4 and UPN 38 video manager is responsible
23  for ensuring that the material does not get archived.
24       That is as an example when there's an

119

1   agreement that may limit the number of times the
2   material may be broadcast and/or set an expiration date
3   of broadcasting the material.
4        First, who was the video manager, if you
5   know, in 1998?
6        A.  I believe it was Tom Janssen.
7        Q.  And Tom Janssen, if my memory is correct, was
8   at some point in time the executive producer; was he
9   not?
10       A.  No, no, he's been the video manager --
11       Q.  Video manager right along, you're absolutely
12  correct.
13       A.  Yep.  I used his name in reference to
14  authorizing the recording of the material.
15       Q.  Now, you gave, as an example there having been
16  an agreement that limited the number of times material
17  could be broadcast or may have set an expiration date of
18  the broadcast of material.
19       Can you think of any specific times that
20  WBZ or UPN 38 could use copyrighted material for
21  particular number of times or only for a particular time
22  segment?
23       A.  The Olympics.
24       Q.  And what were the photographs involved in

120

1   that?
2        A.  It was video.  It was NBC footage, everyday
3   day for the sporting events.  That is the only films, so
4   NBC supplied certain footage for CBS.
5        Q.  Did CBS have to pay for that?
6        A.  No.
7        Q.  Do you regularly supply footage of sporting
8   events amongst and between the Network broadcasters?
9        A.  It is a fairly common occurrence that if, yes,
10  if ABC aired Monday Night Football, which is now a thing
11  of the past, that we would be able to use 30 seconds of
12  football highlights without paying for it.
13       Q.  Would you have to give credit to the other
14  networks to use the footage?
15       A.  Yes, usually there is an on-screen credit for
16  the footage.
17       Q.  Do you ever supply a video footage to the WBZ
18  Network?  Strike the question.
19       Knowing what you know about
20  Mr. Fitzgerald and his lawsuit against CBS Corporation
21  and WBZ, in 1998, and the use of the Flemmi photographs
22  that we've identified as Exhibits 1 and 2, would you
23  consider the subsequent use of the photo Flemmi in
24  Exhibit 1, by CBS 4 by UPN 38, to be fair use?

121

```
1        MS. MURRANE:  Objection.
2     A.  I really have two answers to that question.
3   Yes, I think that in the coverage text we used it, it
4   was fair use.  It was a mistake in my opinion -- not in
5   my opinion.  It was a mistake for that to get on the air
6   not because it wasn't fair use but because we had gone
7   through the litigation with Mr. Fitzgerald in 1998.  We
8   made a decision we would not air the photograph ever
9   again based on our experience of having gone through
10  litigation.
11            It was not, as I said earlier, just not a
12  path we wanted to go down again.
13     Q.  If you absolutely, positively needed to use
14  and wanted to use Mr. Fitzgerald's photograph of Steve
15  Flemmi in the 2004 broadcast, and if you didn't have any
16  bad blood or prior litigation, I should say, with
17  Mr. Fitzgerald, how much would you have expected to pay
18  in licensing fees for the use of that photograph on the
19  news?
20        MS. MURRANE:  Objection.
21     A.  I would expect to pay about $150.
22     Q.  And on what do you base your expectation?
23     A.  The fact that I usually pay 75 to $100.
24     Q.  And why would you pay Mr. Fitzgerald more?
```

122

```
1     A.  Well, I guess I'm basing that on the fact that
2   we do have a prior history and that it would cost me
3   more.  If there were no prior history, then $100 would
4   be the standard rate for a photograph like this, for CBS
5   and TV 38 newsroom.
6     Q.  Can you think of any use of a photograph of
7   Stephen Flemmi that might not be extremely newsworthy?
8        MS. MURRANE:  Objection.
9     A.  I'm sorry. any use of a Steve Flemmi
10  photograph that might not be extremely newsworthy?
11  Sure, we do stories on Whitey Bulger often, as I think
12  everyone here knows, and Flemmi is often mentioned as an
13  aside in those stories.
14            In the Martorano story, he was a key
15  figure.  This was the story of Martorano flipping on
16  Flemmi and Bulger.  Now, there's a discontinuation in
17  the stories we do at least once a month on Whitey Bulger
18  and his appearance and the legend of Whitey Bulger,
19  Flemmi is often mentioned, but he's not a central figure
20  in those stories.
21     Q.  Okay.  Do you have any particular photographs
22  in the Boston area that you regularly deal with in
23  purchasing any still photographs or film or video
24  footage?
```

123

```
1     A.  No, not as a regular, pick-up-the-phone and
2   someone we always talk to.
3     Q.  Can you name any photographer that you have
4   used in the period from 2003 to date, any still or video
5   photographers or filmmakers you have used, video
6   contacted for the use of still video and film footage?
7     A.  There is a videotape stringer, I use the word
8   stringer, on Cape Cod named Frank Paparo with whom we've
9   done regular business.
10     Q.  Where on the Cape?
11     A.  I don't know what town he's based in, but
12  he'll generally go anywhere on the Cape.  And if we
13  can't get there fast enough, sometimes he'll have some
14  videotape which we'll purchase for $100.  David Curran
15  is a videographer also on the Cape for the same kind of
16  deal.
17            And there's a gentleman named Bill
18  Harrigan who works in the Boston area.  I don't know
19  where he's based, but we've purchased videotape from
20  Bill Harrigan.  And the fourth one I can think of is
21  videotape stringer name Doug McGrath.
22     Q.  And how is the price determined with the
23  photographers?
24     A.  It's $100, is what we pay.
```

124

```
1     Q.  How many times can you use the footage?
2     A.  We then own the footage.
3     Q.  You own the footage?
4     A.  Unlimited use.
5     Q.  Do you own the copyright or just the right to
6   rebroadcast?
7     A.  Just the right to rebroadcast.
8     Q.  Do you have any restrictive uses that
9   particular photographers will not sell the same footage
10  taken to any one of the compete stations in the Boston
11  market?
12     A.  There's an exclusivity on it?
13     Q.  Yes.
14     A.  The same four gentlemen I just mentioned,
15  conduct business, to my knowledge, with most of the
16  television stations in town.
17     Q.  So it would be okay for you if the same four
18  gentlemen sold the same footage to Channel 5, Channel 7
19  and Channel 56?
20     A.  Mm-hmm.
21     Q.  While we're waiting for a better copy of this,
22  and I know there's one floating around somewhere --
23     A.  I recognize it.  You don't have to go through
24  the trouble for me.  That's my handwriting.
```

125

1    Q. Could you tell me what that is, please?
2    A. Yes, it's a copy of Exhibit 1, the photograph
3  that is Exhibit 1.
4    Q. And there appears to be something written on
5  the edge which you identified as your handwritten?
6    A. Yes, this has my handwriting. In June 2004,
7  after receiving notice of intent for a lawsuit, that was
8  addressed to Ed Goldman from your office. I had posted
9  this throughout our newsroom.
10    MR. EPSTEIN: Until and unless we find another
11  copy of this, why don't we mark this as the next
12  exhibit.
13    (Exhibit 25 Marked for Identification)
14  BY MR. EPSTEIN:
15    Q. I'll just refer quickly to Exhibit No. 25. Do
16  you know how long that image was posted in the newsroom
17  at Channel 4?
18    A. How long?
19    Q. Yes.
20    A. From June of 2004 until current. It's posted
21  in the newsroom right now.
22    Q. Now, still?
23    A. Yes. Do you think I would take it down?
24    Q. Okay. One of the other areas of inquiry that

126

1  I have, has to do with CBS and UPN 38, CBS 4 and UPN 38.
2    Do both Channel 4 and Channel 38 share
3  the same building at 1170 Soldiers Field Road in --
4    A. Yes.
5    Q. -- in Allston?
6    A. Yes.
7    Q. Other than broadcast towers, do either of the
8  stations have any other premises or building that they
9  use for any part of their operations?
10    A. No.
11    Q. Do they use the same broadcast towers?
12    A. I'm not sure.
13    Q. And you, in fact, do share your broadcast
14  tower with WGDH-TV in Boston, do you not?
15    A. Yes.
16    Q. Do all the writers that work for Channel 4
17  also work for Channel 38?
18    A. Yes.
19    Q. Does Channel 38 have any writers that do not
20  work for Channel 4?
21    A. No.
22    Q. Does Channel 4 have any writers that do not
23  work for Channel 38?
24    A. No.

127

1    Q. I'm sorry. You want to make an interjection?
2    A. I do. I answering that in the context of news
3  writers. I believe there are promotion writers assigned
4  only to UPN 38 and only to News 4.
5    Q. So there are some personnel that are employed
6  by CBS 4 that do not work for UPN 38 and there are some
7  that are employed by UPN 38 that do not work for
8  Channel 4?
9    A. They work in the same room, but they have
10  different duties. Their duties are assigned to
11  different stations, and we are now dealing with non-news
12  employees for whom I don't know the exact guidelines
13  under which they work.
14    Q. Are there any on-air personalities that appear
15  on UPN 38 that do not appear on CBS 4?
16    A. Are you asking in 2006 or 2004?
17    Q. 2004. Let me interject and say that all these
18  questions relate to 2004.
19    A. I am making an assumption, and I just decided
20  to clarify, that all my answers hold. In 2004, there
21  were no on-air employees who appeared exclusively on
22  UPN 38.
23    Q. Were there on-air personalities that appeared
24  primarily on UPN 38?

128

1    A. No.
2    Q. What about today?
3    A. Today, there are, at this moment, there are no
4  on-air employees in the news department who appear on
5  UPN 38, within the last year. I being very literal
6  because you said today.
7    Q. Okay. Let's go to the past year then.
8    A. In 2005 and part of 2006, we had three on-air
9  employees who appeared on the UPN Morning Show
10  exclusively. That was a show that aired at 8:00, that
11  was Ted Wayman, Robin Hamilton and David Robichaud.
12    Q. What about Dan Roach?
13    A. Dan Roach is a sports reporter for part of
14  CBS4 and the host of Red Sox This Week which is airs on
15  UPN 38 and CBS 4.
16    Q. Do you know why a decision was made for Ted
17  Wayman, Robin Hamilton and David Robichaud to start
18  appearing on both Channel 4 and Channel 38?
19    A. When do I believe they started to appear on
20  both?
21    Q. Did they appear on both from 2004 to 2006?
22  I'll clarify the question, if you want me to.
23    A. When we launched the UPN Morning Show in April
24  of 2005, that is when those three hosts began to appear

Street, Jennifer - Vol. 1 [30(b)(6)]  7/19/2006  12:00:00 PM

129

```
1    exclusively on UPN.  They no longer appeared on CBS 4.
2       Q.  Okay.  Does the morning show still -- is it
3    still broadcast by Channel 38?
4       A.  No, it was cancelled on June 30th of this
5    year.
6       Q.  And the on-air talent I just mentioned now
7    work for both Channel 4 and Channel 38; is that correct?
8       A.  As of the yesterday, Ted Wayman is no longer
9    employed by the station, and Robin Hamilton and David
10   Robichaud are both reporting for CBS 4.
11      Q.  Where is Ted Wayman going; do you know?
12      A.  I don't, no.  He's doing some guest hosting
13   under the RKO; that's as much as I know now.
14      Q.  In 2004, were there any reporters, writers,
15   weather reporters, camera crew, videographers, film or
16   still photographers, first sound engineers, sound and
17   lighting technicians that worked exclusively for either
18   CBS 4 or UPN 38?
19      A.  Let's go through that list.  Can we go through
20   it one at a time?
21      Q.  Reporters?
22      A.  No.
23      Q.  Writers?
24      A.  No.
```

130

```
1       Q.  Weather reporters?
2       A.  No.
3       Q.  Camera crew?
4       A.  Meaning field camera crew?
5       Q.  Field and studio?
6       A.  There were no field camera crew working
7    exclusively.  I'm not sure on the studio, but I don't
8    believe there were studio crew.
9       Q.  Did UPN 38 have a separate studio facility --
10      A.  No.
11      Q.  -- other than CBS 4?
12      A.  No, they had their own screen that we pulled
13   down with their own logo on it exactly the same.
14      Q.  So both Channel 4 and Channel 38 broadcast
15   from the same studio?
16      A.  Yes, we would finish the CBS 4 broadcast at
17   6:58; 30 seconds later, the anchors would not move.
18   They would stay exactly in their desk.  And at seven
19   o'clock, the same two anchors would appear on Channel 38
20   at the same desk, sitting at the same desk with a
21   different logo behind them.
22      Q.  And did you ever broadcast the 10 o'clock
23   News?
24      A.  Yes.
```

131

```
1       Q.  On Channel 38?
2       A.  Yes.
3       Q.  When you finished the broadcast of the 10
4    o'clock News, would the news broadcasters remain in
5    place and would a backdrop with the different logo
6    appear?
7       A.  Between 10:00 and 11:00, we did change anchor
8    teams.  The anchor team at that time was Ted Wayman and
9    Sara Underwood on Channel 38.  They would leave the set;
10   usually one or perhaps both of them had a role in our 11
11   o'clock News.
12         And in 2004, Joe Shortsleeve and Lisa
13   Hughes would come in and sit down at the same desk with
14   the different backgrounds and deliver the 11 o'clock
15   News, if that makes sense.
16      Q.  I think I get it.
17         Did you have separate news trucks for
18   location shoots or location reporting for Channel 38 and
19   Channel 4?
20      A.  No, we do not.
21      Q.  Did both logos appear on the outside of your
22   news vehicles in 2004?
23      A.  I don't believe so.  I believe they were just
24   CBS 4.
```

132

```
1       Q.  What about today?
2       A.  CBS 4 vans.
3       Q.  What about sales and advertising between
4    Channel 4 and Channel 38, do you have the same sales and
5    advertising staff at Channel 4 that exists at Channel
6    38?
7       A.  I believe those are separate.
8       Q.  Channel 4, and we're talking 2004, did have
9    its own sales and advertising, didn't it?  And UPN 38
10   had its own sales and advertising department?
11      A.  Yes.
12      Q.  Now is revenue between the two stations
13   combined or is it separate?
14      A.  To the best of my knowledge, it's separate.
15      Q.  Okay.  And was CBS 4 and UPN 38 in 2004,
16   separately licensed by the Federal Communications
17   Commission?
18      A.  To the best of my knowledge.
19      Q.  Yes?
20      A.  Yes.
21      Q.  When you licensed film or video footage or
22   photographs for the use on CBS 4, do you also negotiate
23   the rights to use the film and video film and
24   photographs on UPN 38?
```

133

1    A.  I haven't done it.  I haven't -- I cannot
2  think of an instance in which we have licensed something
3  for use.
4    Q.  For use by one station and not the other?
5    A.  Right.
6    Q.  Do you know what a stock photography agency
7  is?
8    A.  I've never done business with one, but by the
9  name of it I can, yes.
10    Q.  Do you know what stock film is?
11    A.  Yes, what I would call file footage.
12    Q.  Did you ever deal with any stock film footage?
13    A.  A company called, Video Encyclopedia.
14    Q.  Where are they located.
15    A.  I don't know.
16    Q.  And when you deal with them, what kind of
17  dealings do you have?
18    A.  We have a contract with them and they provide
19  news, historic news reel, that we receive on a -- I
20  don't know if it's monthly or it's quarterly.
21    Q.  But do they provide you with news footage on
22  an as-needed basis?
23    A.  No.
24    Q.  How do they provide you with news footage?

134

1    A.  We receive it on reels that come to us several
2  times a year.  So it's not a call up and request.
3    Q.  What do you use this news footage for?
4    A.  If I'm doing a story on John F. Kennedy, I'll
5  go to the Video Encyclopedia and find some footage on
6  John F. Kennedy for 1961.
7    Q.  You keep it on file for use even if you have
8  no present use?
9    A.  Correct.
10    Q.  They just send you footage?
11    A.  Right.
12    Q.  And you use it at your discretion?
13    A.  And in that case, it's mainly historical.
14    Q.  Do you deal with any other companies that
15  supply video footage?
16    A.  No, we -- if I felt that I needed footage for
17  a story of any magnitude, I would deal with CBS Network.
18    Q.  In your dealings with CBS Network, have they
19  ever charged you for the use of any footage on either
20  CBS 4 or UPN 38?
21    A.  Not to my knowledge.
22    Q.  Have they ever denied you usage of any film or
23  video footage for use on CBS 4 or UPN 38?
24    A.  I'm not aware they've had footage denied to

135

1  us.
2    Q.  Does CBS 4 have a Website?
3    A.  Yes.
4    Q.  Does UPN 38 have a Website?
5    A.  Yes.
6    Q.  Are they run by the same Web master, if you
7  will?
8    A.  They are certainly not now.  In 2004, I
9  believe they fell under the same person.
10    Q.  So some time between 2004 and today, there was
11  a change of how the Websites --
12    A.  Yes.
13    Q.  -- for both stations were set up?
14    A.  In September of 2005, CBS 4, we vastly changed
15  how we run that Website.
16    Q.  How did you change it and why did you change
17  it?
18    A.  It was a project that was done through the 16
19  CBS News organizations around the country.  They owned
20  and operated stations.  We joined together with a group
21  called Digital Media Group in New York, and created what
22  we believe are highly competitive local news Websites.
23  This was not quite a year ago.
24        And the main point of them is to provide

136

1  the best local news that we can on a Website.
2    Q.  And do you accept advertising on the Channel 4
3  Website and the Channel 38 Website?
4    A.  Is this a 2004 question or 2006?
5    Q.  2004.
6    A.  There was no paid advertising in 2004.
7    Q.  Is there paid advertising now?
8    A.  There is on CBS 4.  I don't know about UPN 38.
9  UPN 38's Website is not a news Website nor has it ever
10  been.
11    Q.  Just to finish up with Websites.
12    A.  Sure.
13    Q.  I would like to show you a copy that was taken
14  off of my computer.  Do you recognize that?
15    A.  Sure.
16    Q.  What is it?
17    A.  It's the photo in Exhibit 1.
18    Q.  Does that appear to be a CBS 4 Website?
19    A.  Yes, I think it was the CBS 4 Website in 2004
20  based on the anchor teams that are listed here.  And
21  this is an image that was not on the home page, but if
22  you clicked on the video, if you were to view the story.
23    Q.  So the picture of Stephen Flemmi, that appears
24  on Exhibit 1, also appears on the Website through the

Street, Jennifer - Vol. 1 [30(b)(6)]  7/19/2006  12:00:00 PM

137

1  link of Channel 4?
2      A.  Yes, I believe what I'm looking at is the
3  still image of the photo which makes it appear that the
4  photo is appearing on the Website.  I believe what you
5  did is capture the moment of which the Christina Hager
6  piece was playing.
7      Q.  I agree with you.  I captured a moment in time
8  when the video was then shown on the Website.  There's
9  no other way to do it with a still photograph.
10      A.  I understand.  I'm just making a point.
11      MR. EPSTEIN:  Let's have this marked as the
12  next exhibit, please.
13      (Exhibit 26 Marked for Identification)
14          (Short Recess)
15  BY MR. EPSTEIN:
16      Q.  Do you work for both CBS 4 and UPN 38?
17      A.  I do.
18      Q.  What is the relationship between the two TV
19  stations?
20      A.  Can you be more specific?  We all get along.
21      Q.  Well, they're referred to on the air as a
22  sister station?
23      A.  Mm-hmm.
24      Q.  What is that reference to?

138

1      A.  We're owned by the same company and we share a
2  great number of resources.
3      Q.  Do you share all of your resources?
4      A.  In the news department, we do.
5      Q.  What departments don't you share the same
6  resources with?
7      A.  I can't speak for sales.  I just can't speak
8  for them.  As I've already mentioned, there's more
9  division in their area than there is in mine.
10      Q.  What about programming?
11      A.  Programming is, we have different programming
12  on both stations.  There are a couple of instances in
13  which programs airs on both.  I already mentioned Red
14  Sox This Week.  That's the best example of a show that
15  actually is on both stations.
16          What we will do that no other two
17  stations in Boston will do, is on CBS 4 in the six
18  o'clock sports cast, Bob Lobel might say, Hey, be sure
19  to catch the ACC Basketball this week on the other
20  sister station this Saturday; so we'll cross-promote
21  between the two stations.
22      Q.  Is the Red Sox show that airs on both
23  stations, does it have separate revenue stream attached
24  to it?  In other words, if you advertise on Red Sox This

139

1  Week on Channel 4, you also advertise on Red Sox This
2  Week on Channel 38?
3      A.  I believe those commercials are sold
4  separately.  There's a different commercial there on
5  each viewing of the show.
6      Q.  And would you agree that the viewer
7  demographics for Channel 4 and Channel 38 are different?
8      A.  It depends on what program you're watching.
9  Demographics are -- a great deal have to do with time of
10  day and the program than what the station is.
11      Q.  What does your paystub look like when you get
12  one from CBS?
13      MS. MURRANE:  Not big enough.
14      MR. EPSTEIN:  I was expecting, directly
15  deposited, but that is another story.
16      A.  It is directly deposited, but you asked about
17  the stub.  I believe it says, CBS Broadcasting.
18          Is that the question?
19      Q.  Mm-hmm?
20      A.  You don't want the amount?
21      Q.  You're welcome to tell me.
22      MS. MURRANE:  No, objection.
23  BY MR. EPSTEIN:
24      Q.  It doesn't make any difference to me what your

140

1  compensation is.
2      A.  My attorney has already answered that
3  question.
4      Q.  I'm sure you're underpaid for what you do.
5          Do you know if the paystubs for employees
6  of UPN 38 are any different from those of Channel 4 CBS
7  4 in Boston?
8      A.  All of the employees whose paystubs I know
9  about and actually have access to are news employees.
10  And we are all employed by both TV stations and
11  therefore, our paystubs say, CBS Broadcasting.
12      Q.  I asked before about demographics.  Your
13  answer was a very good one.
14          What I was really trying to get at is, do
15  CBS 4 and UPN 38 target different audiences?
16      A.  My answer is the same.  It depends on the time
17  of day and the show that we're discussing.
18      Q.  Are the ad rates the same for Channel 4 and
19  Channel 38?
20      A.  I don't think so, no.
21      Q.  Which station charges more?
22      A.  I think we submitted a document that it would
23  be nice for me to refer to that when I answer that
24  question, so I'm sure I'm right.  I can offer this --

141

1    Well, I'll wait.
2    Q.  I show you a document that is Bate stamped
3    No. 0123 and 0124 that was supplied to me as part of the
4    litigation, and ask if you this is the document you're
5    talking about?
6    A.  This is not.  This is not for television.
7    Q.  What is this for?
8    A.  That was what the Web master drew up of what
9    she would like to charge for advertising.  She kept
10   track of that knowing that someday we would be in the
11   advertising game on the Web.
12   Q.  Okay.  So as far as 0123 and 0124, that was
13   supplied to me, this document tells us the number of
14   page views and unique visitors to the CBS 4 Boston
15   Website in December 2003, January 2004 and February,
16   2004, and it's pretty much the same information for
17   UPN 38?
18   A.  Yes.
19   Q.  What's the last colum, PPV?
20   A.  People purview.
21   MR. EPSTEIN:  While we're here, let's mark
22   this document as the next one.
23   THE WITNESS:  I just want to reiterate that
24   those rates were never actually charged.

142

1    MR. EPSTEIN:  I understand that.
2    (Exhibit 27 Marked for Identification)
3    BY MR. EPSTEIN:
4    Q.  So even though we do not have that document,
5    you would like to attempt to answer that question
6    anyway; is that correct?
7    A.  Yes, I can tell you with certainty that the
8    rates charged at 6:00 a.m. on CBS 4 were higher than the
9    rates charge at 7:00 a.m. on UPN 38.
10   Q.  Are the rates charged on the 10 o'clock News
11   on Channel 38, lower than the rates charged on the
12   11 o'clock News for CBS 4 Boston?
13   A.  I would need the document.  I believe so, but
14   I would need the document.
15   Q.  I'm sorry, I don't know where it is.
16   Do you have the same sister television
17   station relationship with any of the other CBS or UPN or
18   WBZ affiliated stations within the umbrella of the CBS
19   Television Stations that we discussed early on in your
20   deposition?
21   A.  To say it's the same relationship, no, because
22   it's a very unique situation to have another television
23   station in the same building sharing all of the same
24   news resources, but we do have a relationship with the

143

1    other stations in our group.  As a matter of example, I
2    do a conference call every Thursday at two o'clock with
3    the news directors from the other newsrooms owned by CBS
4    in which we share ideas and visions and exchange
5    thoughts.
6    So in that regard, yes, they are
7    certainly a sister relationship, if you will.
8    Q.  And if it's a news story that breaks in
9    Baltimore Maryland on WJZ, is it okay to supply you with
10   film footage for that?
11   A.  Yes.
12   Q.  As you would supply them with film footage if
13   there was a breaking story in Boston that had national
14   implications?
15   A.  Mm-hmm.
16   Q.  To the best of your knowledge, do all of the
17   CBS, UPN and WBZ affiliated stations within the CBS
18   Television Station package, maintain separate financial
19   records and revenues?
20   A.  I don't have knowledge of any station group
21   outside of our own, any duopoly markets.
22   Q.  I wasn't talking so much of a duopoly market.
23   I was talking about in terms of how the revenues from
24   Channel 4 Boston are kept separate from the revenues of

144

1    KDKA in Pittsburgh, for example?
2    A.  I can answer that question, yes.
3    Q.  And is that the same for all the other CBS
4    stations we've identified earlier and all the our UPN
5    stations?
6    A.  To the best of my knowledge.
7    Q.  Now, your business and your career in the news
8    department here in Boston, whether it's Channel 4 or
9    Channel 38, did you gain any knowledge or understanding
10   of the copyright law of the United States?
11   A.  Yes.
12   Q.  And where did you gain that understanding?
13   A.  Mainly through, the best association is the
14   CBS Standards Books that we use.
15   Q.  And who produces the CBS Standards Book?
16   A.  CBS Networks News.
17   Q.  And who is given a copy of the Standards Book?
18   A.  The news manager at the CBS stations and I
19   would imagine throughout the group and throughout the
20   Network.
21   Q.  When are they given a copy?
22   A.  When they join the company or when a new
23   version of the book is published, whichever comes first.
24   Q.  As part of the discovery in this case, you

145

1  supplied to me two pages.  The first page is entitled,
2  CBS News Standards, and a page that you supplied is a
3  page on Production Standards, Editing and Production,
4  section III-2, Fair Use.
5        Is there more to this book than these
6  pages?
7  A.  Yes, it's more than a one-page book.
8  Q.  So the only portion of that book that you
9  supplied to me was the section on Fair Use; is that
10  correct?
11  A.  Correct.
12  Q.  And if I draw your attention to the first
13  paragraph in what you gave me on the page that's Bates
14  stamped 0081, it states:  Copyrighted materials
15  generally may not be used in producing a report without
16  a copyright owner's consent, unless the fair use
17  doctrine is applicable.
18        Do you see that?
19  A.  I do.
20  Q.  And then it goes on to say that the concept of
21  fair use is complicated and may be invoked in only
22  limited circumstances.
23        Now, have you had any instruction on the
24  concept of fair use other than what is contained in this

146

1  CBS News Standards booklet?
2  A.  Yes, in discussions with our attorney.
3  Q.  Which attorney?
4  A.  Nick Poser, who I mentioned at the beginning
5  of this deposition.
6  Q.  Was it a discussion about specific
7  photographs --
8  MS. MURRANE:  Objection, I'm not sure --
9  Q.  -- or?
10  MS. MURRANE:  -- if we're getting into
11  attorney-client privilege, if she's seeking advice
12  from her internal counsel.
13  MR. EPSTEIN:  We do not know.
14  MS. MURRANE:  Then let's not talk about what
15  was discussed.
16  BY MR. EPSTEIN:
17  Q.  I'm trying to determine whether it was a
18  course given by him or it was a discussion because you
19  had questions?
20  A.  It comes in the context of more similar to a
21  course.
22  Q.  And where was the course given?
23  A.  At WBZ.
24  Q.  And Nick Poser was in attendance --

147

1  A.  Yes.
2  Q.  -- at WBZ?
3  A.  Yes.
4  Q.  And how many other people were in that course,
5  if you will?
6  A.  I'm going to guess.  At the session I attended
7  there were 25, but he had three sessions that day.
8  Q.  And when was it that that occurred?
9  A.  This was approximately five years ago.
10  Q.  And is this the only instruction that you've
11  ever received on copyright laws of the United States?
12  A.  When you use the word, instruction, I presume
13  we're talking about formal instruction.  I'm quite sure
14  that I studied fair use at the New House School at
15  Syracuse University.
16  Q.  When did you graduate from Syracuse?
17  A.  In 1987, since you asked, but I would say
18  there have certainly been -- my true education and fair
19  use has come through discussions with Nick regarding
20  various cases.
21        I would say that's been my best
22  education, are the times we've had to face fair use
23  on a case-by-case basis.
24  MR. EPSTEIN:  Okay.  That's the information I

148

1  don't want to get involved with.  But the other I
2  don't think was attorney-client privilege.
3        Would you agree?
4  MS. MURRANE:  If there was an instruction or
5  course, I'm okay with that.
6  BY MR. EPSTEIN:
7  Q.  These guidelines go on to say that:  As a
8  general ure. to meet the fair use test, copyrighted
9  footage must be directly relevant to a news story and
10  the excerpt should be no longer than truly necessary for
11  the news-reporting purposes involved.
12        And it's your testimony that your use of
13  the Steve Flemmi photograph in 2004, was truly necessary
14  for the news reporting purpose involved, and it was no
15  longer than truly necessary; would you agree that?
16  A.  Yes, I would agree with that.
17  Q.  Then it goes to say:  The use of such material
18  must be discussed in advance with the executive producer
19  or bureau chief.
20        Now, was the use of that photograph
21  discussed in advance with the executive producer at that
22  time for any of the news broadcast or the bureau
23  chief --
24  A.  I don't have any specific knowledge of any

149

1  conversations that happened. I was not the executive
2  producer at the time nor was I the news director.
3  Q. Now, who was the executive producer or bureau
4  chief for all of the news broadcasts in 2004 that you
5  used the Flemmi photograph in?
6  A. The executive producer for the 11 o'clock News
7  is a gentleman name Peter Wilson.
8  Q. Is he still with WBZ?
9  A. Yes. And the senior producer for the Morning
10  News is a person named Maggie McGrath.
11  Q. Is she still there?
12  A. Yes.
13  Q. Now it goes on to say: It must also be
14  approved by the CBS News Business Affairs Department.
15      Do you know if the use of the Steve
16  Flemmi photograph in Exhibit 1 was approved by the CBS
17  News Business Affairs Department?
18  A. I don't believe it was.
19  Q. So that WBZ Boston and UPN 38 used that Steve
20  Flemmi photograph in 2004 without following the
21  procedures in the CBS News Standards, would you agree
22  with me?
23  A. I believe so.
24  Q. Thank you.

150

1      What kind of stories most appeal to the
2  audience of Channel 4 and Channel 38?
3      MS. MURRANE: Objection.
4  A. What we produce on CBS 4 is a newscast. I
5  don't know if I can describe what kinds of stories. I
6  don't know what the question means.
7      We try to cover stories that will have
8  interest to a great range of viewers.
9  Q. Do crime stories resonate with the viewers
10  more than the news in Israel and Lebanon?
11  A. More? I can't say they do more. I say they
12  often fall in -- we do both. And so to say which one is
13  more interesting, I think depends on the story that
14  you're talking about.
15  Q. What kind of stories do you lead with,
16  typically?
17  A. They often involve crime of some sort. They
18  often involve corruption. They very often involve
19  public safety. They do not necessarily involve
20  international affairs because we are a local news
21  program.
22  Q. Does the adage, if it bleeds, it leads --
23      MS. MURRANE: Objection.
24  A. It's never been true at Channel 4.

151

1  Q. -- still hold true today?
2      (Short Recess)
3      MR. EPSTEIN: I'm having a ball, but I can't
4  think of any more questions to ask you at this time
5  and I know you're very disappointed with that and I
6  thank you for coming today.
7      MS. MURRANE: Just one question I wanted to
8  ask at the end here, just to clear something up.
9
10      EXAMINATION BY MS. MURRANE:
11
12  Q. In the beginning, Mr. Epstein asked you about
13  archiving of tapes?
14  A. Mm-hmm.
15  Q. And that tapes will be archived of news
16  broadcast for several years; was that your answer?
17  A. I don't remember answering the question.
18  Q. All right. I just want to clear up, I think
19  there's a little confusion about what does or doesn't
20  get archive.
21      So earlier, many hours ago at the
22  beginning of the deposition, there were a couple of
23  questions about archiving tapes. And is it true that
24  CBS 4 and UPN 38 do archive its news broadcasts?

152

1  A. Yes, that's true.
2  Q. And do they in fact archive all of the news
3  broadcast or just some?
4  A. No, we do not archive all of the news
5  broadcasts. We archive the 4:00 p.m., 5:00 p.m.
6  6:00 p.m. and 11:00 p.m.
7  Q. But not the morning broadcast?
8  A. Morning broadcasts are held usually for five
9  or six days.
10      MS. MURRANE: That's all I wanted to ask and
11  that's the only thing I had.
12      MR. EPSTEIN: All right. And if we could have
13  this document marked as the next exhibit please?
14  Thank you.
15      (Exhibit 28 Marked for Identification)
16      (Deposition concluded at 3:45 p.m.)
17
18
19
20
21
22
23
24

Street, Jennifer - Vol. 1 [30(b)(6)] 7/19/2006 12:00:00 PM

153

```
 1          C E R T I F I C A T E
 2   COMMONWEALTH OF MASSACHUSETTS )
 3                    )
 4   COUNTY OF PLYMOUTH        )
 5        I, Rosemary F. Grogan, a Registered
 6   Professional Reporter and Notary Public duly
 7   commissioned and qualified in and for the Commonwealth
 8   of Massachusetts, do hereby certify:
 9        That JENNIFER STREET, the witness whose
10   deposition is hereinbefore set forth, was duly
11   identified and sworn by me, and that the foregoing
12   transcript is a true record of the testimony given by
13   such witness to the best of my ability.
14        I further certify that I am not related to any
15   of the parties in this matter by blood or marriage, and
16   that I am in no way interested in the outcome of this
17   matter.
18        IN WITNESS WHEREOF, I have hereunto set my
19   hand and affixed my notarial seal this 31st day of July,
20   2006.
21        _____
22             Rosemary F. Grogan, RPR
23             CSR No. 112993
24   My Commission Expires:  January 7, 2011
```

155

```
 1          SIGNATURE / ERRATA SHEET
 2   Re:  Christopher Fitzgerald Vs. CBS Broadcasting, Inc.
 3   DEPOSITION OF:  Jennifer Street 7/19/06
 4        I, JENNIFER STREET, do hereby certify that I
 5   have read the foregoing transcript of my testimony, and
 6   I further certify that said transcript it is a true and
 7   accurate record of said testimony (with the exception of
 8   the corrections that are noted below).
 9   PAGE   LINE(S)    READS       SHOULD READ
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17        Signed under the pains and penalties of
18   perjury this _____day of _____, 2006.
19   _____
20   JENNIFER STREET                    Date
21        Subscribed and sworn to before me this ____day
22   of _____, 2006.
23   _____
24   Notary Public     My Commission Expires:_____
```

154

```
 1   ERRATA SHEET DISTRIBUTION INFORMATION
 2   DEPONENT'S ERRATA & SIGNATURE INSTRUCTIONS
 3
 4   ERRATA SHEET DISTRIBUTION INFORMATION
 5        The original of the Errata Sheet has
 6   been delivered to Mary Murrane, Esquire.
 7   When the Errata Sheet has been completed by
 8   the deponent and signed, a copy thereof should
 9   be delivered to each party of record and the
10   Original forwarded to Andrew Epstein,
11   Esquire, to whom the original deposition
12   transcript was delivered.
13
14   INSTRUCTIONS TO DEPONENT
15        After reading this volume of your
16   deposition, please indicate any corrections or
17   changes to your testimony and the reasons
18   therefor on the Errata Sheet supplied to you
19   and sign it.  DO NOT make marks or notations n
20   on the transcript volume itself.  Add
21   additional sheets, if necessary?  Please
22   refer to above instructions for errata sheet
23   distribution information.
24
```