# EXHIBIT 5

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| V.  ) | CRIMINAL NO. 97-10009-MLW |
| ) | |
| JOHN V. MARTORANO, ) | |
| ) | |
| Defendant. ) | |

GOVERNMENT'S MOTION FOR DEPARTURE PURSUANT TO
SECTION 5K1.1 OF THE UNITED STATES SENTENCING GUIDELINES

The United States of America, by and through United States
Attorney Michael J. Sullivan and Assistant United States
Attorneys Fred M. Wyshak, Jr. and Brian T. Kelly, hereby submits
this motion to depart downward from the defendant's sentencing
guideline range based upon his substantial assistance to the
authorities in the investigation and prosecution of another
person who has committed an offense.

I.    PROCEDURAL HISTORY

The defendant John Martorano (hereinafter "Martorano") was
arrested in January 1995 on a warrant that had issued as a result
of his indictment in the matter captioned United States v. John
Martorano, et al., Crim. No. 79-00042-RCL (hereinafter "the race
fix case"). Martorano had been a fugitive for approximately 16
years at the time of his arrest, and was apprehended in 1995 as a
result of an investigation into the activities of members of the
Winter Hill Gang. This investigation also resulted in the
indictment of seven other individuals in January 1995 in the

matter captioned <u>United States v. James Bulger, et al.</u>, Crim. No.
94-10287-MLW (hereinafter "the <u>Salemme</u> case").

The charges in the race fix case were dismissed without
prejudice on July 24, 1995 by Judge Lindsay for failure to give a
speedy trial.  Martorano was subsequently added as a defendant in
the <u>Salemme</u> case in a superseding indictment issued on August 2,
1995.  Martorano faced racketeering, illegal gambling,
loansharking, extortion and money laundering charges all of which
stemmed from his membership in and association with the Winter
Hill Gang.

On May 21, 1996, the grand jury issued a third superseding
indictment in the <u>Salemme</u> case.  At that time, Martorano was
removed as a defendant in the <u>Salemme</u> case and was charged
separately in the matter captioned <u>United States v. John
Martorano</u>, Crim. No. 97-10009-MLW.  This indictment incorporated
both the previously dismissed race fix charges against Martorano
as well as the then pending racketeering charges.  However,
because the allegations in Martorano's case were closely related
to those in the <u>Salemme</u> case and many of the legal issues were
identical or overlapped, the cases were managed together by the
Court.

In approximately January 1997, evidentiary hearings on the
defendants' motions to suppress electronic surveillance
commenced.  During the course of those hearings in approximately

2

April 1997, it was revealed that two of the defendants in the
Salemme case, James Bulger and Stephen Flemmi, had been longtime
informants for the Federal Bureau of Investigations (FBI). This
revelation caused extensive litigation including a protracted
evidentiary hearing which commenced in January 1998 and concluded
in October 1998. In the midst of this hearing in approximately
June 1998, Martorano entered into a proffer agreement with the
United States. Approximately one month later, Martorano was
moved from the Plymouth County Correctional Facility where he had
been incarcerated, and eventually was placed in a secure Bureau
of Prisons facility.

On August 23, 1999, Martorano signed a plea agreement with
the government wherein he agreed to cooperate with federal and
state law enforcement authorities. Martorano also agreed to
plead guilty to an Information which incorporated all the charges
from the 1996 indictment and added ten murders committed pursuant
to the racketeering conspiracy. Martorano also agreed to plead
guilty to murder charges in Tulsa, Oklahoma and Miami, Florida.
On September 30, 1999, Martorano pled guilty in federal court to
the aforementioned Information. At the time that Martorano
entered his plea, the Court reserved decision on whether to
accept the plea.

In November 1999, Kevin Weeks and Kevin O'Neil were indicted
for racketeering and related offenses. (See United States v.

3

<u>Kevin Weeks and Kevin O'Neil</u>, Crim. No. 99-10371-RGS.) Both Weeks and O'Neil eventually agreed to cooperate. Primarily based upon the assistance of Martorano and Weeks, a superseding indictment was issued in September 2000 which charged Bulger and Flemmi with approximately twenty murders committed pursuant to the Winter Hill Gang racketeering conspiracy.

Similarly, the combination of Martorano and Weeks yielded sufficient evidence to charge former FBI agent John Connolly with racketeering based upon his participation in the criminal activities of the Winter Hill Gang.[1]

Since the entry of his plea in September 1999, Martorano has been incarcerated in a Witness Security Unit operated by the Bureau of Prisons. He has appeared before several grand juries and testified. He testified at the trial of John Connolly. He has met with federal and state investigators on numerous occasions for hundreds of hours. More recently, he was prepared to testify at the trial of Stephen Flemmi as well as former FBI agent H. Paul Rico who had recently been charged with murder by state authorities in Oklahoma, but has since died. Martorano also stands ready to testify against James Bulger who remains a fugitive

---

[1]    La Cosa Nostra boss Frank Salemme also provided important evidence in the case against Connolly.

II.  ARGUMENT

A.  Legal basis.

Section 5K1.1 of the United States Sentencing Guidelines

("U.S.S.G.") permits the Court to impose a sentence of

imprisonment below a defendant's applicable sentencing guideline

range:

> [u]pon motion of the government stating that
> the defendant has provided substantial
> assistance in the investigation or
> prosecution of another person who has
> committed an offense[.]

U.S.S.G. § 5K1.1.

Further, Section 5K1.1(a) provides that the appropriate

reduction shall be determined by the Court based upon, but not

limited to, the following considerations:

> (1)  the court's evaluation of the
>      significance and usefulness of the
>      defendant's assistance, taking into
>      consideration the government's
>      evaluation of the assistance rendered;
>
> (2)  the truthfulness, completeness, and
>      reliability of any information or
>      testimony provided by the defendant;
>
> (3)  the nature and extent of the defendant's
>      assistance;
>
> (4)  any injury suffered, or any danger or
>      risk of injury to the defendant or his
>      family resulting from his assistance;
>      and
>
> (5)  the timeliness of the defendant's
>      assistance.

Assessing these factors seriatim, it is clear that the

5

defendant has provided substantial assistance to the United States.

B.    Government's evaluation of the assistance rendered.

There is little doubt that the tortured path of the prosecution which commenced in 1995 has left an indelible stamp on the history of Boston.  The fact that James Bulger and Stephen Flemmi were informants for the FBI while at the same time being the leaders of an extremely violent and dangerous criminal organization not only raised concerns at the national level regarding the FBI's implementation of its informant program, but also created legal issues that threatened the viability of the then pending prosecution.

Despite the improbability that Bulger and Flemmi did not intentionally commit the crimes alleged against them in the 1995 indictment, but rather engaged in that criminal activity in their capacities as FBI informants, the government lacked direct evidence regarding the exact nature of their relationship with the FBI generally and particularly with FBI agent John Connolly. It was not until Martorano agreed to cooperate that the government obtained such evidence.[2]

Martorano's proffer, which commenced during the course of

---

[2]    Although former FBI agent John Morris had agreed to cooperate with the government in approximately December 1997, Morris was unable to provide direct evidence of the broad criminal conspiracy that existed between Bulger, Flemmi and Connolly.

the 1998 evidentiary hearings convincingly established that the
relationship between Flemmi, Bulger and John Connolly was a
purely criminal relationship - not one that would provide any
legal succor for Flemmi or Bulger.  Martorano also provided
firsthand knowledge of Flemmi and Bulger's involvement in a
series of gangland slayings that occurred during the 1970's and
1980's as well as John Connolly's involvement in several of those
murders.  More significantly, Martorano's cooperation at that
juncture in the legal proceedings not only provided the impetus
to the prosecutors and investigators then assigned to the pending
case to "stay the course," but also fueled plans which ultimately
led to the full exposure of Bulger, Flemmi, and Connolly's
heinous criminal activity.

To say that Martorano "broke the logjam" would be an
understatement.  His cooperation in 1998 sent ripples through the
criminal underworld that ultimately led, in whole or in part, to
the following significant events:

1.   the cooperation of Kevin Weeks;

2.   the cooperation of Frank Salemme;

3.   the indictment and conviction of FBI agent John
     Connolly;

4.   the indictment and conviction of Massachusetts State
     Police lieutenant Richard Schneiderhan;

5.   the indictment and conviction of Boston Police
     Department police officer Michael Flemmi;

6.   the recovery of the remains of six individuals murdered

7

by Bulger, Flemmi and others;

7.   the seizure of the largest cache of illegal weapons in the history of the Commonwealth of Massachusetts;

8.   the indictment of Bulger and Flemmi for racketeering and related offenses including approximately twenty murders;

9.   the indictment of former FBI agent H. Paul Rico for murder in Tulsa Oklahoma; and

10.  the conviction of Stephen Flemmi who is currently serving a life sentence in a federal correctional institution.

C.   <u>Truthfulness, completeness, and reliability of information provided.</u>

As set forth above, Martorano has spent hundreds of hours with law enforcement agents from various agencies over the past five years. He has patiently recounted every detail that he can recall of approximately forty years of criminal activity.[3] He has answered any and all questions put to him in an unhesitating fashion during these extensive debriefings. On his own initiative, he has often followed up with investigators to provide additional information on topics that had been previously discussed.

Before Martorano commenced his proffer, investigators had accessed very few of the relevant homicide files that had been created by state and local authorities at the time of those

---

[3]   For example, Martorano provided information to the Suffolk County District Attorney's Office regarding the 1965 murder of Edward "Teddy" Degan that tended to exculpate several of the individuals who were convicted of that murder.

events.  Martorano's proffer included numerous details about
those murders that were subsequently corroborated by the forensic
evidence recovered at the crime scenes as well as by eyewitness
accounts.  His recollection was uncanny.  Other information
provided by him has also been corroborated by documents, records,
the recollection of other persons including cooperating witnesses
such as Kevin Weeks, and independent investigation.

In conclusion, the reliability of the information provided
by Martorano has been demonstrated time and time again.
Martorano has always been completely truthful and totally
cooperative.

D.    Nature and extent of assistance.

As set forth in detail above, not only did the defendant
fully cooperate with the government, but he also engineered the
cooperation of other individuals.  Some of these individuals
cooperated in a public manner; others cooperated confidentially.
Martorano's "networking" assisted the government by filling in
details of decades old events, helping to identify additional
witnesses, and leading to the recovery of the remains of several
victims of the Winter Hill Gang.

As set forth above, the turn of events commencing with
Martorano's cooperation have been extraordinary.  Certainly,
every case rests upon a series of building blocks, not all of
which are directly attributable to Martorano or his efforts.

9

However, Martorano is clearly one of those foundational building blocks upon which many others rest.

It would have been a tragedy not only for the Commonwealth, but also for the criminal justice system if the Salemme case ended shortly after the 1998 hearings with ambiguous results. Martorano's cooperation insured that the truth about James Bulger, Stephen Flemmi and John Connolly would be exposed and not left to conjecture.

E.    Danger to the defendant.

The defendant has placed himself and his family at considerable risk.  James Bulger, a psycopathic murderer, remains a fugitive and, therefore, a threat to anybody who has cooperated against him.  Bulger has many motives for retribution.  The outcome of this case has not only dismantled Bulger's "Robin Hood" myth and exposed his true depravity, but has also led to the incarceration of his brother John and embarrassment to other members of his family .

In addition to the specific threat that Martorano and his family may face from Bulger and any remaining Bulger loyalists, Martorano also must deal with the general threat inherent in cooperating with the government.  Such a threat may come from any source who perceives Martorano negatively or seeks to enhance his own reputation through an attack on Martorano.

F.    Timeliness of assistance.

Although the defendant did initially litigate the charges in the Salemme case, he cooperated in a timely manner.  In fact, his cooperation came at a juncture in the litigation where the government's case appeared to be in jeopardy.  He did not wait for the resolution of the pre-trial legal issues in the Salemme case.  Nor did he wait for his own conviction or until the outcome of his own case was clear.

The government believes that Martorano's timely cooperation was a significant factor leading to the entire resolution of the Salemme case prior to trial.  Further, the government believes that Martorano's cooperation was also a significant factor leading to Stephen Flemmi's recent plea before Judge Stearns. The trial of both cases would have surely resulted in the expenditure of extensive resources by both the Court and the government.

III. GOVERNMENT'S RECOMMENDATION

The irony of Martorano's cooperation with the government is that, despite the filing of the instant motion, Martorano will serve more time in prison than if he had gone to trial and been convicted of the charges brought against him in 1995.  Had Martorano been convicted of the 1995 charges, he would have likely received a sentence of approximately eight years (96

11

months).  His plea agreement calls for a sentencing range of 150 to 180 months' incarceration.

Martorano's cooperation was predicated upon his truthful disclosure concerning his involvement in numerous homicides committed pursuant to his participation in the Winter Hill Gang racketeering enterprise.  In fact, he has disclosed his role in twenty murders, and pled guilty to charges stemming from twelve murders.

Martorano was not compelled to admit his role in these murders because a murder indictment was imminent.  In fact, government prosecutors and investigators were unaware of Martorano's role in the majority of the murders to which he confessed.  Instead, Martorano was distraught by what he perceived as the treachery of his close associates, and chose to expose the illicit relationship between Bulger, Flemmi and Connolly.  Further, Martorano, who had not engaged in an act of violence since 1982, sought to "clean his slate" so he could start life anew upon his release from prison.

While the government makes no excuses for Martorano's criminal activity, the sad truth is that none of the murders in which he had been involved would have ever been solved had he not confessed.  While it is little solace to the families of those murder victims, to some extent they have received closure and can now stop wondering what happened to their loved ones.

Further, there are those who will say that there is no
appropriate sentence for a man who has caused the death of twenty
people.  However, the impact of Martorano's cooperation
transcends the ordinary case.  There has been a social good that
has resulted from the series of prosecutions which commenced in
1995.  Major changes have been instituted within the Department
of Justice regarding procedures governing informants.  There may
be federal legislation designed to prevent another Bulger/Flemmi
situation.  The City of Boston is a better place today due to the
dismantlement of the Winter Hill Gang and the explosion of the
Bulger myth.

The Court has inquired "whether the government could
successfully prosecute Martorano if the court rejects the ...
plea agreement."  See Order dated April 7, 2004.  Pursuant to
¶6(b) of Martorano's plea agreement, Martorano received use and
derivative use immunity for his statements as long as Martorano
did not breach his agreement with the United States.  (This is a
standard provision.)  Since Martorano has not breached the plea
agreement, he has received the benefits of that protection.  As
mentioned above, the government never had sufficient evidence to
prosecute Martorano for any of the murders to which he has
confessed prior to the execution of Martorano's proffer and plea
agreements.  Investigation of those murders subsequent to
Martorano's confession has, of course, produced additional

13

evidence, but none that was not "directly or indirectly derived" from Martorano's confession.  Now that Kevin Weeks and Stephen Flemmi have pled guilty and cooperated, it might be theoretically possible to prosecute Martorano, but such a course of action would not only create "bad policy," but would also raise legal issues such as "taint" because Martorano might plausibly argue that the cooperation of Weeks and Flemmi were the fruits of Martorano's statements and cooperation.

Thus, the Court now finds itself in a similar posture to that of the government when the government entered into the plea agreement with Martorano in 1998, _i.e._, failure to enter into the agreement would essentially result in a shorter term of imprisonment for Martorano.  As discussed above, this case is unusual because Martorano's cooperation has earned him a lengthier prison sentence than if he had been convicted of the charges originally lodged against him.  Moreover, at the time that the government entered into the plea agreement with Martorano, all of the murders about which he confessed had gone unsolved for decades and would have remained unprosecuted had it not been for Martorano's cooperation.

Finally, the government, consistent with its longstanding, routine practice, has coordinated with the Probation Department and notified all the individuals who are or who represent a victim of a crime of violence of their right to speak and present

14

information to the Court at Martorano's sentencing. Filed separately under seal is a list of all those individuals who have received notice.

In light of the above and in accord with its obligations under the plea agreement, the United States respectfully recommends that the Court impose a sentence of 150 months' incarceration upon John Martorano.


IV.   CONCLUSION

For the reasons set forth above, the United States respectfully requests that the Court accept the plea agreement in the case at bar, depart downward from Martorano's sentencing guideline range because Martorano has rendered substantial assistance to the United States, and impose a sentence of 150 months' incarceration upon Martorano.


                              Respectfully submitted,

                              MICHAEL J. SULLIVAN
                              United States Attorney

                   By:        _Fred M. Wyshak, J._

                              FRED M. WYSHAK, JR.
                              BRIAN T. KELLY
                              Assistant U.S. Attorneys


                              15

## CERTIFICATE OF SERVICE

This is to certify that I have this day served upon the persons listed below a copy of the foregoing document by regular U.S. mail:

Francis DiMento, Esq.

Martin Weinberg, Esq.

This 13th day of May 2004.

FRED M. WYSHAK, JR.
Assistant U.S. Attorney

16

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal No. 97-10009-MLW |
| | : | |
| JOHN V. MARTORANO | : | May 13, 2004 |

GOVERNMENT'S SUPPLEMENTAL INFORMATION REGARDING
MOTION FOR DEPARTURE PURSUANT TO § 5K1.1 OF THE
UNITED STATES SENTENCING GUIDELINES

On September 9, 1999, the defendant John V. Martorano pleaded guilty to the

superceding information filed in the above-captioned case. In accordance with his agreement to

cooperate and cooperate completely with law enforcement, the defendant met on a number of

occasions with agents assigned to the Justice Task Force, was fully debriefed, and provided

information in a number of investigations which were being conducted by the Task Force.

The two most significant contributions made by the defendant Martorano to matters under

review by the Justice Task Force involved the investigation and subsequent prosecution of

former FBI Supervisory Special Agent John J. Connolly, Jr. on Racketeering and Obstruction of

Justice charges in the case known as United States v. John J. Connolly, Jr., Criminal Number 99-

10428-JTL, and the investigation of former Massachusetts State Police Lieutenant Richard J.

Schneiderhan, Criminal Number 00-10412-REK, for Conspiracy to Obstruct Justice and

Obstruction of Justice. In connection with the Connolly matter, the defendant testified before the

grand jury and during the course of Connolly's racketeering trial. In the government's view, the

defendant's testimony offered against Connolly was truthful, and, to the extent that the details of

his testimony could be independently corroborated, was corroborated.

As to the Schneiderhan investigation, while the government elected not to call Martorano to testify during the course of that jury trial,[1] he was called before the grand jury and testified to the facts and circumstances surrounding his lengthy, corrupt relationship with Schneiderhan. In the government's view, the cooperation and testimony of John Martorano was extremely valuable, and contributed to the indictments and successful prosecutions of Connolly and Schneiderhan.

The undersigned would note that the defendant Martorano answered all questions put to him by Justice Task Force investigators and prosecutors without hesitation. He provided Justice Task Force investigators with a substantial amount of information relating to other matters that were under inquiry by the Justice Task Force, a number of which were of significant historical value, but which related to conduct that fell outside the applicable statute of limitations.[2]

Significance of the Defendant's Cooperation
in the Connolly and Schneiderhan Cases

As noted above, the defendant Martorano was a witness in the Connolly trial. With respect to those proceedings, the undersigned believe that the defendant's cooperation and willingness to testify before the grand jury and at trial were important to the jury's ultimate guilty verdicts on RICO and Obstruction of Justice charges. While the jury did not find a number of

---

1. The defendant Martorano was the first to identify Schneiderhan as a corrupt law enforcement official. Martorano's involvement with Schneiderhan, however, preceded his becoming a fugitive in 1978, at which time Martorano turned Schneiderhan over to Stephen Flemmi as a source for sensitive law enforcement information.

2. Based on the independent investigation of the information provided to the Justice Task Force by the defendant Martorano, and to the extent the information was susceptible to being corroborated, he was in fact corroborated. One such example being the fact that he and Bulger had provided a diamond ring to Connolly at a particular point in time, and Connolly's former wife confirming that at the same point in time Connolly had given her an elaborate diamond ring out of the blue.

Racketeering Acts that Martorano testified about to have been proven beyond a reasonable doubt, the undersigned have no doubt that Martorano provided truthful information. Indeed, subsequent events involving the co-defendant Steven Flemmi further corroborated the reliability of the information Martorano provided.

As to the Schneiderhan prosecution, the defendant Richard J. Schneiderhan, prior to his retirement from the Massachusetts State Police Department (MSP), had been involved in numerous organized crime investigations for the MSP. After he retired from that job, Schneiderhan continued to have access to sensitive law enforcement information as an employee of the New England State Police Intelligence Network. Still later, Schneiderhan worked for a program known as MassBuy, which was overseen by the MSP. The defendant Martorano disclosed to the Justice Task Force that, beginning in the late 1960's, he and then-Winter Hill gang leader Howard Winter had a corrupt relationship with Schneiderhan. At the time that relationship began, Schneiderhan was assigned to the Organized Crime Unit of the Massachusetts Attorney General's Office. Martorano related that on a regular basis he and Winter met with and paid Schneiderhan for information. This corrupt relationship continued until Martorano became a fugitive shortly before the federal grand jury returned the indictment in the so-called "race fixing" case at which time Martorano fled the jurisdiction. The defendant Martorano further advised investigators that at or about the time he became a fugitive, he introduced Schneiderhan to Stephen Flemmi, and, thereafter, Schneiderhan began provided information to Flemmi and James Bulger.

Ultimately the information provided by Martorano regarding Schneiderhan was corroborated by Kevin Weeks who, during the pendency of the instant case, was directed by Flemmi to contact Schneiderhan. Thereafter, Weeks had numerous face-to-face meetings with

Schneiderhan, and Schneiderhan provided Weeks with very sensitive information concerning

what Schneiderhan believed was wiretap information relating to the telephones of William and

Jackie Bulger, but which in reality was pen register information. In addition, Flemmi himself

subsequently confirmed his corrupt relationship with Schneiderhan, including corrupt payments

made by Flemmi to Schneiderhan.

Finally, it should be noted that Martorano's identification of Schneiderhan as a corrupt

individual ultimately led to investigators determining that a Bell Atlantic employee, namely

Network Operations Manager Richard O'Brien, had been taking bribes from bookmakers for a

number of years in exchange for leaking information concerning sealed electronic surveillance

orders which had been obtained by the FBI and MSP. When confronted, O'Brien admitted that

over time he had accepted $100,000 in payments and gambling debt relief from bookmakers. A

number of those bookmakers were associated with the defendant Martorano and the Winter Hill

organization. Bell Atlantic immediately terminated O'Brien's employment, and the Justice Task

Force subsequently brought a successful case against him for obstructing criminal investigations

in violation of Title 18, United States Code, Section 1510.

Conclusion

The Justice Task Force believes that the defendant fulfilled his obligation to cooperate

fully and completely with Justice Task Force investigators. Further, the Justice Task Force

believes that the defendant rendered substantial assistance to the United States in its

investigations and prosecutions of John J. Connolly, Jr. and Richard J. Schneiderhan, two corrupt

law enforcement officials who for several decades seriously undermined the interests of justice

and did incalculable damage to law enforcement efforts in the District of Massachusetts and

beyond.

Respectfully Submitted,

MICHAEL J. SULLIVAN
UNITED STATES ATTORNEY

JOHN DURHAM
SPECIAL ATTORNEY
JUSTICE TASK FORCE
U.S. ATTORNEY'S OFFICE
157 CHURCH ST., 23RD FLR.
NEW HAVEN, CT  06510
(203) 821-3700

LEONARD C. BOYLE
SPECIAL ATTORNEY
JUSTICE TASK FORCE
U.S. ATTORNEY'S OFFICE
157 CHURCH ST., 23RD FLR.
NEW HAVEN, CT  06510
(203) 821-3700

CERTIFICATION

This is to certify that copies of the foregoing Government's Supplemental Information

Regarding Motion for Departure were hand-delivered and/or mailed to the following on this 13th

day of May, 2004:

> James Herbert
> Chief, Strike Force Unit
> U.S. Attorney's Office
> District of Massachusetts
> One Courthouse Way
> Boston, MA  02211
>
> Fred Wyshak
> Assistant United States Attorney
> Strike Force Unit
> U.S. Attorney's Office
> District of Massachusetts
> One Courthouse Way
> Boston, MA  02211
>
> Brian Kelly
> Assistant United States Attorney
> Strike Force Unit
> U.S. Attorney's Office
> District of Massachusetts
> One Courthouse Way
> Boston, MA  02211
>
> Francis DiMento, Esq.
> DiMento & Sullivan
> 7 Fanueil Marketplace
> Boston, MA 02109

JOHN H. DURHAM