UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CHRISTOPHER FITZGERALD, ) | |
| ) | |
| Plaintiff ) | |
| ) | CIVIL ACTION NO. |
| v. ) | |
| ) | No. 04-12138-NG |
| CBS BROADCASTING, INC., ) | |
| ) | |
| Defendant ) | |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This Memorandum is submitted in opposition to Defendant's Motion for Summary Judgment. Plaintiff, Christopher Fitzgerald ("Fitzgerald") maintains that Defendant is not entitled to summary judgment based on the "fair use" defense under Section 107 of the Copyright Act, for its unauthorized use of the photograph of Stephen Flemmi ("Flemmi"). On the contrary, Plaintiff maintains in his cross-motion for partial summary judgment that he is entitled to summary judgment on the issue of copyright infringement, and that he is entitled to multiple awards of statutory damages because two CBS stations used the Flemmi Photograph at different times. In addition, Plaintiff maintains that based on CBS's history of unauthorized use of the same Photograph in 1998, he is entitled to a pretrial ruling that CBS willfully infringed his copyright.

I.   Argument

**A.   Defendant is not entitled to Summary Judgment because it used a Copyrighted Photograph that it knew or should have known it could not use without permission.**

Contrary to Defendant's assertions, this action presents a compelling case for copyright infringement. Plaintiff owns the copyright to the Flemmi Photograph that both WBZ-TV (Channel 4) and WSBK-TV (Channel 38) used in separate newscasts that were broadcast at different times. In 1998, Plaintiff sued both WBZ-TV and the CBS Television Network alleging that both the local station (Channel 4) and the CBS Network (on *60 Minutes*) infringed the Flemmi Photographs. The parties settled the 1998 Action in 1999, and although neither WBZ-TV nor CBS admitted that it infringed Plaintiff's Photographs of Flemmi, Channels 4 and CBS were on notice that Plaintiff owned the copyrights to these images and that Fitzgerald was not going to permit anyone to use them without his permission. Certainly, a lawsuit is probably the most powerful way of bringing this point home.[1] Furthermore, although CBS claims that after the 1998 Action was settled, it instituted preventative measures to avoid further litigation with respect to the Photograph [CBS Memo p. 9-10], the measures that CBS undertook were totally inadequate and ineffective. Moreover, in June 2004, when Channel 4 had further need for a photograph of Flemmi, it did not even follow its own written "CBS News Standards" regarding the use of copyrighted materials under the fair use news reporting exception of Section 107. [See, Exhibit A to Affidavit of Andrew D. Epstein, submitted herewith.]

---

[1] Even CBS admits this. "It was a mistake for that [Photograph] to get on the air not because it wasn't fair use but because we had gone through the litigation with Mr. Fitzgerald in 1998. We made a decision we would not air the photograph ever again based on our experience of having gone through litigation." [Street Dep. p. 121.]

**B.**     **The Newscasts were not a Fair Use of the Photograph of Flemmi.**

Channel 4 and the CBS Television Network were forewarned that Fitzgerald considered the unauthorized use of his Photographs of Flemmi to be copyright infringement. Fitzgerald carefully controlled and monitored the distribution of the Photographs and he pursued every unauthorized use he detected. [See, Fitz. Aff. ¶ 1 and Epstein Aff.[2].] Even if Fitzgerald's work was factual as to Flemmi's 1995 arrest and his appearance in 1995, it was not factual as used by WBZ-TV in 2004. Also, the Photographs demonstrated a high degree of photojournalistic skill when Fitzgerald captured a moving target who probably did not want to be photographed. [Fitz. Aff. ¶ 2.] The brief use made of the Photograph on Channel 4 is less indicative of fair use than it is of the typical air time that photographs get on television.[3] In addition, as a photo-journalist, Fitzgerald makes part of his living by selling residual rights to photographs to news publications and television stations, so that Channel 4's use of the Photograph directly impacted his income. [Fitz. Aff. ¶ 4.]

---

[2] Fitzgerald is presently in a remote section of Europe. A draft form of an Affidavit prepared by counsel was sent to Fitzgerald by email several days ago. The Affidavit was prepared by counsel from the record, and (without waiving the attorney/client privilege) from conversations Fitzgerald had with counsel. Fitzgerald did not expect to have ready access to a computer but he promised to check his email as often as he could. As of October 4, 2006, counsel has not heard from Plaintiff. Fitzgerald is not expected to return to the US until approximately October 20, 2006. Unfortunately, Plaintiff's counsel will be in Europe from October 20 through November 6, 2006. Fitzgerald's Affidavit will be duly signed and filed in court as soon as possible upon counsel's return to the US. See, Affidavit of Andrew D. Epstein.
[3] In, *The News About the News, American Journalism in Peril*, (Vantage Books, a Division of Random House, Inc. (2003)) authors Leonard Downie, Jr. and Robert G. Kaiser talk about network newscasts evolving into more entertaining, faster-paced programs with better pictures and more drama. p. 137. They also discuss that television consultants often encourage local stations to offer "fast-paced, action-packed local television newscasts." p. 181.

> **1.  The Purpose and Character of the Use Weighs Heavily in Favor of Infringement.**
>
> **a)  CBS's use of the Flemmi Photograph was not transformative.**

CBS did not make a transformative use of the Flemmi Photograph by adding something new to the image or by using it for a different purpose. Channel 4 merely cropped the picture by taking out the arresting officers who were escorting Flemmi to jail in 1995, so that only Flemmi's face was visible. This is dramatically different from the transformative use discussed in Blanch v. Koons, 396 F.Supp. 2d 476 (S.D.N.Y. 2005). There the court held that artist, Jeff Koons made fair use of a copyrighted photograph when he copied the model's legs, feet and sandals as one component of his painting, and totally inverted their orientation, added other contrasting images of legs along with ice cream, donuts and pastries floating them above a landscape of grass, a waterfall and sky.

> The use Koons made of the only items he copied - the crossed legs, feet and sandals - was different from their use in the photograph, whose purpose was to illustrate metallic nail polish. The painting's use does not "supersede" or duplicate the objective of the original, but uses it as raw material in a novel context to create new information, new aesthetics, and new insights. Such use, whether successful or not artistically, is transformative.

Id. at 481.

CBS did not contribute new intellectual value to the Flemmi Photograph thereby transforming the Photograph into something that has a further purpose or different character. CBS merely used a portion of the Flemmi Photograph on a news broadcast, thereby superseding Fitzgerald's purpose in taking the Photograph. This provides limited justification for a finding of fair use. Id. at 480. (Contrast, Kelly v. Arriba Soft Corp., 336 F. 3d 811, 819-20 (9th Cir. 2003), where defendant created a new purpose for the images and was not simply superseding plaintiff's purpose.)

4

CBS relies heavily on Núñez v. Caribbean International News Corp., 235 F. 3d 18 (1st Cir. 2000) for authority for its defense of fair use. In Núñez, a photographer sued a newspaper for copyright infringement for using photographs that were intended to be used in a modeling portfolio, but which were used in a news article instead. The photographs had been distributed to members of the Puerto Rican modeling community in accordance with normal practice. The subject, who was later crowned Miss Puerto Rico in the Miss Universe beauty pageant, was naked or nearly naked in at least one of the photographs. A controversy arose as to whether or not the model was fit to retain her crown. Three of plaintiff's photographs were published in a newspaper without permission. The court held that by putting copies of the photographs in the newspaper, the images were transformed into news, creating a new meaning or purpose for the work. Id. at 23. The court noted that the use of the photographs is not necessarily fair just because they are used for news reporting purposes. Id. at 22. The court held that the photographs were transformed into news because they were used for a purpose that was completely different from the reason they were taken, and that it would have been much more difficult to explain the controversy about whether or not Miss Puerto Rico should complete her reign without using the photographs. Id.

With respect to the photographs presently before the Court, there was nothing inherently newsworthy in June 2004, about the 1995 arrest photographs of Flemmi. CBS did not transform the Photograph by adding new meaning to the image and it used the Photograph for the same purpose for which it was taken. CBS simply used a nine year old news photograph in a current news broadcast. Núñez cautions that a news organization would have an incentive to create news so that an infringement falls within

the fair use exception. "Were a 'newsworthy' use per se fair, journalists and news photographers would be left with little assurance of being rewarded for their work." Id. at 22, citing Harper & Row, Publishers v. The Nation Enterprises, 471 U.S. 539, 558, 561, and 562.

     **b)   The use of the Photograph by CBS was not factual.**

Channel 4 used a cropped photograph of Flemmi because it would not have made sense for the station to use the entire frame. The entire frame captured a moment in time after Flemmi was arrested in 1995, when he was being escorted to prison by police officers. The police officers who are clearly visible in Fitzgerald's full frame photograph[4] have no relevance to a story about Flemmi's role in the sentencing of John Martorano. The "fact" shown in the image was Flemmi's arrest in 1995. This is the reason that WBZ-TV and WSBK-TV had to crop the photograph to show only Flemmi's head and face. Otherwise, the Photograph would have been just an outdated arrest photograph that was nine (9) years old by the time of the June 2004 newscasts, instead of the rare image that it is.[5] If CBS was truly trying to use the Photograph as a fact, Channels 4 and 38 would have had to disclose on the air that this was the only Flemmi photograph that it could find to show what Flemmi looked like in recent years. The truth is that CBS used the Flemmi Photograph to mislead its viewers as to the facts and not to enlighten them. Even if Flemmi was relevant to Martorano's sentencing in 2004, Plaintiff's 1995 Photograph of Flemmi was not relevant to <u>this</u> news story. There was simply nothing newsworthy or topical <u>in 2004</u> about the 1995 Photograph to warrant a finding of fair use.

---

[4] See Exhibits to Complaint.
[5] See, Fitzgerald Affidavit ¶ 6, 16 and 18, submitted with his Motion for Partial Summary Judgment.

6

      **c)**      **CBS used the Photograph for its own Commercial Gain and Usurped Fitzgerald's right to Exploit the Photograph.**

CBS argues that the Flemmi Photograph "was used to enhance a news report. . . ." [CBS Memo p. 13] and that it "was used because of its relevance to that breaking news event in 2004, not to illustrate Flemmi's arrest in 1995." [CBS Memo p. 14] Fitzgerald agrees. Clearly, the Photograph was used to enhance the news report; why else would it have been used by Channel 4? As Jennifer Street said, television is a visual medium and people expect to see visual images when they watch and listen to the news. [Street Dep. p. 63-4.[6]] Without a constant stream of visual materials, one might as well listen to the radio or watch public television. Fitzgerald's photograph might not have helped to sell advertisements for the June 2004 newscast in which his Photograph was used, but it did help to enhance the news report. By making the news entertaining and lively, Channel 4 was striving to keep viewer's attention, which ultimately might lead to higher ratings and might help to sell future advertisements.[7]

Commercial gain and residual use is why Fitzgerald and all photojournalists work long hours for little compensation. Fitzgerald earned $150 plus expenses per assignment with the Boston Globe in 1995. [Fitz. Dep. p. 81.] If the Photograph was used without permission under the fair use exception by every one of the newspapers, magazines, television stations and networks that paid Fitzgerald over $60,000 during the last ten years, Fitzgerald's market for the Photograph would be nonexistent.[8] Fitzgerald has

---

[6] The entire transcript of the Street Deposition is attached as Exhibit 3 to the Affidavit of Mary B. Murrane filed in support of Defendant's Motion for Summary Judgment and in Opposition to Plaintiff's Motion for Summary Judgment.

[7] "Television is a visual medium. Making the news on television fun to look at and entertaining has always been relatively easy, and one way to draw a crowd of visitors. This begins with crime coverage. . . ." *The News About News*, *infra*, p. 177. News shows are far and away the most important source of advertising revenue, and "profitability is at the center of every decision stations make about news coverage." Id. p. 175.

[8] See, Fitzgerald Affidavit ¶ 7, submitted with his Motion for Partial Summary Judgment.

7

selectively controlled the use of the Flemmi Photographs. For example, he refused to allow a national news wire service to distribute the photograph because he would have reduced his potential residual income from the Photographs to zero. [Fitz. Aff. ¶ 3.] Furthermore, apart from the news, there is no market for 8" x 10" glossies of the Flemmi Photographs. If CBS and other news organizations appropriate copyrighted photographs and use them under the guise of the fair use exception, photojournalists like Fitzgerald will loose a huge potential market for their work. Besides, Channel 4 owned a courtroom illustration of Flemmi that it could easily have used in place of the Photograph. [Street Dep. p. 65-9.]

### 2. The Nature of the Copyrighted Work Heavily Favors a Finding of Infringement.

#### a) One of the Flemmi Photographs was first published by the *Boston Globe* in 1995.

Fitzgerald did not state as CBS suggests, that the use of the Flemmi Photograph by CBS in 1998 was the first time the image was used. [CBS Memo p. 18.] The *Boston Globe* first published one of the Flemmi Photographs on January 7, 1995. [See Epstein Aff. Exhibit B.] This date is clearly stated on the Copyright Registration Certificate that is attached to the Complaint. However, in 1995, the *Globe* published the Photograph of Flemmi looking to the left, while in June 2004, WBZ-TV used the image of Flemmi looking to the right. The important consideration is that the copyrights to both Photographs were separately registered with the Copyright Office, and Fitzgerald carefully controlled the extent and frequency of their use. [See, Fitzgerald's letter of March 18, 1998, to the producer for *60 Minutes* enclosing the Photographs of Flemmi. "I am leery of other news organizations gleaning the photos without permission, especially

8

since these are the only topical photos – still or video – which exist of Mr. Flemmi (at least to the best of my knowledge)." Exhibit E to Fitzgerald's Motion for Partial Summary Judgment.]

        **b)**        **The Flemmi Photograph is Creative Expression.**

Contrary to Defendant's contention, the Photographs are creative expression. Fitzgerald had control over the timing, location, lighting and composition of the Flemmi Photographs. Fitzgerald had the choice to use either existing lighting conditions or flash; he chose the location where he anticipated Flemmi would be escorted by the police; he decided specifically what to include in each frame of the photograph; and he decided what camera and lens combination to use to maximize the probability of getting a usable photograph, all while he was walking backwards and had only seconds to get clear focused shots. [Fitz. Dep. p. 80 and Fitz. Aff. ¶ 2.] Thus, Fitzgerald maintains that there is no question that the Photographs are creative expression. (Feist Publications, Inc. v. Rural Telephone Service Co., Inc., 499 U.S. 340, 345, 111 S.Ct. 1282 (1991); only some minimal degree of creativity is needed.) Despite the number of photographers who were present in Dallas, Texas in November 1967, only one photographer managed to take the iconic photograph of Jack Ruby shooting Lee Harvey Oswald. Photojournalism is a unique combination of skill, experience, creativity, timing and luck. [Fitz. Aff. ¶ 2.]

        **3.**        **The Amount and Substantiality of the Use Strongly Favors Fitzgerald.**

CBS did not use the full frame of the Flemmi Photograph. CBS cropped the Photograph to exclude the police officers who were escorting Flemmi to prison. However, Flemmi's head and face were totally and clearly visible. Thus, CBS used the "heart" of Fitzgerald's work. (Harper & Row, 471 U.S. at 565; and Campbell, 510 U.S.

9

at 587.  CBS's reliance on Núñez is misplaced.  In Núñez, the partially nude image of Miss Puerto Rico went to the core of the issue as to her qualifications to continue to compete in the Miss Universe beauty contest.  In Núñez, the photograph was an integral part of the news.  235 F. 3d at 22.   Unlike Núñez, the Flemmi Photograph was not news in 2004, and Channel 4 could have used any other photograph of Flemmi it could find, including its own courtroom illustration, in order to satisfy its own needs.  In light of this, the third factor clearly favors Fitzgerald.

> **4.    The Fourth Facter, the Effect of the Use on the Potential Market for or Value of the Copyrighted Work, also Strongly Favors Fitzgerald.**
>
> **a)    CBS failed to follow its own internal procedures for using copyrighted materials under the fair use exception.**

CBS admits that not every future use of the Flemmi Photograph will be a fair use but that this court has to determine that this use was a fair use.  "The only question presented in this case is whether *this* use of the Photograph was a fair use."  [Emphasis in original; CBS Memo p. 22.]  Conceivably, if Stephen Flemmi escaped from prison and he was an imminent threat to the public, and there were no other photographs of Flemmi available except for Fitzgerald's, WBZ-TV's decision to use the Flemmi Photographs might be justified as fair use.  However, even if this unlikely event were to occur, WBZ-TV would still have to follow its own CBS News Standards.

> Part III-2; FAIR USE
> The concept of fair use is complicated and may be invoked only in limited circumstances. . . .  The use of such material must be discussed in advance with the executive producer or bureau chief.  It must also be approved by the CBS News Business Affairs Department.  Each use of copyrighted material . . . must be brought to the attention of the CBS News Business Affairs Department.

[Exhibit A.]

It is significant that when WBZ-TV used the Flemmi Photograph in June 2004, it did not follow its own internal procedures for using copyrighted materials under the fair use exception. If WBZ-TV had followed its own guidelines, its claim of fair use might be more credible than it is now.

In <u>Leibovitz v. Paramount Pictures Corp.</u>, 137 F. 3d 109, 117 (2nd Cir. 1998) Paramount must have made a conscious decision to use Annie Leibowitz's famous picture of Demi Moore as the basis for a movie poster for the film, *Naked Gun 33⅓; The Final Insult*, showing Leslie Nielsen grinning at the camera with his face superimposed on the naked body of a pregnant woman in profile, with the tag line, "Due [in theaters] in March." The Second Circuit affirmed that Paramount's use of the composite photograph was a parody and thus Paramount's transformation of the original photograph was permitted as fair use. Paramount's use of the spoof photograph of Leslie Nielsen probably helped to enhance Leibowitz's reputation and sales of the Moore photograph.

      **b)**     **CBS's Actions had a Direct Impact on Fitzgerald's Earnings.**

When Martorano was sentenced, CBS chose to use the Flemmi Photograph rather than ask Fitzgerald for permission and negotiate a reasonable licensing fee. Thus, Fitzgerald lost income. Flemmi is a cold-blooded murderer and not a beauty queen. Unlike the semi-nude photographs in <u>Nuñez</u>, 235 F. 3d at 23, there is no market for 8" x 10" glossy photographs of Stephen Flemmi. The Flemmi Photographs only have value in print media and on television, and the use by WBZ-TV and WSBK-TV clearly usurped Fitzgerald's only market for these rare images.

**c)      Litigation is expensive, time consuming, and risky.**

CBS fails to recognize that litigation is not necessarily more lucrative than licensing the photograph.  Litigation is expensive, time-consuming, stressful for litigants and risky.  Fitzgerald had to meet with counsel, review documents, answer interrogatories, assemble documents, write affidavits, attend depositions, read transcripts, pay legal fees and incur costs, all with the risk that there may be no recovery or that the recovery would be less than the amount of Fitzgerald's attorney fees and costs.  [Fitz. Aff. ¶ 5.]  Granted, Plaintiff has earned more in settlements than he has earned in negotiated licensing fees, but his settlements were not without risk and inconvenience.

**d)      The 1995 Photograph of Flemmi was not "extremely newsworthy" in 2004.**

CBS points out that courts should not decide "what is and what is not news."  Harper & Row, 471 U.S. at 561.  If this is the case, then who should decide; the news director at Channel 4 who makes the determination that the picture of Flemmi is "extremely newsworthy" [Street Dep. p. 61] and decides to publish the image under the excuse of fair use despite prior warnings, or Fitzgerald who owns the Photograph of Flemmi?  What if Fitzgerald had sold exclusive rights to the Flemmi Photograph to Channel 7 to be used in conjunction with the Martorano story, and WBZ-TV decided to use the Photograph with the hope that the fair use exception would come to its aid?   This would have put Fitzgerald in a difficult position and would have directly impaired both his credibility and his ability to earn a living.

> **5.** **Both the Statutory and Non-Statutory Factors in § 107 Require a Finding of Copyright Infringement.**
>
> **a)** **CBS is keeping the circumstances surrounding the archiving of the Flemmi Photograph a mystery.**

CBS claims that it found the Flemmi Photograph sometime between the 10 p.m. news on WSBK-TV and the 11:00 p.m. news on WBZ-TV. CBS has not identified the video editor who found the Photograph but it did identify the film librarian, Eric Cox. Of course, CBS has moved to quash Fitzgerald's timely notice to depose Cox and his supervisor, Tom Janssen in an attempt to prevent Fitzgerald from finding out exactly how the Flemmi Photograph was found, how it was indexed, where it was located, and under what circumstances it suddenly appeared, and who found it. CBS had no valid reason for refusing to produce Eric Cox and Tom Janssen, other than to frustrate Fitzgerald's efforts to get at the truth.

> **b)** **The "preventative measures" that CBS supposedly took were in utter disregard of Fitzgerald's rights.**

CBS claims that it took preventative measures to avoid a future lawsuit over the Flemmi Photograph, but its measures were woefully ineffective. First, CBS did not even follow its own fair use guidelines for using photographs. Street admitted this in her deposition.

> Q.  Do you know if the use of the Steve Flemmi photograph in Exhibit 1 was approved by the CBS News Business Affairs Department?
> A.  I don't believe it was.
> Q.  So that WBZ Boston and UPN 38 used that Steve Flemmi photograph in 2004 without following the procedures in the CBS News Standards, would you agree with me?
> A.  I believe so.

[Street Dep. p. 149.]

13

Second, CBS claims that after Fitzgerald's 1998 lawsuit, it instructed its film librarian to review all archived tapes in the station's library and remove all images of the photograph. Eric Cox was the film librarian at WBZ-TV in 1998 and he is still the film librarian at the station. CBS admits that it made "routine" copies of all *60 Minutes* broadcasts including the one with the Flemmi Photographs. [CBS Ints. # 3.[9]] How did Eric Cox miss the *60 Minutes* tape with the Flemmi Photographs? How did Eric Cox miss the so-called "pitch reel" that was made from the *60 Minutes* tape that was supposedly the source of the Photograph used in June 2004? If an unidentified film editor found the Photograph in June 2004, why didn't Mr. Cox find it in 1998 or 1999? Since CBS will not let Fitzgerald depose Mr. Cox, one can only speculate that at worst, CBS never told Eric Cox to purge the film library of Mr. Fitzgerald's photographs, or that Mr. Cox never bothered to purge the Photographs and no one followed up with him, or that his efforts were simply negligent. Of course, if the photographs had been purged from the 60 Minutes broadcast, there would not have been a pitch reel, and CBS would not have had the Flemmi Photograph in its files, and would not have been able to use it, and this lawsuit would not have been filed.

> Q. Would you agree with me that the pitch reel was made from that 60 Minutes broadcast of May 10, 1998?
> A. Yes.
> Q. And do you know when that pitch reel was made? How long after or soon after the 1998 broadcast of the 60 Minutes show?
> A. No, we did discuss this earlier. I don't know when. I don't know who. Only that it must have been made fairly soon after the broadcast.
> Q. And how did you come to this conclusion that it must have been made shortly after the broadcast?

---

[9] CBS's answers to interrogatories are attached as Exhibit 2 to the Affidavit of Mary B. Murrane in support of Defendant's Motion for Summary Judgment and Opposition to Plaintiff's Motion for Partial Summary Judgment.

14

> A. Because given the litigation that happened in 1998, it was certainly the policy of WBZ and UPN 38, we would not use Mr. Fitzgerald's photograph because we didn't want to have to go down this path again.
> Q. Okay. If you had been given a copy of Exhibit 14, the Stock Photography Contract, between CBS News and Christopher Fitzgerald, if you had been given a copy of that on or about May 10th, 1998, would you have made a recording of the 60 Minutes broadcast that evening?
> A. That's a good question. Probably not.
> Q. Why not?
> A. Having gone the road we went down or were in the middle of in May of 1998, there's no one at the television station that wanted to continue to do litigation with Mr. Fitzgerald or yourself or anyone else, and perhaps the safest way to ensure that didn't happen would be not to make the recording.
> Q. And of course if the recording were never made, a pitch reel would never have been made. And if the pitch reel would never have been made, the June of 2004 broadcast of the news that contained Mr. Flemmi's photograph would never have been aired; would you agree with me?
> A. I thought about that many times. Yes, I agree.

[Street Dep. p. 104-6.]

CBS also claims that it sent an internal email message to all staff instructing them to search their individual files and destroy all copies of the Photograph. However, WBZ-TV was unable to find a copy of the email message. [Street Dep. p. 38.] Regardless, assuming that WBZ did send an email to all employees in or around 1998, there is no suggestion that anyone followed up this email with either a reminder or an inspection. Moreover, there is no suggestion that WBZ-TV did in 1998 what CBS management did in 2004, that is, post a copy of the Flemmi Photograph in numerous places "throughout the station, including the library, the news room, every editing bay and the photographer's area instructing staff not to use the Photograph." The notation on the Photograph boldly said, "Do Not Ever use this Photo of Steve Flemmi on WBZ or UPN Air." [See, Epstein Aff., Exhibit C.] In fact, the Flemmi Photograph was posted in the news department from June 2004 through at least the time of Street's deposition on July

15

19, 2006. [Street dep. p. 125, and CBS Ints. #9] Both Eric Cox and now News Director, Jennifer Street were employed in the news department by WBZ-TV at all times from 1998 to date. They should have recognized Fitzgerald's Photograph. CBS's efforts to prevent the repeated use of the Flemmi Photographs from 1998 to 2004 were highly ineffective. For example, even when the pitch reel was purged in 2004, only four of the five uses of the Flemmi Photographs were removed. No wonder CBS admits that "[d]espite these efforts [made after June 2004], a copy of the Photograph inadvertently remained in the possession of CBS 4." [CBS Memo p. 9.] CBS's "inadvertence" amounts to negligence.

      The lack of communication about the Flemmi Photograph between CBS Corporation in New York and WBZ-TV is further evidence of Defendant's willful misbehavior. As has been shown, the Stock Photograph Contract signed by both Fitzgerald and the CBS Network says that "[t]his contract does not grant CBS <u>or its affiliates</u> the permission to republish these photos on other television programs or in other media. <u>Additional uses</u> and re-broadcasts . . . would require further negotiation." [See Exhibit C to Plaintiff Motion for Partial Summary Judgment; emphasis supplied.] WBZ-TV admitted that if it was given a copy of this Contract on or about May 10, 1998 (which was just before the *60 Minutes* broadcast), it would "probably not" have made a recording of the broadcast with the Flemmi Photographs. [Street Dep. p. 105.] In fact, WBZ-TV never disclosed to the CBS Network that it had a copy of the *60 Minutes* broadcast, or that it made the pitch reel from this broadcast when the Mutual Settlement and Release was signed on October 23, 1999. [Street Dep. p. 118.] This lack of communication shows a pattern of conduct that up to June 2004 reflects an

utter disregard of Fitzgerald's rights evidenced by ineffective efforts to implement standards that would have ensured that neither the network nor any of the CBS stations would ever use the Flemmi Photographs again without permission. This is part of the reason why Fitzgerald maintains that he is entitled to pre-trial ruling that CBS willfully infringed his copyright in June 2004. See, Jobete Music Co., Inc. v. Johnson Communications, Inc., 285 F. Supp. 2d 1077, (S.D.Ohio 2003) and Swallow Turn Music, Inc. v. Wilson, 831 F. Supp. 575 (E.D. Texas 1993) cited in Plaintiff's Motion for Partial Summary Judgment.

      **c)**     **CBS has breached the Warranties and Representation provisions of the Mutual Settlement and Release dated October 23, 1999.**

WBZ-TV erroneously claims that the Copyright Act may not prohibit it from storing a copy of its own broadcasts under the authority of Sony Corp. of America v. Universal City Studios, Inc., 464 U.S. 417, 449 (1984). Sony stands for, *inter alia*, the proposition that recording copyrighted broadcasts for private home use is not an infringement. Regardless, CBS's contract with Fitzgerald prohibited all affiliates of CBS including WBZ-TV from making other uses of the Flemmi Photographs.[10] Furthermore, CBS claims that there is nothing in the 1999 Mutual Settlement and Release[11] that required CBS to destroy all copies of the Photograph. CBS is wrong again. The Settlement is predicated on the warranties and representations made by CBS that it disclosed all uses of the Flemmi Photograph in discovery. Fitzgerald asserts that he did not know that WBZ-TV made a bootleg copy of the *60 Minutes* broadcast, and if he did,

---

[10] CBS's answers to interrogatories are attached as Exhibit 2 to the Affidavit of Mary B. Murrane in support of Defendant's Motion for Summary Judgment and Opposition to Plaintiff's Motion for Partial Summary Judgment.
[11] See, Stock Photography Contract (March 16, 1998) attached as Exhibit 11 to the Affidavit of Mary B. Murrane in support of Defendant's Motion for Summary Judgment and Opposition to Plaintiff's Motion for Partial Summary Judgment.

17

he would have insisted that his Flemmi Photographs were purged from this broadcast. [See Fitz Aff. ¶ 17 filed with his Motion for Partial Summary Judgment.] Now, of course, WBZ-TV opposes Fitzgerald's reasonable request for leave to ask a few more than 25 Interrogatories so that WBZ-TV can verify in writing that it did not disclose that it made a bootleg copy of the *60 Minutes* broadcast or the derivative pitch reel.

        **d)**        **WBZ-TV lack of good faith weighs against a finding of fair use.**

WBZ-TV made an unauthorized copy of the *60 Minutes* broadcast and an unauthorized pitch reel of this tape. WBZ-TV has not asserted a good faith belief that it could have recorded the broadcast or made the pitch reel in reliance on the fair use exception. In fact, Ms. Street asserts that if the station knew about the 1998 Contract between CBS and Fitzgerald, Channel 4 would "probably not" have recorded the *60 Minutes* show. [Street Dep. p. 105.] Nuñez says that an unlawful acquisition of a copyrighted work "generally weighs against a finding of fair use. . . ." 235 F. 3d at 23.

## II.  Summary

The combination of actions and omissions by WBZ-TV and the CBS Network takes this case out of the ordinary realm of copyright infringement cases. The totality of the Defendant's actions in using the Flemmi Photographs negates a finding of fair use, and compels a finding as a matter of law that WBZ-TV and WSBK-TV willfully infringed Mr. Fitzgerald's Flemmi Photograph.

    1.    CBS was sued in 1998 for copyright infringement for using the same two Photographs that are at issue here, and, as a result, Defendant was on notice not to use these images again without permission.

2. WBZ-TV made a bootleg copy of the *60 Minutes* show with the Flemmi Photograph despite a contract that both Fitzgerald and CBS signed that prohibited such a practice by CBS and its affiliates.

3. WBZ-TV never purged its files of the Flemmi Photograph that were in the *60 Minutes* broadcast.

4. Someone at WBZ-TV made a pitch reel from the 60 Minutes tape that contained another copy of the Flemmi Photograph. This act itself constituted another instance of copyright infringement.

5. CBS never implemented an effective or reasonable system to prevent it from ever using the Flemmi Photograph. Frankly, there was a complete lack of communication between WBZ-TV and the CBS Network.

6. At least two key employees of the news department at WBZ-TV (Film Librarian, Eric Cox, and News Director, Jennifer Street) have been employed by the station from the time of the first copyright infringement action to date. Both employees had a duty to prevent the use of the Flemmi Photograph.

7. WBZ-TV failed to follow its own internal News Standards for using copyrighted materials under the fair use exception by discussing such use <u>in advance</u> with the executive producer or bureau news chief <u>and</u> by getting approval from the CBS News Business Affairs Department.

8. WBZ-TV failed to disclose as part of the 1999 Mutual Settlement and Release agreement that it made a copy of the *60 Minutes* show and the derivative pitch reel both of which contained multiple copies of the Flemmi Photograph, as it represented and warranted that it had.

19

9. WBZ-TV provided no evidence that it did anything in 1999, other than send an internal email to certain employees not to use the Flemmi Photographs. Also, WBZ-TV has not produced a copy of this email. Of course, now, as a result of the present litigation, the News Director of WBZ testified that a copy of the Flemmi Photograph was posted in the news room with a notation boldly notifying everyone not to use the Photograph. This was not done in 1999.

Both WBZ-TV and CBS were negligent, incompetent, inept, sloppy, and acted in total disregard of Fitzgerald's rights, and in breach of the contract that the CBS Network made with Fitzgerald. Consequently, Plaintiff requests that this court negate Defendant's fair use defense and enter partial summary judgment for Plaintiff on the issue of liability, and further find that Defendant willfully infringed Plaintiff's copyrighted Photograph.[12]

        CHRISTOPHER FITZGERALD,
        By his attorney,

        /s/ Andrew D. Epstein

October 4, 2006
        Andrew D. Epstein, Esquire
        BBO #155-140
        Barker, Epstein & Loscocco
        10 Winthrop Square
        Boston, MA  02110
        (617) 482-4900
        FAX: (617) 426-5251

---

[12] In his Motion for Partial Summary Judgment, Plaintiff is also seeking a ruling from this court that he is entitled to two awards of Statutory Damages under 17 U.S.C. § 504(c). CBS claims that since it owns both WBZ-TV and WSBK-TV, which are referred to as "sister" stations [Street Dep. p. 137], Plaintiff is entitled to only one award of Statutory Damages. On Sunday, October 1, 2001, veteran reporter Mike Wallace interviewed Bob Woodward about his controversial new book, *State of Denial*. The book is published by Simon & Schuster. In the interest of full disclosure, Wallace reported that Simon & Schuster is a "CBS sister company." [See, www.cbs.com, accessed on October 2, 2006.] According to the CBS website, Simon & Schuster is a separate corporation under the CBS Corporation umbrella. Query whether a use of one of the Flemmi Photographs by CBS sister company, Simon & Schuster would trigger an additional award of Statutory Damages because it is a separate corporation, but that the use by sister station, WBSK-TV would not? Plaintiff contends that such a result would be inequitable and unreasonable.