# EXHIBIT C

Case 1:04-cv-12138-NG    Document 46-4    Filed 10/18/2006    Page 1 of 2

# True or not, assertions put FBI in a no-win situation

**By Kevin Cullen**
GLOBE STAFF

**News Analysis**

Now that Stevie Flemmi is singing like the proverbial canary, claiming that the FBI gave him and James J. "Whitey" Bulger carte blanche to run their criminal empire, and even tipped them to avoid arrest, the federal government finds itself in an uncomfortable Catch-22.

The FBI and US Justice Department lawyers can and probably will assert that Flemmi is lying to save his own skin, that he is a duplicitous career criminal who has beaten and even killed people who crossed him.

But that raises the question: Why did the FBI and Justice Department use him as an informant to snare other gangsters for more than two decades, instead of building a case against him and Bulger?

That may be the ultimate question posed in the courtroom of US District Judge Mark L. Wolf, whose inquisition of the Boston FBI and how it built its biggest cases against the biggest mobsters continues to uncover bombshells like yesterday's affidavit from Flemmi.

At the least, Flemmi's sensational allegations that someone connected to the FBI compromised the investigation that finally garnered indictments against Flemmi and Bulger will force the federal government to conduct an investigation into that claim. The seriousness of the allegation, and the FBI's and Justice Department's conflict of interest in weighing it, could even force the appointment of a special prosecutor, according to legal experts.

And if it wasn't the case before Flemmi's affidavit yesterday, the FBI will be tarnished by the allegations, publicly and in its dealings with other law enforcement agencies. At a more practical level, a number of high-profile convictions against some two dozen mobsters, and the pending case against Flemmi, Bulger and reputed Mafia boss Francis P. "Cadillac Frank" Salemme are in jeopardy.

While Flemmi's credibility is dubious, it should be noted that many members of the Massachusetts State Police and the US Drug Enforcement Administration, including those who took part in the investigation that led to the indictments of Bulger and Flemmi, suspected all along that Bulger, Flemmi and Salemme got a heads-up before police


**JAMES J. "WHITEY" BULGER**
Indicted but missing

went looking for them in January 1995.

While Salemme and Bulger eluded the dragnet, sprung when the FBI told the State Police and DEA that it had learned their targets might flee, Flemmi was arrested by state troopers and a federal drug agent near his son's Financial District restaurant. Flemmi later told friends he thought he had more time to get away. When Salemme was arrested in Florida seven months later, and Bulger remained on the lam, many in law enforcement got suspicious. Some state troopers and DEA agents suspected that Salemme was allowed to stay on the lam just long enough to avoid the outrage of only Bulger's getting away.

Flemmi's claims will be difficult to corroborate, but they still put the onus on the FBI to do some explaining. The FBI's critics say that is exactly what the FBI has been avoiding in its strategy of arbitrarily selecting who it will target and who it will protect as an informant. Harvey Silverglate, a Boston defense attorney, said the FBI wanted to carry on its jihad against the Mafia without having to explain to federal judges why some mobsters were being used to get others. Silverglate says the ruse, in which the federal government allegedly misled judges, including Wolf, about the existence and calibre of informants so they could obtain court authorization for electronic surveillance, is not the rogue actions of a few, but standard practice by federal prosecutors and the FBI.

"The real problem is that the FBI has protectors at Justice, who allow this stuff to go on," says Silverglate.

Flemmi's claim that he and Bulger were assured by FBI agents that they could engage in anything short of murder will lead to a procession of FBI agents and former FBI agents to the witness stand in Wolf's courtroom. It will be an embarrassing episode for the bureau, and depending on further disclosures, it could be more than embarrassing.

Of particular interest to Wolf, meanwhile, is Flemmi's assertion that he told FBI agents about a Mafia induction ceremony in Medford in 1989 several weeks before it happened, and that the FBI had the specifics four days before it happened. That flies in the face of assertions the government made to justify getting its "roving bug" to tape the ceremony.

It is true that, given his position, Stevie Flemmi has little credibility. But is also true that Wolf dramatically turned up the heat on the government after Flemmi claimed in an earlier affidavit that the federal government had lied to Wolf about the existence of an informant at the induction ceremony. So far, judged by Wolf's actions, the FBI and Stevie Flemmi have about the same amount of credibility in this case.

---

## Tipoff forced hand of FBI

*Sources say Flemmi had dropped from sight in the weeks before his arrest and it was 'pure luck' investigators nabbed him.*

**By Shelley Murphy**
GLOBE STAFF

It was a bitter cold night and investigators were tired after hours of searching unsuccessfully for reputed underworld leaders James J. "Whitey" Bulger, Stephen J. "The Rifleman" Flemmi and Francis P. "Cadillac Frank" Salemme.

A carefully orchestrated plan to arrest all three men the following week when a grand jury returned racketeering indictments was scrapped when the FBI said it learned the trio was planning to flee.

State Police Sergeants Thomas Duffy and John Tutungian and Drug Enforcement Administration Special Agent Daniel Doherty shivered in their cars along High Street in downtown Boston on Jan. 5, 1995, their eyes trained on Schooners, a restaurant being renovated by Flemmi's sons.

Then they got lucky. Flemmi entered the restaurant at 7 p.m. with his girlfriend, Jan Feeney.

With the elusive Bulger and Salemme still unaccounted for, orders were to arrest Flemmi only if he went "mobile." Investigators closed in when the couple drove off in Hu's Honda Accord. They chased the car in a block away and arrested Flemmi at gunpoint.

It was another seven months before Salemme was captured after the FBI followed his girlfriend to the modest two-story townhouse on the outskirts of Palm Beach, Fla., where he had been hiding out.

Bulger, who moonlighted as an FBI informant for two decades, remains a fugitive with a $250,000 reward being offered by the FBI for his arrest.

Amid criticism in the days after Salemme and Bulger slipped away, one law enforcement source said, "Hindsight is always 20/20, but obviously something went wrong. What went wrong, I honestly don't know."

Last week, federal prosecutors confirmed that Bulger and Flemmi were FBI informants from 1971 through 1990. And yesterday, Flemmi said in an affidavit that he was warned about the pending indictment "so that I could flee if I chose to do so."

Flemmi's lawyer, Kenneth Fishman, refused to comment on why Flemmi remained in Boston to possibly face the rest of his life in prison on racketeering charges if he was tipped.

But sources say Flemmi had dropped from sight in the weeks before his arrest and it was "pure luck" that investigators nabbed him when he resurfaced to resolve a problem.

In fact, Bulger had disappeared from the area several weeks before the warrant was issued for his arrest, according to sources.

---

# Flemmi says he, Bulger got FBI's OK on crimes

**■ INFORMANT**
Continued from Page A1

nated as an informant in December 1990.

There was talk of terminating him as an informant in 1988 after Boston Globe Spotlight stories, quoting sources, first reported Bulger's role, but he was kept on.

His claim that he was authorized to commit crimes, however, is contradicted by an affidavit filed in April by a high-ranking Justice Department official. In that document, Paul E. Coffey, chief of the department's Organized Crime and Racketeering Section, said Flemmi and Bulger were warned periodically that they were not authorized to commit any crimes without specific permission — something Coffey said they never received.

But Flemmi's contentions are backed, at least in part, by a January 1995 report by the chief division counsel of the Boston office of the FBI. It concluded that Flemmi's handlers had at least tacitly authorized his participation in illegal gambling and "La Cosa Nostra" policymaking.

Flemmi's assertions, if true, could open another front for defense lawyers attacking the racketeering charges against him, Bulger, New England Mafia boss Francis P. "Cadillac Frank" Salemme and three others.

If the defense can show that the alleged racketeering conspiracy between the Winter Hill Gang and the local Mafia was in fact orchestrated by the FBI, the racketeering charges could be challenged.

"If someone is authorized to commit a criminal act, then they can't be a bona fide co-conspirator," John W. Mitchell, Salemme's lawyer, said outside the courtroom. In a case where many documents still remain secret, Mitchell and co-counsel Anthony M. Cardinale said they were confining their remarks to what is in the public record.

"They're charging that there was an enterprise, that these gentlemen worked together to make the enterprise run," said Mitchell. "If it turned out that wasn't the case, that these people were actually acting as government agents, then that would affect whether the enterprise would be deemed to exist."

Defense lawyers are already challenging wiretap evidence — including conversations of Bulger and Flemmi and a 1989 Mafia induction ceremony in Medford — on grounds that the judge who authorized the bugging should have been told that informants like Flemmi and Bulger were available.

Flemmi's assertion that he was alerted before charges were brought against him would confirm long-held suspicions that he and other codefendants were given head starts.

Though Flemmi did not get away, Salemme remained a fugitive until his capture in Florida seven months later. Bulger is still at large.

US District Judge Mark L. Wolf said Flemmi's affidavit raises the possibility that the charges could be challenged on two grounds: that the racketeering enterprise alleged in the indictment didn't exist, or that the government entrapped the defendants.

While agreeing that the defense is entitled to information showing Bulger and Flemmi "lacked intent to commit crimes," prosecutor Fred M. Wyshak Jr. chastised Kenneth J. Fishman, Flemmi's lawyer, for the blind reference to Flemmi's having been alerted to the upcoming indictment.

Flemmi's affidavit says he was specifically informed of the precise date of the indictment "so that I could flee if I chose to do so." It does not say who tipped him off.

"I want to know why they don't say who is it that tipped him off," said Wyshak. "To me, that's obstruction of justice. And the Department of Justice has a duty to investigate criminal activity."

In a prepared statement later, the US attorney's office said it reported Flemmi's allegations to the FBI in Washington — just as it had when Salemme's lawyers alleged misconduct by agents earlier this year.

Flemmi's affidavit was made public during hearings to determine what information defense attorneys are entitled to before hearings in August on suppressing wiretap evidence. The defense has also said it plans to ask that criminal charges be dismissed, possibly citing government misconduct.

Flemmi has already received documents from his FBI file, But so far, the government has not agreed to turn over the "administrative" portion of his file — something Fishman argued for yesterday.

"Clearly the government's position is going to be that there was a rogue agent out there who had an illicit relationship with Mr. Flemmi," said Fishman. "That's exactly why we need this material."

### Testimony of an informant

I, Stephen J. Flemmi, under the pains and penalties of perjury hereby certify . . .

On numerous occasions, Mr. Bulger, I and agents of the FBI held secret meetings at the home of Special Agent John Morris, for the purpose of discussing, among other things, our activities and to exchange information. I specifically recall meeting on one occasion at Mr. Morris' home in Lexington, Massachusetts, and during a conversation in which I was asking the agents present about whether certain individuals were informants and who should Mr. Bulger and I stay away from, the issue of our criminal activities came up. Mr. Morris told Mr. Bulger and I that we could do anything we wanted so long as we didn't "clip anyone." On several occasions, in the course of similar conversations, Mr. Bulger and I were assured that we could be involved in any criminal activities short of committing murder and we would be "protected." I operated and relied upon this express agreement with the FBI.

The last issue I would like to address is (whether) Mr. Bulger and I were "terminated" as informants on December 10, 1990. This is categorically false. At no time did any FBI agent or any government representative inform me — or to my knowledge Mr. Bulger — that we had in any manner been terminated or discontinued as informants. Although in or about 1988, I was advised by the FBI that, as a result of articles appearing in the Boston Globe relating to Mr. Bulger's status, the FBI was considering terminating our relationship, I was later informed that a decision was made by Special Agent Morris and ASAC Larry Potts to continue the relationship, and I believe that memoranda are in the FBI files to that effect. I further represent that I continued to supply information to agents of the government up until the time I was arrested in this case. Indeed, as part of my continuing relationship with the FBI, I was specifically informed of the precise date that the indictment was to be returned so that I could flee if I chose to do so.

*Globe staff report*

*Stephen J. "The Rifleman" Flemmi (above) described secret meetings at the home of an FBI agent where Flemmi says, he and James J. "Whitey" Bulger were all but given carte blanche to break the law.*
GLOBE FILE PHOTO

*Stephen J. Flemmi said he was tipped off to the exact date when he, 'Whitey' Bulger and four others would be indicted so he could take off.*

---

# Judge's OK on milk price pact means some shoppers pay more

**■ MILK**
Continued from Page B1

paying about 25 cents more than they had to pay under the federal pricing system.

Farmers will not pocket the entire price increase, since some of their milk goes for cheese and other dairy products that are priced differently. But the goal of the compact, which was approved by all six New England states, is to give the region's dairy farmers some measure of price stability.

For states like Massachusetts, Rhode Island, and Connecticut, which have relatively few dairy farmers and lots of dairy consumers, the big concern is whether the new pricing system will result in sharply higher prices on supermarket shelves.

Dairies like Hood and Garelick are expected to pass the price increase along to supermarkets. But farmers and many officials at the Dairy Compact Commission say supermarkets are making huge profits on milk and can easily absorb the price increase.

Price-tracking information generated by the Massachusetts Department of Food and Agriculture indicates retail prices for milk have remained steady since October, even though prices paid to farmers have slightly increased. The price for a gallon of whole milk has held steady at $2.59 a gallon, while the price paid to farmers has dropped 32 cents since last fall.

Douglas DiMento, a spokesman for Agri-Mark, the region's largest dairy cooperative, said even with the Dairy Compact Commission's new price the supermarkets will still be buying milk at prices lower than they were paying last fall.

"Consumers shouldn't see an increase in retail prices unless they saw a decrease in prices since last fall," he said.

Rogan at Shaw's said supermarkets try to keep the price of milk relatively steady, ignoring the ups and downs of wholesale prices so shoppers see little change.

But he predicted this latest price increase won't be absorbed. "I can't envision any chain not having some price increase as a result of the compact," he said, noting that the size of any increase will be determined partially by what competitors do.

Charles Arbing, vice president for manufacturing and transportation at Stop & Shop, said the company was still studying yesterday's decision. "We have not decided on the impact that it's going to have at retail yet," he said.

Star Market officials had no comment yesterday.