UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
_____
CHRISTOPHER FITZGERALD,        )
     Plaintiff,                )
                               )
     v.                        )    Civil Action No. 04cv12138-NG
                               )
CBS BROADCASTING, INC.,        )
         Defendant.            )
_____)
CHRISTOPHER FITZGERALD,        )
     Plaintiff,                )
                               )
     v.                        )    Civil Action No. 06cv11302-NG
                               )
CBS BROADCASTING, INC.,        )
     Defendant.                )
_____)
```
GERTNER, D.J.:

MEMORANDUM & ORDER RE: SUMMARY JUDGMENT
June 21, 2007

I.    INTRODUCTION

Christopher Fitzgerald ("Fitzgerald"), a freelance photographer, brings this copyright action (04-12138) against CBS Broadcasting, Inc. ("CBS") for its unauthorized broadcast of photographs he took of Stephen "the Rifleman" Flemmi. CBS argues that its broadcast of the photographs was fair use.

Fitzgerald has also brought a second, nearly identical copyright action (06-11302) against CBS on the same set of facts, seeking to collect double statutory damages because the broadcast at issue went out over two of CBS's Boston affiliate stations, CBS-4 and UPN-38.

CBS has moved to dismiss the second lawsuit and has moved for summary judgment in the first. Fitzgerald has moved for summary judgment as to liability in both lawsuits.

For the reasons set forth below, Defendant's Motion to Dismiss (document # 3) in the second lawsuit (06-11302) is **GRANTED IN PART**: Fitzgerald's statutory damage claims in that lawsuit are **DISMISSED**, and the remaining claim for actual damages is **CONSOLIDATED** with the first lawsuit (04-12138).

Further, Fitzgerald's motion for partial summary judgment (document # 24) in 04-12138 is **GRANTED** as to liability, but **DENIED** as to willfulness. The question of whether CBS's infringement was willful is for the jury to decide. Fitzgerald's motion for partial summary judgment in 06-11302 (document # 7) is **MOOT**, as the only surviving claims in that case are now consolidated with 04-12138.

Finally, Defendant's Motion for Summary Judgment (document # 32) in 04-12138 is **DENIED.**

## II.  BACKGROUND

### A.    Facts

#### 1.    The Photographs

Christopher Fitzgerald is a freelance photographer. On January 6, 1995, while on assignment for *The Boston Globe*, he photographed well-known mobster Stephen Flemmi while Flemmi was being transferred from the Framingham State Police barracks to an

undisclosed location shortly after his arrest.  Walking backwards
as Flemmi was led out of the barracks by state police troopers,
Fitzgerald took two photographs, one showing Flemmi facing
towards the left of the frame, and one showing him facing towards
the right.  Fitzgerald was the only photographer at the scene,
and thus his are the only known publicly-available photographs of
Flemmi's arrest.  The left-facing photograph was published on the
front page of the *The Boston Globe* on January 7, 1995.  *The
Boston Globe* paid Fitzgerald $150.00 for the assignment.
Fitzgerald registered both photographs with the Copyright Office
on February 10, 1998 (copyright # V au 411-320).

The photographs have been published multiple times since
then (not including uses by defendant), including six times by
*The Boston Globe*, twice by *The New York Times*, twice by the
*Boston Herald*, and once by *The American Lawyer*.  One of the
photographs aired on *America's Most Wanted* in 1998.  It is
unclear which photograph was used in each of these instances.
Fitzgerald has received $4,350 in fees for seventeen uses of the
photographs, and has sued or threatened to sue six times for
copyright infringement over unauthorized uses of the photographs,
resulting in six settlements totaling $58,600.

### 2.  The Television Stations

CBS Broadcasting Corporation owns two television stations in
Boston, CBS-4 (previously known as WBZ-TV) and UPN-38 (now

officially known as WSBK-TV, but still referred to popularly and by the parties by its old name).  CBS-4 broadcasts over channel 4, and UPN-38 over channel 38.  As is required for each separate frequency that an entity broadcasts over, each station has its own FCC license.  The stations are not independently incorporated; they are assets of CBS, which is a publicly-traded corporation incorporated in Delaware.

The two stations share many resources:  They have the same studio space, operate out of the same building, use the same video library, and share some staff, including writers, reporters, camera crew, and on-air news personalities.  They broadcast the same news programs produced by the same employees.  When a news segment is pre-produced, the tape is used on CBS-4's newscast and then re-used an hour later on UPN-38.  For live news reporting and announcing, the anchors simply repeat their performance using the same notes an hour later with a different backdrop.

In other ways, the two stations operate as separate entities:  They have different sales staffs and maintain their revenue separately (though all profit belongs to CBS and all staff are paid by CBS), and most of their non-news programming is different.

3.    <u>**The Prior Suit**</u>

In 1998, CBS-4 (at that time called WBZ-TV) used the left-facing photo (taken from the front page of the January 7, 1995, *Boston Globe*) in a broadcast without Fitzgerald's authorization. Fitzgerald filed a lawsuit for copyright infringement. <u>Fitzgerald v. CBS Corporation</u>, U.S. District Court, District of Massachusetts, Docket Number 98-11510-JLT ("1998 action").

In March 1998, while the 1998 action was pending, CBS contacted Fitzgerald for permission to use the photographs on a broadcast of the television news show *60 Minutes*. Fitzgerald and CBS signed a stock photography contract authorizing CBS to use each photo for one screen exposure, and expressly withholding permission for CBS to republish the photographs on other programs or in other media. When the *60 Minutes* episode was aired, it included five separate screen exposures of the right-facing photo. Fitzgerald amended the 1998 complaint to include claims for the four extra exposures.

In November 1999, Fitzgerald and CBS settled the 1998 action for $15,000. In the written settlement agreement, CBS admitted to the uses alleged by Fitzgerald, but did not concede that these uses constituted copyright infringement. Defs.' Ex. 13 in Supp't. of Mot. for S.J. (document #37-17).

After the settlement, CBS took several measures to ensure that it would not accidentally broadcast the photographs again: CBS-4/UPN-38's librarian was instructed to review all of the

station's archive tapes and remove any images of the photographs; all internal staff were instructed by email to search their files and destroy any copies of the photographs that they found.

However, a copy of the *60 Minutes* broadcast had been used by an unidentified CBS-4/UPN-38 staff person to create a "pitch reel" that included all five of the exposures.  (A "pitch reel" is a tape of material organized by subject matter for later reference.)  Four of the five exposures were purged following the settlement, but the fifth remained (defendant claims by accident; plaintiff does not offer evidence disputing this claim).

### 4.    The 2004 Use of the Photographs

In 1995, John Martorano, a former member of the Winter Hill Gang, was arrested and agreed to cooperate with law enforcement officials in their investigation of Stephen Flemmi and Whitey Bulger.  It was allegedly his cooperation that led in part to the arrest of Flemmi, which was the subject of Fitzgerald's photographs.

Martorano was sentenced on June 24, 2004.  That day, CBS-4 reporter Christina Hager and video editor Scott Erdman prepared a news report on the sentencing.  Erdman found the unpurged image of Flemmi on the pitch reel, cropped out the part of the photo showing the officers accompanying Flemmi, and used an exposure of the cropped image on the 11:00 news that evening on CBS-4.  The report was broadcast again at 1:35 AM on June 25, and probably

three times more, at 5:00 AM and 6:00 AM on CBS-4, and at 7:00 AM
on UPN-38 that same day.  The photograph was also posted on the
CBS-4 website from June 25 to June 29.

**B.  <u>Procedural History</u>**

Fitzgerald filed a complaint in the first action, 04-12138
("'04 action"), on October 12, 2004 (document #1) against CBS for
copyright infringement based on the June 24-25 CBS-4 broadcasts.
He moved for summary judgment as to liability on September
September 1, 2006 (document #24).  CBS cross-moved for summary
judgment on September 20, 2006 (document #32).

Fitzgerald also filed a complaint in a second action, 06-
11302 ("'06 action"), against CBS on July 28, 2006 (document #1).
That complaint is absolutely identical to the '04 complaint,
except that its copyright infringement claim is based on the
broadcast over UPN-38.  (This was a re-broadcast of the CBS-4
broadcast at issue in the '04 suit.)  Fitzgerald seeks either
actual or statutory damages in both actions.  CBS moved to
dismiss the second action on September 7, 2006 (document #3).

**C.  <u>Claims</u>**

In both the '04 and '06 actions, Fitzgerald raises a claim
of copyright infringement, seeking either actual or statutory
damages.  He seeks to enhance any statutory damages based on a
claim that CBS's infringement was willful.

### III. <u>DEFENDANT'S MOTION TO DISMISS IN THE 2006 ACTION</u>

Plaintiff justifies filing two separate actions against this defendant - action #04-12138, based on the broadcast of the photographs by CBS-4, and action # 06-11302, based on the broadcast of the photographs by UPN-38 – by the argument that CBS-4 and UPN-38 are separate infringers.  As such, he claims that he is entitled to a separate statutory damage award for each.  Defendant argues that the two stations are in fact only closely-related divisions of the same corporation, and therefore that they can neither be sued separately nor give rise to separate awards.  Defendant's argument is correct.

A plaintiff in a successful action for copyright infringement may elect to collect either "actual damages and any additional profits of the infringer," or statutory damages. 17 U.S.C. § 504(a).  As actual damages in this case would likely be difficult to calculate and prove, Fitzgerald has indicated that he is likely to elect statutory damages. Pl.'s Memo in Supp't of Mot. for S.J. at 17-18 (document #25-1).

When a plaintiff in a copyright suit elects statutory damages, the damages are calculated based on the number of copyrighted works and the number of infringers, not on the number of incidents of infringement.[1] <u>See</u> <u>Venegas-</u>

---

[1]      [T]he copyright owner may elect, at any
         time before final judgment is rendered, to
         recover, instead of actual damages and
         profits, an award of statutory damages for

Hernandez v. Sonolux Records, 370 F. 3d 183, 194 (1st Cir. 2004);
17 U.S.C. 504(c)(1); H.R. Rep. No. 94-1476 at 162 (1976) ("A
single infringer of a single work is liable for a single amount .
. . no matter how many acts of infringement are involved in the
action and regardless of whether the acts were separate,
isolated, or occurred in a related series.")  While the
calculation of statutory damages must be done by a jury, Segrets,
Inc. v. Gillman Knitwear Co., Inc., 207 F.3d 56, 63-4 (1st Cir.
2000) (citing Feltner v. Columbia Pictures TV, 523 U.S. 340, 355
(1998)), what is raised here is a legal question -- specifically,
how to construe 17 U.S.C. 504(c)(1)'s provisions for the method
of calculating statutory damages.  Thus, it must be resolved by
the Court. Sonolux, 370 F. 3d at 194.

Unfortunately for plaintiff, "a tort plaintiff may not
multiply defendants by breaking up a corporation or other
institution into its organizational components when those
components have no separate legal identity." Albers v. Church of
Nazarene, 698 F. 2d 852, 857 (7th Cir 1983).  In Sonolux, the
First Circuit based the number of statutory awards available on
"the number of individually liable infringers . . . unaffected by

---

> all infringements involved in the action,
> with respect to any one work, for which
> any one infringer is liable individually,
> or for which any two or more infringers
> are liable jointly and severally, in a sum
> of not less than $ 750 or more than $
> 30,000 as the court considers just.

17 U.S.C. § 504(c)(1).

the number of infringements." 370 F. 3d at 194.  By this standard, CBS-4 and UPN-38 are not individually liable, because they are only different divisions of the CBS corporation.  That they have separate FCC licenses is irrelevant.  An FCC license is only an asset, analogous to a vehicle registration.  Defendant CBS is the only alleged infringer that can be sued.

In fact, plaintiff does not bring claims against either CBS-4 or UPN-38, but only against parent corporation CBS, for exactly the reason that the stations, as mere operations of defendant, cannot sue or be sued.  Therefore, there can be only one award of statutory damages.

Accordingly, plaintiff's statutory damage claim in the '06 action is DISMISSED.  The remaining claim for actual damages involves the same facts and the same parties as the claims in the '04 action, and is therefore CONSOLIDATED with that action.

## IV.  **FAIR USE**

Plaintiff and defendant have brought cross-motions for summary judgment (though plaintiff only seeks summary judgment as to liability, leaving the final calculation of damages for the jury). Pursuant to Fed. R. Civ. P. 56, summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).

Once the moving party demonstrates the "'absence of evidence to support the nonmoving party's case,' the burden of production shifts to the nonmovant." <u>Dow v. United Brotherhood of Carpenters</u>, 1 F.3d 56, 58 (1st Cir. 1993) (quoting <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 325 (1986)). The nonmovant must then "affirmatively point to specific facts that demonstrate the existence of an authentic dispute." <u>McCarthy v. Northwest Airlines, Inc.</u>, 56 F.3d 313, 315 (1st Cir. 1995). The court must:

> 'view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor,' but paying no heed to 'conclusory allegations, improbable inferences, [or] unsupported speculation.' If no genuine issue of material fact emerges, then the motion for summary judgment may be granted.

<u>Id.</u> (citations omitted).

Defendant does not dispute that the broadcasts at issue took place and that they were unauthorized by plaintiff. Defendant's sole defense is that its broadcasts were a fair use, not requiring authorization. Plaintiff, of course, disagrees. Fair use determinations usually present mixed questions of fact and law. <u>Harper & Row, Publishers, Inc. v. Nation Enters.</u>, 471 U.S. 539, 560 (1985). However, where "no material historical facts are at issue" and "[t]he parties dispute only the ultimate conclusions to be drawn from the admitted facts," fair use can be decided by the Court. <u>Fisher v. Dees</u>, 794 F.2d 432, 436 (9th Cir.

1986).  Here, the parties are in substantial agreement as to the origin, history, content, and defendant's use of plaintiff's photographs.  The only issue of fact remaining has to do with the state of mind of defendant's employees, which goes to the question of willfulness (<u>see</u> <u>infra</u> § V) but not fair use.  As to fair use, the parties' disagreements are over the interpretation of facts.  As these are questions of law, I analyze them below.

Fair use "permits courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster." <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569, 577 (1994) (quoting <u>Stewart v. Abend</u>, 495 U.S. 207, 236 (1990)).  Fair use is not defined by statute except in terms of the four factors courts must consider in determining whether the doctrine applies to a specific use: "(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107.  I consider each of these factors in turn.

## A.    Purpose and Character of Use

Courts typically ask three questions to determine whether a defendant's use of copyrighted material is of the type that copyright is meant to prohibit, or whether it is instead the type that actually tends to advance copyright's goals of "promot[ing] the progress of science and the useful arts." U.S. Const., art. I, § 8 cl. 8. First, courts ask whether a defendant's use of the copyrighted material falls into a category specifically identified by Congress in the copyright statute as especially important to copyright's ends: "criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship or research." 17 U.S.C. § 107. Second, courts ask whether the defendant's use was "productive" or "transformative" - i.e. whether it added anything to the copyrighted work in its use, and thus is treatable more as a new work referencing the old than as an instance of strict copying. Third, courts ask whether the use was commercial - i.e. whether it primarily served defendant's private interests rather than the public interest in underlying copyright law. See 17 U.S.C. § 107; Arica Institute, Inc. v. Palmer, 970 F. 2d 1067, 1077 (2d Cir. 1992); Rubin v. Brooks-Cole Publishing Co., 836 F. Supp. 909, 917 (D. Mass. 1993); Campbell, 510 U.S. at 579; Triangle Publications, Inc. v. Knight-Ridder Newspapers, Inc., 626 F.2d 1171, 1175 (5th Cir. 1980). These three questions are cumulative - courts consider all three in order to build a picture of the nature of the use. Accordingly, I consider each below.

-13-

### 1.   Whether Defendants' Use Falls Into an Enumerated Category of the Statute

News reporting is one of the categories of use expressly mentioned in the Copyright Act as particularly appropriate to the application of fair use doctrine.  17 U.S.C. § 107.  However, the mere fact that a use falls into one of those categories does not by itself create a presumption of fair use.  Harper & Row, 471 U.S. at 561 (citing H. R. Rep. No. 83 at 37 (1967)).  Rather, it is only one of the considerations that go into determining the first factor.

Plaintiff argues that the 2004 use of the Flemmi photo was not "news," as Flemmi's actual arrest had occurred years before.  Plaintiff asks that I make a determination as to how "new" something has to be in order to qualify as "news."  I decline to make such a distinction.  See Harper & Row Publishers v. Nation Enterprises, 723 F. 2d 195, 207 (9th Cir. 1983) ("[courts] should be chary of deciding what is and what is not news"), rev'd on other grounds, 471 U.S. 539 (1985); accord Gertz v. Robert Welch, Inc., 418 U.S. 323, 346 (1974).  The Martorano sentencing itself was undisputably news, Flemmi's arrest was undisputedly related to the Martorano sentencing (as Martorano's alleged cooperation led in part to Flemmi's arrest), and CBS's reference to Flemmi followed that relationship.  That is enough to establish CBS's use as "news reporting" for fair use purposes.

**2.   Whether Defendants' Use of the Photograph was Transformative**

Where copyrighted material "add[s] something new, with a further purpose or a different character, altering the first with new expression, meaning or message," it blurs the line between plain copying - which tends to inhibit original creation - and development of a new work that builds on and references the old, and thus participates in the very progress that copyright is meant to promote. <u>Campbell</u>, 510 U.S. at 579.  In general, for a use to be transformative, the "copyrightable expression in the original work [must be] used as raw material, transformed in the creation of new information, new aesthetics, new insights and understandings." <u>Castle Rock Ent. v. Carol Pub. Group, Inc.</u>, 150 F.3d 132, 141 (2d Cir. 1998).  "[C]opying that is complementary to the copyrighted work (in the sense that nails are complements of hammers) is fair use, but copying that is a substitute for the copyrighted work (in the sense that nails are substitutes for pegs or screws) . . . is not fair use." <u>Ty, Inc. v. Publications Int'l</u>, 292 F.3d 512, 517 (7th Cir. 2002).  Of course all reuse of copyrighted material occurs in a somewhat different context from the original use, and so to some extent changes the material. There is no bright line marking the point at which this change is sufficient to become "transformative."  A posed studio photograph of a model, intended to be part of the model's portfolio showing her modeling talent and versatility, was held to have been

"transformed" for fair use purposes when it was published on the front page of a newspaper as part of a news story about controversy in the model's participation in a beauty contest. <u>Nunez v. Caribbean Int'l News Corp.</u>, 235 F. 3d 18, 22-23 (1st Cir. 2000).  On the other hand, reuse of news videos of the 1992 Los Angeles riots was not "transformative" where the videos were simply re-transmitted in their entirety without comment, editing, or context.  <u>Los Angeles News Serv. v. Reuters TV Int'l</u>, 942 F. Supp. 1265 (C.D. Cal. 1996) <u>aff'd in part, rev'd on other grounds</u> 149 F.3d 987.

CBS's use of the Flemmi photographs in the instant case is somewhere between <u>Nunez</u> and <u>LA News Service</u>.  It is less transformative than the use in <u>Nunez</u>, where the photo in question was recontextualized from one market - studio fashion imagery - to another - daily news - and from aesthetic use to documentary use.  On the other hand, it is more transformative than was the use in <u>LA News Service</u>, where the videos were resold without being embedded in any news broadcast.  To determine exactly how much transformation occurred in CBS's broadcast of the photo requires an analysis of the original, intended meaning and use of the photograph and its ultimate meaning and use on June 24-25, 2004.

Fitzgerald photographed the arrest of Stephen Flemmi for use in news reporting of the arrest.  CBS argues that it transformed the meaning of the photo by cropping out some of the evidence of

the arrest - the state troopers - and embedding the cropped photo
in a narrative about John Martorano.  This is slicing things a
bit thinly.  In its news report, CBS highlighted the importance
of Martorano's sentencing partly by explaining that Martorano's
testimony had led to Flemmi's arrest; CBS used Fitzgerald's
photograph of the arrest to enhance this point.  The only
"transformation" was that Flemmi's arrest was downgraded from
breaking news to a supplementary part of a larger story.  The
distinction that CBS argues for here is so fine that it ceases to

have meaning in the context of ordinary news practice. [2]

Therefore, I find its use to be non-transformative.

---

[2] If such a minor adjustment was transformative in the fair use sense, then it is hard to imagine any use of archived imagery in news reporting  that would not be fair use.  For perspective, below is an example of a typical freelance photojournalism transaction involving far more recontextualization than exists in the facts of the instant case.  The use in this example was never litigated, and so there was no finding as to whether it was or was not fair use.  It is cited here not as precedent, but to give some context as to the ordinary processes of the industry in which this case arose:

> [T]he November 18, 1991 issue of Newsweek carried an archival photograph of David Duke.  The photograph's history began when free-lance photojournalist Chris Harris shot a picture in the late 1970's of a young Ku Klux Klan leader and his wife in Baton Rouge, Louisiana for The New York Times.  As it turns out, the picture was of David Duke and his wife, Chloe.  The photograph showed the couple in their Ku Klux Klan robes holding a picture of the first cross-burning they had participated in as a couple.  The picture ran in The New York Times within a week of being taken.
>
> When Newsweek decided to do a piece on David Duke's political history for its November 18, 1991, issue, its photo editors contacted the major stock photo agencies in New York City requesting photographs of Duke . . . Newsweek selected, among others, the Harris photograph just described, ran it as a black and white picture and was billed by Gamma/Liaison [a stock photo agency] for its use . . . Upon payment by Newsweek, Gamma/Liaison retained fifty percent of the fee as its commission and sent the remaining fifty percent to Harris.

Don E. Tomlinson & Christopher Harris, <u>Free-Lance Photojournalism in a Digital World</u>, 45 Fed. Comm. L.J. 1, 5 (1992).

The recontextualization of a photo from a "local color" essay on an unknown young Klan couple to a background piece on a newly-elected Congressman is far more transformative than CBS's use in the instant case.  Of course, the mere fact that Newsweek voluntarily licensed the Duke photo in the above anecdote does not necessarily mean that its use would not be fair use had it not obtained a license; but this excerpt does show that calling CBS's use transformative would contradict the regular and long-running practices and assumptions of photojournalists, media outlets, and intermediary agencies.  To be sure, industry practices should not dictate copyright law.  But where the Court is called on to make a pragmatic ruling about where to draw lines so as to best "promote the progress of science and the useful arts," U.S. Const., art. I, § 8 cl. 8., it is appropriate to consider how those useful arts actually progress.  Otherwise, finer and finer distinctions of what is "transformative" degenerate into pure semiotics.

### 3.    Whether Defendant's Use was Commercial

Fair use exists to further the public interest in promotion of creative work.  Thus, courts ask to what extent a defendant's use promotes only the defendant's own private interests - i.e. whether it is "commercial."  "While commercial motivation and fair use can exist side by side, the court may consider whether the alleged infringing use was primarily for public benefit or for private commercial gain."  MCA, Inc. v. Wilson, 677 F.2d 180, 182 (2d Cir. 1981).

CBS, CBS-4 and UPN-38 are all undisputedly commercial entities.  CBS operates the stations for profit, and the stations earn revenue from commercials that run during their newscasts.  CBS does not argue that its newscasts are non-commercial, but instead argues that the use of the Flemmi photo had no commercial impact because the advertisements that ran during the broadcasts had been purchased months in advance, and were unaffected by the decision to use the photo.

CBS's argument is dubious both economically and legally.  The decision to use the photo - and all the other decisions involved in the June 24-25 broadcasts - affected ratings and commercial revenues *in the future*, as all real-time broadcasts do.  A district court pointed out this fact in holding that a television station's broadcast of a commercial-free program was commercial because it was aimed at increasing the station's

viewership - and therefore ratings and revenue - in the long run.
Roy Export Co. Establishment v. Columbia Broadcasting Sys., Inc.,
503 F. Supp. 1137, 1144 (S.D.N.Y. 1980).  Similarly, though there
were no advertisements on CBS-4's website at the time that it
hosted the photo, the website's purpose was to attract viewers to
the station and raise the station's profile, ratings, and
commercial revenues.  More broadly, "[t]he crux of the
profit/nonprofit distinction is not whether the sole motive of
the use is monetary gain but whether the user stands to profit
from exploitation of the copyrighted material without paying the
customary price.'"  Harper & Row, 471 U.S. at 562.  CBS certainly
stood to profit from its use of the photo on television and on
the internet.  Newscasts without imagery draw fewer viewers,
ratings fall, and revenue falls in turn.  CBS's use was
commercial.

### 4.  Conclusion as to First Factor

Though CBS's use of Fitzgerald's photographs was for news
reporting, that use was nontransformative and commercial.
Therefore, I find that the nature and character of the use weigh
against a finding of fair use, and in favor of Fitzgerald.

### B.  Nature of the Copyrighted Work

In determining whether it is appropriate to invoke fair use,
courts ask two questions about the copyrighted work itself:

whether the work has been previously published, and whether it is factual or creative.

Previous publication is relevant because an author has a strong right to decide whether or not to release previously private material. See Harper & Row, 471 U.S. at 564. Where a defendant has usurped an author's right to decide whether previously unpublished material should be made public, that weighs against fair use.

The photographs here had undisputedly been published previous to CBS's use in this case. See supra § II. A. 1. That does not mean that this inquiry weighs in favor of fair use, only that Fitzgerald's photographs do not fall into the category of private works to which the doctrine of fair use is especially unsuited. I turn therefore to the second inquiry: whether the photographs are primarily factual or creative works.

Copyright is meant to encourage creative work and protect its fruits. Thus, creative works justify stronger copyright protection and are less amenable to fair use. Financial Information, Inc. v. Moody's Investors Service, Inc., 751 F.2d 501, 509 (2d Cir. 1984). Exclusive ownership of facts, on the other hand, does not "promote the progress of the useful arts," and therefore a wider scope of fair use is appropriate for factual works. Id.; Feist Publications, Inc. v. Rural Telephone Service Co., Inc., 499 U.S. 340, 345 (1991).

Fitzgerald argues that his photographs are creative works because he made artistic decisions as to composition and timing. (He also claims to have made decisions as to lighting and location, but the photographs were taken outdoors in natural light during the brief moment when Flemmi was visible, so that Fitzgerald actually had no latitude or control over lighting and location). Fitzgerald incorrectly cites to Feist for the proposition that only minimal authorial control is necessary to make a work creative. Feist actually held that minimal authorial control is necessary to make a work *copyrightable* at all. 499 U.S. at 345. Creativity for the purposes of fair use is harder to establish than threshold copyrightability. In Los Angeles News Service, 942 F. Supp. at 1273, news videos of the Los Angeles riots taken on the scene were held to be factual works for the purposes of fair use; those videos involved all of the same authorial choices made by Fitzgerald here - framing, angle, timing, lighting, etc. Id. In Nunez, 235 F. 3d at 23, even though a photographer posed a model, chose her clothing, makeup and hairstyle, arranged lighting and backdrop, and gave her instructions on facial expression - all choices that Fitzgerald did not make here - the court still found that the "pictures could be categorized as either factual or creative" because they "were not artistic representations designed primarily to express [the photographer's] ideas, emotions, or feelings, but instead a publicity attempt to highlight [the model's] abilities as a

potential model." Contrast Haberman v. Hustler Magazine, Inc., 626 F. Supp. 201, 204, 211 (D. Mass. 1986) (Wolf, J.) (staged surreal photographs, one a "social commentary on the traditional family gathering," the other "intended to surprise or shock the viewer by presenting a different perspective," were creative works for fair use purposes).

Here, Fitzgerald exercised no more than the minimum authorial decision-making necessary to make a work copyrightable under Feist. While arguably impressive and resourceful, Fitzgerald's getting the scoop was not a creative process for the purposes of fair use doctrine; the photographs are factual works, and therefore this factor weighs against him and in favor of fair use.

### C. **Amount of the Work Used**

This factor weighs less when considering a photograph - where all or most of the work often must be used in order to preserve any meaning at all - than a work such as a text or musical composition, where bits and pieces can be excerpted without losing all value. Nunez, 235 F. 3d at 24; Bill Graham Archives v. Dorling-Kindersley Ltd., 448 F. 3d 605, 613 (2d Cir. 2006). What matters is whether the alleged infringer used the "heart" of the material; in other words, superficial editing or cropping does not impact the Court's consideration. Harper & Row, 471 U.S. at 565; Campbell, 510 U.S. at 587.

Here, CBS did edit the photo in a way that was arguably more
than superficial: it cropped out the image of the state police
officer's arm and torso visible in the original, thus removing
the major visual cue that Flemmi was being arrested.  But it did
use most of the "heart" of the photo - the rare image of Flemmi.
What is more, CBS did not use the cropping to change the
photograph's meaning.  The fact that Flemmi had previously been
arrested was still part of the story.

Given the slight cropping of the photo but the preservation
of most of the photo's meaning, this factor is balanced between
fair use and infringement.  In any event, the overall
significance of this factor to the fair use determination is
minor.

D.    **Effect of the Use Upon the Potential Market**

Under this factor, courts ask whether the defendant's use
actually inhibits the plaintiff's production by negatively
impacting his market.  Since this question goes to the heart of
whether allowing or prohibiting a use furthers the ends of the
Copyright Act, market effect is "undoubtedly the single most
important element of fair use." Harper & Row, 471 U.S. at 566;
Robinson v. Random House, Inc., 877 F. Supp. 830, 842 & n.4, 843
(S.D.N.Y. 1995); Stewart v. Abend, 495 U.S. 207, 238 (1990);
David Nimmer, Nimmer on Copyright § 13.05(A) (2005) (cases
cited).  In determining overall market impact, courts ask two
questions: (i) the extent of the market harm caused by the

specific infringing incident, and (ii) "whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original."   Infinity Broadcasting Corp. v. Kirkwood, 150 F. 3d 104, 110 (2d Cir. 1998) (quoting Nimmer, § 13.05(A)(4)).

In making the first inquiry, the loss of the licensing fee sought in the case itself does not constitute "market harm."  If it did, circular reasoning would resolve all fair use cases for the plaintiff, who certainly profits less if the defendant wins. Ringgold v. Black Entertainment TV, 126 F.3d 70, 81 (2d Cir. 1977) ("Since the issue is whether the copying should be compensable, the failure to receive licensing revenue cannot be determinative in the plaintiff's favor.")  When Fitzgerald's loss of the licensing fee is removed, there is no showing that this specific infringing incident harmed the market for the Flemmi photographs.  In fact, as plaintiff admits, the flashing of Flemmi's image on television may "heat up" interest in Flemmi, and therefore increase demand for plaintiff's photographs.  Pl.'s Memo in Supp't of S.J. at 12-13 (document # 25-1).

The second inquiry, however, must go in plaintiff's favor. CBS's use of the photographs is paradigmatic of the only market the photographs could reasonably have: licensing to media outfits.  There is no significant demand for 8x10 glossies of Flemmi sold directly to the public.  The market for media licenses for these photographs clearly exists, and is the only

market in which the photographs have seen use: Various media
outfits have used the photographs more than 20 times, resulting
in over $60,000 in fees and settlements for exactly this kind of
use.[3]  Pl.'s Stmt. of Fact ¶ 7 (document # 43).  If the Court
finds that CBS's use was fair use, then all of these media uses -
and uses like them in the future - would also be fair use,
destroying the only potential market that exists for the
photographs.  It is hard to imagine that freelance
photojournalists would continue to seek out and capture difficult
to achieve pictures if they could not expect to collect any
licensing fees.  This is exactly the kind of situation that
copyright is meant to impact - where unrestricted use would
likely dry up the source.

    Thus the fourth and most important factor weighs against
fair use and in favor of Fitzgerald.


### E.    Conclusion as to Fair Use

    The two most important factors by far - nature of use and
effect on potential market - weigh in favor of plaintiff.  One
factor - extent of the work used - is neutral, leaving only one

---

[3] That most of this revenue has come from legal damages and settlements
rather than from fees paid up front does not detract from the evidence that a
market for the photographs exist.  What is relevant is that media outlets have
demonstrated demand by repeatedly using the photographs in the same way that
CBS used them.

other factor - the nature of the work - in favor of defendant. In short, a finding of fair use would destroy the expected market for Fitzgerald's photographs and fly in the face of the practical experience of the freelance photojournalism industry.  The balance of the fair use inquiry is in favor of Fitzgerald and against fair use.  **I therefore find that defendant's use of the photographs constituted copyright infringement.**

V.    **WILLFUL INFRINGEMENT**

In addition to defendant's basic liability, plaintiff also argues that he is entitled to heightened statutory damages because defendant's infringement was willful.  Infringement is willful when the infringer knew or should have known that her action was copyright infringement.  Princeton Univ. Press v. Michigan Document Servs., Inc., 99 F.3d 1381, 1392 (6th Cir. 1996); Nimmer § 14.04.  If infringement is found to be willful, the maximum statutory award is increased from $30,000 to $150,000, 17 U.S.C. § 504(c),[4] though even then it is still within the fact-finder's discretion to award less than the maximum, all the way down to the statutory minimum of $750.  Id. Though the Seventh Amendment requires that the final determination of statutory damages be made by a jury, Segrets, Inc. v. Gillman Knitwear Co., Inc., 207 F.3d 56, 62-3, 66 (1st

---

[4] Willfulness is not an issue in determining actual damages.  However, plaintiff has said that he is likely to elect statutory damages.  Pl.'s Memo in Supp't of S.J. at 17-18 (document # 25-1).

Cir. 2000) (citing Feltner v. Columbia Pictures TV, 523 U.S. 340, 355 (1998)), the question of whether an infringement was willful or not (and thus the setting of the range in which the fact-finder's damages award may fall) is usually, like fair use, a mixed question of fact and law.  As there remain material issues of fact as to defendant's state of mind during infringement, the question of willfulness, unlike fair use, cannot be resolved on summary judgment.

Plaintiff argues that CBS was on notice that it did not have license to broadcast the Flemmi photographs when it did, and so its infringement was willful.  Defendant argues that the broadcast of the photographs was done in good faith belief that it was fair use.  A defendant's good faith belief that its use of copyrighted material is fair use is enough to defeat a finding of willfulness.  If a defendant believed it was engaging only in fair use, it cannot be said to have known that it was infringing. Princeton Univ. Press, 855 F. Supp. at 911.  However, the belief in fair use must have existed at the time of the use, not merely at the time of the litigation.  International Korwin Corp. v. Kowalczyk, 855 F.2d 375, 382 (7th Cir. 1988).

CBS, as a corporation, can have no knowledge, belief, or state of mind of its own.  Rather, some individual(s) at CBS must

have had the requisite state of mind for willful infringement.[5]
There are two sets of individuals whose state of mind may be
relevant: (1) the supervisors and (2) the employees directly
involved in the broadcast (video editor Scott Erdman and reporter
Christina Hager).

The supervisors, of course, did not actually broadcast the
photo; nevertheless, they can be liable for willful infringement
if they knew that such a broadcast would be infringing and
there was a risk of broadcast occurring, and if they then acted
with reckless disregard towards that risk and plaintiff's rights.
Lauratex Textile Corp. v. Allton Knitting Mills, 519 F. Supp.

---

[5] District courts in similar cases have glossed over the difference
between supervisors and the employees who actually carried out the
infringement, and so it is difficult to determine exactly on whose state of
mind they based their findings. For example, in Jobete Music Co. v. Johnson
Communs., Inc., 285 F. Supp. 2d 1077, 1090 (S.D. Ohio 2003), the court held
simply that where the supervisor of a radio station knew that the station was
not licensed to play a particular song, and where the supervisor posted a
notice in the DJ booth instructing DJs not to play the song, and where a DJ
played the song anyway, the station was liable for willful infringement. The
court in Jobete did not elaborate on exactly whose state of mind fulfilled the
willfulness requirement; most likely it was the DJ whose infringement was
willful, with the station being liable by respondeat superior.

In another radio station case with nearly identical facts, the station
manager's "claims that he instructed the station's personnel not to play
[copyrighted] material, and that he took other attempts to keep such material
from being broadcast, do not raise a question of fact whether the infringement
was willful." Barnaby Music Corp. v. Catoctin Broadcasting Corp., 1988 U.S.
Dist. LEXIS 15394 *11 (W.D.N.Y. 1988). Again, the court glossed over the
question of exactly whose state of mind created the willfulness, but the most
likely explanation is the same as in Jobete. See also Broadcast Music, Inc.
v. Hobi, Inc., 1993 WL 404152 (E.D. La. June 24, 1993).

Note that fair use was not an issue in any of these radio station cases,
and so they do not resolve the question presented in this case, where
defendants challenge willfulness by claiming that they believed their
broadcast was fair use. They are presented here only to illustrate how
willfulness is located in corporate defendants.

730, 733 (S.D.N.Y. 1981).  Mere negligence is insufficient for a finding of willfulness.

Management at CBS-4 did know that they were not licensed to broadcast the photographs, but they took at least some steps to prevent such a broadcast: They emailed station staff with a notice never to broadcast the Flemmi photographs and instructed the video librarian to destroy all extant copies of the photographs.  That their efforts failed does not necessarily establish reckless disregard - it is perfectly likely that they failed through mere negligence or simple accident, neither of which is sufficient to constitute willfulness.  See Martin v. City of Indianapolis, 192 F.3d 608, 614 (7th Cir. 1999) (bureaucratic ineptitude did not constitute willfulness).  Thus, the record at this stage does not support a finding of willfulness on the part of the supervisors.

On the other hand, the employees directly involved in the broadcast did commit an infringing act.  The record does not establish whether they actually knew that their broadcast was unauthorized, but actual knowledge is not required; constructive knowledge is sufficient for willfulness.  Fitzgerald Pub. Co. v. Baylor Pub. Co., 807 F.2d 1110, 1115 (2d Cir 1986) ("a defendant's actual or constructive knowledge proves willfulness").  The record establishes that the employees did have constructive knowledge that Fitzgerald had not authorized their broadcast of the photographs: They had received emails

instructing them that CBS-4 was not authorized to broadcast the Flemmi photographs and that they must destroy any copies they found.  Defs.' Stmt. of Facts ¶ 50 (document #33).  However, there is nothing in the record suggesting the employees' beliefs as to fair use.  CBS had fair use guidelines in place, requiring that any use of copyrighted materials must be discussed in advance with the executive producer or bureau chief, Defs. Ex. H at 148 (document # 25-9).  Hagerty and Erdman do not appear to have discussed their use of the photographs with their executive producer or bureau chief.  Id.  But while this may establish an infraction of CBS's internal rules, it does not put the employees' states of mind as to the law beyond dispute.  The question remains whether the employees acted in good faith belief that they were engaging only in fair use.

Therefore, it must remain for the same jury that determines the extent of damages to determine whether defendant's copyright infringement was willful.

## VI.  CONCLUSION

Because plaintiff cannot treat CBS-4 and UPN-38 - divisions of a single corporation - as separate infringers giving rise to separate statutory awards, defendant's motion to dismiss the '06 case (06-11302, document # 3) is hereby **GRANTED IN PART**: Plaintiff's statutory damages claims in that case are **DISMISSED**, and the remaining claims for actual damages in that case

**CONSOLIDATED** with the claims in 04-12138.  See Order of Consolidation and Dismissal accompanying this Memorandum.

Because the fair use analysis weighs against fair use, plaintiff's motion for summary judgment in the '04 case (04-12138, document # 24) is hereby **GRANTED AS TO LIABILITY,** and defendant's cross-motion for summary judgment (document # 32)is hereby **DENIED**.  However, because the record does not resolve questions of the state of mind of CBS employees, plaintiff's motion for **summary judgment is DENIED AS TO WILLFULNESS.**  Both willfulness and the final determination of damages are left to the jury.

Finally, plaintiff's motion for partial summary judgment in 06-11302 (document # 7) is **MOOT**, as the only surviving claims in that case are now consolidated with 04-12138.


**SO ORDERED.**

Date:  June 22, 2007          /s/ Nancy Gertner
                              **NANCY GERTNER, U.S.D.C.**