# Exhibit A

0800

EXHIBIT 28
Sheet
R. Grogan 7/19/06



cbs news standards

INTRODUCTION
TABLE OF CONTENTS

cbs news standards

## PRODUCTION STANDARDS
## EDITING AND PRODUCTION

III-2

### FAIR USE

Copyrighted materials—motion pictures, commercials, photographs, amateur video—generally may not be used in producing a report without the copyright owner's consent, unless the "fair-use" doctrine is applicable. The concept of fair use is complicated and may be invoked only in limited circumstances. As a general rule, to meet the fair-use test, copyrighted footage must be directly relevant to a news story and the excerpt should be no longer than truly necessary for the news-reporting purpose involved. The use of such material must be discussed in advance with the executive producer or bureau chief. It must also be approved by the CBS News Business Affairs Department.

Each use of copyrighted material—including that used in promos, teases and headlines—must be brought to the attention of the CBS News Business Affairs Department.

Pursuant to a legal settlement, use of material from the Academy of Motion Picture Arts and Sciences—i.e., The Academy Awards—requires special permission and precise on-screen credit.

### COMMERCIALS

When using commercials in news reports, there are two questions to keep in mind: how is that commercial to be used in the report, and where was it obtained?

USAGE: Keep in mind that commercials are copyrighted property. To use a portion of a commercial, you must have permission from the company or the fair-use doctrine must be applicable. With

# Exhibit B

Jennifer Street

07/19/2006

Page 142

1    MR. EPSTEIN: I understand that.
2    (Exhibit 27 Marked for Identification)
3    BY MR. EPSTEIN:
4    Q. So even though we do not have that document,
5    you would like to attempt to answer that question
6    anyway; is that correct?
7    A. Yes, I can tell you with certainty that the
8    rates charged at 6:00 a.m. on CBS 4 were higher than the
9    rates charge at 7:00 a.m. on UPN 38.
10   Q. Are the rates charged on the 10 o'clock News
11   on Channel 38, lower than the rates charged on the
12   11 o'clock News for CBS 4 Boston?
13   A. I would need the document. I believe so, but
14   I would need the document.
15   Q. I'm sorry, I don't know where it is.
16      Do you have the same sister television
17   station relationship with any of the other CBS or UPN or
18   WBZ affiliated stations within the umbrella of the CBS
19   Television Stations that we discussed early on in your
20   deposition?
21   A. To say it's the same relationship, no, because
22   it's a very unique situation to have another television
23   station in the same building sharing all of the same
24   news resources, but we do have a relationship with the

Page 143

1    other stations in our group. As a matter of example, I
2    do a conference call every Thursday at two o'clock with
3    the news directors from the other newsrooms owned by CBS
4    in which we share ideas and visions and exchange
5    thoughts.
6       So in that regard, yes, they are
7    certainly a sister relationship, if you will.
8    Q. And if it's a news story that breaks in
9    Baltimore Maryland on WJZ, is it okay to supply you with
10   film footage for that?
11   A. Yes.
12   Q. As you would supply them with film footage if
13   there was a breaking story in Boston that had national
14   implications?
15   A. Mm-hmm.
16   Q. To the best of your knowledge, do all of the
17   CBS, UPN and WBZ affiliated stations within the CBS
18   Television Station package, maintain separate financial
19   records and revenues?
20   A. I don't have knowledge of any station group
21   outside of our own, any duopoly markets.
22   Q. I wasn't talking so much of a duopoly market.
23   I was talking about in terms of how the revenues from
24   Channel 4 Boston are kept separate from the revenues of

Page 144

1    KDKA in Pittsburgh, for example?
2    A. I can answer that question, yes.
3    Q. And is that the same for all the other CBS
4    stations we've identified earlier and all the our UPN
5    stations?
6    A. To the best of my knowledge.
7    Q. Now, your business and your career in the news
8    department here in Boston, whether it's Channel 4 or
9    Channel 38, did you gain any knowledge or understanding
10   of the copyright law of the United States?
11   A. Yes.
12   Q. And where did you gain that understanding?
13   A. Mainly through, the best association is the
14   CBS Standards Books that we use.
15   Q. And who produces the CBS Standards Book?
16   A. CBS Networks News.
17   Q. And who is given a copy of the Standards Book?
18   A. The news manager at the CBS stations and I
19   would imagine throughout the group and throughout the
20   Network.
21   Q. When are they given a copy?
22   A. When they join the company or when a new
23   version of the book is published, whichever comes first.
24   Q. As part of the discovery in this case, you

Page 145

1    supplied to me two pages. The first page is entitled,
2    CBS News Standards, and a page that you supplied is a
3    page on Production Standards, Editing and Production,
4    section III-2, Fair Use.
5       Is there more to this book than these
6    pages?
7    A. Yes, it's more than a one-page book.
8    Q. So the only portion of that book that you
9    supplied to me was the section on Fair Use; is that
10   correct?
11   A. Correct.
12   Q. And if I draw your attention to the first
13   paragraph in what you gave me on the page that's Bates
14   stamped 0081, it states: Copyrighted materials
15   generally may not be used in producing a report without
16   a copyright owner's consent, unless the fair use
17   doctrine is applicable.
18      Do you see that?
19   A. I do.
20   Q. And then it goes on to say that the concept of
21   fair use is complicated and may be invoked in only
22   limited circumstances.
23      Now, have you had any instruction on the
24   concept of fair use other than what is contained in this

37 (Pages 142 to 145)

Jennifer Street

07/19/2006

Page 146

1  CBS News Standards booklet?
2      A.  Yes, in discussions with our attorney.
3      Q.  Which attorney?
4      A.  Nick Poser, who I mentioned at the beginning
5  of this deposition.
6      Q.  Was it a discussion about specific
7  photographs --
8          MS. MURRANE:  Objection, I'm not sure --
9      Q.  -- or?
10         MS. MURRANE:  -- if we're getting into
11  attorney-client privilege, if she's seeking advice
12  from her internal counsel.
13         MR. EPSTEIN:  We do not know.
14         MS. MURRANE:  Then let's not talk about what
15  was discussed.
16  BY MR. EPSTEIN:
17     Q.  I'm trying to determine whether it was a
18  course given by him or it was a discussion because you
19  had questions?
20     A.  It comes in the context of more similar to a
21  course.
22     Q.  And where was the course given?
23     A.  At WBZ.
24     Q.  And Nick Poser was in attendance --

Page 147

1      A.  Yes.
2      Q.  -- at WBZ?
3      A.  Yes.
4      Q.  And how many other people were in that course,
5  if you will?
6      A.  I'm going to guess.  At the session I attended
7  there were 25, but he had three sessions that day.
8      Q.  And when was it that that occurred?
9      A.  This was approximately five years ago.
10     Q.  And is this the only instruction that you've
11  ever received on copyright laws of the United States?
12     A.  When you use the word, instruction, I presume
13  we're talking about formal instruction.  I'm quite sure
14  that I studied fair use at the New House School at
15  Syracuse University.
16     Q.  When did you graduate from Syracuse?
17     A.  In 1987, since you asked, but I would say
18  there have certainly been -- my true education and fair
19  use has come through discussions with Nick regarding
20  various cases.
21         I would say that's been my best
22  education, are the times we've had to discuss fair use
23  on a case-by-case basis.
24         MR. EPSTEIN:  Okay.  That's the information I

Page 148

1      don't want to get involved with.  But the other I
2      don't think was attorney-client privilege.
3          Would you agree?
4          MS. MURRANE:  If there was an instruction or
5      course, I'm okay with that.
6  BY MR. EPSTEIN:
7      Q.  These guidelines go on to say that:  As a
8  general ure. to meet the fair use test, copyrighted
9  footage must be directly relevant to a news story and
10  the excerpt should be no longer than truly necessary for
11  the news-reporting purposes involved.
12         And it's your testimony that your use of
13  the Steve Flemmi photograph in 2004, was truly necessary
14  for the news reporting purpose involved, and it was no
15  longer than truly necessary; would you agree that?
16     A.  Yes, I would agree with that.
17     Q.  Then it goes to say:  The use of such material
18  must be discussed in advance with the executive producer
19  or bureau chief.
20         Now, was the use of that photograph
21  discussed in advance with the executive producer at that
22  time for any of the news broadcast or the bureau
23  chief --
24     A.  I don't have any specific knowledge of any

Page 149

1  conversations that happened.  I was not the executive
2  producer at the time nor was I the news director.
3      Q.  Now, who was the executive producer or bureau
4  chief for all of the news broadcasts in 2004 that you
5  used the Flemmi photograph in?
6      A.  The executive producer for the 11 o'clock News
7  is a gentleman name Peter Wilson.
8      Q.  Is he still with WBZ?
9      A.  Yes.  And the senior producer for the Morning
10  News is a person named Maggie McGrath.
11     Q.  Is she still there?
12     A.  Yes.
13     Q.  Now it goes on to say:  It must also be
14  approved by the CBS News Business Affairs Department.
15         Do you know if the use of the Steve
16  Flemmi photograph in Exhibit 1 was approved by the CBS
17  News Business Affairs Department?
18     A.  I don't believe it was.
19     Q.  So that WBZ Boston and UPN 38 used that Steve
20  Flemmi photograph in 2004 without following the
21  procedures in the CBS News Standards, would you agree
22  with me?
23     A.  I believe so.
24     Q.  Thank you.

38 (Pages 146 to 149)