UNITED STATES DISTRICT COURT

FOR THE

DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| CHRISTOPHER FITZGERALD, ) | |
| ) | |
| Plaintiff ) | |
| ) | CIVIL ACTION NO. |
| v. ) | |
| ) | No. 04-12138-NG |
| CBS BROADCASTING, INC., ) | |
| ) | |
| Defendant ) | |

**REPLY BRIEF IN FURTHER SUPPORT OF PLAINTIFF'S MOTION TO COMPEL DISCOVERY AND PERMIT TAKING TWO ADDITIONAL DEPOSITIONS; LEAVE TO FILE GRANTED ON OCTOBER 3, 2007**

Plaintiff, Christopher Fitzgerald, submits this reply brief in further support of his motion to compel discovery and to take depositions of additional key witnesses.

**1.   The long awaited deposition of the Video Archive Librarian for WBZ-TV was just conducted.**

On Friday, September 28, 2007, Plaintiff conducted the long-awaited deposition of Eric Cox.  The deposition of Mr. Cox was first noticed well within the discovery deadlines of this court but it was opposed by Defendant CBS.  [Document 20]  This court eventually ordered the deposition on December 11, 2006.  Because of various scheduling conflicts of the parties, the deposition was not conducted until September 28, 2007.  Plaintiff originally requested the deposition of both Mr. Cox and his immediate superior, Tom Janssen but, on Defendant's objection, this court permitted only the deposition of Eric Cox.

From the deposition of Eric Cox, Plaintiff has learned that sometime in or around 1999, Mr. Cox was requested by then news director, Peter Brown, to purge the WBZ-TV archives of all copies of Plaintiff's photograph of Stephen Flemmi.[1]  Mr. Cox complied with this request to the best of his ability.  Mr. Cox found a copy of the original *60 Minutes* broadcast and he "blacked out" four of the five uses of the Flemmi Photograph on the tape.  He missed one of the copies of the image.

Mr. Cox remembers that the newsroom was plastered with a copy of the Flemmi Photograph with the marginal notation not to use the photograph.  Mr. Cox's memory of this event was that the photograph was hung in and around the newsroom sometime in or around 1999, but consistent with Jennifer Street's deposition testimony, the photograph and admonition was more likely displayed in 2004, sometime after WBZ-TV infringed Plaintiff's photograph for a second time.  (Document 37, page 14 of 21, Street Transcript page 125)

### 2. The Video editor at WBZ-TV found the Flemmi Photograph that was infringed in 2004.

Mr. Cox testified that he usually left work at about 6 PM and that he was not working on that particular evening in June 2004, when the station was looking for a visual of Flemmi to help illustrate the John Martorano sentencing.  Cox testified that Scott Erdman was the video editor who ultimately found the image in the WBZ-TV archives.  Erdman is one of two individuals Plaintiff is now trying to get permission from this court to depose.  The other is reporter, Christina Hager.  Cox said that Erdman retired

---

[1] The transcript has not yet been prepared.  Plaintiff is relying on the memory of his counsel and the attached Affidavit of Andrew D. Epstein in recalling the testimony.

from the station about a year ago and that he believed he was living in Dartmouth, Massachusetts.

Plaintiff's counsel located Mr. Erdman in Dartmouth and spoke to him on October 1, 2007. Mr. Erdman worked at WBZ-TV for 27 years and he developed many strong friendships and had many positive feelings about the station and the people with whom he worked.[2] He also confirmed that the photograph of Flemmi with the admonition not to use the image was hung in and around the WBZ-TV newsroom in 2004, not in 1999. Again, this is consistent with Jennifer Street's deposition testimony.

### 3. WBZ-TV like most typical television newsrooms was frenetic, chaotic and disorganized.

Mr. Erdman remembered looking for the image of Flemmi for the news broadcast in June 2004. Erdman said that the nature of a television newsroom is "frenetic and chaotic." He said that the newsroom was constantly "up against the clock" and that putting a newscast together is "by nature frantic and too (sic) a certain degree disorganized." He said that this scene would basically be the same in any major city newsroom. "[F]acts have to be confirmed and are not always readily available, major elements sometimes are missing right up to air time, hence chaos and panic, crews are racing to the scene, info comes in drips and drabs, live shots are being thrown together, much editing is done in the field, people are pushed to the limit, both in house and out."

Erdman said that he looked for any video image of Flemmi but he could not find either library tapes or pitch reels. He said he ultimately went to the library and checked

---

[2] Attorney Epstein sent a draft copy of this Memorandum to Mr. Erdman to verify the facts. Mr. Erdman responded that the Memo was "a little heavy." Mr. Epstein revised the Memo in keeping with the email letter he received from Mr. Erdman. See, copy of email letter from Scott Erdman to Drew Epstein dated October 4, 2007, which is attached to the Epstein Affidavit.

the shelf on crime in New England where he found an "air check" copy of the *60 Minutes* broadcast that contained a copy of Fitzgerald's photograph of Flemmi. The Photograph was broadcast several times on the news and it was used on the WBZ-TV website.

**4.     Prior to the 2004 infringement, neither Cox nor Erdman were told anything about the Flemmi Photograph.**

Mr. Erdman described the newsroom as a very busy place that churned out news at a rapid pace. He said one hand did not know what the other hand was doing. Scott Erdman also said that the video library was always disorganized, that tapes were rarely in the right places, that too many people had access to the library, that tapes were frequently misfiled and often kept on TV news trucks and not returned to the archives. Scott Erdman blamed some of the management at the station for the chaos that existed in the newsroom in general and in the video library in particular. Mr. Erdman did not blame Eric Cox for failing to find all copies of the Flemmi Photograph; rather, he blamed management for failing to run an organized newsroom with an organized video library.

Erdman said that when he needed a copy of the Flemmi Photograph, he simply went to one of the shelves in the library marked New England Crime and he found the tape with the Flemmi Photograph. Mr. Erdman claims that he did not even have to use the computer system to type in keywords such as "Bulger" or "Flemmi."

Both Eric Cox and Scott Erdman also said that neither of them ever heard of the booklet entitled, *CBS News Standards*, a portion of which was produced by CBS during discovery but the balance of which CBS is purposefully withholding from Plaintiff as irrelevant and subject to the attorney-client privilege despite Fitzgerald's repeated request for same. Both Cox and Erdman confirmed that despite the guidelines that are in the

News Standards booklet that required copyright clearance from legal counsel in New York for certain images, photographs that were found in the archive would routinely be used on the news without clearance.  In addition, Scott Erdman corroborated the disorganized aspect of the library-- everyone had access, many people contributed to indexing, and neither he nor Eric Cox were given any type of tutorial on either proper indexing of video materials, or on copyright law.

> 5.  **CBS should have told WBZ-TV not to make an off-air copy of the 1998 broadcast of *60 Minutes***

This brings Plaintiff back to his original premise, that WBZ-TV should not have made an off-air copy of the original *60 Minutes* broadcast in 1998, and this event constituted the reckless disregard of Plaintiff's rights that led to the 2004 infringement. Fitzgerald specifically said in his licensing agreement with *60 Minutes* that network affiliates did not have permission to use the Flemmi Photograph.

> 6.  This contract does not grant CBS <u>or its affiliates</u> the permission to republish these photos on other television programs or in other media.  Additional uses and re-broadcasts . . . would require further negotiation.  [Emphasis supplied.]

[See, Document 25, Exhibit C.]  Furthermore, in a letter to the producer of *60 Minutes* on March 18, 1998, Fitzgerald says,

> As a reminder, I would be grateful if you could include a copyright notice in the show credits.  I am leery of other news organizations gleaning the photos without permission, especially since these are the only topical photos – still or video—that exist of Mr. Flemmi (at least to the best of my knowledge).

[See, Document 22, Exhibit E.]  As was stated in previous affidavits filed with this court (Document 26 ¶ 12), Fitzgerald did not want to risk that an errant copy of his valuable photographs of Flemmi would be used without his permission.  Obviously, Plaintiff's worst fear about one of the Photographs was realized.

When Jennifer Street was asked what would have happened if WBZ-TV did not make a copy of the *60 Minutes* broadcast, and the so-called "pitch reel" was never produced, she admitted that WBZ-TV would probably not have infringed Fitzgerald's Photograph in 2004. [Document 37, p. 9 of 21, Street transcript p. 106]

There is no question that Scott Erdman purposefully used the Flemmi Photograph on the WBZ-TV news. Erdman said that no one ever told him not to use the Photograph prior to 2004. As Erdman said, if he had been told not to use the image, he would not have used it. Erdman simply followed protocol implemented by WBZ-TV management. CBS management was at fault in 1998 for failing to tell WBZ-TV or any of its other affiliates that the *60 Minutes* program with the Flemmi Photograph was off-limits. CBS management was again at fault for not mandating that WBZ-TV tell all of its employees in 1999, that the Flemmi Photograph was not to be used. WBZ-TV ultimately did this in 2004 but it was clearly too late.

**6.    The definition of willful infringement of a copyright for purposes of statutory damages recoverable under the Copyright Act includes reckless disregard of the rights of the copyright claimant.**

"Copyright infringement is willful when it is done with knowledge that it is in violation of the owner's copyright (infringer knew or had reason to know) or with reckless disregard for the copyright owner's rights." [Mitchell Intern, Inc. v. Gonzalez, 2006 WL 2226052 (D.P.R. 2006).]

> One commentator has concluded that "willfully" means with knowledge that defendant's conduct represents an infringement. Defining knowledge, several district courts have held that something less than proof of actual knowledge will suffice to establish knowledge and, hence, willfulness. For example, one court found a willful infringement based upon the infringer's position-itself a publisher of a copyrighted newspaper-and its failure to appear and defend in the copyright action. Another court held that

"reckless disregard" for the copyright holder's rights establishes knowledge of the infringement.

[Fitzgerald Pub. Co., Inc. v. Baylor Pub. Co., Inc., 807 F.2d 1110, 1115 (2nd Cir. 1986) (citations omitted); See also, Tips Exports, Inc. v. Music Mahal, Inc., 2007 WL 952036, *5 (E.D.N.Y. 2007) ("The standard for determining willfulness 'is simply whether the defendant had knowledge that its conduct represented infringement or perhaps recklessly disregarded that possibility.'") (quoting Twin Peaks Prods., Inc. v. Publications Int'l, Ltd., 996 F.2d 1366, 1382 (2d Cir.1993)).]

Furthermore, "[a] defendant's knowledge may be actual or constructive; it may be inferred from his conduct." [Id. (Citing Fitzgerald Publishing Co. v. Baylor Publishing Co., 807 F.2d 1110 (2nd Cir.1986).] Most jurisdictions offer similar definitions of willfulness in regard to copyright infringement. [See Universal City Studios Productions LLLP v. Bigwood, 441 F. Supp.2d 185 (D.Me., 2006) (Citing N.A.S. Import Corp. v. Chenson Enters., Inc., 968 F.2d 250, 252 (2d Cir. 1992) ("An infringement is considered 'willful' if the defendant had 'knowledge that its actions constitute an infringement… Knowledge does not need to be proven directly but can be inferred from the defendant's conduct.'")]

In the current case, Erdman, who found the Flemmi photograph on the library shelf was a CBS employee for 27 years. Erdman never received notice prior to the 2004 infringement that Fitzgerald's photographs of Flemmi were off-limits. As far as Erdman knew, CBS had full rights to use Fitzgerald's Photograph.

CBS is at fault for failing to tell everyone who had access to the film library that the Photograph was not to be used. CBS did not tell either Cox or Erdman about Fitzgerald's 1998 lawsuit or the 1999 Settlement. CBS did not widely display a copy of

the Flemmi Photograph around the newsroom in 1998 or 1999 as it did in 2004. Furthermore, *60 Minutes* never told anyone at WBZ-TV that it had only limited rights to use the Flemmi Photograph. In fact, Street admits that if she knew that CBS had only limited rights to use the Photograph, she would "probably not" have permitted a copy of the original 1998 broadcast to be made. The failure by CBS to notify WBZ-TV that it only had limited rights to the Flemmi Photograph, the failure of CBS to instruct WBZ-TV not to tape the 1998 broadcast of *60 Minutes*, the failure of WBZ-TV in 1998 or 1999 to instruct everyone in the newsroom not to use the Flemmi Photograph as it did in 2004 after the second infringement, constituted the reckless disregard of Fitzgerald's rights under the Copyright Act.

In Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., Inc., 74 F.3d 488, 496 (4th Cir. 1996), the court correctly instructed the jury that "[i]n general, evidence that notice has been accorded to the defendants before the specific facts found to have constituted infringement occurred is perhaps the most persuasive evidence of willfulness." [See also, Segrets, Inc. v. Gillman Knitwear Co., Inc., 42 F.Supp.2d 58, 82 (D.Mass., 1998) (Citing Video Views, Inc. v. Studio 21, Limited, 925 F.2d 1010, 1021 (7th Cir.) In determining willfulness, the jury was also asked to weigh "the actual damages suffered by the plaintiffs" and any evidence that the defendants have a history of copyright infringement; any evidence that the defendants are apparently impervious to either deterrence or rehabilitation; the extent of the defendant's knowledge of the copyright laws . . . and any factor which the jury believes evidences the defendants knew, had reason to knew, or recklessly disregarded the fact that its conduct constituted

copyright infringement. [Superior Form Builders, Inc. v. Dan Chase Taxidermy Supply Co., Inc., 74 F.3d 488, 496 (4th Cir. 1996).]

### 7. CBS Breached the 1998 Licensing Agreement.

In addition to acting in reckless disregard for Fitzgerald's rights under the Copyright Act, CBS breached its 1998 licensing agreement with Fitzgerald by failing to inform network affiliates like WBZ-TV, not to make an off-air recordings of the *60 Minutes* broadcast. If WBZ-TV did not make the unauthorized copy of the *60 Minutes* broadcast, bootlegged copies of the Flemmi Photograph would not have existed in the video library. In fact, Fitzgerald specifically told CBS that he did not want affiliates to make copies of the Photograph.

### 8. CBS Breached the 1999 Mutual Settlement Agreement and Release.

CBS claims that it had a right under the Copyright Act to make a copy of the original *60 Minutes* broadcast in 1998. Even if CBS is correct in this conclusion, which Plaintiff does not concede, neither CBS nor WBZ-TV disclosed to Fitzgerald that WBZ-TV made a copy of the *60 Minutes* broadcast. Fitzgerald maintains that CBS had an obligation to disclose this fact to him under the terms of the 1999 Mutual Settlement Agreement and Release. Plaintiff and Defendant agreed to the terms of the 1999 Settlement "in consideration of the mutual promises, covenants, and warranties" contained in the agreement. [See, Document 22, Exhibit F.] Fitzgerald relied on the warranty made by CBS that it had disclosed all known uses of Plaintiff's Flemmi photographs. We now know that CBS breached its warranty by withholding the fact that it made an off-air copy of the *60 Minutes* broadcast. This is what led directly to the June

2004 infringements. It was Defendant's careless, negligent, or intentional failure to disclose in the 1998 Action that a copy of the *60 Minutes* broadcast was made by WBZ-TV that directly led to the alleged infringements in the current Action. The failure by CBS to disclose this fact constituted a breach of the Settlement Agreement.

If the newsroom at WBZ-TV had been properly organized and indexed, Mr. Cox might have found all copies of the Flemmi Photograph when he looked for them in 1999. The breach of Plaintiff's 1998 licensing agreement, the breach of the Parties' 1999 Settlement Agreement, the chaos that existed during the tenure of both Mr. Cox and Mr. Erdman, and the lack of clear standards for using photographs on news reports is what constituted the reckless disregard of Mr. Fitzgerald's rights under the Copyright Act.

**9. Further Depositions and single document Requested.**

Against this backdrop, Fitzgerald is now seeking permission to subpoena Scott Erdman for a deposition in order to perpetuate his testimony and Fitzgerald is asserting his request to depose Christina Hager. Fitzgerald is also seeking to depose Tom Janssen, who was originally noticed for deposition within the discovery deadline set by this court, but which this court refused to permit. Fitzgerald is also seeking a complete copy of the *CBS News Standards* booklet.

**10.     Plaintiff's delay in seeking discovery was excusable.**

While some of these discovery requests were made after the court discovery deadline, Fitzgerald should be excused from waiting to make them. Plaintiff deposed News Director Jennifer Street promptly after receiving documents and answers to interrogatories. Her deposition naturally led Plaintiff to seek the deposition of Cox and

Janssen. If the deposition of Mr. Cox had not been delayed until this court permitted it in December 2006, Plaintiff would have noticed Erdman and Hager for depositions within the discovery timeframe. Meanwhile, both parties moved for Partial Summary Judgment also within this court's scheduling order. While this court was considering these Cross-Motions, the parties did not conduct further discovery. Under the circumstances, Mr. Fitzgerald believes that his delay in making the present discovery requests was certainly excusable.

                                              Christopher Fitzgerald,
                                              By his attorney,

October 11, 2007                      /s/ Andrew D. Epstein

                                              Andrew D. Epstein, Esquire
                                              BBO #155-140
                                              Barker, Epstein & Loscocco
                                              10 Winthrop Square
                                              Boston, MA  02110
                                              (617) 482-4900
                                              FAX: (617) 426-5251